UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| BOKF, N.A., as indenture trustee, | |
| Plaintiff, | |
| vs. | Civil Action Number: 1:21-cv-00029 |
| Bama Oaks Retirement, LLC; Saint Simons Heath Care, LLC; Medical Clinic Board of the City of Mobile (Second), | |
| Defendants. | |

## VERIFIED COMPLAINT FOR DAMAGES, APPOINTMENT OF RECEIVER, INJUNCTIVE RELIEF, AND AN ACCOUNTING

COMES NOW BOKF, N.A., d/b/a Bank of Oklahoma, solely in its capacity as indenture trustee (the "Indenture Trustee" or "BOKF") under that certain Trust Indenture dated as of November 1, 2012, (the "Indenture"), by and between Medical Clinic Board of the City of Mobile (Second) (the "Issuer") and BOKF, by and through its undersigned counsel, and files this *Verified Complaint for Damages, Appointment of Receiver, Injunctive Relief, and an Accounting* (the "Complaint") against the Issuer, Bama Oaks Retirement, LLC (the "Lessee"), and Saint Simons Health Care, LLC ("Saint Simons") and respectfully shows the Court as follows:

### NATURE OF THE ACTION

1.      The Indenture Trustee is the trustee for $5,740,000 of Medical Clinic Board of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II) Series 2012A and 2012B Bonds (the "Bonds").

2.      The Bonds were issued to finance the acquisition and renovation of an 88-unit independent living facility located in Mobile, Alabama (the "Facility").

3.      Through January 5, 2021, the Bonds are outstanding in the principal amount of $5,466,707.38, plus unpaid interest in the amount of $1,498,149.42, plus trustee's fees and other

charges in the amount of $159,659.28 (interest, costs, and fees continue to accrue), for a total of $7,104,516.08

4.       As a result of, among other things, its failure to make payments as required, the Lessee is in default under that certain Lease Agreement, dated as of November 1, 2012, by and between the Issuer and the Lessee (the "Lease Agreement"), and that certain Mortgage and Security Agreement, dated as of November 1, 2012, granted to BOKF by the Issuer (the "Security Deed").

5.       The Issuer and the Lessee have defaulted under the terms of the Bond Documents (as the term is defined below).

6.       Pursuant to express terms of the Bond Documents and applicable law, this Complaint seeks to enforce the Bond Documents.

7.       The Bond Documents provide that, upon the occurrence of an Event of Default, the Indenture Trustee shall be entitled as a matter of strict right, without notice, to the appointment of a receiver to take possession of and to operate the Facility.

8.       The Indenture Trustee seeks entry of an order granting the following relief: (a) a money judgment against the Lessee for the outstanding balance due under the Bond Documents, pre-judgment interest, post-judgment interest, attorneys' fees, and the expenses of collection; (b) appointment of a receiver for the Facility; (c) injunctive relief; (d) an accounting; and (e) such other and further legal and equitable relief as the Court may find just and proper.

9.       A true and correct copy of the Indenture is attached hereto as **Exhibit "A"** and is incorporated herein by reference.

10.      A true and correct copy of the Lease Agreement is attached hereto as **Exhibit "B"** and is incorporated herein by reference.

11.     A true and correct copy of the Security Deed is attached hereto as **Exhibit "C"** and is incorporated herein by reference. (The Indenture, the Lease Agreement, and the Security Deed, and any other documents executed and delivered in connection with the relevant bond transaction shall be collectively referred to as the "Bond Documents.")

### STATEMENT OF THE PARTIES, JURISDICTION, AND VENUE

12.     BOKF is a national banking association with its principal place of business being in the State of Oklahoma and its principal office address being One Williams Center, 10th Floor, Tulsa, Oklahoma 74172. For the purposes of diversity jurisdiction, BOKF is a citizen of Oklahoma. BOKF brings this action solely in its capacity as indenture trustee under the Bond Documents for the benefit of the holders of the Bonds (the "Bondholders").

13.     BOKF is authorized under Section 908 of the Indenture to act on behalf of, in the interests of, and in lieu of, the Bondholders. BOKF has independent rights under the Lease Agreement and the Security Deed, as assigned to the Indenture Trustee by the Issuer pursuant to Granting Clause I and Granting Clause II, respectively, of the Indenture. As such, BOKF is the proper party in interest to enforce the terms and conditions of the Bond Documents.

14.     The Lessee is a Georgia limited liability company and, on information and belief, is not a citizen of Oklahoma for the purposes of diversity jurisdiction. Its members are Christopher F. Brogdon ("Brogdon"), an individual who is a citizen of Georgia, and Mark Berkowitz, an individual who, on information and belief, is not a citizen of Oklahoma.

15.     The Lessee is a proper party defendant because it is directly responsible for making payments to the Indenture Trustee pursuant to the terms of the Lease Agreement, which payments are to be applied to the amounts due and owing on the Bonds pursuant to the Bond Documents.

16.     The Issuer is a public body corporate and politic created and existing under the laws of the State of Alabama, with its principal place of business in Alabama.  Accordingly, the Issuer is a citizen of Alabama for the purposes of diversity jurisdiction.

17.     The Issuer is a proper party defendant because it is the record title holder of the Facility and is being named in this action for that sole reason. No monetary judgment is being sought against the Issuer.

18.     Saint Simons is a Georgia limited liability company and is a citizen of Georgia for the purposes of diversity jurisdiction. Saint Simons's sole member is Brogdon, an individual who is a citizen of Georgia.

19.     Saint Simons is a proper party because it entered into the Management Agreement for the Facility pursuant to the terms of the Indenture. A true and correct copy of the Management Agreement is attached hereto as **Exhibit "D"** and is incorporated herein by reference.

20.     At all relevant times, Saint Simons has transacted business through its management of the Facility, which is located in the State of Alabama, such that this Court may exercise personal jurisdiction over Saint Simons.

21.     Saint Simons is wholly owned by Brogdon, who serves as principal of the Lessee. The Securities and Exchange Commission ("SEC") brought an action against Mr. Brogdon and his wife, Connie Brogdon. *See* Complaint, *S.E.C. v. Brogdon*, No. 15-cv- 8173, Doc. No. 1 (D.N.J. Nov. 20, 2015).

22.     The Lessee is referenced in paragraph 1 of the SEC Complaint as one of the 43 entities through which Mr. Brogdon "conducted his fraud." *Id* at ¶ 1. On January 17, 2020, the United States District Court for the District of New Jersey entered judgment against the Brogdons

in the amount of $47,742,882.49. *See* Final Judgment, *S.E.C. v. Brogdon*, No. 15-cv- 8173, Doc. No. 543 (D.N.J. Jan. 17, 2020).

23.    The Lessee filed a Chapter 11 bankruptcy petition on February 1, 2020, after BOKF threatened to seek appointment of a receiver over the Facility. The bankruptcy case remains pending.

24.    On December 17, 2020, BOKF was awarded relief from the automatic stay to file the present action.

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that (i) there is diversity of citizenship between the plaintiff and all defendants and (ii) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

26.    Venue is proper in the Southern District of Alabama pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this Verified Complaint occurred in the Southern District of Alabama, specifically in Mobile, Mobile County, Alabama. Moreover, the property at issue in this action is located in the Southern District of Alabama, specifically, in Mobile, Mobile County, Alabama.

## I.    THE BOND DOCUMENTS

27.    Under the Indenture and other related documents, the Issuer financed the acquisition and renovation of the Facility.

28.    Under the terms of the Indenture, the Issuer issued the Bonds in the amount of $5,740,000, the proceeds of which were used for the benefit of the Lessee under the terms of the Lease Agreement to, among other things, acquire and renovate the Facility.

29.     The Lessee's obligations under the Lease Agreement were secured by the Security Deed granted to BOKF by the Issuer, which granted BOKF and its successors and assigns a first-priority security interest in, among other things, the following:

(a)     the land on which the Facility was constructed, as more particularly described in Exhibit "A" to the Security Deed (the "Land");

(b)     the Facility itself, together with all other buildings, structures, and improvements constructed on the Land;

(c)     all furnishings, furniture, fixtures, machinery, appliances, vehicles and personal property in any way connected with the use and enjoyment of the Facility, as more particularly described in the Security Deed (collectively, the "FF&E"); and

(d)     all existing and future accounts, revenues, contract rights, all existing and future instruments, chattel paper and general intangibles of the Lessee and all proceeds therefrom, directly related to or arising from the Facility and/or its operation, as more particularly described in the Security Deed (collectively, the "Accounts, Intangibles, and Revenues" and together with the Land, the Facility, the FF&E, collectively, the "Collateral").

See Ex. C at pp. 1-3.

30.     The Security Deed was properly recorded on December 3, 2012, at Deed Book 6961, Page 1273, with the Probate Judge for Mobile County, Alabama.

31.     The Issuer assigned all of its rights, title, and interests under the Lease Agreement, the Security Deed, and any and all revenues pledged to satisfy repayment of the Bonds, to BOKF under Granting Clause I, Granting Clause II, and Granting Clause III of the Indenture.

**II.     EVENTS OF DEFAULT UNDER THE LEASE AGREEMENT AND SECURITY DEED**

32.     Events of default have occurred and are continuing under Section 6.1 of the Lease Agreement and under Section 2.01 of the Security Deed.

A.      **Payment Defaults under the Lease Agreement.**

33.     It is an event of default under Section 6.1(a) of the Lease Agreement for Lessee to fail to pay any amounts required to be paid under Section 4.2(a) of the Lease Agreement as and when due. Ex. B, § 6.1, at 39.

34.     Section 4.2(a) of the Lease Agreement specifies, in relevant part:

> So long as no Lock Box Trigger Event (defined below) has occurred and is continuing under this Agreement, the Lessee may collect or cause the collection of all Gross Revenues received in connection with the management or operation of the Facility and deposit them, or cause them to be deposited, into the Operating Account, which is to be established by Lessee for this purpose. From such Gross Revenues, Lessee shall pay, or cause the payment of, all operating expenses of the Facility . . . and . . . will remit to the Trustee monies sufficient to permit the Trustee to make the payments of deposits set forth below in order of priority set forth:

> (i)   First, on the twenty-fifth (25th) day of each consecutive calendar month, beginning with May 25, 2013, after the Trustee has made interest payments through May, 2013, from the Capitalized Interest Account, for deposit into the Interest Account of the Bond Fund of the amount equal to the next interest payment coming due on the Bonds on the next Interest Payment Date;

> (ii) Second on the twenty-fifth (25th) day of each consecutive calendar month, beginning with October 25, 2015, for deposit into the Principal Account of the Bond Fund, one-twelfth of the amount equal to the next principal or mandatory sinking fund redemption payment coming due on the Bonds;

> (iii) Third, beginning if and when required by the Code, for deposit into the Arbitrage Rebate Fund, the amount of any rebatable arbitrage;

> (iv) Fourth, beginning in January 2013, for deposit into the Ad Valorem Tax Fund, an amount equal to one-twelfth of the estimated ad valorem taxes that are to become due on the Facility the next following October (one-ninth in the case of such payments coming due in October of 2013);

> (v)  Fifth, commencing the month next following the month in which there shall have occurred any transfer from, or decline in value of, the Debt Service Reserve Fund, for deposit into the Debt Service Reserve Fund, an

amount equal to one-twelfth of the amount needed to restore the balance therein to the Debt Service Reserve Fund Requirement;

(vi) Sixth, for payment to the Management Company, the Management Fee for the forthcoming month, but failure of the Lessee to remit to the Trustee an amount adequate for the trustee to make all or any part of such payment shall not constitute an Event of Default if, and to the extent that, such failure resulted from an insufficiency of such Gross Revenues; and

(vii) Seventh, for payment of any terminated manager of the Facility, an amount equal to all fees that remain due and owing to such terminated manager, but the failure of the Lessee to remit to the Trustee an amount adequate for the Trustee to make all or any part of such payment shall not constitute an Event of Default if, and to the extent that, such failure resulted from an insufficiency of such Gross Revenues.

Ex. B, § 4.2(a), at 20-21.

35.    The Lease Agreement further provides that "if on any such payment date, the balance in the Bond Fund is insufficient to make the required payments of principal of, and redemption premium (if any) and interest on, the Bonds on such date, the Lessee shall forthwith pay any such deficiency." Id. at 21.

36.    Upon the occurrence of a Lock Box Trigger Event, the Lease Agreement provides, in relevant part:

Lessee shall transfer all amounts then on deposit in the Operating Account, and all other Gross Revenues held by it, to the Trustee for deposit into the Revenue Fund and, thereafter, on a daily basis, shall collect and transfer all Gross Revenues to the Trustee for deposit into the Revenue Fund . . . . Amounts transferred to the Trustee will be (1) deposited into the Revenue Fund established under the Indenture, and (2) thereafter, disbursed by the Trustee to pay all operating expenses of the Facility pursuant to the current Operating Budget then on file with the Trustee upon receipt of written directions from the Lessee, and (3) thereafter . . . used by the Trustee to make the payments and deposits [due to holders of the Bonds pursuant to the Indenture].

Ex. B, § 4.2(b), at 21.

37.    In July 2017, BOKF notified the Lessee and the Bondholders that the Lessee would not make a July interest payment and was in payment default. A true and correct copy of the notice is available on the Electronic Municipal Market Access ("EMMA") website at emma.msrb.org.

38.    The Lessee failed to cure the payment default and has not made further interest payments since the March 2017 payment, and the Lessee remains past due for those amounts due and payable to BOKF as of the filing of the complaint.

**B.    Covenant Breaches under the Lease Agreement.**

39.    Pursuant to Section 5.4(a) of the Lease Agreement, the Lessee is required, among other things, to provide BOKF with an operating budget and regular financial disclosures.

40.    The Lessee is in breach under the terms of Sections 5.4 of the Lease Agreement by failing to provide BOKF the above-stated operating budget and financial disclosures.

41.    On August 31, 2015, and October 13, 2015, BOKF posted a notice advising the Lessee and the Bondholders of the Lessee's failure to comply with its financial covenant obligations. True and correct copies of the notices are available on the EMMA website at emma.msrb.org.

42.    The Lessee has failed to cure its financial covenant obligation breaches under the Lease Agreement.

**C.    Payment Defaults under the Security Deed.**

43.    It is an event of default under Section 2.01 of the Security Deed for the Issuer to fail to pay as and when due any installment of principal or interest as required by the Bonds or any other amount payable pursuant to the Security Deed.

44.    The Lessee has defaulted in its payment obligations under the Lease Agreement, the Issuer has not paid the Lessee's obligations, and, therefore, the Issuer therefore is in default under the terms of Section 2.01 of the Security Deed.

**E.    Remedies and Notices of Default/Acceleration/Demand for Payment.**

45.    The Lease Agreement entitles BOKF, among other things, to accelerate all payments owed by the Lessee under the Lease Agreement upon an event of default. Ex. B, § 6.2(a), at 39.

46.    The Lease Agreement further entitles BOKF to "take whatever action at law or in equity may appear necessary or desirable to collect any sums then due and thereafter to become due hereunder or to enforce performance and the observance of any agreement of the Lessee hereunder." Ex. B, § 6.2(b), at 40.

47.    In July 2017, Bondholders were sent notice of Lessee's interest payment default and Lessee has not made further interest payments since the March 2017 payment.

48.    On January 11, 2021, counsel for BOKF sent the Lessee, via certified letter, a Notice of Acceleration and Demand For Payment under the Bond Documents (the "Acceleration Notice"), a true and correct copy of which is attached hereto as **Exhibit "E"** and is incorporated herein by reference.

49.    The total amount due and owing under the Lease Agreement to January 5, 2021, is $7,104,516.08, which includes $5,466,707.38 in principal, $1,498,149.42 in accrued but unpaid interest, and $159,659.28 in trustee fees and expenses. Interest, fees, and expenses continue to accrue per the terms of the Lease Agreement. This amount is past due and immediately payable to BOKF together with interest and other charges that have accrued since January 5, 2021, and continue to accrue.

50.     BOKF is also entitled to the payment of attorneys' fees and other costs of collection pursuant to the terms of the Bond Documents.

### COUNT ONE: BREACH OF BOND DOCUMENTS AND MONEY JUDGMENT

51.     Paragraphs 1 through 50 of this Complaint are incorporated herein as if fully restated.

52.     As a result of the events of default under the Bond Documents, BOKF is entitled to a judgment against the Lessee for all amounts owed or payable under the Bond Documents, including, without limitation, BOKF's fees and costs, pre-judgment interest, and costs incurred in enforcing the Bond Documents (including attorneys' fees and costs of collection).

53.     As such, BOKF is entitled to entry of a money judgment against the Lessee for breach of contract under the Lease Agreement, the Indenture, and the Security Deed in an amount not less than $7,104,516.08 which includes $5,466,707.38 in principal, $1,498,149.42 in accrued but unpaid interest to January 5, 2021, and $159,659.28 in trustee fees and other charges, plus accrued and accruing interest, fees, expenses, and charges, all of which continue to accrue (the "Money Judgment").

### COUNT TWO: APPOINTMENT OF RECEIVER

54.     Paragraphs 1 through 53 of this Complaint are incorporated herein as if fully restated.

55.     Pursuant to Section 905 of the Indenture, Section 2.05 of the Security Deed, and Section 6.2 of the Lease Agreement, BOKF is entitled to the appointment of a receiver over the Facility and other Collateral in order to enforce the Indenture Trustee's rights under the Bond Documents.

56.    Also, pursuant to Federal Rule of Civil Procedure 66, this Court is authorized to appoint a receiver over the Facility and other Collateral.

57.    BOKF has a valid claim against the Lessee and the Issuer and a valid and perfected security interest against the property of the Issuer.

58.    Given the Lessee's payment defaults and financial covenant breaches, BOKF's ability to recover by contract from the Lessee will likely be limited to the real property, improvements, and revenues identified in the Security Deed that secure repayment of the Lessee's obligations under the Bond Documents. Accordingly, BOKF's recovery against the Lessee rests largely upon the Facility and its revenues, making the protection and preservation of the Facility and the business conducted therein paramount.

59.    BOKF believes that the revenues and profits of the Facility, as well as the value of the other items of Collateral identified in the Security Deed, will help lessen the outstanding principal and interest due and owing to the Bondholders. Absent appointment of a receiver, BOKF fears that the Bondholders will continue to go unpaid and that the total sums ultimately paid to the Bondholders will be dramatically reduced. The appointment of a receiver is necessary to preserve, protect, and maintain the value of BOKF's secured interests in the collateral described in the Security Deed and thus the ultimate value to the Bondholders.

60.    Due to the fungible nature of certain of the Collateral, the Collateral is at risk.

61.    As each day passes, revenues are expended and BOKF and the Bondholders are irreparably harmed as those revenues can never be recouped or otherwise generated again.

62.    Absent the appointment of a receiver, BOKF will likely have no ability to enforce and satisfy the Money Judgment.

63.    BOKF is contractually entitled to the appointment of a receiver.

64.     The Security Deed entitles BOKF to apply for the appointment of a receiver "as a matter of strict right without notice and without regard to the occupancy or value of any security for the indebtedness secured hereby or the solvency of any party bound for its payment[.]" Ex D, § 2.05, at 14. The Security Deed further entitles BOKF "to the appointment of a receiver to take possession of and to operate the Facility and to collect and apply the rents, issues, profits and revenues thereof." Ex. D, § 2.05, at 14.

65.     The Indenture entitles the Indenture Trustee "as a matter of right, to the appointment of a receiver or receivers of the Trust Estate…." Ex. A, § 905, at 61.

66.     Accordingly, BOKF is entitled to the entry of an order appointing Derek A. Pierce of Healthcare Management Partners, LLC, or another qualified individual, as receiver (the "Receiver") over the Collateral, with the Receiver having all the rights, powers, duties, authorities, and protections ordinarily granted to a receiver and necessary to take possession of, maintain, and preserve the Collateral, including, without limitation: (a) the obligation to provide monthly operating reports to the Court reflecting the Facility's prior month's financial performance and status in such form and content, and by such time, as required by order of this Court; (b) the right and authority to market, and if appropriate, sell the Facility and other Collateral, or any part thereof, under 28 U.S.C. § 2001, *et seq.*, upon the request of the Indenture Trustee in accordance with the terms hereafter approved by this Court; (c) the right to retain a management company to assist the Receiver in managing and operating the Facility; (d) the right and authority to hire an accountant, attorney, or other professionals, subject to further approval by this Court; (e) the right and authority to audit the books and records of Lessee; and (f) the right and authority to use the revenues generated by the Facility and other Collateral to pay reasonable and necessary expenses of

managing and operating the Facility, including the Receiver's fees and expenses in accordance with operating budgets approved by this Court.

## COUNT THREE: INJUNCTIVE RELIEF

67.     Paragraphs 1 through 66 of this Complaint are incorporated herein as if fully restated.

68.     In order to empower the Receiver appointed by this Court, and to protect the interests of BOKF, the Bondholders, and any residents or patients of the Facility, the Indenture Trustee requests that this Court enter a preliminary injunction as described below to take effect immediately and to remain in effect for the duration of this case or until further order of this Court.

69.     Without an injunction to empower the Receiver, it is unlikely that the receivership will succeed.

70.     Under applicable law, BOKF is entitled to a preliminary and permanent injunction.

71.     The Lessee and the Issuer have defaulted under the terms of the Bond Documents.

72.     Under Section 905 of the Indenture, Section 2.05 of the Security Deed, and Section 6.2 of the Lease Agreement, BOKF is entitled to the appointment of a receiver over the Facility and other Collateral in order to enforce BOKF's rights under the Bond Documents.

73.     Pursuant to the Bond Documents and due to the continuing defaults by the Lessee and the Issuer thereunder, Defendants do not have the right to control the rents, revenues, earnings, income, products, and profits of the Facility or other Collateral.

74.     The Lessee's and the Issuer's defaults under the terms of the Bond Documents violate BOKF's rights thereunder and impair the value of the Collateral.

75.     BOKF will suffer imminent and irreparable injury, and will be left without an adequate remedy at law, unless injunctive relief is granted in aid of the Receiver because of the

nature of the Collateral (*i.e.*, the revenues of a senior living facility) permit it to be dissipated, concealed or removed from the Court's jurisdiction and because the nature of the business conducted at the Facility is ripe for loss of business good will.

76.     Injunctive relief is also imperative to prevent irreparable harm to the Collateral itself.

77.     Accordingly, BOKF is entitled to:

A.      entry of a preliminary injunction against all Defendants and their successors, assigns, agents, employees, attorneys, or anyone acting for or in concert with them: (i) enjoining them from possessing or managing the Facility and from interfering in any way with the possession or management of the Facility by the Receiver; (ii) enjoining them from collecting, withdrawing, transferring, conveying, concealing, or otherwise disposing of the Collateral, including any revenues and profits derived therefrom, during and pending the appointment of the Receiver; (iii) requiring them to pay the revenues and other cash collateral derived from the Facility and other Collateral to the Receiver; (iv) enjoining them from removing any property from the Facility and from removing, destroying, concealing, changing, or altering in any manner any of the books or records relating to the ownership, possession, or operation of the Facility and other Collateral; (v) requiring them to immediately pay and turn over to the Receiver and to perform all other acts necessary to transfer to the Receiver all funds on hand in cash and all funds held in deposit accounts for the benefit of the Facility or arising from the ownership, possession, or operation of the Facility and all accounts, accounts receivable, and any other collectibles, and

all keys, books, records, equipment, and all things in any manner related to the ownership, possession, or operation of the Facility;

B.    entry of a preliminary injunction enjoining Defendants, or any party who is provided with notice of the Court's order, from prosecuting any claim against the Receiver or the Collateral, other than in this action and only after a proper motion is filed and an order entered allowing such party to file such a claim herein; and

C.    on final trial of this cause, enter a permanent injunction consistent with the above preliminary injunctions, except as modified to the extent necessary to protect the Indenture Trustee's interests in the Collateral.

## COUNT FOUR: ACCOUNTING

78.    Paragraphs 1 through 77 of this Complaint are incorporated herein as if fully restated.

79.    Pursuant to Section 5.4 of the Lease Agreement, the Lessee is required to provide BOKF with an annual operating budget and comply with other financial covenants.

80.    The Lessee has failed to timely comply with financial covenant obligations required by the Bond Documents, and as such, BOKF has been unable to properly account for all of the Facility's revenues and expenses and otherwise adequately protect the Collateral.

81.    BOKF is entitled to an accounting from the Lessee and Saint Simons, as the party performing management services for the Facility, of the Facility's financial performance and expenses.

82.    Accordingly, BOKF is entitled to entry of an order directing the Lessee and Saint Simons to provide the Indenture Trustee with an accounting of the Facility's financial performance

and expenses for the life of their lease/management of the Facility preceding the commencement of this action, up to and including the date of entry of any such order.

WHEREFORE, premises considered, BOKF respectfully requests as follows:

Upon Count One, that BOKF have judgment against Lessee for the principal amount of $5,466,707.38, accrued interest to January 5, 2021, in the amount of $1,498,149.42, fees and other charges in the amount of $159,659.28, and interest and other fees and charges that will have accrued since January 5, 2021;

Upon Count Two, that a receiver be appointed as soon as possible to take possession and control of the Collateral in order to satisfy the Money Judgment and granting that such receiver be granted all powers, duties, authorities, and protections ordinarily granted to a receiver and necessary to possess, maintain, and preserve and otherwise maximize the value of the Collateral for the benefit of the Bondholders, including, without limitation, the power to sell the Collateral or any part thereof pursuant to 28 U.S.C. § 2001, *et seq.*, upon request and further order of this Court;

Upon Count Three, that BOKF be granted the injunctive relief as requested herein to, among other things, enjoin Defendants (and their agents and all parties acting by, through, or in concert with them) from interfering with the duties of the Receiver, to direct the payment of revenues from the Facility and other Collateral to the Receiver, and for all other relief that may become necessary to maintain, preserve, and protect the Collateral and in aid of the duties conferred upon the Receiver by order of this Court;

Upon Count Four, an order directing the Lessee and Saint Simons to provide BOKF with an accounting for the life of their lease/management of the Facility preceding the commencement of this action, up to and including the date of entry of any such order.

That the Court order such other and further relief as the Court deems just and proper.

Respectfully submitted this 15th day of January, 2021.

*/s/ W. Joseph McCorkle, Jr.*
W. JOSEPH MCCORKLE, JR.
ABN MCC-056
**BALCH & BINGHAM LLP**
P.O. Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
jmccorkle@balch.com

**BALCH & BINGHAM LLP**[1]
Walter E. Jones, GBN 163287
Patrick N. Silloway, GBN 971966
30 Ivan Allen Jr. Boulevard, NW, Suite 700
Atlanta, Georgia 30309
Telephone: (404) 962-3544
Facsimile: (404) 786-2743
wjones@balch.com
psilloway@balch.com

**FREDERIC DORWART, LAWYERS**[2]
Frederic Dorwart, OBA No. 2436
James A. Higgins, OBA No. 18570
Nora R. O'Neill, OBA No. 19901
124 East Fourth Street
Tulsa, Oklahoma 74103
Telephone: (918) 583-9922
Facsimile: (918) 583-8251
fdorwart@fdlaw.com
jhiggins@fdlaw.com
noneill@fdlaw.com

---

[1] Pending filing and approval of Pro Hac Vice Applications.
[2] Pending filing and approval of Pro Hac Vice Applications.

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| BOKF, N.A., as indenture trustee,<br><br>    Plaintiff,<br><br>vs.<br><br>Bama Oaks Retirement, LLC; Saint Simons<br>Heath Care, LLC; Medical Clinic Board of<br>the City of Mobile (Second),<br><br>    Defendants. | Civil Action Number: **1:21-cv-00029** |

## **VERIFICATION**

Before the undersigned officer, duly authorized by law to administer oaths, comes S. BRENT VARZALY, Senior Vice President, on behalf of BOKF, N.A., solely in its capacity as indenture trustee for $5,740,000 of Medical Clinic Board of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds, who, after first being duly sworn according to law on oath, deposes and states that the facts contained in **VERIFIED COMPLAINT FOR DAMAGES, APPOINTMENT OF RECEIVER, INJUNCTIVE RELIEF, AND AN ACCOUNTING** are true and correct and within his personal knowledge, except those facts pleaded on information and belief, which he deposes and states he believes to be true and correct.

Sworn to and subscribed before me
this 15th day of January, 2021.

_____
Notary Public
My Commission Expires: June 12, 2023

[NOTARIAL SEAL]

_____
Name: S. BRENT VARZALY

```
JANET J. FYKE
NOTARY PUBLIC - STATE OF MISSOURI
CLAY COUNTY
MY COMMISSION EXPIRES: 06-12-2023
COMMISSION# 11263263
```

# EXHIBIT "A"

### TRUST INDENTURE

## THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND)

and

## BOKF, NA DBA BANK OF OKLAHOMA
as Trustee

Dated as of November 1, 2012

Relating to:

$5,740,000
Assignment of Interest of Issuer

The interest of THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND) in a Lease Agreement, dated as of November 1, 2012, between the Issuer and BAMA OAK RETIREMENT, LLC is assigned to BOKF, NA dba Bank of Oklahoma, Trustee herein.

This instrument was prepared by:

SELL & MELTON, L.L.P.
Fickling & Company Building, 14th Floor
577 Mulberry Street
Post Office Box 229
Macon, Georgia 31202-0229
Telephone: (478) 464-5342, direct
Facsimile: (478) 464-5382
Email: rcmiller@sell-melton.com

# EXHIBIT "A"

# *Table of Contents*

GRANTING CLAUSE I...................................................................................................... 3
GRANTING CLAUSE II...................................................................................................... 3
GRANTING CLAUSE III..................................................................................................... 3
GRANTING CLAUSE IV..................................................................................................... 3
GRANTING CLAUSE V. ..................................................................................................... 3
ARTICLE I............................................................................................................................ 4
DEFINITIONS AND CERTAIN RULES OF INTERPRETATION................................... 4
Section 101.      Definitions. .............................................................................................. 4
Section 102.      Certain Rules of Interpretation. ........................................................... 15
ARTICLE II......................................................................................................................... 15
THE BONDS........................................................................................................................ 15
Section 201.      Authorized Amount of Bonds.. ............................................................ 15
Section 202.      Issuance of Bonds. ................................................................................ 15
Section 203.      Execution; Limited Obligation ............................................................ 17
Section 204.      Authentication. ..................................................................................... 17
Section 205.      Form of Bonds. ..................................................................................... 17
Section 206.      Delivery of Bonds. ............................................................................... 40
Section 207.      Mutilated, Lost, Stolen or Destroyed Bonds ...................................... 41
Section 209.      Book – Entry – Only System. ............................................................... 42
ARTICLE III....................................................................................................................... 44
REDEMPTION OR PURCHASE OF BONDS BEFORE MATURITY ........................... 44
Section 301.      Redemption Dates and Prices................................................................ 44
Section 302.      Notice of Redemption.. ........................................................................ 45
Section 303.      Cancellation. ......................................................................................... 45
Section 304.      Mandatory Redemption. ....................................................................... 45
Section 305.      Redemption Prior to Maturity .............................................................. 48
Section 306.      Payment of Bonds Upon Redemption................................................... 48
Section 307.      Redemption. .......................................................................................... 48
Section 308.      Option to Prepay Installment Amounts Under Lease Agreement in Whole in
Certain Events.................................................................................................................... 48
ARTICLE IV........................................................................................................................ 48
GENERAL AGREEMENTS................................................................................................ 48
Section 401.      Payment of Principal and Interest.. ...................................................... 49
Section 402.      Performance of Agreements; Authority................................................ 49
Section 403.      Recordation of Security Agreement and Financing Statements.. .......... 49
Section 404.      Priority of Pledge and Security Interest.. ............................................. 49
Section 405.      Rights Under Lease Agreement and Security Agreement.. ................... 50
Section 406.      Maintenance of Insurance; Payment of Taxes, Charges, etc... ............ 50
Section 407.      Maintenance and Repair........................................................................ 50
Section 408.      Insurance and Condemnation Proceeds.. .............................................. 50
Section 409.      Covenants Regarding Maintenance of Lessee's Existence.................... 50
Section 410.      Indemnification of Issuer and Trustee................................................... 51
ARTICLE V......................................................................................................................... 52

REVENUES AND FUNDS...........................................................................................52
Section 501.    Source of Payment of Bonds................................................................52
Section 502.    Creation of the Bond Fund..................................................................52
Section 503.    Payments into the Bond Fund.............................................................52
Section 504.    Use of Moneys in the Bond Fund........................................................53
Section 505.    Non-presentment of Bonds at Final Maturity. ....................................53
Section 506.    Trustee's and Paying Agents' Fees, Charges and Expenses. ..............54
Section 507.    Moneys to Be Held in Trust................................................................54
Section 508.    Payments to the Lessee from the Bond Fund. .....................................54
Section 509.    Creation of the Revenue Fund............................................................55
Section 510.    Creation of Ad Valorem Tax Fund......................................................55
Section 511.    Creation of Arbitrage Rebate Fund .....................................................55
ARTICLE VI...........................................................................................................55
CUSTODY AND APPLICATION OF PROCEEDS OF BONDS ...........................55
Section 601.    Creation of the Project Fund ..............................................................55
Section 602.    Disposition of Bond Proceeds.............................................................55
Section 603.    Disbursements from Project Fund.......................................................55
Section 604.    Completion of the Project...................................................................56
Section 605.    Creation of Special Fund....................................................................56
Section 606.    Creation of Debt Service Reserve Fund...............................................56
ARTICLE VII..........................................................................................................57
INVESTMENTS.......................................................................................................57
Section 701.    Project Fund and Debt Service Reserve Fund Investments. ...............57
Section 702.    Bond Fund Investments......................................................................57
Section 703.    Non-Arbitrage Covenant;...................................................................58
ARTICLE VIII. DISCHARGE OF LIEN .................................................................58
Section 801.    Discharge of Lien and Security Interests. ...........................................58
Section 802.    Provision for Payment of Bonds .........................................................59
Section 803.    Discharge of the Indenture..................................................................59
ARTICLE IX............................................................................................................59
DEFAULT PROVISIONS AND REMEDIES OF TRUSTEE AND BONDHOLDERS...........60
Section 901.    Defaults; Events of Default.................................................................60
Section 902.    Other Remedies...................................................................................60
Section 903.    Rights of Bondholders........................................................................60
Section 904.    Rights of Bondholders to Direct Proceedings......................................61
Section 905.    Appointment of Receivers...................................................................61
Section 906.    Waiver of Benefit of Laws...................................................................61
Section 907.    Application of Moneys........................................................................62
Section 908.    Rights and Remedies Vested in Trustee...............................................63
Section 909.    Rights and Remedies of Bondholders. .................................................63
Section 910.    Termination of Proceedings ...............................................................64
Section 911.    Waivers of Events of Default ..............................................................64
Section 912.    Notice of Defaults;..............................................................................65
Section 913.    Bondholder Lists..................................................................................65
ARTICLE X. THE TRUSTEE ..................................................................................65

Section 1001.    Acceptance of the Trusts. .......................................................................... 65
Section 1002.    Fees, Charges and Expenses of Trustee. ................................................... 69
Section 1003.    Notice to Bondholders If Default Occurs. ................................................. 69
Section 1004.    Intervention by Trustee. ............................................................................. 69
Section 1005.    Successor Trustee. ...................................................................................... 69
Section 1006.    Resignation by the Trustee ......................................................................... 70
Section 1007.    Removal of the Trustee. .............................................................................. 70
Section 1008.    Appointment of Successor Trustee by the Bondholders; ........................... 70
Section 1009.    Concerning Any Successor Trustee ........................................................... 70
Section 1010.    Right of Trustee to Pay Taxes and Other Charges ..................................... 71
Section 1011.    Trustee Protected in Relying Upon Resolutions, etc. ................................ 71
Section 1012.    Successor Trustee as Custodian of Funds, Paying Agent and Bond Registrar..... 71
Section 1013.    Filing of Certain Continuation Statements. ............................................... 71
Section 1014.    Supplying of Names and Addresses Bondholders Desiring Certain Financial
Information. ....................................................................................................................... 72
Section 1015.    Trustee Entitled to Indemnity. ................................................................... 72
Section 1016.    Appointment of Co-Trustee.. ..................................................................... 73
ARTICLE XI. ..................................................................................................................... 73
MEETINGS OF BONDHOLDERS .................................................................................... 73
Section 1101.    Purposes for Which Bondholders' Meetings May Be Called. ..................... 73
Section 1102.    Place of Meetings of Bondholders. ............................................................ 74
Section 1103.    Call and Notice of Bondholders' Meetings. ............................................... 74
Section 1104.    Persons Entitled to Vote at Bondholders' Meetings. ................................... 74
Section 1105.    Determination of Voting Rights; Conduct and Adjournment of Meetings. ........... 75
Section 1106.    Counting Votes and Recording Action of Meetings.. .................................. 75
Section 1107.    Revocation by Bondholders.. ..................................................................... 76
ARTICLE XII. .................................................................................................................... 76
SUPPLEMENTAL INDENTURES ..................................................................................... 76
Section 1201.    Supplemental Indentures Not Requiring Consent of Bondholders. ............ 76
Section 1202.    Supplemental Indentures Requiring Consent of Bondholders. .................... 77
Section 1203.    Trustee Authorized to Join in Supplements, Reliance on Counsel.. ............. 78
ARTICLE XIII. ................................................................................................................... 78
AMENDMENT OF LEASE AGREEMENT AND SECURITY AGREEMENT ...................... 78
Section 1301.    Amendments, etc., to Lease Agreement and Security Agreement Not Requiring
Consent of Bondholders. ................................................................................................... 78
Section 1302.    Amendments, etc., to Lease Agreement and Security Agreement Requiring
Consent of Bondholders.. .................................................................................................. 79
Section 1303.    Trustee Authorized to Join in Amendments, Reliance on Counsel ............. 79
ARTICLE XIV. ................................................................................................................... 79
MISCELLANEOUS ........................................................................................................... 79
Section 1401.    Consents, etc., of Bondholders. ................................................................. 79
Section 1402.    Issuer's Obligations Limited. ..................................................................... 80
Section 1403.    Immunity of Directors, Officers or Employees of Issuer. ........................... 81
Section 1404.    Limitation of Rights.. ................................................................................. 81
Section 1405.    No Liability of Issuer. ................................................................................. 81

-iv-

Section 1406.    Severability ................................................................................. 82
Section 1407.    Notices........................................................................................ 82
Section 1408.    Trustee as Paying Agent and Bond Registrar. .................................... 83
Section 1409.    Payments Due on Saturdays, Sundays and Holidays ........................... 83
Section 1410.    Counterparts ............................................................................... 83
Section 1411.    Laws Governing Indenture.............................................................. 83
Section 1412.    Venue and Jurisdiction ................................................................. 83

## TRUST INDENTURE

THIS TRUST INDENTURE (the "Indenture"), dated as of November 1, 2012, made and entered into between THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND), a public corporation and instrumentality duly organized and existing under the laws of the State of Alabama (the "Issuer") and BOKF, NA DBA BANK OF OKLAHOMA, a national banking association with a corporate trust office in Tulsa, Oklahoma (the "Trustee").

## W I T N E S S E T H:

WHEREAS, the Issuer, by due corporate action, has authorized (i) the acquisition and rehabilitation of the 88-unit independent living facility (the "Facility") located at 3145 Knollwood Drive, Mobile, Alabama 36693; (ii) the funding of various trust funds with the Trustee; and (iii) the payment of certain costs of issuing the Bonds described below (the "Project II"), such Project to be financed through the Issuer for the benefit of  Bama Oaks Retirement, LLC, a Georgia limited liability company (the "Lessee"), pursuant to a Lease Agreement, dated as of November 1, 2012 (the "Lease Agreement"); and

WHEREAS, after study and investigation of the nature of the proposed Project, the Issuer has determined that, in assisting with the financing of the Project, it will be acting in furtherance of the public purposes intended to be served by the Act, and

WHEREAS, the Issuer has been advised by the Lessee that the amount necessary to finance the cost of the Project, including expenses incidental thereto, is, and, by proper corporate action, the Issuer has authorized the issuance and sale of $5,740,000 in aggregate principal amount of $5,110,000 The Medical Clinic Board of the City of  Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012A (the "Series A Bonds") and $630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Taxable Series 2012B (the "Series B Bonds") (the Series A Bonds and Series B Bonds being collectively referred to as the "Bonds"), the proceeds of which will be used to finance the cost of the Project; and

WHEREAS, the Issuer has entered into the Lease Agreement with the Lessee under the terms of which the Issuer has agreed to finance the cost of the Project through the issuance of the Bonds and, in consideration thereof, the Lessee has agreed to pay to the Issuer moneys sufficient to pay the principal of, the redemption premium (if any) and the interest on, the Bonds as the same become due and payable and to pay certain administrative expenses in connection with the Bonds; and

WHEREAS, the Lessee and the "Management Company" (hereinafter defined) will enter into a "Management Agreement" (hereinafter defined) whereby any fees payable to the Management Company will be subordinated to the payment of the debt service on the Bonds; and

WHEREAS, the Trustee and the Issuer have entered into a Mortgage and Security Agreement, dated as of November 1, 2012 (the "Security Agreement"), pursuant to the terms of which the Issuer has conveyed to the Trustee a security title to and security interest in that portion of the Project consisting of real property, all improvements thereon, and certain personal property as security for the payments required to be made under the Lease Agreement; and

WHEREAS, as security for the payment of the Bonds, the Issuer has agreed to assign and pledge to the Trustee all right, title and interest of the Issuer in (a) the Lease Agreement (except certain rights reserved by the Issuer under the terms of this Indenture), together with the Lease Agreement and the Security Agreement, (b) the "Pledged Revenues" (hereinafter defined), and (c) all amounts on deposit from time to time in the "Project Fund" (hereinafter defined); and

WHEREAS, all things necessary to make the Bonds, when authenticated by the Trustee and issued and delivered as in this Indenture provided, the legal, valid, binding and enforceable limited obligations of the Issuer, according to the import thereof, and to create a valid assignment and pledge of the Pledged Revenues to the payment of the principal of, and the redemption premium (if any) and the interest on, the Bonds and a valid assignment of certain of the rights, title and interest of the Issuer in the Lease Agreement and the Security Agreement, have been done and performed, and the execution and delivery of this Indenture and the execution, issuance and delivery of the Bonds, subject to the terms hereof, have in all respects been authorized;

NOW, THEREFORE, KNOW ALL BY THESE PRESENTS, THIS INDENTURE WITNESSETH:

That the Issuer, in consideration of the premises and of the acceptance by the Trustee of the trusts hereby created, and of the purchase and acceptance of the Bonds by the holders thereof, and of the sum of TEN DOLLARS ($10.00), lawful money of the United States of America, to it paid by the Trustee, at or before the execution and delivery of these presents, and for other good and valuable consideration the receipt of which are hereby acknowledged, in order to secure the payment of the principal of, and the redemption premium (if any) and the interest on, the Bonds and all other amounts payable by the Issuer pursuant to the terms of the Bonds and/or this Indenture according to their tenor and effect and to insure the performance and observance by the Issuer of all the agreements expressed or implied herein and in the Bonds, has given, granted, assigned and pledged and does by these presents give, grant, assign and pledge to the Trustee, and to its successors in the trusts hereby created, and to them and their assigns forever:

- 2 -

## GRANTING CLAUSE I.

All right, title and interest of the Issuer in the Lease Agreement, together with the Lease Agreement itself, and all amendments, modifications and renewals thereof, reserving, however, the rights (a) providing that notices, approvals, consents, requests and other communications be given to the Issuer, and (b) of the Issuer under Sections 5.2 and 6.4 of the Lease Agreement.

## GRANTING CLAUSE II.

All right, title and interest of the Issuer in the Security Agreement and the property described therein, together with the Security Agreement itself.

## GRANTING CLAUSE III.

All right, title and interest of the Issuer in the Pledged Revenues.

## GRANTING CLAUSE IV.

All amounts on deposit from time to time in the Special Fund, Bond Fund, Revenue Fund, Debt Service Reserve Fund, Ad Valorem Tax Fund and Project Fund, subject to the provisions of this Indenture and the Lease Agreement permitting the application thereof for the purposes and on the terms and conditions set forth herein and therein.

## GRANTING CLAUSE V.

Any and all other property of every name and nature from time to time hereafter by delivery or by writing of any kind, given, granted, assigned and pledged as and for additional security hereunder, by the Issuer or by anyone in its behalf or with its written consent, to the Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

TO HAVE AND TO HOLD all the same with all privileges and appurtenances hereby given, granted, assigned and pledged or agreed or intended so to be, to the Trustee and its successors in said trusts and to them and their assigns forever;

IN TRUST, NEVERTHELESS, upon the terms and trusts herein set forth, for the equal and proportionate benefit, security and protection of all holders of the Bonds issued or to be issued under and secured by this Indenture, without preference, priority or distinction as to lien or otherwise of any of the Bonds over any of the others except as herein expressly provided;

- 3 -

PROVIDED, HOWEVER, that when the principal of, and the interest on, all of the Bonds secured hereby have been paid or shall be deemed to have been paid in accordance with the terms and provisions of this Indenture, then this Indenture and the rights hereby granted shall cease, determine and be void; otherwise, this Indenture shall be of full force and effect.

THIS INDENTURE FURTHER WITNESSETH and it is expressly declared that all Bonds issued and secured hereunder are to be issued, authenticated and delivered and all property hereby given, granted, assigned or pledged is to be dealt with and disposed of under, upon and subject to the terms, conditions, stipulations, agreements, trusts, uses and purposes as hereinafter expressed, and the Issuer has agreed and DOES HEREBY AGREE with the Trustee and with the respective holders, from time to time, of the Bonds or any part thereof, as follows, that is to say:

## ARTICLE I.
## DEFINITIONS AND CERTAIN RULES OF INTERPRETATION

Section 101.   Definitions.  In addition to the words and terms elsewhere defined herein, the following words and terms as used herein shall have the following meanings unless the context or use clearly indicates another or different meaning or intent, and any other words and terms defined in the Lease Agreement shall have the same meanings as assigned to them in the Lease Agreement when used herein unless the context or use clearly indicates another or different meaning or intent:

"Act" means Section 11-58-1 *et seq.*, of *Code of Alabama* (1975), as amended, and other applicable provisions of law;

"Act of Bankruptcy" means the filing of a petition in bankruptcy under the *United States Bankruptcy Code* or the commencement of a proceeding under any other applicable law now or hereafter in effect concerning insolvency, reorganization or bankruptcy by or against the Lessee or the Issuer, as debtor;

"Ad Valorem Tax Fund" means the Ad Valorem Tax Fund created in Section 510 hereof;

"Arbitrage Rebate Fund" means the Arbitrage Rebate Fund created in Section 511 hereof;

"Bond Fund" means the Bond Fund created in Section 502 hereof;

"Bond Payment Date" means any date on which, pursuant to the provisions hereof, there shall be due and payable to the Bondholders any payment of principal (including any mandatory sinking fund payment), premium or interest on account of the Bonds;

- 4 -

"Bond Purchase Agreement" means the Bond Purchase Agreement, dated November 27, 2012, among the Issuer, Lawson Financial Corporation, 3352 E. Camelback Road, Phoenix, Arizona (hereinafter "Underwriter"), and the Lessee;

"Bond Rate" means the interest rate of 7.00% and 7.25% per annum in the case of the Series 2012A Bonds and at the rate of 8.75% per annum in the case of the Series 2012B Bonds;

"Bond Registrar" means the Trustee;

"Bond Resolution" means that certain Bond Resolution adopted by the Issuer with respect to the Bonds on November 26, 2012;

"Bond Year" means November 2 through November 1 of each year that the Bonds are Outstanding, except in the case of the first Bond Year, which shall begin on the date of the issuance of the Bonds and end on November 1, 2012;

"Bondholder" or "holder of the Bonds" or "holder" means the registered owner of any Bond;

"Bonds" means the Series A Bonds and Series B Bonds of the Issuer issued hereunder in the aggregate face amount of $5,740,000. Any percentage of Bonds, specified herein for any purpose, is to be figured on the aggregate principal amount of Bonds then outstanding;

"Capitalized Interest Account" means the Capitalized Interest Account, initially containing $186,996.00, that forms a part of the Bond Fund, which amount shall be held by the Trustee to pay interest on the Bonds during the period that the Facility is being rehabilitated;

"Chairman" means the Chairman of the Issuer;

"City" means the City of Mobile, Alabama;

"Code" means the Internal Revenue Code of 1986, as amended, and the applicable Income Tax Regulations thereunder;

"Co-Trustee" means any entity appointed as co-trustee by the Trustee pursuant to Section 1016 hereof, its successors or assigns;

"Counsel" means an attorney, or firm thereof, admitted to practice law before the highest court of any state in the United States of America or the District of Columbia;

"Debt Service Requirement" means the maximum principal and interest coming due on the Bonds in the coming Bond Year;

"Debt Service Reserve Fund" means the Debt Service Reserve Fund created in Section 606 hereof;

"Default" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice or both, become an event of default;

"Determination of Taxability" means a determination that the interest income on any of the Series 2012A Bonds is subject to Federal income taxation, which determination shall be deemed to have been made upon the occurrence of the first to occur of the following:

(a)    the date on which the Trustee is notified that an attorney or a law firm having a national reputation in the field of municipal law whose opinions are generally accepted by purchasers of municipal obligations is unable to deliver an opinion requested of it that the interest on the Series 2012A Bonds qualifies as exempt interest under Section 103 of the Code, it being understood that no such attorney or firm is under any obligation to deliver such opinion unless retained specifically to do so; or

(b)    the date on which any change in law or regulation becomes effective or on which the Internal Revenue Service issues any public ruling or on which there shall occur a ruling or decision of a court of competent jurisdiction with or to the effect that the interest income on any of the Series 2012A Bonds is not excludable from gross income of the Holders thereof for federal income tax purposes under Section 103 of the Code; or

(c)    the date on which the Lessee receives notice from the Trustee in writing that the Trustee has been notified by the Internal Revenue Service, or is advised by any Bondholder or former Bondholder that the Internal Revenue Service has issued a notice of deficiency or similar notice which asserts that the interest on any of the Series 2012A Bonds is not excludable from gross income of the Holders thereof for federal income tax purposes under Section 103 of the Code;

provided, however, that, should the Lessee elect to contest, at its own expense, any determination of taxability made pursuant to subparagraphs (a), (b) or (c) of this paragraph and shall deliver to the Trustee a letter of credit from a bank acceptable to the Trustee, and approved by the holders of more than fifty percent (50%) of the outstanding principal amount of the Series 2012A Bonds in an amount sufficient to provide for the payment of additional interest which would be required to be paid on the Series 2012A Bonds  as a result of a Determination of Taxability (calculated at 12.00% per annum from the Event of Taxability), then no determination of taxability shall be deemed to have occurred unless such contest has been finally determined;

"Event of Default" means the events specified in Section 901, subject to the terms of Section 912;

"Event of Taxability" means the date on which the interest income on the Series 2012A Bonds becomes subject to Federal income taxation as a result of any of the following conditions or circumstances:

       (a)     the Series 2012A Bonds constitute an "arbitrage bond" within the meaning of Section 148 of the Code; or

       (b)     more than 25% of the net proceeds of the sale of the Series 2012A Bonds are used to provide a facility the primary purpose of which is one of the following:  retail food and beverage services (including eating and drinking places, but excluding grocery stores), automobile sales or service, or the provision of recreation or entertainment; or

       (c)     any portion of the net proceeds of the sale of the Series 2012A Bonds is used to provide the following:  any private or commercial golf course, country club, massage parlor, tennis club, skating facility (including roller skating, skateboard and ice skating), racquet sports facility (including any handball or racquetball court), hot tub facility, suntan facility or racetrack; or

       (d)     any portion of the net proceeds of the sale of the Series 2012A Bonds is used (directly or indirectly) for the acquisition of land (or an interest therein) to be used for farming purposes, or 25% or more of the net proceeds of the sale of the Series 2012 Bonds is used (directly or indirectly) for the acquisition of land (or an interest therein) other than land to be used for farming purposes; or

       (e)     any portion of the net proceeds of the sale of the Series 2012A Bonds is used for the acquisition of any property the first use of which property is not pursuant to such acquisition, except with respect to any building (and the equipment therefor) if the rehabilitation expenditures with respect to such building equals or exceeds 15% of the portion of the cost of acquiring such building (and equipment) financed with the proceeds of the issue; or

       (f)     any portion of the net proceeds of the sale of the Series 2012A Bonds is used to provide any airplane, skybox or other luxury box, any health club facility, any facility primarily used for gambling, or any store the principal business of which is the sale of alcoholic beverages for consumption off premises; or

       (g)     the taking of any action by the Issuer, the Lessee or any person acting on the Lessee's behalf or upon the Lessee's direction, or the failure of the Issuer, the Lessee or any such person to take any action, or any mistake in or untruthfulness of any representation of the Issuer or the Lessee contained in this Indenture or in any certificate of the Issuer or the Lessee delivered pursuant to this Indenture or in connection with the issuance of the Series 2012A Bonds, if such act or omission, or such mistake in or untruthfulness of such representation, has the effect of causing the interest income on the Series 2012A Bonds to be or become subject to Federal income taxation; or

(h)    as a result of a change in the tax laws of the United States; or

(i)    any other condition or circumstance that results in a Determination of Taxability;

provided, however, that no Event of Taxability shall be deemed to have occurred with respect to the Series 2012A Bonds if the interest income thereon shall be subject to Federal income taxation for any period solely because during that period the Series 2012A Bonds were held by a person who is a "Substantial User" or a "Related Person," as those terms are defined in the Code;

"Facility" means the existing 88-unit independent living facility located at 3145 Knollwood Drive, Mobile, Alabama 36693, and improvements thereto;

"Financing Statements" means any and all financing statements (including continuation statements) filed for record from time to time to perfect the security interests created or assigned hereunder or pursuant hereto;

"Funds Available for Debt Service" means in any period the Pledged Revenues for such period, minus the Lessee's operating expenses (as set forth in the Operating Budget required by Section 5.4 of the Lease Agreement), plus, to the extent included in such Operating Expenses, depreciation and amortization, interest on long-term indebtedness (including the Series 2012 Bonds), amortization of discount and financial expenses incurred in connection with the issuance of long-term indebtedness, and other non-cash expense deducted in accordance with generally accepted accounting principles consistently applied;

"Government Obligations" means (a) direct obligations of the United States of America for the payment of which the full faith and credit of the United States of America is pledged, or (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and the interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any security described in (a) or (b) issued or held in book-entry form on the books of the Department of the Treasury of the United States of America), which obligations in either case, are not subject to redemption prior to maturity at less than par by anyone other than the holder;

"Gross Revenues" means the gross revenues received by the Lessee and/or Manager in connection with the management or operation of the Facility;

"Indenture" means this Trust Indenture and any indentures supplemental hereto;

"Independent Auditor" means a certified public accountant, or firm thereof, who or which is "independent" as that term is defined in Rule 101 and related interpretations of the Code of Professional Ethics of the American Institute of Certified Public Accountants, of recognized

- 8 -

standing, who or which does not devote his or its full time to either the Issuer or the Lessee (but who or which may be regularly retained by either);

"Independent Counsel" means an attorney, or firm thereof, admitted to practice law before the highest court of any state in the United States of America or the District of Columbia and not an employee on a full-time basis of either the Issuer or the Lessee (but who or which may be regularly retained by either);

"Interest Payment Date" means the first day of each month, beginning February 1, 2013, and the first day of each consecutive month thereafter that the Bonds are Outstanding;

"Issuer" means The Medical Clinic Board of the City of Mobile (Second), a public corporation and instrumentality duly organized and existing under the laws of the State of Alabama;

"Land Use Restriction Agreement" means that certain Land Use Restriction Agreement, dated as of November 1, 2012, between the Lessee and the Trustee;

"Land Use Restrictions" means certain general covenants, specific covenants and other agreements with respect to the Project and the use and operation thereof, described as the following:

    (a)    General Covenants - The Issuer and Lessee covenant to the following:

        (i)    to comply with respect to the Project with 142(d) of the Code and applicable regulations thereunder for the longer of the remaining term of the Series 2012A Bonds or the end of the Qualified Project Period, subject to prior termination upon the occurrence of certain events described in the Land Use Restrictions; and

        (ii)    to not knowingly take or permit any action to be taken which would adversely affect the exemption of interest under 142(d) of the Code from federal income taxation. The Issuer and the Lessee, each for its own part, agrees to take any lawful actions, including amending the Land Use Restrictions, as is necessary, in the opinion of a nationally-recognized bond counsel, to comply fully with all applicable requirements affecting the federal tax exemption of interest on the Series 2012A Bonds under 142(d) of the Code.

    (b)    Specific Covenants - The Lessee makes certain representations, covenants, and warranties to the following:

        (i)    the Facility is being acquired, rehabilitated, and installed for the purpose of providing "residential rental property" as such phrase is used in 142(d) of the Code; the Lessee will own the entire 2012 Project for federal tax purposes; and the Lessee will own, manage, and operate the Project as a project to provide residential rental property consisting of

- 9 -

similarly constructed residential dwelling units and facilities functionally related and subordinate thereto, in accordance with 142(d);

(ii)     none of the dwelling units in the Facility will be used on a transient basis or leased or rented for a period of less than thirty (30) days;

(iii)    no part of the Facility will be used as a hotel, motel, dormitory, fraternity house, sorority house, rooming house, hospital, nursing home, sanitarium, rest home, or trailer park or court for use on a transient basis;

(iv)    the Lessee will rent continuously or make available for rent on a continuous basis the dwelling units in the Facility to members of the general public for the longer of the remaining term of the Series 2012A Bonds or the Qualified Facility Period (the "Rental Restrictions Period"); and will not give preference in renting dwelling units in the Facility to any particular class or group of persons, other than persons and families of low and moderate income, elderly persons, and a resident manager and maintenance personnel;

(v)     for the Qualified Facility Period, at least 20% (15% if the Facility is, or subsequently becomes, a "targeted area project," as defined in 26 §1.103-8(b)(8)(iii)) of the completed and occupied dwelling units in the Facility shall be occupied or held for occupancy by Low or Moderate Income Tenants;

(vi)    the Lessee has designed and will maintain the Facility so that the dwelling units to be rented to Low or Moderate Income Tenants will be intermingled with all other dwelling units in the Facility, and the tenants in such dwelling units will enjoy equal access to all common facilities of the Facility; the Lessee agrees that there will be no material changes to the design of the Facility hereafter without an unqualified opinion of nationally-recognized bond counsel, a copy of which shall be provided to the Issuer and the Trustee, that the proposed changes will not adversely affect the tax-exempt status of the interest payable on the Series 2012A Bonds;

(vii)   to obtain and maintain on file and available for inspection by the Issuer or the Trustee, income certifications from each Low or Moderate Income Tenant residing in the Facility in the form and manner required by Treasury Regulation 1.167(k)-3(b) or in such other form and manner as may be required by applicable rules, regulations, or policies promulgated or proposed by the Department of the Treasury or the Internal Revenue Service with respect to obligations issued under 142(d) of the Code;

(viii)  to provide in each lease to a Low or Moderate Income Tenant that a material misrepresentation in such tenant's income certification will be grounds for default and eviction (the enforcement of such provisions, however, being subject to limitations under applicable law);

(ix)     to the extent permitted by law, to obtain from each Low or Moderate Income Tenant residing in the Facility and maintain on file and available for inspection by the Issuer or the Trustee, a copy of such Low or Moderate Income Tenant's federal income tax return (or other documents and records acceptable to the Trustee and the Issuer) for the taxable year immediately preceding such Low or Moderate Income Tenant's initial occupancy in the Facility, or, in the event that a Low or Moderate Income Tenant certifies that he or she did not file or did not retain a copy of such tax return, to obtain and maintain on file alternate independent evidence of such Low or Moderate Income Tenant's income for such year, such as wage statements or employer records;

(x)     to prepare and submit to the Issuer and to the Trustee, at the end of each month, a certificate executed by the Lessee stating the percentage of the dwelling units of the Facility that were occupied by Low or Moderate Income Tenants (or that were during such month occupied by, or held vacant and available for occupancy by, Lot or Moderate Income Tenants) at all times during such month; and

(xi)     immediately upon discovering any violation of any of the covenants, restrictions, and representations set forth in the Land Use Restrictions, to notify the Trustee and the Issuer in writing of such violation.

For purposes of the Land Use Restrictions, a dwelling unit occupied by an individual or family who at the beginning of its occupancy is a Low or Moderate Income Tenant shall be treated as occupied by a Low or Moderate Income Tenant during such individual's or family's tenancy in such unit even if the individual or family, as the case may be, subsequently ceases to qualify as a Low or Moderate Income Tenant.  In addition, such unit shall be treated as occupied by a Low or Moderate Income Tenant until reoccupied, other than for a temporary period of not exceeding thirty-one days, by another occupant, at which time the character of the unit shall be redetermined according to the provisions of this section.

The Land Use Restrictions and the covenants contained therein shall run with the land and shall inure to the benefit of and shall be binding upon the legal representatives, successors, and assigns of all parties thereto.  No part of the Facility shall be voluntarily transferred by the Lessee prior to expiration of both the Rental Restrictions Period and the Qualified Facility Period unless prior thereto or simultaneously therewith the transferee enters into an agreement, in form acceptable to the Issuer and the Trustee, assuming all obligations of the Lessee under the Land Use Restrictions with respect to the transferred property.

"Lease Agreement" means the hereinbefore-mentioned Lease Agreement, of even date herewith, between the Issuer and the Lessee, including any amendments thereto;

"Lessee" means Bama Oaks Retirement, LLC, a Georgia limited liability company;

- 11 -

"Management Agreement" means the Management Agreement between the Lessee and the Management Company for the management of the Facility on behalf of the Lessee, dated as of November 1, 2012;

"Management Company" means Saint Simons Health Care, L.L.C., a Georgia limited liability company;

"Official Statement" means the Official Statement of the Issuer, dated November 29, 2012, which relates to the Bonds;

"Outstanding", when used with reference to the Bonds at any dates on which the amount of outstanding Bonds is to be determined, means all Bonds which have been authenticated and delivered by the Trustee hereunder, except:

      (a)    Bonds canceled on or prior to such date;

      (b)    Bonds for the payment or redemption of which sufficient moneys and/or Government Obligations meeting the terms and conditions specified in Section 802 shall have been theretofore transferred or deposited into the special account established in the Bond Fund (whether upon or prior to the maturity or redemption date of any such Bonds); provided that if such Bonds are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given or arrangements satisfactory to the Trustee shall have been made therefor, or waiver of such notice satisfactory in form to the Trustee shall have been filed with the Trustee;

      (c)    Bonds in lieu of which others have been authenticated under Section 207 or 208; and

      (d)    For the purposes of any consent or other action to be taken by the holders of a specified percentage of outstanding Bonds hereunder, all Bonds held by or for the Issuer or the Lessee, except that for purposes of any such consent or action the Trustee shall be obligated to consider as not being outstanding only Bonds known by the Trustee to be so held;

"Payment in full of the Bonds" specifically encompasses the situations referred to in Section 5.7 of the Lease Agreement and in Section 802 hereof;

"Permitted Investments" means any obligations which have been assigned to a rating category no less than an "investment grade" category assigned by Standard & Poor's Corporation, Moody's Investors Services, or any other similar rating service;

The Trustee may make investments permitted by this definition through its own bond department or the bond department of any bank or trust company under common control with the Trustee. Investments will be made so as to mature or be subject to redemption at the option of the holder on or before the date or dates that the Trustee anticipates that moneys from the investments will be required. The Trustee, when authorized by the Lessee, may trade with itself

in the purchase and sale of securities for such investment. Investments will be registered in the name of the Trustee and held by or under the control of the Trustee. The Trustee will sell and reduce to cash a sufficient amount of investments whenever the cash held by the Trustee is insufficient. The Trustee shall not be liable for any loss from such investments to the extent directed by the Lessee and to the extent such directions have been complied with by the Trustee. The Issuer (and the Lessee by its execution of the Lease Agreement) acknowledge that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant the Issuer or the Lessee the right to receive brokerage confirmations of security transactions as they occur, the Issuer and the Lessee acknowledge that such parties will not receive such confirmations to the extent permitted by law. The Trustee will furnish the Issuer (if requested by it) and the Lessee periodic cash transaction statements which include detail for all investment transactions made by the Trustee hereunder. The Trustee or any of its affiliates may act as sponsor, advisor or manager in connection with any investments made by the Trustee hereunder. The investments described in this paragraph of the definition of Permitted Investments may be made by the Trustee only if permitted by State law;

"Person" means any natural person, corporation, cooperative, partnership, trust or unincorporated organization, government or governmental body or agency, political subdivision or other legal entity as in the context may be appropriate;

"Pledged Revenues" means and shall include:

    (a)    the Gross Revenues received by the Lessee and/or Management Company in connection with the management or operation of the Facility, the payments required to be made by the Lessee under the Lease Agreement except payments to be made to the Trustee for services rendered as Trustee under the Indenture and as Bond Registrar and paying agent for the Bonds and except for expenses, indemnification and other payments required to be made pursuant to Sections 4.3, 5.2 and 6.4 of the Lease Agreement;

    (b)    any proceeds which arise upon the foreclosure of the Security Agreement, or with respect to any disposition of the Trust Estate and from any action against the Lessee for any deficiency;

    (c)    the proceeds of insurance required to be carried pursuant to Section 5.12 of the Lease Agreement and the proceeds of condemnation awards or sale in lieu of condemnation also described in Section 5.13 of the Lease Agreement; and

    (d)    amounts on deposit in the trust funds created herein;

"Premises" means the real and personal property and fixtures used in the trade or business described in the Security Agreement;

"Principal," whenever used with reference to the Bonds or any portion thereof, shall be deemed to include "and the redemption premium (if any)";

- 13 -

"Principal office of the Trustee" means the principal corporate trust office of the Trustee in Tulsa, Oklahoma at which at any particular time its corporate trust business shall be administered, which office at the time of the execution of this Indenture has an address of One Williams Center, Tulsa, Oklahoma 74192.

"Project" means the Project as defined in the Lease Agreement, as it may at any time exist;

"Project Fund" means the Project Fund created by Section 601 hereof;

"Record date" means the fifteenth day of the calendar month next preceding each interest payment date on the Bonds;

"Rehabilitation Period" means the period between the beginning of the rehabilitation of the Project or the date of issuance and delivery of the Bonds (whichever is earlier) and the Completion Date;

"Revenue Fund" means the Revenue Fund created in Section 509 hereof;

"Secretary" means the Secretary of the Issuer;

"Security Agreement" means the Mortgage and Security Agreement, of even date herewith, from the Lessee to the Issuer and Trustee, including any amendment thereto;

"Security interest" or "security interests" refers to the security interests created herein and in the Security Agreement and shall have the meaning set forth in the U.C.C.;

"Series 2012A Bonds" or "Series A Bonds" means the $5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012;

"Series 2012B Bonds" or "Series B Bonds" means the $630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Taxable Series 2012;

"Special Fund" means the Special Fund created in Section 605 hereof;

"State" means the State of Alabama;

"Taxable Rate" means twelve percent (12.00%) per annum;

- 14 -

"Trustee" means the party so named and designated in the first paragraph hereof and its successors and any corporation or association resulting from or surviving any consolidation or merger to which it or its successors may be a party;

"Trust Estate" means the property described in the granting clauses hereof;

"Underwriter" means Lawson Financial Corporation, Phoenix, Arizona.

"U.C.C." means the Uniform Commercial Code of the State, as now or hereafter amended.

Section 102.    Certain Rules of Interpretation.  The definitions set forth in Section 101 shall be equally applicable to both the singular and plural forms of the words and terms therein defined and shall cover all genders.

"Herein", "hereby", "hereunder", "hereof", "hereinbefore", "hereinafter" and other equivalent words refer to this Indenture and not solely to the particular Article, Section or subdivision hereof in which such word is used.

Reference herein to an Article number (e.g., Article IV) or a Section number (e.g., Section 702) shall be construed to be a reference to the designated Article number or Section number hereof unless the context or use clearly indicates another or different meaning or intent.

ARTICLE II.
THE BONDS

Section 201.    Authorized Amount of Bonds.   No Bonds may be issued under the provisions of this Indenture except in accordance with this Article.  The total principal amount of Bonds that may be issued hereunder is expressly limited to $5,740,000, subject to the provisions of Sections 207 and 208.

Section 202.    Issuance of Bonds.  The Bonds (i) shall be designated "$5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012A" (the "Series A Bonds") and "$630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Taxable Series 2012B" (the "Series B Bonds") as originally issued hereunder shall be dated the date of original issuance and delivery, (iii) shall bear interest from date (or, in the event a Bond is authenticated after a Record Date but before the next interest payment date, such Bond shall bear interest from such next interest payment date), until paid, at the rate of 7.00% and 7.25% per annum in the case of the Series 2012A Bonds and at rates ranging from 8.75% per annum in the case of the

- 15 -

Series 2012B Bonds, such interest to be payable on January, 1, 2013, and continuing on the first day of each consecutive month thereafter, through November 1, 2042, in the case of the Series A Bonds, and through November 1, 2020, in the case of the Series B Bonds, and shall bear interest on overdue principal and, to the extent legally enforceable, on overdue installments of interest and other amounts payable under the Bonds, for each day until paid at the rate of interest borne by the Bonds, and (iv) shall finally mature on November 1, 2042, in the case of the Series A Bonds, and on November 1, 2020, in the case of the Series B Bonds, subject to extraordinary, optional and mandatory redemption prior to maturity in accordance with Article III. The interest rate on the Bonds (the "Bond Rate") shall be that annual rate as set forth in each form of Bond and shall be based on a 360-day year comprised of twelve 30-day months.

Anything herein or in the Bonds to the contrary notwithstanding, the obligation of the Issuer hereunder shall be subject to the limitation that payments of interest to the holder of any Bond shall not be required to the extent that the receipt of any such payment by such holder would be contrary to the provisions of law applicable to such holder which limit the maximum rate of interest which may be charged or collected by such holder.

The Bonds are subject to the sinking fund provisions of Section 304.

The Bonds (including Bonds issued in exchange therefor) shall be issued as registered Bonds without coupons in the minimum denomination of $5,000 each or any higher integral multiple of $5,000. The Bonds shall be numbered consecutively from R-1 for both the Series A Bonds and the Series B Bonds upwards in order of issuance according to the records of the Bond Registrar.

Every Bond issued in exchange for a Bond as originally issued shall be dated the date of its authentication. The first payment of interest on a Bond shall be due on the interest payment date next succeeding the date of such Bond unless such Bond is dated on an interest payment date, in which case the first payment of interest thereon shall be due on the next succeeding interest payment date, or unless such Bond is dated after a record date but before the next interest payment date, in which case the first payment of interest thereon shall be due on the second succeeding interest payment date. The interest to be paid on an interest payment date shall be computed from the date on which interest was last paid on the Bonds or, if interest has not previously been paid on the Bonds, from the date of original issuance and delivery thereof.

Subject to the provisions of Section 208, the person in whose name a Bond is registered at the close of business on any Record Date with respect to any interest payment date shall be entitled to receive the interest payable on such interest payment date notwithstanding the cancellation of such Bond upon any transfer or exchange subsequent to such Record Date and prior to such interest payment date; provided, however, that if and to the extent that the Issuer shall default in the payment of interest due on such interest payment date, such past due interest shall be paid to the persons in whose name outstanding Bonds are registered on a subsequent Record Date established by notice given by mail by the Trustee or by or on behalf of the Issuer to the holders of the Bonds not less than thirty (30) days preceding such subsequent Record Date.

- 16 -

The principal of the Bonds shall be payable in lawful money of the United States of America at the principal office of the Trustee upon surrender thereof and interest on the Bonds shall be payable by check drawn upon the account held by the Trustee for such purpose and mailed to the persons in whose names the Bonds are registered on the registration books maintained by the Trustee, as Bond Registrar, at the close of business on the Record Date next preceding such interest payment date. The Trustee shall maintain a record of the amount and date of any payment of principal and/or interest on the Bonds (whether at the maturity date or the redemption date prior to maturity or upon the maturity thereof by declaration or otherwise).

Section 203.    Execution; Limited Obligation.  The Bonds shall be executed on behalf of the Issuer by the manual or facsimile signature of its Chairman or Vice Chairman and the Issuer's corporate seal shall be affixed thereto or printed or otherwise reproduced thereon and attested by the manual or facsimile signature of its Secretary.  If any officer of the Issuer who shall have executed any Bond shall cease to be such officer before the Bond so executed (by manual or facsimile signature) shall be authenticated and delivered by the Trustee, such Bond nevertheless may be authenticated and delivered as though the person who executed such Bond had not ceased to be such officer of the Issuer, and also any Bond may be executed on behalf of the Issuer by such persons as at the actual time of such execution of such Bond shall be the proper officers of the Issuer, although at the date of such Bond such persons may not have been officers of the Issuer.

The obligation of the Issuer to pay the Bonds and the interest thereon shall not be a general obligation of the Issuer but shall be a limited obligation which shall be payable from, and wholly secured by, the Trust Estate.  The Bonds will constitute only a limited obligation of the Issuer and will be payable solely from the Pledged Revenues to be assigned and pledged to the payment thereof and will not constitute a debt or a general obligation or a pledge of the faith and credit of the State of Alabama or any political subdivision thereof, including the City of Mobile, Alabama ("City"), and will not directly, indirectly, or contingently obligate said State or any political subdivision thereof, including said City, to levy or to pledge any form of taxation whatever for the payment thereof.

Section 204.    Authentication.    Only such Bonds as shall have endorsed thereon a certificate of authentication substantially in the form hereinafter set forth executed by the Trustee shall be entitled to any right or benefit hereunder.  No Bond shall be valid or obligatory for any purpose unless and until such certificate of authentication shall have been executed by the Trustee, and such executed certificate of the Trustee upon any such Bond shall be conclusive evidence that such Bond has been authenticated and delivered hereunder.  Said certificate of authentication on any Bond shall be deemed to have been executed by the Trustee if signed by an authorized officer of the Trustee, but it shall not be necessary that the same officer sign the certificate of authentication on all of the Bonds issued hereunder.

- 17 -

Section 205.   Form of Bonds.  The Bonds, the Trustee's certificate of authentication, and the form of assignment shall, at the Trustee's discretion, be in substantially the forms and format hereinafter set forth (the Series A Bond form is followed by the Series B Bond form) with such appropriate variations, omissions, substitutions and insertions as are permitted or required hereby and may have such letters, numbers or other marks of identification and such legends and endorsements placed thereon, as may be required to comply with any applicable laws or rules or regulations, or as may, consistently herewith, be determined by the officers executing such Bonds, as evidenced by their execution of the Bonds:

UNITED STATES OF AMERICA

STATE OF ALABAMA

THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND)
FIRST MORTGAGE HEALTHCARE FACILITY REVENUE BONDS
(BAMA OAKS RETIREMENT, LLC PROJECT II), SERIES 2012A

No. _____          Interest Rate: 7.00% and 7.25%

Dated: November __, 2012          Maturity Date: November 1, 2042

Cusip Number: _____

Principal Amount: Five Million One Hundred Ten Thousand Dollars ($5,110,000)

Registered Owner:_____

FOR VALUE RECEIVED, The Medical Clinic Board of the City of Mobile (Second) (the "Issuer"), a public corporation and instrumentality created and existing pursuant to Section 11-58-1 *et seq.*, of *Code of Alabama* (1975), as amended, and other applicable provisions of law (the "Act"), hereby promises to pay, on the date hereinabove set forth, to the Registered Owner identified above, or registered assigns, on the Maturity Date identified above, the Principal Amount identified above, solely from the Pledged Revenues (defined in the Indenture) hereinafter described and from no other sources, and to pay to the registered owner hereof solely from said Pledged Revenues, interest on said principal sum at the interest rate set forth above (computed on the basis of a 360-day year, 30-day month), payable monthly on each interest payment date, commencing February 1, 2013, from the latest interest payment date to which interest has been paid or duly provided for, or from the original issue date set forth above, until this Series 2012A Bond has been fully paid. Upon a Determination of Taxability (as defined in the Indenture) this Series 2012A Bond shall bear interest, commencing from and after the Event of Taxability (as defined in the Indenture) equal to twelve percent (12%) per annum (the "Taxable Rate"). This Series 2012A Bond shall bear interest on overdue installments of interest and other amounts payable hereunder, for each day until paid at the rate of interest borne by this Series 2012A Bond. This Bond shall bear interest from the date hereof until payment in full of the principal amount hereof.

- 19 -

The first payment of interest on this Series 2012A Bond shall be due on the interest payment date next succeeding the date hereof unless this Series 2012A Bond is dated on an interest payment date, in which case the first payment of interest hereon shall be due on the next succeeding interest payment date, or unless this Series 2012A Bond is dated after a record date but before the next interest payment date, in which case the first payment of interest hereon shall be due on the second succeeding interest payment date. The interest to be paid on an interest payment date shall be computed from the date on which interest was last paid on this Series 2012A Bond or, if interest has not previously been paid on this Series 2012A Bond, from the date of original issuance and delivery hereof. As used herein, the term "interest payment date" means the first day of each consecutive month, commencing February 1, 2013, of each consecutive year from 2013, with the final scheduled interest payment date being the due date indicated on the face of this Series 2012A Bond.

The principal of this Series 2012A Bond shall be payable in lawful money of the United States of America at the corporate trust office of BOKF, NA dba Bank of Oklahoma, as trustee (the "Trustee") under the Indenture (hereinafter defined), upon surrender hereof and the interest hereon shall be payable by check drawn upon the Trustee and mailed on each interest payment date to the Bondholder at his address as it appears on the Series 2012A Bond registration books to be kept by the Trustee as of the close of business on the fifteenth day of the calendar month next preceding each interest payment date. Payment of and interest on this Series 2012A Bond shall be in any coin or currency of the United States of America as, at the respective times of payment, shall be legal tender for the payment of public and private debts.

Anything herein or in said Indenture to the contrary notwithstanding, the obligation of the Issuer hereunder and under said Indenture shall be subject to the limitation that payments of interest to the holder of this Series 2012A Bond shall not be required to the extent that the receipt of any such payment by the holder of this Series 2012A Bond would be contrary to the provisions of law applicable to such holder which limit the maximum rate of interest which may be charged or collected by such holder.

This Series 2012A Bond is one of a series in the aggregate principal amount of $5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012A (the "Series 2012A Bonds" or the "Bonds"), of like tenor except as to numbers and denominations issued under and secured by a Trust Indenture, dated as of November 1, 2012, between the Issuer and the Trustee (the "Indenture"), and a resolution by the Issuer adopted on November 26, 2012 for the purpose of financing, in whole or in part, of (i) the acquisition and rehabilitation of the existing 88-unit independent living facility located at 3145 Knollwood Drive, Mobile, Alabama 36693 (the "Facility"); (ii) the funding of various trust funds with the Trustee; and (iii) the payment of costs of issuance with respect to the Bonds (the "Project"). This Series 2012A Bond is issued on a parity basis with those certain $630,000 The Medical Clinic Board of the City of

Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Taxable Series 2012B, also issued under the Indenture.

THIS SERIES 2012A BOND AND THE REDEMPTION PREMIUM (IF ANY) AND THE INTEREST HEREON SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR A GENERAL OBLIGATION OR A PLEDGE OF THE FAITH AND CREDIT OF THE ISSUER, CITY OF MOBILE, ALABAMA, THE STATE OF ALABAMA OR OF ANY POLITICAL SUBDIVISION OF THE STATE, AND DOES NOT DIRECTLY, INDIRECTLY OR CONTINGENTLY OBLIGATE ISSUER, SAID CITY, SAID STATE, OR ANY POLITICAL SUBDIVISION OF THE STATE TO LEVY OR TO PLEDGE ANY FORM OF TAXATION WHATEVER FOR THE PAYMENT OF SUCH PRINCIPAL, REDEMPTION PREMIUM (IF ANY) AND INTEREST. NEITHER THE ISSUER, THE STATE OF ALABAMA, MOBILE COUNTY, NOR THE CITY OF MOBILE IS OBLIGATED TO PAY THE PRINCIPAL OR REDEMPTION PRICE, IF ANY, OF, OR INTEREST ON, THIS SERIES 2012A BOND as this Series 2012A Bond is a special, limited obligation of the Issuer and is payable solely from the "Pledged Revenues" (as defined in the Indenture). This Series 2012A bond does not now and never shall constitute a charge against the general credit of the Issuer, and/or the City of Mobile, Alabama. The Issuer has no taxing power. No holder of this Series 2012A Bond shall ever have the right to compel the exercise of the taxing power of the State of Alabama or any political subdivision thereof, or the City of Mobile, Alabama, or to pay this Series 2012A Bond or the redemption premium (if any) or the interest hereon or any other cost incident thereto, or to enforce payment hereof against any property of said City or said State or any political subdivision thereof. No recourse shall be had for the payment of the principal of, or the redemption premium (if any) or the interest on, this Series 2012A Bond against any officer or director of the Issuer.

This Series 2012A Bond is issued and the Indenture was authorized, executed and delivered by the Issuer under and pursuant to the Constitution and laws of the State of Alabama, including particularly the Act. Prior to the issuance hereof, the Issuer entered into a Lease Agreement, dated as of the date of the Indenture (the "Lease Agreement"), with Bama Oaks Retirement, LLC, a Georgia limited liability company (the "Lessee"), pursuant to the terms of which the Lessee has agreed to pay to the Issuer such amounts as will be fully sufficient to pay the principal of, and the redemption premium (if any) and the interest on, the Bonds as the same become due and to pay certain administrative expenses in connection with the Bonds.

As security for the payments required to be made under the Lease Agreement, the Issuer has conveyed first security title to that portion of the Project consisting of real property, all improvements thereon, and certain personal property pursuant to the terms of a Mortgage and Security Agreement (the "Security Agreement"), dated the date of the Indenture.

-21-

In addition, a Debt Service Reserve Fund, initially containing $476,117, has been created to secure the payment of the Bonds, all as more particularly set forth in the Indenture.

As additional security for the payment of the Bonds, all right, title and interest of the Issuer in (a) the Lease Agreement and the Security Agreement (except certain rights reserved by the Issuer under the terms of the Indenture), together with the Lease Agreement and the Security Agreement, (b) the Pledged Revenues, and (c) all amounts on deposit from time to time in the "Project Fund" (defined in the Indenture), have been assigned to the Trustee under the Indenture and pledged to the payment of the principal of, and the redemption premium (if any) and the interest on, the Bonds.

Reference to the Indenture is hereby made for a description of the aforesaid Project Fund which is charged with, and pledged to, the payment of the principal of, and the redemption premium (if any) and the interest on, the Bonds, the nature and extent of the security, the rights, duties and obligations of the Issuer, the Lessee, and the Trustee, the rights of the holders of the Bonds, the terms and conditions under and upon the occurrence of which the Indenture, the Lease Agreement, and the Security Agreement may be modified and the terms and conditions under and upon the occurrence of which the lien of the Indenture may be defeased as to this Series 2012A Bond prior to the maturity or redemption date hereof, to all of the provisions of which the holder hereof, by the acceptance of this Series 2012A Bond, assents.

IT IS HEREBY CERTIFIED AND RECITED that all acts, conditions and things required by the Constitution and laws of the State of Alabama to happen, exist and be performed precedent to and in the issuance of this Series 2012A Bond, the execution of the Indenture and the adoption of the aforesaid resolution by the Issuer, have happened, exist and have been performed in due time, form and manner as required by law.

This Series 2012A Bond shall not be entitled to any benefit under the Indenture and shall not become valid or obligatory for any purpose until it shall have been authenticated by execution by the Trustee by manual signature of the certificate hereon endorsed.

IN WITNESS WHEREOF, The Medical Clinic Board of the City of Mobile (Second) caused this Series 2012A Bond to be executed with the manual or duly authorized reproduced facsimile signature of its Chairman, and the reproduced facsimile of its corporate seal to be imprinted hereon and attested by the manual or duly authorized reproduced facsimile signature of its Secretary.

THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND)

(SEAL)

By: _____
　　　　　　Chairman

ATTEST:

_____
Secretary

-23-

* * * * * * *

FORM OF REVERSE OF BOND

This Series 2012A Bond is transferable by the Bondholder in person or by his attorney duly authorized in writing at the principal corporate trust office or agency of the Trustee, in Tulsa, Oklahoma, all subject to the terms and conditions provided in the Indenture.

The Bonds, upon the surrender thereof at the principal corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee executed by the Bondholder or his duly authorized attorney, may, at the option of the Bondholder, be exchanged for an equal aggregate principal amount of Bonds of any other authorized denomination, in the manner and subject to the conditions provided in the Indenture.

The Trustee shall not be required to transfer or exchange any Series 2012A Bond after the giving of notice calling such Series 2012A Bond for redemption or partial redemption has been made.

The Trustee may require payment of a service charge for any exchange or transfer of Series 2012A Bonds, together with any tax or other governmental charges required to be paid with respect to the Series 2012A Bond(s), and the same shall be paid by the holder of the Bond requesting such transfer or exchange as a condition precedent to the exercise of such privilege.

This Series 2012A Bond is issued with the intent that the laws of the State of Alabama shall govern its construction.

The Bonds may be called for redemption prior to maturity in the event the Lessee is required to prepay the installment amounts called for in the Lease Agreement under the circumstances set forth in Sections 7.1 or 7.2 (i.e., after a Determination of Taxability) of the Lease Agreement.

If called for redemption prior to maturity as provided in the preceding paragraph, the Series 2012A Bonds may be redeemed in whole at any time on any interest payment date, at a redemption price equal to the principal amount of each Bond to be redeemed plus accrued interest or interest due thereon for the Series 2012A Bonds at the Taxable Rate and on such redemption date, and following the Determination of Taxability at a redemption price equal to:

-24-

(A)    the principal amount of each Bond to be redeemed plus accrued interest thereon to the redemption date; plus

(B)    an amount equal to any interest, penalties on overdue interest and additions to tax as referred to in Subchapter A of Chapter 68 of the Code owing by any holder of a Bond; plus

(C)    all fees and expenses of the Issuer and Trustee incurred in connection with the redemption described above.

The Series 2012A Bonds are subject to mandatory redemption at any time, in whole or in part, at a price of one hundred percent (100%) of the principal amount of the Series 2012A Bonds to be redeemed together with accrued interest to the date of redemption, in the event of condemnation of the Project or any part thereof, any damage or destruction of the Project or any part thereof within 90 days after the Lessee has determined that the Project cannot be restored or rebuilt.

<u>OPTIONAL REDEMPTION</u>

The Series 2012A Bonds are subject to redemption prior to maturity on or after November 1, 2014 in whole at any time or in part on any Interest Payment Date, at the redemption prices (expressed as percentages of principal amount) set forth in the table below plus accrued interest or interest due thereon on such redemption date; provided that no partial redemption may be made unless all debt service on the Series 2012A Bonds and Series 2012B Bonds shall have been paid on the due date.

| Dates of Redemption Inclusive | Redemption Prices |
|---|---|
| From September 1, 2014 through August 31, 2015 | 103% |
| From September 1, 2015 through August 31, 2016 | 102% |
| From September 1, 2016 through August 31, 2017 | 101% |
| From September 1, 2017 and thereafter | 100% |

## MANDATORY SINKING FUND REDEMPTION

The Series 2012A Bonds maturing are subject to mandatory sinking fund redemption prior to maturity, with Section 304 of the Indenture, in part, at a redemption price equal to 100% of the principal amount of each Series 2012A Bond to be redeemed, plus the interest due thereon on the redemption date, in the following amounts and on the dates set forth below:

### Series 2012A Term Bonds Maturing November 1, 2027

| Bond Year Ending November 1 | Principal Amount Due November 1 of Each Year |
|---|---|
| 2021 | $100,000 |
| 2022 | $110,000 |
| 2023 | $115,000 |
| 2024 | $125,000 |
| 2025 | $135,000 |
| 2026 | $145,000 |
| 2027 (Maturity) | $155,000 |

### Series 2012A Term Bonds Maturing November 1, 2042

| Bond Year Ending November 1 | Principal Amount Due November 1 of Each Year |
|---|---|
| 2028 | $165,000 |
| 2029 | $175,000 |
| 2030 | $190,000 |
| 2031 | $205,000 |
| 2032 | $220,000 |
| 2033 | $235,000 |
| 2034 | $250,000 |
| 2035 | $270,000 |
| 2036 | $290,000 |
| 2037 | $310,000 |
| 2038 | $330,000 |
| 2039 | $355,000 |
| 2040 | $380,000 |
| 2041 | $410,000 |
| 2042 (Maturity) | $440,000 |

Generally, in the event of a partial redemption of Series 2012 Bonds, the amount of future mandatory sinking fund redemptions with respect to the Series 2012 Bonds will be reduced to take into account such partial redemption in inverse order of redemption dates.

The Lessee may purchase, and deliver to the Trustee for cancellation, Series 2012 Bonds in any aggregate principal amount and receive at 100% of such principal amount, a credit against mandatory sinking fund payments next coming due in respect of such Series 2012 Bonds.

## EXTRAORDINARY REDEMPTION

The Bonds are subject to redemption in whole, at any time, at a redemption price equal to 100% of the principal amount of each Bond redeemed, as of the redemption date, plus accrued interest to the redemption date, from and to the extent of the property or title insurance proceeds, condemnation awards or proceeds of any conveyance in lieu of condemnation, which are directed to be applied to the redemption of Bonds pursuant to Section 301 of the Indenture.

The person in whose name this Series 2012A Bond is registered shall be deemed and regarded as the absolute owner hereof for all purposes, and payment of or on account of either principal or interest made to such registered holder shall be valid and effectual to satisfy and discharge the liability upon this Series 2012A Bond to the extent of the sum or sums so paid.

The particular Series 2012A Bond of this series, or portion thereof in the case of certain Series 2012A Bonds of a principal amount greater than $5,000 to be redeemed in the case of a partial redemption under any of the provisions of the Indenture, shall be selected by the Trustee by lot in such manner as may be determined by the Trustee. Any partial redemption shall be in multiples of $5,000.

Written notice of the redemption in whole or in part of this Series 2012A Bond shall be given by the Trustee by first class mail, postage prepaid, mailed not less than thirty or more than sixty days prior to the redemption date to the Bondholder at the last address shown on the registration book kept by the Trustee.

Upon deposit with the Trustee of the moneys required to effect any redemption, the Bonds or portion thereof thus called and provided for shall not bear interest after the redemption date and shall not be considered to be outstanding or to have any other rights under the Indenture other than the right to receive payment.

By the acceptance of this Series 2012A Bond, the Bondholder agrees that if less than the entire principal amount of this Series 2012A Bond is to be redeemed, payment of the redemption price will be made only upon the surrender of this Series 2012A Bond to the Trustee. Upon surrender hereof, there shall be issued to the Bondholder, without charge to the Bondholder therefor, for the unredeemed balance hereof, a Bond or Bonds in any of the authorized denominations as more fully set out in the Indenture.

-27-

The holder of this Series 2012A Bond shall have no right to enforce the provisions of the Indenture or to institute action to enforce the agreements therein, or to take any action with respect to any "event of default" as defined in the Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Indenture. The stated maturity of this Series 2012A Bond and the stated dates for the payment of interest may be accelerated upon the occurrence of certain "events of default" as defined in the Indenture. The occurrence of certain other such "events of default" will permit the acceleration of the stated maturity of this Series 2012A Bond and the stated dates for the payment of interest as provided in the Indenture. Modifications, amendments or supplements to the Indenture may be made only to the extent and in the circumstances permitted by the Indenture.

\* \* \* \* \* \* \* \*

FORM OF TRUSTEE'S AUTHENTICATION CERTIFICATE
TO APPEAR ON FACE OF BOND

TRUSTEE'S AUTHENTICATION CERTIFICATE


The above Series 2012A Bond is one of the Bonds described in the within-mentioned Trust Indenture, and is hereby authenticated as of the date set forth below.



BOKF, NA DBA BANK OF OKLAHOMA,
as Trustee



By: _____
Authozied Officer


Authentication Date:_____

-29-

\* \* \* \* \* \* \*

FORM OF ASSIGNMENT
TO APPEAR ON REVERSE OF BOND

FORM OF ASSIGNMENT


FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____
_____
_____
_____
_____

the within Series 2012A Bond of The Medical Clinic Board of the City of Mobile (Second) and does hereby constitute and appoint _____ attorney to transfer the said Bond on the books of the within named Issuer, with full power of substitution in the premises.


Dated:

In the presence of:          _____
                                            Bondholder

Signature Guarantee


_____

Medallion Stamp


(END OF FORM OF BOND)

UNITED STATES OF AMERICA
STATE OF ALABAMA
THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND)
FIRST MORTGAGE HEALTHCARE FACILITY REVENUE BONDS
(BAMA OAKS RETIREMENT, LLC PROJECT II), TAXABLE SERIES 2012B

No. _____    Interest Rate: 8.75%

Dated: November __, 2012    Maturity Date: November 1, 2020

Cusip Number: _____

Principal Amount: Six Hundred Thirty Thousand Dollars ($630,000)

Registered Owner:_____


   FOR VALUE RECEIVED, The Medical Clinic Board of the City of Mobile (Second) (the "Issuer"), a public corporation and instrumentality created and existing pursuant to Section 11-58-1 *et seq.*, of *Code of Alabama* (1975), as amended, and other applicable provisions of law (the "Act"), hereby promises to pay, on the date hereinabove set forth, to the Registered Owner identified above, or registered assigns, on the Maturity Date identified above, the Principal Amount identified above, solely from the Pledged Revenues (defined in the Indenture) hereinafter described and from no other sources, and to pay to the registered owner hereof solely from said Pledged Revenues, interest on said principal sum at the interest rate set forth above (computed on the basis of a 360-day year, 30-day month), payable monthly, on each interest payment date, commencing on February 1, 2013, from the latest interest payment date to which interest has been paid or duly provided for, or from the original issue date set forth above, until this Series 2012B Bond has been fully paid. This Series 2012B Bond shall bear interest on overdue installments of interest and other amounts payable hereunder, for each day until paid at the rate of interest borne by this Series 2012B Bond. This Series 2012B Bond shall bear interest from the date hereof until payment in full of the principal amount hereof.

   The first payment of interest on this Series 2012B Bond shall be due on the interest payment date next succeeding the date hereof unless this Series 2012B Bond is dated on an interest payment date, in which case the first payment of interest hereon shall be due on the next succeeding interest payment date, or unless this Series 2012B Bond is dated after a record date but before the next interest payment date, in which case the first payment of interest hereon shall be due on the second succeeding interest payment date. The interest to be paid on an interest payment date shall be computed from the date through which interest was last paid on this Series 2012B Bond or, if interest has not previously been paid on this Series 2012B Bond, from the date of original issuance and delivery hereof. As used herein, the term "interest payment date" means the first day of each consecutive month, commencing February 1, 2013 of each consecutive year

-31-

from 2012, with the final scheduled interest payment date being the due date indicated on the face of this Series 2012B Bond.

The principal of this Series 2012B Bond shall be payable in lawful money of the United States of America at the principal office of BOKF, NA dba Bank of Oklahoma, Tulsa, Oklahoma, as trustee (the "Trustee") under the Indenture (hereinafter defined), upon surrender hereof and the interest hereon shall be payable by check drawn upon the Trustee and mailed on each interest payment date to the Bondholder at his address as it appears on the Bond registration books to be kept by the Trustee as of the close of business on the fifteenth day of the calendar month next preceding each interest payment date. Payment of and interest on this Series 2012B Bond shall be in any coin or currency of the United States of America as, at the respective times of payment, shall be legal tender for the payment of public and private debts.

Anything herein or in said Indenture to the contrary notwithstanding, the obligation of the Issuer hereunder and under said Indenture shall be subject to the limitation that payments of interest to the holder of this Series 2012B Bond shall not be required to the extent that the receipt of any such payment by the holder of this Series 2012B Bond would be contrary to the provisions of law applicable to such holder which limit the maximum rate of interest which may be charged or collected by such holder.

This Series 2012B Bond is one of a series in the aggregate principal amount of $630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Taxable Series 2012B (the "Series 2012B Bonds"), of like tenor except as to numbers and denominations issued under and secured by a Trust Indenture, dated as of November 1, 2012, between the Issuer and the Trustee (the "Indenture"), and a resolution of the Issuer adopted on November 26, 2012, for the purpose of financing, in whole or in part, of (i) the acquisition and rehabilitation of the existing 88-unit independent living facility located at 3145 Knollwood Drive, Mobile, Alabama 36693 (the "Facility"); (ii) the funding of various trust funds with the Trustee; and (iii) the payment of costs of issuance with respect to the Bonds (the "Project"). This Series 2012B Bond is issued on a parity basis with those certain $5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project), Series 2012A (the "Series 2012A Bonds"), also issued under the Indenture.

THIS SERIES 2012B BOND AND THE REDEMPTION PREMIUM (IF ANY) AND THE INTEREST HEREON SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR A GENERAL OBLIGATION OR A PLEDGE OF THE FAITH AND CREDIT OF THE ISSUER, CITY OF MOBILE, ALABAMA, THE STATE OF ALABAMA OR OF ANY POLITICAL SUBDIVISION OF THE STATE, AND DOES NOT DIRECTLY, INDIRECTLY OR CONTINGENTLY OBLIGATE ISSUER, SAID CITY, SAID STATE, OR ANY POLITICAL SUBDIVISION OF THE STATE TO LEVY OR TO PLEDGE ANY FORM OF TAXATION WHATEVER FOR THE PAYMENT OF SUCH PRINCIPAL, REDEMPTION PREMIUM (IF ANY) AND INTEREST. NEITHER THE ISSUER, THE STATE OF ALABAMA, MOBILE COUNTY, NOR THE CITY OF MOBILE IS OBLIGATED TO PAY THE PRINCIPAL OR REDEMPTION PRICE, IF ANY, OF, OR INTEREST ON, THIS

SERIES 2012B BOND as this Series 2012B Bond is a special, limited obligation of the Issuer and is payable solely from the "Pledged Revenues" (as defined in the Indenture). This Series 2012B bond does not now and never shall constitute a charge against the general credit of the Issuer, and/or the City of Mobile, Alabama. The Issuer has no taxing power. No holder of this Series 2012B Bond shall ever have the right to compel the exercise of the taxing power of the State of Alabama or any political subdivision thereof, or the City of Mobile, Alabama, to pay this Series 2012B Bond or the redemption premium (if any) or the interest hereon or any other cost incident thereto, or to enforce payment hereof against any property of said City or said State or any political subdivision thereof. No recourse shall be had for the payment of the principal of, or the redemption premium (if any) or the interest on, this Series 2012B Bond against any officer or director of the Issuer.

This Series 2012B Bond is issued and the Indenture was authorized, executed and delivered by the Issuer under and pursuant to the Constitution and laws of the State of Alabama, including particularly the Act. Prior to the issuance hereof, the Issuer entered into a Lease Agreement, dated the date of the Indenture (the "Lease Agreement"), with Bama Oaks Retirement, LLC, a Georgia limited liability company (the "Lessee"), pursuant to the terms of which the Lessee has agreed to pay to the Issuer such amounts as will be fully sufficient to pay the principal of, and the redemption premium (if any) and the interest on, the Bonds as the same become due and to pay certain administrative expenses in connection with the Bonds.

As security for the payments required to be made under the Lease Agreement, the Issuer has conveyed first security title to that portion of the Project consisting of real property, all improvements thereon, and certain personal property pursuant to the terms of a Mortgage and Security Agreement (the "Security Agreement"), dated the date of the Indenture.

In addition, a Debt Service Reserve Fund, initially containing $476,117, has been created to secure the payment of the Bonds, all as more particularly set forth in the Indenture.

As additional security for the payment of the Bonds, all right, title and interest of the Issuer in (a) the Lease Agreement and the Security Agreement (except certain rights reserved by the Issuer under the terms of the Indenture), together with the Lease Agreement and the Security Agreement, (b) the Pledged Revenues, and (c) all amounts on deposit from time to time in the "Project Fund" (defined in the Indenture), have been assigned to the Trustee under the Indenture and pledged to the payment of the principal of, and the redemption premium (if any), and the interest on the Bonds.

Reference to the Indenture is hereby made for a description of the aforesaid Project Fund which is charged with, and pledged to, the payment of the principal of, and the redemption premium (if any) and the interest on, the Bonds, the nature and extent of the security, the rights, duties and obligations of the Issuer, the Lessee, and the Trustee, the rights of the holders of the Bonds, the terms and conditions under and upon the occurrence of which the Indenture, the Lease Agreement, and the Security Agreement may be modified and the terms and conditions under and upon the occurrence of which the lien of the Indenture may be defeased as to this

-33-

Series 2012B Bond prior to the maturity or redemption date hereof, to all of the provisions of which the holder hereof, by the acceptance of this Series 2012B Bond, assents.

IT IS HEREBY CERTIFIED AND RECITED that all acts, conditions and things required by the Constitution and laws of the State of Alabama to happen, exist and be performed precedent to and in the issuance of this Series 2012B Bond, the execution of the Indenture and the adoption of the aforesaid resolution by the Issuer, have happened, exist and have been performed in due time, form and manner as required by law.

This Series 2012B Bond shall not be entitled to any benefit under the Indenture and shall not become valid or obligatory for any purpose until it shall have been authenticated by execution by the Trustee by manual signature of the certificate hereon endorsed.

IN WITNESS WHEREOF, The Medical Clinic Board of the City of Mobile (Second) has caused this Series 2012B Bond to be executed with the manual or duly authorized reproduced facsimile signature of its Chairman, and the reproduced facsimile of its corporate seal to be imprinted hereon and attested by the manual or duly authorized reproduced facsimile signature of its Secretary.

THE MEDICAL CLINIC BOARD OF THE CITY
OF MOBILE (SECOND)


(SEAL)                    By: _____
                               Chairman

ATTEST:


_____
Secretary

\* \* \* \* \* \* \*

## FORM OF REVERSE OF BOND

This Series 2012B Bond is transferable by the Bondholder in person or by his attorney duly authorized in writing at the principal corporate trust office or agency of the Trustee, in Tulsa, Oklahoma, all subject to the terms and conditions provided in the Indenture.

The Bonds, upon the surrender thereof at the principal corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee executed by the Bondholder or his duly authorized attorney, may, at the option of the Bondholder, be exchanged for an equal aggregate principal amount of Bonds of any other authorized denomination, in the manner and subject to the conditions provided in the Indenture.

The Trustee shall not be required to transfer or exchange any Bond after the giving of notice calling such Bond for redemption or partial redemption has been made.

The Trustee may require payment of a service charge for any exchange or transfer of Series 2012B Bonds, together with any tax or other governmental charges required to be paid with respect to the Series 2012B Bond(s), and the same shall be paid by the holder of the Bond requesting such transfer or exchange as a condition precedent to the exercise of such privilege.

## OPTIONAL REDEMPTION

The Series 2012B Bonds are subject to redemption prior to maturity on or after November 1, 2014 in whole at any time or in part on any Interest Payment Date, at the redemption prices (expressed as percentages of principal amount) set forth in the table below plus accrued interest or interest due thereon on such redemption date; provided that no partial redemption may be made unless all debt service on the Series 2012B Bonds shall have been paid on the due date.

| Dates of Redemption Inclusive | Redemption Prices |
|---|---|
| From September 1, 2014 through August 31, 2015 | 103% |
| From September 1, 2015 through August 31, 2016 | 102% |
| From September 1, 2016 through August 31, 2017 | 101% |
| From September 1, 2017 and thereafter | 100% |

-35-

## MANDATORY SINKING FUND REDEMPTION

### Series 2012B Term Bonds Maturing November 1, 2020

The Series 2012B Bonds maturing November 1, 2020, will be subject to mandatory sinking fund redemption prior to maturity, on November 1 of the years and in the amounts set forth in the table below, at a redemption price equal to 100% of the principal amount thereof plus accrued interest to the redemption date:

| 2016 | $100,000 | 2019 | $140,000 |
| 2017 | $110,000 | 2020 (Maturity)* | $150,000 |
| 2018 | $130,000 | | |

*Maturity

Generally, in the event of a partial redemption of Series 2012 Bonds, the amount of future mandatory sinking fund redemptions with respect to the Series 2012 Bonds will be reduced to take into account such partial redemption in inverse order of redemption dates.

The Lessee may purchase, and deliver to the Trustee for cancellation, Series 2012 Bonds in any aggregate principal amount and receive at 100% of such principal amount, a credit against mandatory sinking fund payments next coming due in respect of such Series 2012 Bonds

## EXTRAORDINARY REDEMPTION

The Bonds are subject to redemption in whole, at any time, at a redemption price equal to 100% of the principal amount of each Bond redeemed, as of the redemption date, plus accrued interest to the redemption date, from and to the extent of the property or title insurance proceeds, condemnation awards or proceeds of any conveyance in lieu of condemnation, which are directed to be applied to the redemption of Bonds pursuant to Section 301 of the Indenture.

This Series 2012B Bond is issued with the intent that the laws of the State of Alabama shall govern its construction.

The person in whose name this Series 2012B Bond is registered shall be deemed and regarded as the absolute owner hereof for all purposes, and payment of or on account of either principal or interest made to such registered holder shall be valid and effectual to satisfy and discharge the liability upon this Series 2012B Bond to the extent of the sum or sums so paid.

The particular Bond of this series, or portion thereof in the case of certain Bonds of a principal amount greater than $5,000 to be redeemed in the case of a partial redemption under any of the provisions of the Indenture, shall be selected by the Trustee by lot or at the discretion of the Trustee with the lowest numbers being chosen first. Any partial redemption shall be in multiples of $5,000 in excess thereof.

Written notice of the redemption in whole or in part of this Series 2012B Bond shall be given by the Trustee by first class mail, postage prepaid, mailed not less than thirty or more than sixty days prior to the redemption date to the Bondholder at the last address shown on the registration book kept by the Trustee.

Upon deposit with the Trustee of the moneys required to effect any redemption, the Bonds or portion thereof thus called and provided for shall not bear interest after the redemption date and shall not be considered to be outstanding or to have any other rights under the Indenture other than the right to receive payment.

By the acceptance of this Series 2012B Bond, the Bondholder agrees that if less than the entire principal amount of this Series 2012B Bond is to be redeemed, payment of the redemption price will be made only upon the surrender of this Series 2012B Bond to the Trustee. Upon surrender hereof, there shall be issued to the Bondholder, without charge to the Bondholder therefor, for the unredeemed balance hereof, a Bond or Bonds in any of the authorized denominations as more fully set out in the Indenture.

The holder of this Series 2012B Bond shall have no right to enforce the provisions of the Indenture or to institute action to enforce the agreements therein, or to take any action with respect to any "event of default" as defined in the Indenture, or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Indenture. The stated maturity of this Series 2012B Bond and the stated dates for the payment of interest may be accelerated upon the occurrence of certain "events of default" as defined in the Indenture. The occurrence of certain other such "events of default" will permit the acceleration of the stated maturity of this Series 2012B Bond and the stated dates for the payment of interest as provided in the Indenture. Modifications, amendments or supplements to the Indenture may be made only to the extent and in the circumstances permitted by the Indenture.

FORM OF TRUSTEE'S AUTHENTICATION CERTIFICATE
TO APPEAR ON FACE OF BOND

TRUSTEE'S AUTHENTICATION CERTIFICATE

The above Series 2012B Bond is one of the Bonds described in the within-mentioned Trust Indenture, and is hereby authenticated as of the date set forth below.

BOKF, NA DBA BANK OF OKLAHOMA,
as Trustee

By: _____
      Authorized Officer

Authentication Date: _____

\* \* \* \* \* \* \*

-38-

FORM OF ASSIGNMENT
TO APPEAR ON REVERSE OF BOND

FORM OF ASSIGNMENT


FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto


PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE


_____
_____
_____
_____
_____


the within Bond of The Medical Clinic Board of the City of Mobile (Second), and does hereby constitute and appoint _____, attorney to transfer the said Bond on the books of the within named Issuer, with full power of substitution in the premises.


Dated:

In the presence of:          _____
                                          Bondholder

Signature Guarantee


_____

Medallion Stamp


END OF FORM OF BOND


-39-

Section 206.   Delivery of Bonds.  Upon the execution and delivery hereof, the Issuer shall execute the Bonds and deliver them to the Trustee, and the Trustee shall authenticate the Bonds and deliver them to the purchaser or purchasers as shall be directed by the Issuer as hereinafter in this Section provided.

Prior to the delivery by the Trustee of any of the Bonds there shall be filed or presumed to be filed with the Trustee:

(a)     A copy, certified by the Secretary of the Issuer of all resolutions adopted and proceedings had by the Issuer authorizing the issuance of the Bonds, including the resolution authorizing the execution, delivery and performance of this Indenture, the Lease Agreement, the Security Agreement, and the Bond Purchase Agreement;

(b)     An original executed counterpart of this Indenture, the Lease Agreement, the Security Agreement and the Bond Purchase Agreement;

(c)     Copies of the Financing Statements filed to perfect the security interests;

(d)     An original executed counterpart of the certification of the Issuer establishing its reasonable expectations to the effect that the Bonds will not be "arbitrage bonds" within the meaning of Section 148 of the Code, together with an opinion of Sell & Melton, L.L.P., Bond Counsel, to the effect that the Bonds are not "arbitrage bonds";

(e)     An opinion of Counsel for the Lessee to the effect that the Lease Agreement, the Bond Purchase Agreement and the Security Agreement have been duly authorized, executed and delivered by the Lessee and enforceable according to their terms;

(f)     An opinion of Sell & Melton, L.L.P., Bond Counsel, to the effect that the Bonds have been duly authorized, executed and delivered by the Issuer and constitute legal, valid, binding and enforceable limited obligations of the Issuer entitled to the benefits of and secured by this Indenture, and the Security Agreement; and that the Bonds are exempt from registration under the Securities Act of 1933 and the Indenture is exempt from registration under the Trust Indenture Act of 1939;

(g)     A request and authorization to the Trustee on behalf of the Issuer and signed by its Chairman or Vice Chairman to authenticate and deliver the Bonds in such specified denominations as permitted herein to the initial purchaser or purchasers therein identified upon payment to the Trustee, but for the account of the Issuer, of a specified sum of money.  The proceeds from the sale of the Bonds shall be paid over to the Trustee and deposited to the credit of the Project Fund as hereinafter provided in Article VI;

(h)     Certificates of insurance required under Section 5.12 of the Lease Agreement;

-40-

(i)    A written opinion of Bond Counsel to the effect described in the Official Statement;

(j)    An original executed counterpart of the Management Agreement between the Lessee and the Management Company (as described in the Official Statement); and

(k)    A marked-up title commitment for a standard American Land Title Association (ALTA) Issuer and Trustee Title Insurance Policy (1987 edition Form B) insuring the lien of the Trustee under the Security Agreement.

Section 207.    Mutilated, Lost, Stolen or Destroyed Bonds.    If any Bond is mutilated, lost, stolen or destroyed, the Issuer may execute and the Trustee (upon the receipt of a written authorization from the Issuer) may authenticate and deliver a new Bond of the same aggregate principal amount and tenor in lieu of and in substitution for the Bond mutilated, lost, stolen or destroyed; provided that, in the case of any mutilated Bond, such mutilated Bond shall first be surrendered to the Trustee, as Bond Registrar, and in the case of any lost, stolen or destroyed Bond, there shall be first furnished to the Trustee evidence satisfactory to it of the ownership of such Bond and of such loss, theft or destruction, together with indemnity satisfactory to it. If any such Bond shall have matured or a redemption date pertaining thereto shall have passed, instead of issuing a new Bond the Issuer may pay the same without surrender thereof. The Issuer and the Trustee may charge the holder of such Bond with their reasonable fees and expenses in this connection.

Section 208.    Exchangeability and Transfer of Bonds; Persons Treated as Owners.    The Issuer shall cause books for the registration and for the transfer of the Bonds as provided herein to be kept by the Trustee which is hereby constituted and appointed the Bond Registrar of the Issuer.

Bonds may be transferred on the books of registration kept by the Trustee by the holder in person or by his duly authorized attorney, upon surrender thereof, together with a written instrument of transfer executed by the holder or his duly authorized attorney. Upon surrender for transfer of any Bond with all partial redemptions endorsed thereon at the principal office of the Trustee, the Issuer shall execute and the Trustee shall authenticate and deliver in the name of the transferee or transferees a new Bond or Bonds of the same aggregate principal amount and tenor and of any authorized denomination or denominations and numbered consecutively in order of issuance according to the records of the Bond Registrar.

Bonds may be exchanged at the principal office of the Trustee for an equal aggregate principal amount of Bonds of the same aggregate principal amount and tenor and of any authorized denomination or denominations. The Issuer shall execute and the Trustee shall authenticate and deliver Bonds which the Bondholder making the exchange is entitled to receive, bearing numbers not contemporaneously then outstanding.

The Trustee may require payment of a service charge for any exchange or transfer of Bond(s), together with a sum sufficient to cover any taxes or other governmental charges

-41-

required to be paid with respect to the Bonds, and the same shall be paid by the holder of the Bond requesting such transfer or exchange as a condition precedent to the exercise of such privilege.

The Trustee shall not be required to transfer or exchange any Bond after the giving of notice calling such Bond for redemption or partial redemption has been made.

The person in whose name any Bond shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of or on account of either principal or interest shall be made only to or upon the order of the registered owner thereof or his duly authorized attorney, but such registration may be changed as hereinabove provided. All such payments shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

The inclusion of the foregoing provisions shall constitute the appointment of the Trustee as agent for the Issuer to do any and all things necessary to effect any exchange or transfer.

All Bonds issued upon any transfer or exchange of Bonds shall be the legal, valid and binding limited obligations of the Issuer, evidencing the same debt, and entitled to the same security and benefits under this Indenture as the Bonds surrendered upon such transfer or exchange.

Section 209.    Book – Entry – Only System.   The Depository Trust Company ("DTC"), New York, New York, will act as securities depository for the Series 2012 Bonds. The Series 2012 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered certificate will be issued for each maturity of the Series 2012 Bonds, in the aggregate principal amount of such maturity of the Series 2012 Bonds, and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its participants ("Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect

-42-

Participants"). The Rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of Series 2012 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2012 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2012 Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase, but Beneficial Owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2012 Bonds are to be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Series 2012 Bonds, except in the event that use of the book-entry system for the Series 2012 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2012 Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of Series 2012 Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2012 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2012 Bonds are credited, which may or may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. will consent or vote with respect to the Series 2012 Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2012 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal and interest payments on the Series 2012 Bonds will be made to DTC. DTC's practice is immediately to credit Direct Participants' accounts on the payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payable date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Issuer, subject to any statutory and regulatory requirements as may be in effect from time to time. Payment of principal and interest to DTC is the responsibility of the Issuer or the Trustee, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services with respect to the Series 2012 Bonds at any time by giving reasonable notice to the Issuer or to the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, certificates are required to be printed and delivered. The Issuer may decide to discontinue the system of book-entry transfers through DTC (or a successor securities depository). In that event, certificates will be printed and delivered.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Issuer believes to be reliable, but the Issuer takes no responsibility for the accuracy thereof.

ARTICLE III.
REDEMPTION OR PURCHASE OF BONDS BEFORE MATURITY

Section 301.     Redemption Dates and Prices.

EXTRAORDINARY REDEMPTION

The Bonds are subject to redemption in whole, at any time, at a redemption price equal to 100% of the principal amount of each Bond redeemed, as of the redemption date, plus accrued interest to the redemption date, from and to the extent of the property or title insurance proceeds, condemnation awards or proceeds of any conveyance in lieu of condemnation, which are directed to be applied to the redemption of Bonds pursuant to the Indenture in the event: (a) the Facility shall have been damaged or destroyed to such extent that, in the opinion of an independent engineer (expressed in a certificate filed with the Issuer and the Trustee within sixty (60) days after such damage or destruction), (i) the Facility cannot be reasonably restored within a period of three (3) consecutive months from the date of such damage or destruction to the condition thereof immediately preceding such damage or destruction, (ii) the Lessee is thereby prevented or is reasonably expected to be thereby prevented from carrying on its normal operations within the Facility or such portion thereof for a period of one (1) year from the date of such damage or destruction, or (iii) the restoration cost of the Facility or any portion thereof would exceed the total amount of all insurance proceeds, including any deductible amount, in respect to such damage or destruction; or (b) title to, or temporary use of, all or substantially all of the Facility or any portion thereof shall have been taken by condemnation so that in the opinion of an independent engineer (expressed in a certificate filed with the Issuer and the Trustee within sixty (60) days after the date of such taking), the Lessee is thereby prevented from carrying on its normal operations therein for a period of one (1) year from the date of such taking or condemnation.

The Bonds are subject to redemption, in whole, at a redemption price equal to 100% of the principal amount of each Bond redeemed, as of the redemption date, plus accrued interest to the redemption date, in the event there is a change in the Constitution of the United States of America or the State of Alabama or of legislative or executive action of said State or any political subdivision thereof or the United States of America or by final decree or judgment of any court after the contest by the Lessee, the Lease Agreement becomes void or unenforceable or impossible of performance in accordance with the intent and purpose of the parties as expressed

-44-

in the Lease Agreement or unreasonable burdens or excessive liability are imposed upon the Lessee by reason of the operation of the Facility or any portion thereof.

The Bonds are subject to extraordinary redemption prior to maturity in whole or in part, at a Redemption Price equal to 100% of their principal amount, plus interest accrued to the redemption date, at any time, upon the sale of the Facility to a third party purchaser unrelated to the Lessee.

Upon any redemption in part of the Bonds, the Bonds to be redeemed (or purchased in lieu thereof) will be selected by the Trustee by lot in a manner undertaken at the reasonable discretion of the Trustee; provided, however that the portion of any Bond to be redeemed will be in the principal amount of $5,000 or any integral multiple thereof. Any redemption of a part of the Bonds will be applied to reduce the final payment and mandatory sinking fund requirements on the particular series of the Bonds so redeemed in inverse order of payment.

Section 302.    Notice of Redemption.  Notice of redemption shall be given by the Trustee by first class mail, postage prepaid, mailed not less than thirty (30) days or more than sixty (60) days prior to the redemption date to each holder of the Bonds or portions thereof to be redeemed at the last address shown on the registration books kept by the Trustee.  Failure so to mail any such notice to the holder of any Bond or any defect therein shall not affect the validity of the proceedings for such redemption as to the holders of any Bonds to whom notice has been mailed. The Issuer agrees that it will execute and deliver to the Trustee such notice of redemption as may be required to accomplish the same.

Section 303.    Cancellation.  All Bonds which have been surrendered for the purpose of payment, redemption, exchange or transfer shall be cancelled by the Trustee.  No Bonds shall be authenticated in lieu of or in exchange for any Bond cancelled as provided in this Section, except as expressly permitted by this Indenture.  All cancelled Bonds held by the Trustee shall be destroyed by the Trustee.

Section 304.    Mandatory Redemption.  As and for a sinking fund for the retirement of term Bonds, the payments required to be made under the Lease Agreement which are to be deposited into the Bond Fund on or before each November 1 to and including November 1, 2042 (each such day is hereinafter referred to as a "sinking fund payment date"), shall include sufficient moneys to redeem (after credit as provided below) the following amounts:

<u>Series 2012A Term Bonds Maturing November 1, 2027</u>

| Bond Year Ending November 1 | Principal Amount Due November 1 of Each Year |
|---|---|
| 2021 | $100,000 |
| 2022 | $110,000 |
| 2023 | $115,000 |
| 2024 | $125,000 |
| 2025 | $135,000 |
| 2026 | $145,000 |
| 2027 (Maturity) | $155,000 |

<u>Series 2012A Term Bonds Maturing November 1, 2042</u>

| Bond Year Ending November 1 | Principal Amount Due November 1 of Each Year |
|---|---|
| 2028 | $165,000 |
| 2029 | $175,000 |
| 2030 | $190,000 |
| 2031 | $205,000 |
| 2032 | $220,000 |
| 2033 | $235,000 |
| 2034 | $250,000 |
| 2035 | $270,000 |
| 2036 | $290,000 |
| 2037 | $310,000 |
| 2038 | $330,000 |
| 2039 | $355,000 |
| 2040 | $380,000 |
| 2041 | $410,000 |
| 2042 (Maturity) | $440,000 |

Series 2012B Term Bonds Maturing November 1, 2020

| Bond Year Ending November 1 | Principal Amount Due November 1 of Each Year |
|---|---|
| 2016 | $100,000 |
| 2017 | $110,000 |
| 2018 | $130,000 |
| 2019 | $140,000 |
| 2020 (Maturity) * | $150,000 |

Generally, in the event of a partial redemption of Series 2012 Bonds, the amount of future mandatory sinking fund redemptions with respect to the Series 2012 Bonds will be reduced to take into account such partial redemption in inverse order of redemption dates.

The Lessee may purchase, and deliver to the Trustee for cancellation, Series 2012 Bonds in any aggregate principal amount and receive at 100% of such principal amount, a credit against mandatory sinking fund payments next coming due in respect of such Series 2012 Bonds.

At its option, to be exercised on or before the forty-fifth day next preceding any such sinking fund payment date, the Lessee may (a) deliver to the Trustee for cancellation Bonds in any aggregate principal amount desired, or (b) receive a credit in respect of its sinking fund redemption obligation for any Bonds which prior to said date have been redeemed (otherwise than through the operation of the sinking fund) and cancelled by the Trustee and not theretofore applied as a credit against any sinking fund redemption obligation. Each Bond so delivered or previously redeemed shall be credited by the Trustee at 100% of the principal amount thereof on the obligation of the Issuer on such sinking fund redemption date and any excess shall be credited on future sinking fund redemption obligations in chronological order and the principal amount of such Bonds to be redeemed by operation of the sinking fund shall be accordingly reduced.

The Lessee may on or before the sixtieth (60th) day next preceding each sinking fund payment date furnish the Trustee with its certificate indicating whether or not and to what extent the provisions of (a) and/or (b) of the preceding paragraph are to be availed of with respect to such sinking fund payment and confirm that moneys equal to the balance of such sinking fund payment will be paid on or before the next succeeding sinking fund payment date. In the event the Lessee shall satisfy entirely its then current sinking fund redemption obligation in accordance with the provisions of (a) and/or (b) of the preceding paragraph, the Trustee shall not be required to give the notice provided in Section 302.

The Trustee shall redeem, in the manner provided in Section 302, such an aggregate principal amount of the Bonds at a redemption price equal to the principal amount thereof plus the interest due thereon on the sinking fund payment date as will exhaust such cash sinking fund payment. Such redemption shall be in the manner set forth in Section 306.

-47-

Section 305.  Redemption Prior to Maturity.  The Series 2012A Bonds and Series 2012B Bonds are subject to redemption by lot or at the discretion of the Issuer prior to maturity on or after November 1, 2014, in whole at any time or in part on any Interest Payment Date, at the redemption prices (expressed as percentages of principal amount) set forth in the table below plus accrued interest or interest due thereon on such redemption date:

| Dates of Redemption | Redemption Price |
| --- | --- |
| From September 1, 2014 through August 31, 2015 | 103% |
| From September 1, 2015 through August 31, 2016 | 102% |
| From September 1, 2016 through August 31, 2017 | 101% |
| From September 1, 2017 and thereafter | 100% |

Section 306.  Payment of Bonds Upon Redemption.  In the case of a redemption of any Bond or a portion thereof, on the date set for redemption in the written notice to Bondholders required to be given in Section 302, the Trustee, as paying agent, shall pay the redemption price upon surrender of such Bond to the Trustee in lawful money of the United States of America. Upon surrender of a Bond for partial redemption, there shall be issued to such Bondholder for the unredeemed balance thereof, a Bond or Bonds in any of the authorized denominations as provided in Section 202.  The Trustee shall be compensated for issuing such Bonds pursuant to Section 1002 hereof.

Section 307.  Redemption.  With respect to any redemption of Bonds, in whole or in part, the Trustee shall make such redemption by lot.  Any partial redemption shall be in a multiple of $5,000.

Section 308.  Option to Prepay Installment Amounts Under Lease Agreement in Whole in Certain Events.  The Lessee shall have, and is hereby granted, the option to prepay at par in whole the installment amounts required to be made under Section 4.2(a) of the Lease Agreement and to cancel or terminate the Lease Agreement if any of the events described in Section 7.1(a) - (f) or Section 7.2 (i.e., a Determination of Taxability) of the Lease Agreement shall have occurred.

ARTICLE IV.

-48-

## GENERAL AGREEMENTS

Section 401.   Payment of Principal and Interest.  The Issuer agrees that it will promptly pay the principal of, and the interest on, the Bonds at the place, on the dates and in the manner provided herein and in the Bonds according to the true intent and meaning hereof and thereof; provided, however, the Issuer is obligated to pay the principal of, and the interest on, the Bonds solely from payments received pursuant to the Lease Agreement, the Management Agreement and the Security Agreement.  The Bonds and the interest thereon shall not be deemed to constitute a debt or a general obligation or a pledge of the faith and credit of the City, State or of any political subdivision of the State and the Bonds do not directly, indirectly or contingently obligate the City, State or any political subdivision of the State to levy or to pledge any form of taxation whatever for the payment of the principal of, or the interest on, the Bonds.  No recourse shall be had for the payment of the principal of, or interest on, the Bonds against any officer, director or agent of the Issuer.

Section 402.   Performance of Agreements; Authority.   The Issuer agrees that it will faithfully perform at all times any and all agreements, undertakings, stipulations and provisions contained in this Indenture, in any and every Bond, and in all proceedings of the Issuer pertaining thereto.  The Issuer agrees that it is authorized under the Constitution and laws of the State (a) to issue the Bonds and to execute, deliver and perform this Indenture, and (b) to grant to the Trustee a security interest in the Trust Estate in the manner and to the extent herein set forth; and that all action on its part for the issuance of the Bonds and the execution, delivery and performance of this Indenture has been effectively taken; and that the Bonds are and will be legal, valid, binding and enforceable limited obligations of the Issuer according to the import thereof.

Section 403.   Recordation of Security Agreement and Financing Statements.  The Issuer agrees that it will cause the Security Agreement, all Financing Statements (other than continuation statements), and all amendments thereto, and the Indenture, to be kept recorded and filed in such manner and in such places as may be required by law in order to fully protect and preserve the priority of the interest of the Bondholders in the property conveyed thereunder and the rights, privileges and options of the Trustee thereunder.

Section 404.   Priority of Pledge and Security Interest.  The pledge herein made of the Trust Estate and the security interest created herein with respect thereto constitutes a first and prior pledge of, and a security interest in, the Trust Estate.  Said pledge and security interest shall at no time be impaired directly or indirectly by the Issuer or the Trustee, and the Trust Estate shall not otherwise be pledged and, except as provided herein and in the Lease Agreement and in the Security Agreement, no persons shall have any rights with respect thereto.

Section 405.   Rights Under Lease Agreement and Security Agreement.   The Lease Agreement and the Security Agreement set forth the respective obligations of the Issuer and the Lessee, including a provision that subsequent to the initial issuance of the Bonds and prior to payment in full thereof, the Lease Agreement and the Security Agreement may not be effectively amended, changed, modified, altered or terminated (other than as provided thereon) without the written consent of the Trustee.   Reference is hereby made to the Lease Agreement and the Security Agreement for detailed statements of the obligations of the Lessee thereunder, and the Issuer agrees that the Trustee in its own name or in the name of the Issuer may enforce all rights of the Issuer and all obligations of the Lessee under and pursuant to the Lease Agreement and the Security Agreement (except certain rights reserved by the Issuer under the terms hereof) for and on behalf of the Bondholders, including the collection of attorneys' fees, whether or not the Issuer is in default hereunder.

Section 406.   Maintenance of Insurance; Payment of Taxes, Charges, etc.   Pursuant to the provisions of Section 5.12 of the Lease Agreement, the Lessee has agreed to maintain certain insurance and to pay all lawful taxes, assessments and charges at any time levied or assessed upon or against the Premises described and conveyed thereunder, or any part thereof, which might impair or prejudice the lien afforded by this Indenture as to the Trust Estate; provided, however, that nothing contained in this Section shall require the maintenance of such insurance or the payment of any such taxes, assessments or charges if the same are not required to be maintained or paid under the provisions of Section 5.1 of the Lease Agreement.

Section 407.   Maintenance and Repair.  Pursuant to the provisions of Section 5.1 of the Lease Agreement, the Lessee has agreed at its own expense to cause the Premises described thereunder to be maintained, preserved and kept in good condition, repair and working order, and that it will, from time to time, cause to be made all needed repairs so that said Premises shall at all times be kept in good condition and repair, and that the Lessee may, at its own expense, make, from time to time, additions, modifications and improvements to said Premises under the terms and conditions set forth in Section 5.1 of the Lease Agreement.

Section 408.   Insurance and Condemnation Proceeds.   Reference is hereby made to Sections 5.12 and 5.13 of the Lease Agreement whereunder it is provided that under certain circumstances the respective proceeds of insurance and condemnation awards (or proceeds from a sale in lieu of condemnation) are to be paid to the Trustee and deposited in separate trust accounts (but not in the Bond Fund) and to be disbursed and paid out as provided in said Sections 5.12 and 5.13 of the Lease Agreement.   The Trustee hereby accepts and agrees to perform the duties and obligations as therein specified.

Section 409.   Covenants Regarding Maintenance of Lessee's Existence.  The Lessee has covenanted that so long as the Lease Agreement is in effect, it will maintain its existence and will not merge or consolidate with any other corporation or sell or otherwise dispose of all or

substantially all of its assets, provided that the Lessee may, without causing a default under the Lease Agreement or this Indenture, merge or consolidate with another corporation or sell or otherwise transfer to another domestic partnership, corporation or other business entity all or substantially all of its assets as an entirety and thereafter dissolve, provided any surviving, resulting or transferee entity (i) is authorized to do business in the State of Alabama, (ii) is a domestic corporation, partnership, or other entity, or, if a natural person, is a resident of the United States of America, (iii) assumes in writing all of the obligations of the Lessee under the Lease Agreement, and Security Agreement, (iv) has net worth (after giving effect to such transaction) at least equal to that of the Lessee immediately prior to such transaction, and (v) provided further that the Lessee immediately shall furnish to the Trustee an opinion of nationally recognized bond counsel or ruling of the Internal Revenue Service to the effect that no "Determination of Taxability" has theretofore occurred or will occur or result from such transaction and (vi) provided further that the Lessee immediately shall furnish to the Trustee a certificate certifying that no default under the Lease Agreement or under this Indenture theretofore occurred or resulted from such transaction.

Section 410.    Indemnification of Issuer and Trustee.

(a)    Pursuant to Section 5.2 of the Lease Agreement, Lessee has agreed to indemnify and save the Issuer and the Trustee harmless against and from all claims by or on behalf of any person, firm or corporation arising from the conduct or management of, or from any work or thing done on the Project and against and from all claims arising from (i) any condition of or operation of the Project, (ii) any breach or default on the part of Lessee in the performance of any of its obligations under the Lease Agreement, (iii) any act or negligence of Lessee or of any of its agents, contractors, servants, employees or licensees, or (iv) any act or negligence of any assignee or lessee of Lessee, or of any agents, contractors, servants, employees or licensees of any assignee or lessee of Lessee, provided however, this indemnity shall not apply to any acts of gross negligence or willful misconduct of the Issuer or the Trustee. The Lessee shall indemnify and save the Issuer and the Trustee harmless from and against all costs and expenses incurred in or in connection with any such claim arising as aforesaid from (i), (ii), (iii) or (iv) supra, or in connection with any action or proceeding brought thereon, including reasonable attorneys' fees actually incurred, and upon notice from the Issuer or the Trustee, Lessee shall defend them or either of them in any such action or proceeding.

(b)    Pursuant to Section 5.2 of the Lease Agreement, Lessee has agreed that it will indemnify and hold the Trustee harmless from any and all liability, cost, or expense incurred without gross negligence or bad faith in the course of the Trustee's duties, including any act, omission, delay, or refusal of the Trustee in reliance upon any signature, certificate, order, demand, instruction, request, notice, or other instrument or document believed by it to be valid, genuine and sufficient.

(c)    Notwithstanding the fact that it is the intention of the parties that the Issuer shall not incur any pecuniary liability by reason of the terms of the Lease Agreement, or the undertakings required of the Issuer hereunder, by reason of (i) the issuance of the Bonds; (ii) the execution of the Indenture; (iii) the performance of any act required of it by the Lease

-51-

Agreement, the Security Agreement, or the Indenture; (iv) the performance of any act requested of it by the Lessee; or (v) any other costs, fees, or expenses incurred by the Issuer with respect to the Project or the financing thereof, including all claims, liabilities or losses arising in connection with the violation of any statutes or regulations pertaining to the foregoing, nevertheless, if the Issuer should incur any such pecuniary liability then in such event the Lessee, pursuant to the terms of Section 5.2 of the Lease Agreement, has agreed to indemnify and hold harmless the Issuer against all claims by or on behalf of any person, firm or corporation, arising out of the same, and all costs and expenses (including reasonable attorneys' fees) incurred in connection with any such claim or in connection with any action or proceeding brought thereon, and upon notice from the Issuer, the Lessee has agreed to defend the Issuer in any such action or proceeding and pay the reasonable attorneys' fees actually incurred by the Issuer in defending any such action.

The provisions of this Section shall survive the termination of the Lease Agreement.

ARTICLE V.
REVENUES AND FUNDS

Section 501.    Source of Payment of Bonds.    The obligation of the Issuer to pay the principal of, and the interest on, the Bonds is not a general obligation of the Issuer but is a limited obligation payable solely from the Pledged Revenues.

The installment amounts provided for in Section 4.2 of the Lease Agreement are to be remitted directly to the Trustee for the benefit of the Bondholders and are to be deposited in the Bond Fund.  Said installment amounts are sufficient in amount and become due in a timely manner so as to insure the prompt payment of the principal (including redemption premiums) of, and the interest on, the Bonds.

Section 502.    Creation of the Bond Fund.    There is hereby created by the Issuer and ordered established with the Trustee a trust fund to be designated the " The Medical Clinic Board of the City of Mobile (Second) Bond Fund -- Bama Oaks Retirement, LLC Project II, 2012", which shall be used to pay the principal of, and the interest on, the Bonds.  There shall be established within the Bond Fund a principal account and an interest account, as well as the Capitalized Interest Account.

Section 503.    Payments into the Bond Fund.  There shall be paid into the Bond Fund, as and when received,

(a)    any amount remaining in the Project Fund to the extent provided in Section 3.3(h) of the Lease Agreement,

-52-

(b)     all payments into the Bond Fund specified in Section 4.2 of the Lease Agreement,

(c)     all moneys required to be so deposited pursuant to Section 304, and

(d)     all other moneys received by the Trustee under and pursuant to any of the provisions of this Indenture, the Lease Agreement, or the Security Agreement which are required or which are accompanied by directions that such moneys are to be paid into the Bond Fund; including accrued interest on the Bonds and monies from the Debt Service Reserve Fund.

The Issuer agrees that so long as any of the Bonds are outstanding it will pay, or cause to be paid, into the Bond Fund solely from the sources of payment described in Section 501 sufficient moneys to promptly pay the principal of, and the interest on, the Bonds as the same become due and payable (including mandatory sinking fund redemption pursuant to Section 304).  To this end, the Issuer agrees that if there occurs an event of default under this Indenture, the Lease Agreement, or the Security Agreement, the Issuer will fully cooperate with the Trustee and with the Bondholders to the end of fully protecting the rights and security of the Bondholders.

Section 504.   Use of Moneys in the Bond Fund.  Except as provided in Sections 508, 702 and 1002, moneys in the Bond Fund shall be used solely for the payment of the principal (including redemption premiums) of, and the interest on, the Bonds.  No part of the payments to be made by the Lessee under the Lease Agreement required to be paid into the Bond Fund (excluding prepayments under Section 7.2 of the Lease Agreement and amounts paid in connection with the sinking fund requirements of Section 304) shall be used to redeem, prior to maturity, the Bonds or any portions thereof; provided, that whenever the moneys held in the Bond Fund from any source whatsoever are sufficient to redeem all of the Bonds and to pay interest to accrue thereon prior to such redemption, the Issuer agrees to take and cause to be taken the necessary steps to redeem all of the Bonds on the next succeeding redemption date for which the required redemption notice can be given; and, provided, further, that any moneys in the Bond Fund other than the payments required of the Lessee under the Lease Agreement may be used to redeem a portion of the Bonds so long as the Lessee has paid all required payments under the Lease Agreement.

The Issuer hereby authorizes and directs the Trustee to pay the principal of, and the interest on, the Bonds as the same become due and payable, to make any payments required to be made pursuant to Section 301, and to make any payments required to be made on any redemption date in connection with Bonds called for redemption, which authorization and direction the Trustee hereby accepts.

Section 505.   Non-presentment of Bonds at Final Maturity.  If any Bond shall not be presented for payment when the principal thereof or the final installment of principal thereof becomes due, either at maturity or at the redemption date, provided moneys sufficient to pay

-53-

such Bond shall have been made available to the Trustee for the benefit of the holder thereof, all liability of the Issuer to the holder thereof for the payment of such Bond shall forthwith cease, determine and be completely discharged, and thereupon it shall be the duty of the Trustee to hold such moneys, subject to the provisions of Section 508(b), in said account, without liability for interest thereon, for the benefit of the holder of such Bond, who shall thereafter be restricted exclusively to moneys held in said account, or paid by the Trustee to the Lessee pursuant to the provisions of Section 508(b), for any claim of whatever nature on his part hereunder or on, or with respect to, such Bond.

Section 506.    Trustee's and Paying Agents' Fees, Charges and Expenses.  Pursuant to the terms of the Lease Agreement, the Lessee has agreed to pay directly to the Trustee:

(a)    an amount equal to the annual fee of the Trustee and expenses incurred by the Trustee hereunder; and,

(b)    the reasonable fees and charges of the Trustee for acting as paying agent and as Bond Registrar, and the reasonable fees of Trustee's Counsel, as and when the same become due.

Section 507.    Moneys to Be Held in Trust.  All moneys paid over to the Trustee for deposit into the Bond Fund under any provision hereof shall be held (subject to the provisions of Section 508) in trust by the Trustee for the benefit of the holders of the Bonds entitled to be paid therefrom.

Section 508.    Payments to the Lessee from the Bond Fund.

(a)    Any moneys remaining in the Bond Fund after payment in full of all Bonds (taking into account Section 702), the fees, charges and expenses of the Trustee, the paying agent(s) and the Bond Registrar which have accrued and which will accrue and all other items required to be paid hereunder shall be paid to the Lessee upon the expiration or sooner termination of the term of the Lease Agreement as provided in Article VII of the Lease Agreement.

(b)    Any moneys held by the Trustee in the special account in the Bond Fund shall be retained by the Trustee for the payment or the redemption of Bonds not yet presented for payment or redemption.  If after three (3) years such moneys held for the holders of certain Bonds have not been claimed, it shall be the duty of the Trustee forthwith to return to the Lessee all moneys held by the Trustee in said special account, subject to any other requirements of law as may be applicable to such funds, and any such holder shall thereafter, as an unsecured general creditor, look only to the Lessee for the payment of any such Bond and all liability of the Trustee shall thereupon cease.

-54-

Section 509.  Creation of the Revenue Fund.  There is hereby created by the Issuer in order to establish with the Trustee a trust fund to be designated the "The Medical Clinic Board of the City of Mobile (Second) Revenue Fund – Bama Oaks Retirement, LLC Project II, 2012" which shall be used, from time to time, upon the occurrence of a Lock Box Trigger Event as set forth in Section 4.2(b) of the Lease Agreement for the purpose of paying the operating expenses of the Facility as well as for any and all other payments which are required to be made of Lessee under the Lease Agreement.

Section 510.  Creation of Ad Valorem Tax Fund.  There is hereby created by the Issuer and ordered established with the Trustee an Ad Valorem Tax Fund to be designated "The Medical Clinic Board of the City of Mobile (Second) Ad Valorem Tax Fund – Bama Oaks Retirement, LLC Project II, 2012," which shall be funded with regular deposits made by the Lessee pursuant to the provisions of Section 4.2(a)(iv) of the Lease Agreement.  Such amounts shall be used by the Trustee to pay ad valorem taxes due to the City of Mobile and/or Mobile County on the Facility.

Section 511.  Creation of Arbitrage Rebate Fund.  There is hereby created by the Issuer and ordered established with the Trustee an Arbitrage Rebate Fund to be designated "The Medical Clinic Board of the City of Mobile (Second) Arbitrage Rebate Fund – Bama Oaks Retirement, LLC Project II, 2012," which shall be used to receive and administer the Rebate Amount (defined in Section 5.10 of the Lease Agreement.

ARTICLE VI.
CUSTODY AND APPLICATION OF PROCEEDS OF BONDS

Section 601.  Creation of the Project Fund.  There is hereby created by the Issuer and ordered established with the Trustee a trust fund to be designated the " The Medical Clinic Board of the City of Mobile (Second) Project Fund -- Bama Oaks Retirement, LLC Project II, 2012."

Section 602.  Disposition of Bond Proceeds.  Upon the issuance and delivery of the Bonds, the proceeds of the sale of the Bonds (exclusive of accrued interest, if any, and those funds deposited into the Debt Service Reserve Fund pursuant to Section 606 hereof) shall be deposited into the Project Fund and Capitalized Interest Account.

Section 603.  Disbursements from Project Fund.  Moneys in the Project Fund shall be disbursed in accordance with the provisions of the Lease Agreement, and particularly Sections 3.3 and 3.5 thereof.  The Trustee is hereby authorized and directed to issue its checks for each disbursement to be made pursuant to the provisions of the Lease Agreement and the Trustee shall

be relieved of all liability with respect to disbursements made in accordance with the provisions of Sections 3.3 and 3.5 of the Lease Agreement.

Pursuant to Section 144(a)(1) of the Code, 95% of the net proceeds of the Bonds (before subtracting costs of issuance) shall be used for qualifying costs. In addition, pursuant to Section 147(g) of the Code, costs of issuance paid from the proceeds of the Bonds shall not exceed two percent (2%) of the net proceeds of the Bonds. The Trustee has no obligation to insure compliance with the requirements of this paragraph.

The Trustee shall maintain adequate records pertaining to the Project Fund and all disbursements therefrom, and after the Project has been completed and a certificate of payment of all costs filed as provided in Section 604, the Trustee shall file an accounting thereof with the Issuer and the Lessee if requested to do so by either such party.

Section 604.    Completion of the Project. The completion of the Project and the payment of all costs and expenses incident thereto shall be evidenced by the filing with the Trustee of the certificate signed by the Authorized Lessee Representative (designated pursuant to the terms of the Lease Agreement), which certificate shall state that all costs and expenses in connection with the Project and payable out of the Project Fund have been paid except for costs and expenses not then due and payable with respect to which funds are being retained in the Project Fund with the approval of the Lessee for the payment of the same. As soon as practicable, and in any event not later than sixty (60) days from the date of the latter certificate referred to in the preceding sentence, any moneys remaining in the Project Fund (other than moneys retained to pay costs and expenses not then due and payable) shall be used as specified in Section 3.3(h) of the Lease Agreement relating to the use of moneys in the Project Fund. Any balance remaining of moneys retained to pay costs and expenses after full payment of such costs and expenses shall be used as specified in Section 3.3(h) of the Lease Agreement. Unless there shall be delivered to the Trustee an opinion of nationally recognized bond counsel acceptable to the Issuer stating that the yield need not be so restricted, amounts held for application under this Section shall not, after the completion of the Project, be invested at a yield in excess of the yield on the Bonds from which such amounts were derived.

Section 605.    Creation of Special Fund. There is hereby created by the Issuer and ordered established with the Trustee, as part of and within the Bond Fund, a Special Fund to be designated the "The Medical Clinic Board of the City of Mobile (Second) Special Fund - Bama Oaks Retirement, LLC Project II, 2012," which shall be used for the purpose of collecting, managing, and disbursing insurance and condemnation proceeds, if any, associated with the Project.

Section 606.    Creation of Debt Service Reserve Fund. There is hereby created by the Issuer and ordered established with the Trustee a Debt Service Reserve Fund to be designated "The Medical Clinic Board of the City of Mobile (Second) Debt Service Reserve Fund - Bama

-56-

Oaks Retirement, LLC Project II, 2012," which shall be originally funded with a deposit of and maintained in an amount equal to $476,117 from the proceeds of the Bonds. Such amount shall be invested by the Trustee in Permitted Investments as directed in writing by the Lessee and used to pay principal and interest on the Bonds to the extent funds are otherwise unavailable therefore in the Bond Fund. If any amount of the original or replenished $476,117 contained in the Debt Service Reserve Fund or additions to such fund as provided below must be used to make payments of principal and interest on the Bonds, such amount shall be replenished by the Lessee within twelve (12) months of withdrawal as hereinafter described. Beginning on the third business day of the first month in which funds have been withdrawn from the Debt Service Reserve Fund and continuing for twelve consecutive months, the Lessee shall make payments to the Debt Service Reserve Fund, each in an amount equal to one-twelfth of the amount so withdrawn. Any income earned from the investment of funds on deposit in the Debt Service Reserve Fund shall be paid into the Project Fund until the Completion Date of the Project; after the Completion Date said income shall be paid into the Debt Service Reserve Fund until such time as the amount on deposit in such fund equals $476,117; thereafter, said income shall be deposited into the Bond Fund so long as the amount on deposit in the Debt Service Reserve Fund equals at least $476,117.

## ARTICLE VII.
## INVESTMENTS

Section 701.    Project Fund and Debt Service Reserve Fund Investments. Moneys held in the Project Fund and Debt Service Reserve Fund shall be invested and reinvested by the Trustee in Permitted Investments as directed in writing by the Lessee. Such investments shall be held by or under the control of the Trustee and shall be deemed at all times a part of the Project Fund or Debt Service Reserve Fund, and the interest accruing thereon and any profit resulting therefrom shall be credited to the Project Fund or Debt Service Reserve Fund, as the case may be; any loss resulting therefrom shall be charged to the Project Fund or Debt Service Reserve Fund, as the case may be. The Trustee is directed to sell and convert to cash a sufficient amount of such investments whenever the cash held in the Project Fund or Debt Service Reserve Fund is insufficient to pay a requisition when presented or to otherwise make a timely disbursement required to be made therefrom. The provisions of this Section 701 shall be subject to the provisions of Section 703 of this Indenture.

Section 702.    Bond Fund Investments. Moneys held in the Bond Fund shall be invested and reinvested by the Trustee in Permitted Investments as directed in writing by the Lessee. Such investments shall be held by or under the control of the Trustee and shall be deemed at all times a part of the Bond Fund and the interest accruing thereon and any profit realized therefrom shall be credited to the Bond Fund. The Trustee is directed to sell and convert to cash a sufficient amount of such investments in the Bond Fund whenever the cash held in the Bond Fund is insufficient to provide for the payment of the principal of (whether at the maturity date or the redemption date prior to maturity), and the interest on, the Bonds as the same become due

-57-

and payable. Any interest or gain received from such investments shall be credited to and held in the Bond fund and any loss from such investments shall be charged against the Bond Fund and paid by the Lessee.

Moneys held in the Ad Valorem Tax Fund shall be invested and reinvested by the Trustee in Permitted Investments as directed in writing by the Lessee. Such investments shall be held by or under the control of the Trustee and shall be deemed at all times part of the Ad Valorem Tax Fund, and the interest accruing thereon and any profit realized therefrom shall be credited to such funds respectively.

The provisions of this Section 702 shall be subject to the provisions of Section 703 of this Indenture.

Section 703.    Non-Arbitrage Covenant: Compliance with Special Arbitrage Rules. The Issuer, relying on the representations of Lessee, covenants for the benefit of the holders of any of the Bonds, present and future, that moneys on deposit in any fund or account created and held in connection with the Bonds, will not be used in a manner which will cause the Bonds to be classified as "arbitrage bonds" within the meaning of Section 148 of the Code.

The Issuer further covenants and agrees with the Lessee and with the holders of any of the Bonds from time to time outstanding that so long as any of the Bonds remain outstanding, it will cooperate with the Lessee in complying with Section 5.1 of the Lease Agreement.

ARTICLE VIII.
DISCHARGE OF LIEN

Section 801.    Discharge of Lien and Security Interests. If the Issuer shall pay or cause to be paid the principal of, and the interest on, the Bonds at the times and in the manner stipulated therein and herein, and if the Issuer shall keep, perform and observe all and singular the agreements in the Bonds and herein expressed as to be kept, performed and observed by it or on its part, then the lien hereof, these presents and the Trust Estate and the security interests shall cease, determine and be void, and thereupon the Trustee, upon receipt by the Trustee of an opinion of Counsel stating that in the opinion of the signer all conditions precedent to the satisfaction and discharge of this Indenture and the Security Agreement, and the security interests have been met, shall execute and deliver to the Issuer such instruments in writing as shall be required to cancel and discharge this Indenture and the Security Agreement, and the security interests, and reconvey to the Issuer the Trust Estate, and assign and deliver to the Issuer so much of the Trust Estate as may be in its possession or subject to its control, except for moneys and Government Obligations held in the special account in the Bond Fund for the purpose of paying Bonds which have not yet been presented for payment; provided, however, such cancellation and discharge of the Indenture shall not terminate the powers and rights granted to the Trustee with respect to the payment, transfer and exchange of the Bonds.

Section 802.    Provision for Payment of Bonds.  Bonds shall be deemed to have been paid within the meaning of Section 801 if:

(a)    there shall have been deposited irrevocably into the Bond Fund either:

(i)    sufficient moneys, or

(ii)    Government Obligations of such maturities and interest payment days and bearing such interest as will, without further investment or reinvestment of either the principal amount thereof or the interest earnings thereon (said earnings to be held in trust also), be sufficient together with any moneys referred to in subsection (i) above, for the payment at their respective maturities or redemption dates prior to maturity, of the principal thereof and the interest to accrue thereon to such maturity or redemption dates, as the case may be;

(b)    there shall have been paid to the Trustee all Trustee's and paying agent's fees and expenses due or to become due in connection with the payment or redemption of the Bonds or there shall be sufficient moneys in said special account to make said payments; and

(c)    if any Bonds are to be redeemed on any date prior to their maturity, the Issuer shall have given to the Trustee in form satisfactory to the Trustee irrevocable instructions to redeem such Bonds on such date and either evidence satisfactory to the Trustee that all redemption notices required by this Indenture have been given or irrevocable power authorizing the Trustee to give such redemption notices.

Limitations elsewhere specified herein regarding the investment of moneys held by the Trustee in the Bond Fund shall not be construed to prevent the depositing and holding in said Bond Fund of the obligations described in the preceding subparagraph (a)(ii) for the purpose of defeasing the lien of this Indenture as to Bonds which have not yet become due and payable.


Section 803.    Discharge of the Indenture.  Notwithstanding the fact that the lien of this Indenture upon the Trust Estate may have been discharged and cancelled in accordance with Section 801, this Indenture and the rights granted and duties imposed hereby, to the extent not inconsistent with the fact that the lien upon the Trust Estate may have been discharged and cancelled, shall nevertheless continue and subsist until the principal of, and the interest on, all of the Bonds shall have been paid in full or the Trustee shall have returned to the Lessee pursuant to Section 508(b) of this Indenture all funds theretofore held by the Trustee for payment of any Bonds not theretofore presented for payment.

ARTICLE IX.
DEFAULT PROVISIONS AND REMEDIES
OF TRUSTEE AND BONDHOLDERS

Section 901.    Defaults; Events of Default.  If any of the following events occurs, subject to the terms of Section 912, it is hereby defined as and declared to be and to constitute an "event of default" hereunder.

(a)    default in the due and punctual payment of any interest on any Bond; or

(b)    default in the due and punctual payment of the principal of any Bond, whether at the maturity date or the redemption date prior to maturity (including mandatory sinking fund redemption pursuant to Section 304), or upon maturity thereof by declaration; or

(c)    subject to the provisions of Section 912, default in the performance or observance of any other of the agreements or conditions on the part of the Issuer herein or in the Bonds contained; or

(d)    the occurrence of an "event of default" under the Lease Agreement as provided in Section 6.l thereof, the Land Use Restriction Agreement or under the Security Agreement.

Section 902.    Other Remedies.  Upon the occurrence of an event of default, the Trustee shall have the power to proceed with any right or remedy granted by the Constitution and laws of the State, as it may deem best in its sole discretion, including any suit, action or special proceeding in equity or at law for the specific performance of any agreement contained herein or for the enforcement of any proper legal or equitable remedy as the Trustee shall deem most effectual to protect the rights aforesaid, insofar as such may be authorized by law, and the right to the appointment, a matter of right and without regard to the sufficiency of the security afforded by the Trust Estate or the solvency of the Lessee, of a receiver for all or any part of the Trust Estate; the rights herein specified are to be cumulative to all other available rights, remedies or powers and shall not exclude any such rights, remedies or power.  Without intending to limit the foregoing rights, remedies and powers by virtue of such specification, the Trustee is authorized to exercise any and all rights available from time to time under the U.C.C. including the right to further assign the Issuer's right, title and interest in the Lease Agreement and the Security Agreement to a third party.

Section 903.    Rights of Bondholders.  Upon the occurrence of an event of default and if requested so to do by the holders of not less than fifty-one percent (51%) of Bondholders responding to a poll conducted by the Trustee of the holders of all Outstanding Bonds (provided that such responding Bondholders constitute the Owners of at least thirty-five percent (35%) of the aggregate of Bonds Outstanding) and if indemnified as provided in Section 1001(i), the

Trustee shall be obliged to accelerate the maturity date for payment of principal and interest on the Bonds and declare all principal on the Bonds to be due immediately and exercise such one or more of the rights and remedies conferred by this Article as directed by such holders, or in the absence of any such direction, as the Trustee, being advised by Counsel, shall deem to be in the interests of the Bondholders.

No right or remedy by the terms hereof conferred upon or reserved to the Trustee (or to the Bondholders) is intended to be exclusive of any other right or remedy, but each and every such right and remedy shall be cumulative and shall be in addition to any other right or remedy given to the Trustee or to the Bondholders or now or hereafter existing at law, in equity or by statute.

No delay or omission to exercise any right or remedy accruing upon any event of default shall impair any such right or remedy or shall be construed to be a waiver of any such event of default or acquiescence therein; and every such right and remedy may be exercised from time to time and as often as may be deemed expedient.

No waiver of any event of default hereunder, whether by the Trustee or by the Bondholders, shall extend to or shall affect any subsequent event of default or shall impair any rights or remedies consequent thereon.

Section 904.  Rights of Bondholders to Direct Proceedings.  Anything herein to the contrary notwithstanding, the holders of a majority in principal amount of Bonds then outstanding shall have the right, at any time, by an instrument or instruments in writing executed and delivered to the Trustee, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions hereof, or for the appointment of a receiver or any other proceedings hereunder; provided, that such direction shall not be otherwise than in accordance with the provisions hereof and of law, and the Trustee receives the indemnity provided by Section 1001(i) hereof.

Section 905.  Appointment of Receivers.  Upon the occurrence of an event of default and upon the filing of a suit or other commencement of judicial proceedings to enforce the rights and remedies of the Trustee and of the Bondholders hereunder, the Trustee shall be entitled, as a matter of right, to the appointment of a receiver or receivers of the Trust Estate, pending such proceedings, with such powers as the court making such appointment shall confer.

Section 906.  Waiver of Benefit of Laws.  Upon the occurrence of an event of default, to the extent that such rights may then lawfully be waived, neither the Issuer, nor anyone claiming through or under it, shall set up, claim or seek to take advantage of any appraisement, valuation, stay, extension or redemption laws now or hereafter in force, in order to prevent or hinder the enforcement of the Security Agreement or the foreclosure of the Security Agreement, but the Issuer, for itself and all who may claim through or under it, hereby waives, to the extent that they

-61-

lawfully may do so, the benefit of all such laws and all right of appraisement and redemption to which it may be entitled under the laws of the State.

       Section 907.    Application of Moneys.    All moneys received by the Trustee pursuant to any right given or action taken under the provisions of this Article shall, after payment of the costs and expenses of the proceedings resulting in the collection of such moneys and of the expenses, liabilities and advances incurred or made by the Trustee, including, without limitation, fees and expenses of its attorneys and consultants, be deposited into the Bond Fund, and all moneys in the Bond Fund (other than moneys held pursuant to Section 505 or Section 802) shall be applied, as follows:

           (a)    Unless the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied:

              FIRST - to the payment to the persons entitled thereto of all installments of interest then due on the Bonds, in the order of the maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or privilege; and

              SECOND - to the payment to the persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due, in the order of their due dates, with interest on such Bonds from the respective dates upon which they become due and, if the amount available shall not be sufficient to pay in full Bonds due on any particular date, together with such interest, then to the payment ratably, according to the amount of principal due on such date, to the persons entitled thereto without any discrimination or privilege.

           (b)    If the principal of all the Bonds shall have become due or shall have been declared due and payable, all such moneys shall be applied to the payment of the principal and the interest then due and unpaid upon the Bonds without preference or priority of principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any Bond over any other Bond, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or privilege;

           (c)    If the principal of all the Bonds shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this Article, subject to the provisions of paragraph (b) of this Section in the event that the principal of all the Bonds shall later become due or be declared due and payable, the moneys shall be applied in accordance with the provisions of paragraph (a) of this Section.

       Whenever moneys are to be applied pursuant to the provisions of this Section, such moneys shall be applied at such times, and from time to time, as the Trustee shall determine, having due regard to the amount of such moneys available for application and the likelihood of

additional moneys becoming available for such application in the future. Whenever the Trustee shall apply such funds, it shall fix the date (which shall be an interest payment date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such dates shall cease to accrue. The Trustee shall give such notice as it may deem appropriate of the deposit with it of any such moneys and of the fixing of any such date, and shall not be required to make payment to the holder of any Bond until such Bond shall be presented to the Trustee.

Whenever all Bonds and the interest thereon have been paid under the provisions of this Section and all expenses and charges of the Trustee and paying agent have been paid, any balance remaining in the Bond Fund shall be paid to the Lessee as provided in Section 508.

Section 908. Rights and Remedies Vested in Trustee. All rights and remedies of action (including the right to file proof of claims) hereunder or under any of the Bonds may be enforced by the Trustee without the possession of any of the Bonds or the production thereof in any trial or other proceedings relating thereto and any such suit or proceeding instituted by the Trustee shall be brought in its name as Trustee without the necessity of joining as plaintiffs or defendants any holders of the Bonds, and any recovery of judgment shall be for the equal and ratable benefit of the holders of the Bonds.

Section 909. Rights and Remedies of Bondholders. No holder of any Bond shall have any right to institute any suit, action or proceeding in equity or at law for the enforcement hereof, for the execution of any trust hereof or for the appointment of a receiver or to enforce any other right or remedy hereunder, unless a default has occurred of which the Trustee has been notified as provided in subsection (e)(iv) of Section 1001, or of which by said subsection it is deemed to have notice, and unless also such default shall have become an event of default and the holders of not less than fifty-one percent (51%) of Bondholders responding to a poll conducted by the Trustee of the holders of all Outstanding Bonds (provided that such responding Bondholders constitute the Owners of at least thirty-five percent (35%) of the aggregate of Bonds Outstanding) and shall have offered reasonable opportunity either to proceed to exercise the powers hereinbefore granted or to institute such action, suit or proceeding in its own name, and unless also such Bondholders have offered to the Trustee indemnity as provided in Section 1001(i), and unless also the Trustee shall thereafter fail or refuse to exercise the powers hereinbefore granted, or to institute such action, suit or proceeding in its own name. Such notification, request and offer of indemnity are hereby declared in every case at the option of the Trustee to be conditions precedent to the execution of the powers and trusts hereof, and to any action or cause of action for the enforcement hereof, or for the appointment of a receiver or for any other right or remedy hereunder; it being understood and intended that no one or more holders of the Bonds shall have any right in any manner whatsoever to affect, disturb or prejudice the lien hereof by its, his or their action or to enforce any right or remedy hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal and ratable benefit of the holders of all Bonds. Nothing herein contained shall, however, affect or impair the right of any Bondholder to enforce the payment of the principal of, and the interest on, any Bond

-63-

at and after the maturity thereof, or the obligation of the Issuer to pay the principal of, and the interest on, each of the Bonds issued hereunder to the respective holders thereof at the time, place, from the source and in the manner expressed in the Bonds.

In the event that any holder acts unilaterally contrary to the provisions set forth in this Section 909, the interest of such holder shall no longer be entitled to ratable protection under this Indenture, and all fees and expenses incurred by the Trustee or chargeable to the Trust Estate shall be paid by, or levied against the interest of such holder; it being the intent that neither the Trustee nor other holders should bear the costs associated with such unilateral action.

Section 910.  Termination of Proceedings.  If the Trustee shall have proceeded to enforce any right or remedy hereunder by the appointment of a receiver, by entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely, then and in every such case the Issuer, the Trustee, and the Lessee shall be restored to their former positions, rights and obligations hereunder with respect to the Trust Estate, and all rights, remedies and powers of the Trustee shall continue as if no such proceedings had been taken.

Section 911.  Waivers of Events of Default.  The Trustee shall waive any event of default hereunder and its consequences and rescind any declaration of maturity of principal upon the written request of the holders of a majority in principal amount of all Bonds then outstanding in the case of any event of default; provided, however, that there shall not be waived

(a)    any event of default pertaining to the payment of the principal of any Bond at its maturity date or redemption date prior to maturity (including any mandatory sinking fund redemption date),

(b)    any event of default pertaining to the payment when due of the interest on any Bond, or

(c)    any Act of Bankruptcy, insolvency proceedings, liquidation, dissolution, or reorganization, unless prior to such waiver or rescission, all arrears of interest, with interest (to the extent permitted by law) at the rate per annum borne by the Bonds in respect of which such event of default shall have occurred on overdue installments of interest, and all expenses of the Trustee in connection with such event of default, shall have been paid or provided for, and in case of any such waiver or rescission, or in case any proceeding taken by the Trustee on account of any such event of default shall have been discontinued or abandoned or determined adversely, then and in every such case the Issuer, the Trustee, the Lessee, and the Bondholders shall be restored to their former positions and rights hereunder, respectively, but no such waiver or rescission shall extend to any subsequent or other event of default, or impair any right consequent thereon.  The Trustee shall not have any discretion to waive any event of default hereunder and its consequences except in the manner and subject to the terms expressed above.

-64-

Section 912.   Notice of Defaults; Opportunity of Issuer and Lessee to Cure Defaults. No default specified in Section 901(c) shall constitute an event of default hereunder until notice of such default by registered or certified mail shall be given by the Trustee to the Issuer and the Lessee, and the Issuer and the Lessee shall have had thirty (30) days after receipt of such notice to correct said default or cause said default to be corrected, and shall not have corrected said default or caused said default to be corrected within the applicable period; provided, further, that if a default specified in said Section 901(c) be such that it can be corrected but not within the period specified herein, it shall not constitute the basis of an event of default hereunder (a) if corrective action capable of remedying such default is instituted by the Issuer within the applicable period and diligently pursued until the default is corrected, but in any event within ninety (90) days after such notice and (b) if the Issuer shall within the applicable period furnish to the Trustee a certificate executed as provided in Section 1001(e)(ii) certifying that said default is such that it can be corrected but not within the applicable period and that corrective action capable of remedying such default has been instituted and is being diligently pursued and will be diligently pursued until the default is corrected, but in any event within ninety (90) days after such notice.  The Issuer shall notify the Trustee by certificate executed as above when such default has been corrected.  The Trustee shall be entitled to rely upon any such certificate given pursuant to this Section.

With regard to any default concerning which notice is given to the Lessee or the Issuer under the provisions of this Section, the Issuer hereby grants to the Lessee full authority to perform any obligation the performance of which by the Issuer is alleged in said notice to be in default, such performance by the Lessee to be in the name and stead of the Issuer with full power to do any and all things and acts to the same extent that the Issuer could do and perform any such things and acts and with power of substitution.

Section 913.   Bondholder Lists.  In case at any time the holders of at least 10% in aggregate principal amount of the Bonds outstanding shall have so requested in writing, the Trustee shall, unless prohibited by law, provide a list of the current Bondholders to such Bondholders as have made the request.

ARTICLE X.
THE TRUSTEE

Section 1001.  Acceptance of the Trusts.  The Trustee hereby accepts the trusts imposed upon it hereby, and agrees to perform said trusts, but only upon and subject to the following express terms and conditions:

(a)     The Trustee, prior to the occurrence of an event of default and after the curing or waiver of all events of default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied agreement or obligations shall be read into this Indenture against the Trustee.  In case an event of

-65-

default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in a like situation.

(b)    The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees but shall be answerable for the conduct of the same in accordance with the standard specified in subsection (a) above, and shall be entitled to advice of Counsel concerning all matters of trusts hereof and the duties hereunder, and may in all cases pay and be reimbursed for such reasonable compensation to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trusts hereof. The Trustee may act upon the opinion or advice of any attorney (who may be the attorney or attorneys for the Issuer or the Lessee), approved by the Trustee in the exercise of reasonable care. The Trustee shall not be responsible for any loss or damage resulting from any action or non-action in good faith in reliance upon such opinion or advice.

(c)    The Trustee shall not be responsible for any recital herein, or in the Bonds (except in respect to the authentication certificate of the Trustee endorsed on the Bonds), or for the recording or re-recording, filing or re-filing of the Security Agreement or the Indenture or for insuring the Trust Estate or any part of the Project, or for the validity of the execution hereof by the Issuer or of any supplements hereto or instruments of further assurance, or for the sufficiency of the security for the Bonds; and the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any agreements or conditions on the part of the Issuer or on the part of the Lessee under the Lease Agreement or the Security Agreement except as hereinafter set forth; but the Trustee may require but shall have no duty so to require of the Issuer or the Lessee full information and advice as to the performance of the agreements and conditions aforesaid and as to the condition of the Trust Estate.

(d)    The Trustee shall not be liable or responsible because of the failure of the Issuer or of any of its employees or agents to perform any act herein required of the Issuer or because of the loss of any monies arising through the insolvency or the act or default or omission of any other depository in which such monies shall have been deposited under the provisions of this Indenture. The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with Sections 701 and 702. Except to the extent herein specifically provided, the Trustee shall not be accountable for the use of the proceeds of any of the Bonds. The Trustee in any capacity may become the holder or pledgee of any of the Bonds with the same rights which it would have if it were not Trustee.

(e)    Except as is otherwise provided in subsection (a) above:

(i)    The Trustee shall be protected and shall incur no liability in acting or refraining from acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document believed to be genuine and correct and to have been signed, presented or sent by the proper person or persons. Any action or nonaction taken by the Trustee, pursuant hereto upon the request, authority or consent of any person who at the time of making such request or giving such authority or consent is the holder of any Bond, shall be conclusive

and binding upon all future holders of the same Bond and upon Bonds issued in exchange therefor or in place thereof.

(ii)    As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate signed on behalf of the Issuer by its Chairman or Vice Chairman and attested by its Secretary as sufficient evidence of the facts therein contained and prior to the occurrence of a default of which the Trustee has been notified as provided in subsection (e)(iv) of this Section, or of which by said subsection it is deemed to have notice, shall also be at liberty to accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same. The Trustee shall accept a certificate of the Secretary of the Issuer under its seal to the effect that a resolution in the form therein set forth has been adopted by the Issuer as conclusive evidence that such resolution has been adopted and is in full force and effect.

(iii)    The right of the Trustee to do things enumerated herein shall not be construed as a duty and the Trustee shall not be answerable for other than its gross negligence or willful misconduct.

(iv)    The Trustee shall not be required to take notice or be deemed to have notice of any default hereunder except failure by the Issuer to cause to be made any of the payments to the Trustee required to be made by Article V unless the Trustee shall be specifically notified in writing of such default by the Issuer or by the holders of at least twenty-five percent (25%) in principal amount of the Bonds. All notices or other instruments required to be delivered to the Trustee must, in order to be effective, be delivered at the principal office of the Trustee, and in the absence of such notice so delivered the Trustee shall conclusively assume there is no default except as aforesaid. In the event that any payment required to be made by Article V is not paid when due, the Trustee shall immediately notify the Lessee by telephone notice that such payment has not been made and shall immediately confirm such notice by registered letter to the Lessee.

(f)    At reasonable times and as often as reasonably requested in connection with its rights under this Indenture, the Trustee and its duly authorized agents, attorneys or other representatives shall have the right but not the obligation to inspect the Project and all books, papers and records of the Issuer and the Lessee pertaining to the Project or Bonds and to make copies thereof and take such memoranda from and in regard thereto as may be desired.

(g)    The Trustee shall not be required to give any bond or surety in respect of the execution of the said trusts and powers or otherwise in respect of the premises.

(h)    Notwithstanding anything elsewhere herein contained, the Trustee shall have the right, but shall not be required, to demand, in respect of the authentication of any Bonds, the withdrawal of any cash or any action whatsoever within the purview hereof, any showings, certificates, opinions, appraisals or other information, or corporate action or evidence

thereof, in addition to that required by the terms hereof as a condition of such action by the Trustee which the Trustee deems desirable for the purpose of establishing the right of the Issuer to the authentication of any Bonds, the withdrawal of any cash, or the taking of any other action by the Trustee.

(i)    Before taking such action hereunder the Trustee may require that a satisfactory indemnity bond be furnished for the reimbursement of all expenses to which it may be put and to protect it against all liability, except liability which is adjudicated to have resulted from the gross negligence or willful misconduct of the Trustee by reason of any action so taken.

(j)    All moneys received by the Trustee or any paying agent for the Bonds shall, until used or applied or invested as herein provided, be held in trust for the purposes for which they were received but need not be segregated from other funds except to the extent required herein or by law. Neither the Trustee nor any such paying agent shall be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(k)    No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(l)    The Trustee shall have no responsibility with respect to any information, statement, or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds.

(m)    Anything to the contrary notwithstanding, the Trustee shall not be required to enter, take possession of, or take any other action whatsoever with respect to the Project, and shall not be required to initiate foreclosure proceedings with respect to the Project and the Security Agreement unless the Trustee is satisfied that the Trustee will not be subject to any liability under any local, state or federal environmental laws or regulations of any kind whatsoever or from any circumstances present at the Project relating to the presence, use, management, disposal of, or contamination by any environmentally hazardous materials or substances of any kind whatsoever.

(n)    The immunities extended to the Trustee also extend to its directors, officers, employees and agents.

(o)    The Trustee shall not be liable for any action taken or not taken by it in accordance with the direction of a majority (or other percentage provided for herein) in aggregate principal amount of Bonds outstanding relating to the exercise of any right, power or remedy available to the Trustee.

(p)    The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty.

Section 1002.  Fees, Charges and Expenses of Trustee.

(a)    The Trustee shall be entitled to payment of and reimbursement for customary fees for its services rendered hereunder and for all advances, counsel fees and other expenses reasonably made or incurred by the Trustee in connection with such services including, but not limited to, the Trustee's extraordinary fees and expenses.  The Trustee shall be entitled to payment and reimbursement for the reasonable fees and charges of the Trustee as paying agent and Bond Registrar for the Bonds, if any, as herein above provided.  The Trustee may charge its fees and expenses against any fund thirty (30) days following rendering of charges.  Upon the occurrence of an event of default, but only upon such occurrence, the Trustee shall have a first lien on the Trust Estate with right of payment prior to payment of, the principal of, and the interest on, any Bond for the foregoing advances, fees, costs and expenses incurred.

(b)    The Trustee shall be entitled to payment and reimbursement for special services and expenses (including but not limited to those listed herein), rendered on behalf of an individual Bondholder, which special services and expenses have been incurred at the written request of such individual Bondholder.  The Trustee may, but is not obligated to, render such special services and expenses and to charge a reasonable fee for such special services and expenses which shall be paid for by such individual Bondholder. The Trustee may charge these expenses against any fund held on behalf of such individual Bondholder thirty (30) days following the rendering of charges.

Section 1003.  Notice to Bondholders If Default Occurs.  If a default occurs of which the Trustee is by subsection (e)(iv) of Section 1001 required to take notice or if notice of a default be given as in said subsection (e)(iv) provided, then the Trustee shall give written notice thereof by first class mail to the holders of all Bonds then outstanding, and, as to defaults described in Section 901(c), to the Lessee and the Issuer.

Section 1004.  Intervention by Trustee.  In any judicial proceeding to which the Issuer is a party which, in the opinion of the Trustee and its Counsel, has a substantial bearing on the interest of the Bondholders, the Trustee may intervene on behalf of the Bondholders and shall do so if requested in writing by the holders of at least fifty-one percent (51%) of Bondholders responding to a poll conducted by the Trustee of the holders of all Outstanding Bonds (provided that such responding Bondholders constitute the Owners of at least thirty-five percent (35%) of the aggregate of Bonds Outstanding).  The rights and obligations of the Trustee under this Section are subject to the approval of a court of competent jurisdiction if such approval is required by law as a condition to such intervention.

Section 1005.  Successor Trustee.  Any corporation or association into which the Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, ipso facto, shall be and become successor Trustee hereunder and be vested with all of the title to the Trust

-69-

Estate and all the trusts, powers, discretions, immunities, privileges and all other matters as was its predecessor, without the execution or filing of any instrument or any further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 1006. Resignation by the Trustee. The Trustee and any successor Trustee may at any time resign from the trusts hereby created by giving ninety (90) days written notice to the Issuer, the Lessee and each Bondholder, and such resignation shall take effect at the end of such ninety (90) day period, or upon the earlier appointment of a successor Trustee by the Bondholders or by the Issuer and the acceptance of such appointment by such Successor Trustee. Such notice may be served personally or sent by registered or certified mail.

Section 1007. Removal of the Trustee. The Trustee may be removed at any time, by an instrument or concurrent instruments in writing delivered to the Trustee, the Issuer, and the Lessee and signed by the holders of a majority in principal amount of the Bonds, provided that the fees and expenses of the Trustee have been paid in full.

Section 1008. Appointment of Successor Trustee by the Bondholders; Temporary Trustee. If the Trustee shall resign, be removed, be dissolved, be in course of dissolution or liquidation, or shall otherwise become incapable of acting hereunder or in case it shall be taken under the control of any public officer, officers or a receiver appointed by a court, a successor may be appointed by the holders of a majority in principal amount of the Bonds, by an instrument or concurrent instruments in writing signed by such holders, or by their attorneys-in-fact, duly authorized; provided, nevertheless, that in case of such vacancy the Issuer, by an instrument signed by its Chairman or Vice Chairman and attested by its Secretary under its seal, may appoint a temporary Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondholders in the manner above provided; and any such temporary Trustee shall immediately and without further act be superseded by the Trustee so appointed by such Bondholders. Every such Trustee appointed pursuant to the provisions of this Section shall be a trust company or bank (having trust powers) in good standing, shall be located within or outside the State.

Section 1009. Concerning Any Successor Trustee. Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to its predecessor and also to the Issuer and the Lessee an instrument in writing accepting such appointment hereunder, and thereupon such successor, without any further act, deed or conveyance, shall become fully vested with all the estates, properties, powers, trusts, duties and obligations of its predecessor; but such predecessor shall, nevertheless, on the written request of the Issuer, or of its successor, execute and deliver an instrument transferring to such successor Trustee all the estates, properties, rights, powers and trusts of such predecessor hereunder; and every predecessor Trustee shall deliver all securities and moneys held by it as Trustee hereunder to its successor. Should any instrument in writing

-70-

from the Issuer be required by any successor Trustee in order to more fully and certainly vest in such successor the estates, properties, rights, powers and trusts hereby vested or intended to be vested in the predecessor, any and all such instruments in writing shall, on request, be executed, acknowledged and delivered by the Issuer. The resignation of any Trustee and the instrument or instruments removing any Trustee and appointing a successor hereunder, together with all other instruments provided for in this Article, shall be filed and/or recorded by the successor Trustee in each recording office where this Indenture, the Security Agreement and the Financing Statements shall have been filed and/or recorded.

Section 1010. <u>Right of Trustee to Pay Taxes and Other Charges</u>. If any tax, assessment or governmental or other charge upon any part of the Trust Estate or the Project is not paid as required herein, the Trustee may pay such tax, assessment or charge, without prejudice, however, to any rights of the Trustee or the Bondholders hereunder arising in consequence of such failure; and any amount at any time so paid under this Section, with interest thereon from the date of payment at the rate per annum borne by the Bonds, shall become so much additional indebtedness secured hereby, and the same shall be given a preference in payment over the principal of, and the interest on, the Bonds and shall be paid out of the revenues and receipts from the Trust Estate if not otherwise caused to be paid; but the Trustee shall not be under obligation to make any such payment unless it shall have been requested to do so by at least fifty-one percent (51%) of Bondholders responding to a poll conducted by the Trustee of the holders of all Outstanding Bonds (provided that such responding Bondholders constitute the Owners of at least thirty-five percent (35%) of the aggregate of Bonds Outstanding) and shall have been provided with sufficient moneys for the purpose of making such payment.

Section 1011. <u>Trustee Protected in Relying Upon Resolutions, etc.</u>  The resolutions, opinions, certificates and other instruments provided for herein may be accepted by the Trustee as conclusive evidence of the facts and conclusions stated therein and shall be full warrant, protection and authority to the Trustee for the withdrawal or payment of moneys or other action taken hereunder.

Section 1012. <u>Successor Trustee as Custodian of Funds, Paying Agent and Bond Registrar</u>. Upon a change in the office of Trustee the predecessor Trustee which has resigned or has been removed shall cease to be the holder of the Bond Fund, the Project Fund, and any other funds or accounts established pursuant hereto, paying agent for the principal of, and the interest on, the Bonds and Bond Registrar, and the successor Trustee shall become such holder, paying agent and Bond Registrar.

Section 1013. <u>Filing of Certain Continuation Statements</u>. From time to time, the Trustee shall file or cause to be filed continuation statements for the purpose of continuing without lapse the effectiveness of (i) those Financing Statements which shall have been filed at or prior to the issuance of the Bonds in connection with the security for the Bonds pursuant to the authority of

-71-

the U.C.C., and (ii) any previously filed continuation statements which shall have been filed as herein required. The Issuer and the Lessee shall sign and deliver to the Trustee or its designee such continuation statements as may be requested of it from time to time by the Trustee. Upon the filing of any such continuation statement the Trustee shall immediately notify the Issuer that the same has been accomplished.

Section 1014. Supplying of Names and Addresses Bondholders Desiring Certain Financial Information. The Trustee shall promptly notify the Lessee of the name and address of any Bondholder who has notified the Trustee of his desire to receive the financial information referred to in Section 5.4 of the Lease Agreement, which information the Lessee has agreed to forward to each such Bondholder at the specified address.

Section 1015. Trustee Entitled to Indemnity.

(a)     The Lessee shall indemnify the Trustee against any loss, liability or expense incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, except as set forth in subsection (b) below. The Trustee shall notify the Lessee promptly of any claim for which it may seek indemnity. Except where the Lessee is the claimant, the Lessee shall defend the claim, and the Trustee shall cooperate in the defense. The Trustee may have separate counsel, and the Lessee shall pay the reasonable fees and expenses actually incurred of such counsel.

(b)     The Lessee shall not be obligated to reimburse any expense or to indemnify against any loss or liability incurred by the Trustee through gross negligence, bad faith, or willful misconduct.

(c)     To secure the Lessee's payment obligations in this Section, the Trustee shall have a lien prior to the lien of the Trustee for the benefit of the owners of the Bonds on all money or property held or collected by the Trustee. Such obligations shall survive the satisfaction and discharge of this Indenture.

(d)     When the Trustee incurs expenses or renders services after an event of default, the expenses and compensation for the services are intended to constitute expenses of administration under any applicable bankruptcy law.

(e)     The Trustee may, nevertheless, begin suit, or appear in and defend suit, or do anything else in its judgment proper to be done by it as such Trustee, without indemnity, and in such case the Lessee shall reimburse the Trustee from funds available therefor under the Lease Agreement for all costs and expenses, outlays and counsel fees and other reasonable disbursements properly incurred in connection therewith. If the Lessee shall fail to make reimbursement, the Trustee may reimburse itself from any monies in its possession under the provisions of this Indenture and shall be entitled with respect thereto to a preference over the Bonds.

Section 1016.  Appointment of Co-Trustee.  It is the purpose of this Indenture that there shall be no violation of any law of any jurisdiction (including without limitation, the laws of the State) denying or restricting the right of banks or trust companies to transact business as trustees in that jurisdiction.  It is recognized that, (a) if there is litigation under the Indenture or other instruments or documents relating to the Bonds and the Project, and in particular, in case of the enforcement hereof or thereof upon a default or an Event of Default, or (b) if the Trustee should deem that, by reason of any present or future law of any jurisdiction, it may not (i) exercise any of the powers, rights or remedies granted herein to the Trustee, (ii) hold title to the properties, in trust, as granted herein, or (iii) take any action which may be desirable or necessary in connection therewith, it may be necessary that the Trustee appoint an individual or additional institution as a Co-Trustee.  The following provisions of this Section are adapted to these ends.

In the event that the Trustee appoints an individual or additional institution as a Co-Trustee, each and every trust, property, remedy, power, right, duty, obligation, discretion, privilege, claim, demand, cause of action, immunity, estate, title, interest and lien expressed or intended by this Indenture to be exercised by, vested in or conveyed to the Trustee shall be exercisable by, vest in and be conveyed to that Co-Trustee, but only to the extent necessary for it to be so vested and conveyed and to enable that Co-Trustee to exercise it. Every covenant, agreement and obligation necessary to the exercise thereof by that Co-Trustee shall run to and be enforceable by it.

This Article X of this Indenture is hereby made applicable to any Co-Trustee appointed hereunder.

Should any instrument or document in writing from the Issuer reasonably be required by any Co-Trustee for vesting and conveying more fully and certainly in and to that Co-Trustee those trusts, properties, remedies, powers, rights, duties, obligations, discretions, privileges, claims, demands, causes of action, immunities, estates, titles, interests and liens, that instrument or document shall be executed, acknowledged and delivered, but not prepared, by the Issuer. Any Co-Trustee may resign or be removed and a successor Co-Trustee appointed upon the same terms as provided for the Trustee.

ARTICLE XI.
MEETINGS OF BONDHOLDERS

Section 1101.  Purposes for Which Bondholders' Meetings May Be Called.  A meeting of Bondholders may be called at any time and from time to time for any of the following purposes:

(a)    to give any notice to the Issuer, the Lessee, or the Trustee, or to give any directions to the Trustee, or to consent to the waiving of any default or event of default hereunder and its consequences, or to take any other action authorized to be taken by Bondholders pursuant to Section 909;

(b)    to remove the Trustee pursuant to Section 1007, and to appoint a successor trustee pursuant to Section 1008;

(c)    to consent to the execution of a supplemental indenture pursuant to Section 1202, or to consent to the execution of an amendment, change or modification of the Lease Agreement pursuant to Section 1302; or

(d)    to take any other action authorized to be taken by or on behalf of the holders of any specified principal amount of the Bonds under any other provision hereof or under applicable law.

Section 1102.  Place of Meetings of Bondholders.  Meetings of Bondholders may be held at such place or places as the Trustee or, in case of its failure to act, the Bondholders calling the meeting shall from time to time determine.

Section 1103.  Call and Notice of Bondholders' Meetings.

(a)    The Trustee may at any time call a meeting of Bondholders to be held at such time and at such place as the Trustee shall determine.  Notice of every meeting of Bondholders, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be by first class mail postage prepaid, to the Bondholders at the address shown on the registration books.

(b)    In case at any time at least fifty-one percent (51%) of Bondholders responding to a poll conducted by the Trustee of the holders of all Outstanding Bonds (provided that such responding Bondholders constitute the Owners of at least thirty-five percent (35%) of the aggregate principal of Bonds Outstanding) shall have requested the Trustee to call a meeting of the Bondholders by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have given the notice of such meeting within twenty (20) days after receipt of such request, then such Bondholders may determine the time and the place for such meeting and may call such meeting to take any action authorized in Section 1201 by giving notice thereof as provided in subsection (a) of this Section.

Section 1104.  Persons Entitled to Vote at Bondholders' Meetings.  To be entitled to vote at any meeting of Bondholders, a person shall be a holder of one or more Bonds outstanding, or a person appointed by an instrument in writing as proxy for a Bondholder by such Bondholder. The only persons who shall be entitled to be present or to speak at any meeting of Bondholders shall be the persons entitled to vote at such meeting and their Counsel and any representatives of the Trustee and its Counsel and any representatives of the Lessee and its Counsel and any representatives of the Issuer and its Counsel.

-74-

Section 1105.  Determination of Voting Rights; Conduct and Adjournment of Meetings.

(a)     Notwithstanding any other provisions hereof, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Bondholders in regard to proof of the holding of Bonds and of the appointment of proxies and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate.  Except as otherwise permitted or required by any such regulations, the holding of Bonds shall be proved in the manner specified in Section 1401 and the appointment of any proxy shall be proved in the manner specified in Section 1401 or by having the signature of the person executing the proxy witnessed or guaranteed by any bank, banker or trust company authorized by Section 1401 to certify to the holding of Bonds.  Such regulations may provide that written instruments appointing proxies, regular on their face, may be presumed valid and genuine without the proof specified in Section 1401 or other proof.

(b)     The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by Bondholders as provided in subsection (b) of Section 1103, in which case the Bondholders called the meeting shall in like manner appoint a temporary chairman.  A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the holders of a majority of the Bonds represented at the meeting and entitled to vote.

(c)     At any meeting each Bondholder or proxy shall be entitled to one vote for each $5,000 principal amount of Bonds outstanding held or represented by him; provided, however, that no vote shall be cast or counted at any meeting in respect of any Bond challenged as not outstanding and ruled by the chairman of the meeting to be not outstanding.  The chairman of the meeting shall have no right to vote, except as a Bondholder or proxy.

(d)     At any meeting of Bondholders, the presence of persons holding or representing Bonds in an aggregate principal amount sufficient under the appropriate provision hereof to take action upon the business for the transaction of which such meeting was called shall constitute a quorum.  Any meeting of Bondholders called pursuant to Section 1103 may be adjourned from time to time by vote of the holders (or proxies for the holders) of a majority of the Bonds represented at the meeting and entitled to vote, whether or not a quorum shall be present; and the meeting may be held as so adjourned without further notice.

Section 1106.  Counting Votes and Recording Action of Meetings.  The vote upon any resolution submitted to any meeting of Bondholders shall be by written ballots on which shall be subscribed the signatures of the Bondholders or of their representatives by proxy and the number or numbers of the Bonds outstanding held or represented by them.  The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting.  A record, at least in triplicate, of the proceedings of each meeting of Bondholders shall be prepared by the secretary

of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was published or mailed as provided in Section 1103. Each copy shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one such copy shall be delivered to the Issuer, another to the Lessee and another to the Trustee to be preserved by the Trustee, which copy shall have attached thereto the ballots voted at the meeting. Any record so signed and verified shall be conclusive evidence of the matters therein stated.

Section 1107. Revocation by Bondholders. At any time prior to (but not after) the evidencing to the Trustee, in the manner provided in Section 1106, of the taking of any action by the holders of the percentage in aggregate principal amount of the Bonds specified herein in connection with such action, any holder of a Bond the number of which is included in the Bonds the holders of which have consented to such action may, by filing written notice with the Trustee at its principal office and upon proof of holding as provided in Section 1401, revoke such consent so far as concerns such Bond. Except as aforesaid any such consent given by the holder of any Bond shall be conclusive and binding upon such holder and upon all future holders of such Bond and of any Bond issued in exchange therefor or in lieu thereof, irrespective of whether or not any notation in regard thereto is made upon such Bond. Any action taken by the holders of the percentage in principal amount of the Bonds specified herein in connection with such action shall be conclusively binding upon the Issuer, the Lessee, the Trustee and the holders of all the Bonds.

ARTICLE XII.
SUPPLEMENTAL INDENTURES

Section 1201. Supplemental Indentures Not Requiring Consent of Bondholders. The Issuer and the Trustee may without the consent of, or notice to, any of the Bondholders, enter into an indenture or indentures supplemental hereto which shall not be inconsistent with the terms and provisions hereof for any one or more of the following purposes, provided that in the opinion of Independent Counsel the change effected thereby is not to the prejudice of the interests of the Trustee or the Bondholders:

(a)    to cure any ambiguity or formal defect;

(b)    to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers or authorities that may lawfully be granted to or conferred upon the Bondholders or the Trustee or either of them;

(c)    to subject to the lien and pledge hereof additional payments, revenues, properties or collateral;

(d)      to modify, amend or supplement this Indenture or any indenture supplemental hereto in such manner as to permit the qualification hereof and thereof under the Trust Indenture Act of 1939, as amended, or any similar Federal statute hereafter in effect or to permit the qualification of the Bonds for sale under the securities laws of any of the states of the United States of America, and, if they so determine, to add hereto or to any indenture supplemental hereto such other terms, conditions and provisions as may be permitted by said Trust Indenture Act of 1939 or similar Federal statute; or

(e)      to evidence the appointment of a separate Trustee or co-trustee or the succession of a new Trustee hereunder.

Section 1202.  Supplemental Indentures Requiring Consent of Bondholders.  Exclusive of supplemental indentures covered by Section 1201 and subject to the terms and provisions contained in this Section, and not otherwise, fifty-one percent (51%) or more of Bondholders responding to a poll conducted by the Trustee of the holders of all Outstanding Bonds (provided that such responding Bondholders constitute the Owners of at least thirty-five percent (35%) of the aggregate principal of Bonds Outstanding) shall have the right, from time to time, anything contained herein to the contrary notwithstanding, to consent to and approve the execution by the Issuer and the Trustee of such other indenture or indentures supplemental hereto as shall be deemed necessary and desirable by the Issuer for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained herein or in any supplemental indenture; provided, however, that nothing in this Section contained shall permit, or be construed as permitting, (a) an extension of the maturity date (or mandatory sinking fund redemption date) on which the principal of or the interest on any Bond is, or is to become, due and payable, (b) a reduction in the principal amount of any Bond, the rate of interest thereon or any redemption premium, (c) a privilege or priority of any bond or Bonds over any other Bond or Bonds, or (d) a reduction in the principal amount of the Bonds required for consent to such supplemental indenture.

If the Issuer shall request the Trustee to enter into any such supplemental indenture for any of the purposes of this Section, the Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause written notice of the proposed execution of such supplemental indenture together with a copy of such proposed supplemental indenture to be given by first class mail, postage prepaid, to the holders of the Bonds at their addresses shown on the Trustee's books of registration.  If, within sixty (60) days or such longer period as shall be prescribed by the Issuer following the mailing of such notice, the holders of at least fifty-one percent (51%) or more of Bondholders responding to a poll conducted by the Trustee of the holders of all Outstanding Bonds (provided that such responding Bondholders constitute the Owners of at least thirty-five percent (35%) of the aggregate principal of Bonds Outstanding) shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee or the Issuer from executing the same or from taking any action pursuant to the provisions thereof.

-77-

Upon the execution of any such supplemental indenture as in this Section permitted and provided, this Indenture shall be modified and amended in accordance therewith.

Anything herein to the contrary notwithstanding, a supplemental indenture under this Article XII shall not become effective unless and until the Lessee shall have consented to the execution and delivery of such supplemental indenture. In this regard, the Trustee shall cause notice of the proposed execution and delivery of any such supplemental indenture together with a copy of the proposed supplemental indenture to be mailed by certified or registered mail to the Lessee at least fifteen (15) days prior to the proposed date of execution and delivery of any such supplemental indenture. The Lessee shall be deemed to have consented to the execution and delivery of any such supplemental indenture if the Trustee does not receive a letter of protest or objection thereto signed by or on behalf of the Lessee on or before 4:30 o'clock P.M., prevailing Eastern time, of the fifteenth (15th) day after the mailing of said notice and a copy of the proposed supplemental indenture.

This Indenture may not be amended, changed or modified except by the execution and delivery of a supplemental indenture entered into in accordance with the provisions of this Article XII.

Section 1203. Trustee Authorized to Join in Supplements, Reliance on Counsel. The Trustee is authorized to join with the Issuer in the execution and delivery of any supplemental indenture permitted by this Article XII and, in so doing, shall be fully protected by an opinion of Independent Counsel that such supplemental indenture is so permitted and has been duly authorized by the Issuer and that all things necessary to make it a valid and binding supplemental indenture have been done.

ARTICLE XIII.
AMENDMENT OF LEASE AGREEMENT AND SECURITY AGREEMENT

Section 1301. Amendments, etc., to Lease Agreement and Security Agreement Not Requiring Consent of Bondholders. Upon receipt of the documents set forth in Section 405, the Trustee shall without the consent of, or notice to, the Bondholders consent to any amendment, change or modification of the Lease Agreement, this Indenture and/or the Security Agreement as may be required

      (a)     by the provisions of the Lease Agreement, this Indenture, or the Security Agreement or hereby, or

      (b)     for the purpose of curing any ambiguity or formal defect or omission in the Lease Agreement, this Indenture, or the Security Agreement; or

-78-

(c)    in connection with any other change which is not to the prejudice of the Trustee or materially adverse to the holders of the Bonds;

provided that in the opinion of Independent Counsel satisfactory to the Trustee the amendment, change or modification effected thereby is not to the prejudice of the interests of the Trustee or the Bondholders.

Section 1302. Amendments, etc., to Lease Agreement and Security Agreement Requiring Consent of Bondholders. Except for the amendments, changes or modifications as provided in Section 1301, neither the Issuer nor the Trustee shall consent to any other amendment, change or modification of the Lease Agreement, the Security Agreement, or the Indenture without (1) the giving of notice and the written approval or consent of the holders of at least fifty-one percent (51%) or more of Bondholders responding to a poll conducted by the Trustee of the holders of all Outstanding Bonds (provided that such responding Bondholders constitute the Owners of at least thirty-five percent (35%) of the aggregate principal of Bonds Outstanding), and (ii) the giving of notice in accordance with the procedure set forth in Section 1202; provided, however, nothing contained in this Article shall permit, or be construed as permitting, any amendment, change or modification of the Lessee's unconditional obligation to make the payments required under the Lease Agreement or the Lessee's agreements with respect to the use of Bond proceeds.  If at any time the Issuer and the Lessee shall request the consent of the Trustee to any such proposed amendment, change or modification of the Lease Agreement or, the Security Agreement, the Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of such proposed amendment, change or modification to be given in the same manner as provided by Section 1202 with respect to proposed supplemental indentures. Such notice shall briefly set forth the nature of such proposed amendment, change or modification and shall state that copies of the instrument embodying the same are on file at the principal office of the Trustee for inspection by Bondholders.

Section 1303. Trustee Authorized to Join in Amendments, Reliance on Counsel.  The Trustee is authorized to join with the Issuer in the execution and delivery of any amendment permitted by this Article XIII and, in so doing, shall be fully protected by an opinion of Independent Counsel that such amendment is so permitted and has been duly authorized by the Issuer and that all things necessary to make it a valid and binding agreement have been done.

ARTICLE XIV.
MISCELLANEOUS

Section 1401. Consents, etc., of Bondholders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided to be given or taken by Bondholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Bondholders in person or by agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer and the Lessee.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose hereof and conclusive in favor of the Trustee, the Lessee, and the Issuer, if made in the manner provided in this Section.

(b)    The fact and date of the execution by any person of any such instrument or writing may be proved by the affidavit of a witness of such execution by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by an officer of a corporation or a member of a partnership, on behalf of such corporation or partnership, such certificate or affidavit shall also constitute sufficient proof of his authority.

(c)    The ownership of Bonds shall be conclusively proved for all purposes by the registration books kept by the Trustee as Bond Registrar.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by any Bondholder shall bind every future holder of the same Bond in respect of anything done or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Bond.


Section 1402.  Issuer's Obligations Limited.  No recourse under or upon any obligation or agreement contained in this Indenture or in any Bond or under any judgment obtained against the Issuer, or by the enforcement of any assessment or by any legal or equitable proceeding by virtue of any constitution or statute or otherwise or under any circumstances, under or independent of this Indenture, shall be had against the Issuer.

Anything in this Indenture to the contrary notwithstanding, it is expressly understood and agreed by the parties hereto that (a) the Issuer may rely conclusively on the truth and accuracy of any certificate, opinion, notice or other instrument furnished to the Issuer by the Trustee or the Lessee as to the existence of any fact or state of affairs required hereunder to be noticed by the Issuer; (b) the Issuer shall not be under any obligation hereunder to perform any record-keeping or to provide any legal services, it being understood that such services shall be performed either by the Trustee or the Lessee; and (c) none of the provisions of this Indenture shall require the Issuer to expend or risk its own funds or to otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder, unless it shall first have been adequately indemnified to its satisfaction against the cost, expenses and liability which may be incurred thereby.

-80-

Notwithstanding anything herein contained to the contrary, any obligation which the Issuer may incur under this Indenture or under any instrument executed in connection herewith which shall entail the expenditure of money shall not be a general obligation of the Issuer or the City but shall be a limited obligation payable solely from the Pledged Revenues.

Section 1403. Immunity of Directors, Officers or Employees of Issuer. No recourse shall be had for the enforcement of any obligation, promise or agreement of the Issuer contained in the Lease Agreement, this Indenture or in any Bond issued hereunder for any claim based thereon or otherwise in respect thereof, against any director, officer, employee or agent, as such, in his individual capacity, past, present or future, of the Issuer or of any successor corporation, either directly or through the Issuer or any successor corporation, whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assignment or penalty or otherwise; it being expressly agreed and understood that the Bonds, the Lease Agreement, the Security Agreement and this Indenture are solely corporate obligations, and that no personal liability whatsoever shall attach to, or be incurred by, any director, officer, employee, or agent, as such, past, present or future, of the Issuer or of any successor corporation, either directly or through the Issuer or any successor corporation, under or by reason of any of the obligations, promises or agreements entered into between the Issuer and the Lessee whether contained in the Lease Agreement or the Security Agreement or to be implied therefrom as being supplemental hereto or thereto, and that all personal liability of that character against every such director, officer, employee, or agent is, by the execution of the Lease Agreement and this Indenture, and as a condition of, and as part of the consideration for, the execution of the Lease Agreement, the Security Agreement and this Indenture, expressly waived and released.

Section 1404. Limitation of Rights. With the exception of rights herein expressly conferred, nothing expressed or mentioned in or to be implied herefrom or from the Bonds is intended or shall be construed to give to any person other than the parties hereto, the Lessee and the holders of the Bonds, any legal or equitable right, remedy or claim under or in respect hereto or any agreements, conditions and provisions herein contained; this Indenture and all of the agreements, conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto, the Lessee and the holders of the Bonds as herein provided.

Section 1405. No Liability of Issuer. Anything herein to the contrary notwithstanding, nothing contained in this Trust Indenture or in any other document that is a part of this transaction, including, but not limited to, the Bond Resolution of the Issuer, the Lease Agreement and/or the Mortgage and Security Agreement, shall, in any manner whatsoever be deemed to constitute a debt or a general obligation, or a pledge of the faith and credit of the Issuer, the City of Mobile, Alabama, the State of Alabama, or any political subdivision of the State, and does not directly or indirectly or contingently, obligate the Issuer, said City, said State or any political subdivision of the State to levy or to pledge any form of taxation whatever for the payment of the

principal indebtedness, redemption premium (if any), interest, or any other indebtedness, costs, or expense.

Section 1406. Severability. If any provision hereof shall be held or deemed to be or shall, in fact, be inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions or in all jurisdictions, or in all cases because it conflicts with any other provision or provisions hereof or any constitution or statute or rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatever.

Section 1407. Notices. It shall be sufficient service of any notice, approval, consent, request, complaint, demand or other communication if the same shall be delivered or mailed by first class registered or certified mail, return receipt requested, postage prepaid, and addressed, as follows:

(a)   If to the Issuer:        The Medical Clinic Board of the City of Mobile (Second)
                              James P. Rossler
                              1 South Royal Street #300
                              Mobile, Alaama  36602-3249

      with a copy to:          James P. Rossler, Esq.
                              1 South Royal Street #300
                              Mobile, Alabama  36602-3249

(b)   If to the Lessee:       Bama Oaks Retirement, LLC
                              Two Buckhead Plaza
                              3050 Peachtree Road NW, Suite 355
                              Atlanta, Georgia 30305

      with a copy to:          Gregory P. Youra, Esq.
                              Holt Ney Zatcoff & Wasserman, LLP
                              100 Galleria Parkway, Suite 600
                              Atlanta, GA  30339

(c)   If to the Trustee:      BOKF, NA dba Bank of Oklahoma
                              One Williams Center
                              Tulsa, Oklahoma 74192
                              Attn: Marrien Neilson

-82-

(d)    If to the Underwriter:  Lawson Financial Corporation
3352 E. Camelback Road
Phoenix, Arizona 85018
Attn: Robert E. Lawson

A duplicate copy of each notice, approval, consent, request, complaint, demand or other communication given hereunder by the Issuer, the Lessee or the Trustee, to any one of the others shall also be given to all of the others.  The Issuer, the Lessee and the Trustee may, by notice given hereunder, designate any further or different addresses to which subsequent notices, approvals, consents, requests, complaints, demands or other communications shall be sent or persons to whose attention the same shall be directed.

Section 1408.  Trustee as Paying Agent and Bond Registrar.  The Trustee is hereby designated and agrees to act as paying agent and Bond Registrar for and in respect to the Bonds.

Section 1409.  Payments Due on Saturdays, Sundays and Holidays.  In any case where the date of maturity of principal of and/or interest on the Bonds or the date fixed for the redemption of any Bonds shall be, in the city of payment, a Saturday, a Sunday, a legal holiday or a day on which banking institutions are authorized by law to close, then payment of principal and/or interest need not be made on such date in such city but may be made on the next succeeding business day not a Saturday, a Sunday, a legal holiday or a day on which banking institutions are authorized by law to close with the same force and effect as if made on the date of maturity or the date fixed for the redemption, and if such payment is made on the next succeeding business day no interest shall accrue for the period after such date.

Section 1410.  Counterparts.  This Indenture may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

Section 1411.  Laws Governing Indenture.  The effect and meaning hereof and the rights of all parties hereunder shall be governed by, and construed according to, the laws of the State of Alabama.

Section 1412.  Venue and Jurisdiction.  Jurisdiction for any litigation growing out of the enforcement of the provisions of this Indenture shall lie in the State of Alabama, and venue shall lie in the Circuit Court of Mobile County.

-83-

IN WITNESS WHEREOF, the Issuer has caused this Indenture to be executed in its corporate name and its corporate seal to be affixed hereto and attested by its authorized officers, and to evidence its acceptance of the trusts hereby created the Trustee has caused these presents to be executed in its corporate name by its authorized officers, all as of the date first above written.

THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND)

(SEAL)

By: _____
        Chairman

Attest:

_____
Secretary

-82-

BOKF, NA DBA BANK OF OKLAHOMA,
as Trustee



(CORPORATE SEAL)

By: _____

      Senior Vice President

I:\TX.12\10000\10743.0190.Trust Indenture. 11 21  2012 (C)

-85-

# EXHIBIT "B"

2012069513  Book-6961  Page-1391
Total Number of Pages: 59

14950
200
15150

## LEASE AGREEMENT

BETWEEN

## THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND)

and

## BAMA OAKS RETIREMENT, LLC

Dated as of November 1, 2012

This Lease Agreement and certain rights of The Medical Clinic Board of the City of Mobile (Second) (the "Issuer) under this Lease Agreement have been assigned and pledged to, and are subject to a security interest in favor of, BOKF, NA dba Bank of Oklahoma, Tulsa, Oklahoma, as trustee under the Trust Indenture (the "Trustee"), dated as of even date herewith, as amended or supplemented from time to time, between the Issuer and the Trustee, which secures $5,740,000 in aggregate principal amount of (1) $5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012A (the "Series 2012A Bonds"), and of (2) $630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (BAMA Oaks Retirement, LLC Project II), Taxable Series 2012B (the "Series 2012B Bonds") (hereinafter collectively the "Bonds"). Information concerning such security interest may be obtained from the Trustee BOKF, NA dba Bank of Oklahoma, Tulsa, Oklahoma.

This instrument was prepared by:

SELL & MELTON, L.L.P.
577 Mulberry Street, 14th Floor
P.O. Box 229
Macon, Georgia 31202-0229
Telephone: (478) 464-5322
Facsimile: (478) 464-5382
Email: rcmiller@sell-melton.com

State of Alabama-Mobile County
I certify this instrument was filed on:
December 3, 2012 @    11:45:25 AM
NO TAX STAMP            $1.00
S.R. FEE                $2.00
RECORDING FEES        $148.50
TOTAL AMOUNT          $151.50

2012069513
Don Davis, Judge of Probate

# EXHIBIT "B"

## TABLE OF CONTENTS

ARTICLE I.    DEFINITIONS AND CERTAIN RULES OF INTERPRETATION ....................1
Section 1.1.    Definitions. ...........................................................................................1
ARTICLE II.    REPRESENTATIONS..........................................................................9
Section 2.1.    Representations by the Issuer ..........................................................9
Section 2.2.    Representations by the Lesse .........................................................10
ARTICLE III.    REHABILITATION OF THE FACILITY; ISSUANCE OF THE BONDS........13
Section 3.1.    Rehabilitation of the Facility..........................................................13
Section 3.2.    Agreement to Issue Bonds; Application of Proceed............................13
Section 3.3.    Disbursement from the Project Fund ..............................................14
Section 3.4.    Obligation to Furnish Documents to Trustee and Issuer.....................17
Section 3.5.    Establishment of Completion Date ..................................................17
Section 3.6.    Lessee Required to Pay Project Costs and Costs of Facility Rehabilitation........18
Section 3.7.    Remedies Against Suppliers, Contractors and Subcontractors and Their Sureties....19
Section 3.8.    Fund Investment.............................................................................19
ARTICLE IV.    TITLE TO FACILITY; PROVISIONS FOR PAYMENT.................................19
Section 4.l.    Title to the Facility.........................................................................19
Section 4.2.    Payment Obligations of the Lessee...................................................20
Section 4.3.    Other Payments; Trustee's Fees and Expenses. ................................22
Section 4.4.    Obligations of the Lessee Absolute and Unconditional.......................22
Section 4.5.    Lessee Consents to Assignment of Agreement and Security Agreement
                and  Execution of Indenture...........................................................24
Section 4.6.    Lessee's Performance Under Indenture…...........................................23
Section 4.7.    Permitted Encumbrances.. .............................................................23
ARTICLE V.    PARTICULAR AGREEMENTS .............................................................24
Section 5.1.    Maintenance and Operation of Facility; Taxes; No Operation of Facility by
                Issuer Removal of  Equipment........................................................24
Section 5.2.    Indemnification of Issuer and Trustee. ............................................24
Section 5.3.    Covenants Regarding Maintenance of Lessee's Existence ...................25
Section 5.4.    Annual Audit; Provision of Reports and Financial Information..............26
Section 5.5.    Agreement of Issuer Not to Assign or Pledge.. ..................................27
Section 5.6.    Redemption of Bonds .....................................................................27
Section 5.7.    Reference to Bonds Ineffective After Bonds Paid................................27
Section 5.8.    Assignment, Sale or Lease of Facility.. ............................................28
Section 5.9.    Covenants of Lessee and Issuer With Respect to Excludability from Gross
                Income of Interest By the Series 2012A Bonds From Federal Income Taxation..28
Section 5.10.    Non-Arbitrage Covenant; Compliance With Special Arbitrage Rules. .................29
Section 5.11.    Notification of Act of Bankruptcy ...................................................35
Section 5.12.    Insurance.....................................................................................35
Section 5.13.    Condemnation of the Facility. ........................................................36
Section 5.14.    Financial Covenants by Lessee. ......................................................37
Section 5.15.    Inspections.. ................................................................................38
Section 5.16.    No Liability of Issuer......................................................................38

Section 5.17.    Incorporation of "Agreement, Joinder and Indemnity by Lessee" to the
                 Security Agreement. ...................................................................................38
Section 6.1.     Events of Default Defined. ........................................................................39
Section 6.2.     Remedies. ...................................................................................................39
Section 6.3.     No Remedy Exclusive. ...............................................................................40
Section 6.4.     Agreement to Pay Counsel Fees and Expenses. .........................................40
Section 6.5.     Waiver of Events of Default and Rescission of Acceleration. ...................40
ARTICLE VII. PREPAYMENT UNDER AGREEMENT ...........................................................41
Section 7.l.     Option to Prepay Installment Amounts Under Agreement in Whole in Certain
                 Events. ........................................................................................................41
Section 7.2.     Payment of Taxable Rate Upon a Determination of Taxability. ..................42
Section 7.3.     Damage and Destruction. ...........................................................................42
ARTICLE VIII.  MISCELLANEOUS ..........................................................................................43
Section 8.l.     Term of Agreement. ...................................................................................43
Section 8.2.     Notices. .......................................................................................................43
Section 8.3      Binding Effect. ...........................................................................................44
Section 8.4.     Severability. ................................................................................................44
Section 8.5.     Amounts Remaining in Project Fund or Bond Fund or Special Fund ..............44
Section 8.6.     Delegation of Duties and Assignment of Rights by Issuer. ........................44
Section 8.7.     Amendments, Changes and Modifications. .................................................45
Section 8.8.     Counterparts. ..............................................................................................45
Section 8.9.     Captions. .....................................................................................................45
Section 8.10.    Payments Due on Saturday, Sundays and Holidays. ...................................45
Section 8.11.    Law Governing Construction of Agreement ...............................................45
ARTICLE IX. OPTIONS IN FAVOR OF LESSEE ......................................................................45
Section 9.01.    General Options to Terminate Lease Term ..................................................45
Section 9.02.    Option to Purchase Facility in Certain Events ...........................................46
Section 9.03.    Option to Prepay and Redeem Bonds at Optional Redemption Dates. ...........47
Section 9.04     Option to Prepay and Redeem the Series 2012A Bonds upon Determination
                 of Taxability. ..............................................................................................47
Section 9.05.    Conveyance on Exercise of Option to Purchase ..........................................48
Section 9.06.    Relative Position of Options and the Indenture.. ........................................48
Section 9.07.    Public Purpose of Option to Purchase. .......................................................48
EXHIBIT A REQUISITION AND CERTIFICATION ................................................................51
EXHIBIT B REQUISITION AND CERTIFICATION ................................................................53
EXHIBIT C REAL PROPERTY DESCRIPTION .......................................................................55

LEASE AGREEMENT


THIS LEASE AGREEMENT (the "Agreement") is entered into as of November 1, 2012, by and between THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND) (the "Issuer"), a public corporation and instrumentality duly organized and existing under the laws of the State of Alabama, as lender, and BAMA OAKS RETIREMENT, LLC (the "Lessee"), a Georgia limited liability company authorized to do business in the State of Alabama, as Lessee.

W I T N E S S E T H:

In consideration of the respective representations, covenants and agreements hereinafter contained, the Issuer and the Lessee DO HEREBY AGREE, as follows;


ARTICLE I.  DEFINITIONS AND CERTAIN RULES OF INTERPRETATION


Section 1.1.    Definitions.  In addition to the words and terms elsewhere defined herein, the following words and terms as used herein shall have the following meanings unless the context or use clearly indicates another or different meaning or intent, and any other words and terms defined in the Indenture shall have the same meanings when used herein as assigned them in the Indenture unless the context or use clearly indicates another or different meaning or intent:

"Act" means Section 11-58-1 *et seq.*, of Code of Alabama (1975), as amended, and other applicable provisions of law;

"Act of Bankruptcy" means the filing of a petition in bankruptcy under the United States Bankruptcy Code or the commencement of a proceeding under any other applicable law now or hereafter in effect concerning insolvency, reorganization or bankruptcy by or against the Lessee or the Issuer, as debtor;

"Ad Valorem Tax Fund" means the Ad Valorem Tax Fund created in Section 510 of the Indenture;

"Agreement" means this Lease Agreement as it now exists and as it may hereafter be amended pursuant to Article XIII of the Indenture;  "Arbitrage    Rebate    Fund"    means    the Arbitrage Rebate Fund created in Section 511 of the Indenture;

"Authorized Lessee Representative" means the person at the time designated to act on behalf of the Lessee by written certificate furnished to the Issuer and the Trustee containing the specimen signature of such person and signed on behalf of the Lessee by an authorized officer or agent.  Such certificate may designate an alternate or alternates;

"Bond Fund" means the Bond Fund created in Section 502 of the Indenture;

"Bond Purchase Agreement" shall have the meaning ascribed to the term in the Indenture;

"Bond Rate" means those rates of interest set forth in the Indenture;

"Bondholder" or "holder of the Bonds" or "holder" means the registered owner of any Bond;

"Bonds" or "Series 2012A Bonds" means the aggregate of the $5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (BAMA Oaks Retirement, LLC Project II), Series 2012A (the "Series 2012A Bonds") and the $630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (BAMA Oaks Retirement, LLC Project II), Taxable Series 2012B (the "Series 2012B Bonds") issued pursuant to the Indenture;

"Business day" means a day on which the Trustee is open to conduct general business at its corporate trust office;

"Capitalized Interest Account" means the Capitalized Interest Account, initially containing $186,996, that forms a part of the Bond Fund, which amount shall be held by the Trustee to pay interest on the Bonds during the period that the Facility is being rehabilitated;

"Chairman" means Chairman of the Issuer;

"City" means the City of Mobile, Alabama;

"Code" means the Internal Revenue Code of 1986, as amended, including, when appropriate, the statutory predecessor of the Code, and all applicable regulations thereunder whether proposed, temporary or final, including regulations issued and proposed pursuant to the statutory predecessor of the Code, and, in addition, all official rulings and judicial determinations applicable to the Bonds under the Code and under the statutory predecessor of the Code and any successor provisions to the relevant provisions of the Code or regulations;

"Completion Date" means the date of completion of the Facility as that date shall be certified as provided in Section 3.5;

"Counsel" means an attorney, or firm thereof, admitted to practice law before the highest court of any state in the United States of America or the District of Columbia;

"County" means Mobile County, Alabama;

"Days' Cash On Hand" means the number determined as of the last day of each fiscal quarter of the Lessee by (A) multiplying (i) the number of days in such fiscal quarter by (ii) the amount of cash and cash equivalents (determined by reference to the Lessee's financial statements for each such date), and (B) dividing the amount determined in clause (A) by an amount equal to the total operating expenses of the Facility for such fiscal quarter, less any bad debts to the extent included in such operating expenses and all depreciation and amortization attributed to the Facility for such fiscal quarter;

2

"Debt Service Coverage Ratio" has the meaning attributed thereto in Section 5.15 of this Agreement;

"Debt Service Reserve Fund" means the Debt Service Reserve Fund created in Section 606 of the Indenture;

"Default" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice or both, become an Event of Default;

"Determination of Taxability" means a determination that the interest income on any of the Series 2012A Bonds is subject to Federal income taxation, which determination shall be deemed to have been made upon the occurrence of the first to occur of the following:

(a)     the date on which the Trustee is notified that an attorney or a law firm having a national reputation in the field of municipal law whose opinions are generally accepted by purchasers of municipal obligations is unable to deliver an opinion requested of it that the interest on the Series 2012A Bonds qualifies as exempt interest under Section 103 of the Code, it being understood that no such attorney or firm is under any obligation to deliver such opinion unless retained specifically to do so; or

(b)     the date on which any change in law or regulation becomes effective or on which the Internal Revenue Service issues any public ruling or on which there shall occur a ruling or decision of a court of competent jurisdiction with or to the effect that the interest income on any of the Series 2012A Bonds is not excludable from gross income of the Holders thereof for federal income tax purposes under Section 103 of the Code; or

(c)     the date on which the Lessee receives notice from the Trustee in writing that the Trustee has been notified by the Internal Revenue Service, or is advised by any Bondholder or former Bondholder that the Internal Revenue Service has issued a notice of deficiency or similar notice which asserts that the interest on any of the Series 2012A Bonds is not excludable from gross income of the Holders thereof for federal income tax purposes under Section 103 of the Code; provided, however, that, should the Lessee elect to contest, at its own expense, any determination of taxability made pursuant to subparagraphs (a), (b) or (c) of this paragraph and shall deliver to the Trustee a letter of credit from a bank acceptable to the Trustee, and approved by the holders of more than fifty percent (50%) of the outstanding principal amount of the Series 2012A Bonds  in an amount sufficient to provide for the payment of additional interest which would be required to be paid on the Series 2012A Bonds  as a result of a Determination of Taxability (calculated at 12.00% per annum from the Event of Taxability), then no determination of taxability shall be deemed to have occurred unless such contest has been finally determined.

"Event of Default" means one of the events so denominated and described in Section 6.1;

"Event of Taxability" means the date on which the interest income on the Series 2012A Bonds becomes subject to Federal income taxation as a result of any of the following conditions or circumstances:

(a)    the Series 2012A Bonds constitute an "arbitrage bond" within the meaning of Section 148 of the Code; or

(b)    more than 25% of the net proceeds of the sale of the Series 2012A Bonds are used to provide a facility the primary purpose of which is one of the following: retail food and beverage services (including eating and drinking places, but excluding grocery stores), automobile sales or service, or the provision of recreation or entertainment; or

(c)    any portion of the net proceeds of the sale of the Series 2012A Bonds is used to provide the following: any private or commercial golf course, country club, massage parlor, tennis club, skating facility (including roller skating, skateboard and ice skating), racquet sports facility (including any handball or racquetball court), hot tub facility, suntan facility or racetrack; or

(d)    any portion of the net proceeds of the sale of the Series 2012A Bonds is used (directly or indirectly) for the acquisition of land (or an interest therein) to be used for farming purposes, or 25% or more of the net proceeds of the sale of the Series 2012 Bonds is used (directly or indirectly) for the acquisition of land (or an interest therein) other than land to be used for farming purposes; or

(e)    any portion of the net proceeds of the sale of the Series 2012A Bonds is used for the acquisition of any property the first use of which property is not pursuant to such acquisition, except with respect to any building (and the equipment therefor) if the rehabilitation expenditures with respect to such building equals or exceeds 15% of the portion of the cost of acquiring such building (and equipment) financed with the proceeds of the issue; or

(f)    any portion of the net proceeds of the sale of the Series 2012A Bonds is used to provide any airplane, skybox or other luxury box, any health club facility, any facility primarily used for gambling, or any store the principal business of which is the sale of alcoholic beverages for consumption off premises; or

(g)    the taking of any action by the Issuer, the Borrower or any person acting on the Borrower's behalf or upon the Borrower's direction, or the failure of the Issuer, the Borrower or any such person to take any action, or any mistake in or untruthfulness of any representation of the Issuer or the Borrower contained in this Agreement or in any certificate of the Issuer or the Borrower delivered pursuant to this Agreement or in connection with the issuance of the Series 2012A Bonds, if such act or omission, or such mistake in or untruthfulness of such representation, has the effect of causing the interest income on the Series 2012A Bonds to be or become subject to Federal income taxation; or

(h)    as a result of a change in the tax laws of the United States; or

(i)    any other condition or circumstance that results in a Determination of Taxability;

provided, however, that no Event of Taxability shall be deemed to have occurred with respect to

the Series 2012A Bonds if the interest income thereon shall be subject to Federal income taxation for any period solely because during that period the Series 2012A Bonds were held by a person who is a "Substantial User" or a "Related Person," as those terms are defined in the Code;

"Facility" means the existing 88-unit independent living facility located at 3145 Knollwood Drive, Mobile, Alabama 36693;

"Financing Statements" means any and all financing statements (including continuation statements) filed for record from time to time to perfect the security interests created or assigned, pursuant to the Indenture;

"Fiscal Year" means January 1 through December 31;

"Funds Available for Debt Service" means in any period the Facility's Gross Revenues for such period, <u>minus</u> the Facility's operating expenses (as set forth in the Operating Budget required by Section 5.4 of this Agreement), <u>plus</u>, to the extent included in such operating expenses, depreciation and amortization, interest on long-term indebtedness (including the Series 2012 Bonds), amortization of discount and financial expenses incurred in connection with the issuance of long-term indebtedness, and other non-cash expense deducted in accordance with generally accepted accounting principles consistently applied.

"Gross Revenues" means the gross revenues received by the Lessee and/or Manager in connection with the management or operation of the Facility, exclusive, however, of any amounts collected by the Lessee representing sales taxes or user fees which may be required by law or agreement to be paid to the State of Alabama, or gifts, grants, bequests, donations and contributions heretofore or hereafter made and designated at the time of making thereof by the donor or maker as being for certain specified purposes inconsistent with the application thereof to the payment of debt service on the Bonds;

"Indenture" means the Trust Indenture, of even date herewith, between the Issuer and the Trustee, including any indentures supplemental thereto;

"Independent Counsel" means an attorney or firm thereof, duly admitted to practice law before the highest court of any state in the United States of America or the District of Columbia and not an employee on a full-time basis of either the Issuer or the Lessee (but who or which may be regularly retained by either);

"Independent Engineer" means an engineer or engineering firm registered and qualified to practice the profession of engineering under the laws of the State and not an employee on a full-time basis of either the Issuer or the Lessee (but who or which may be regularly retained by either);

"Interest Payment Date" means the first day of each consecutive calendar month commencing February 1, 2013 (each, an "Interest Payment Date") during the period that the Bonds are Outstanding;

"Issuer" means The Medical Clinic Board of the City of Mobile (Second), a public

corporation and instrumentality duly organized and existing under the laws of the State of Alabama, its successors and assigns;

"Land Use Restriction Agreement" means that certain Land Use Restriction Agreement, dated as of November 1, 2012, by and between the Lessee and the Trustee;

"Lessee" means BAMA Oaks Retirement, LLC, a Georgia limited liability company;

"Lease Term" means the term of this Agreement as set forth in Section 8.1 hereof;

"Local Facilities" means "facilities" (as the term "facilities" is used in Section 144 of the Code) of which the Lessee or a Related Person thereto is or will be the Principal User and which are located wholly within the County. For purposes of this definition, a contiguous or integrated "facility" located on both sides of the border between any two or more political jurisdictions shall be considered as being located wholly within each such political jurisdiction;

"Lock Box Release Requirement" shall have the meaning ascribed to this term in Section 4.2 hereof;

"Lock Box Trigger Event" shall have the meaning ascribed to that term in Section 4.2 hereof;

"Management Agreement" means the Management Agreement between the Lessee and the Management Company for the management of the Facility on behalf of the Lessee, dated as of November 1, 2012;

"Management Company" means Saint Simons Health Care, L.L.C., a Georgia limited liability company;

"Management Consultant" means an expert Person of recognized standing, qualified and experienced in the field of independent living management and acceptable to the Trustee;

"Net proceeds of the sale of the Bonds" means those proceeds of the sale of the Bonds remaining after payment of all expenses in connection with the issuance of the Bonds and the deposit of all accrued interest (if any) received from the sale of the Bonds into the Bond Fund, together with investment earnings on such net proceeds earned prior to the Completion Date;

"Net Proceeds" when used with respect to any insurance or condemnation award, or with respect to any other recovery or a contractual claim or claims for damage to or for the taking of property, means the gross proceeds of such award remaining after payment of all expenses incurred in the collection of such gross proceeds;

"Operating Account" means an account to be opened and held by the Lessee for the purposes set forth in Section 4.2 hereof;

"Operating Budget" means the Operating Budget for the operation of the Facility submitted to the Trustee by the Lessee;

"Payment in full of the Bonds" specifically encompasses the situations referred to in Section 5.7 hereof and Section 802 of the Indenture;

"Permitted Encumbrances" means the permitted encumbrances set forth in Section 4.7 of this Agreement;

"Permitted Investments" means those "Permitted Investments" set forth in Section 101 of the Indenture;

"Person" means any natural person, corporation, cooperative, partnership, trust or unincorporated organization, government or governmental body or agency, political subdivision or other legal entity as in the context may be appropriate;

"Pledged Revenues" means and shall include:

(a)    the Gross Revenues received by the Lessee and/or Manager in connection with the management or operation of the Facility, the payments required to be made by the Lessee under this Agreement, except payments to be made to the Trustee for services rendered as Trustee under the Indenture and as Bond Registrar and paying agent for the Bonds and except for expenses, indemnification and other payments required to be made pursuant to Sections 4.3, 5.2 and 6.4 of this Agreement;

(b)    any proceeds which arise upon the foreclosure of the Security Agreement, or with respect to any disposition of the Trust Estate and from any action against the Lessee for any deficiency;

(c)    the proceeds of insurance required to be carried pursuant to Section 5.12 of this Agreement and the proceeds of condemnation awards or sale in lieu of condemnation also described in Section 5.13 of this Agreement; and

(d)    amounts on deposit in the trust funds created in the Indenture.

"Principal," whenever used with reference to the Bonds or any portion thereof, shall be deemed to include "and the redemption premium (if any)";

"Project" means the financing of (i) the Issuer's costs of the acquisition and rehabilitation of the 88-unit independent living facility located at 3145 Knollwood Drive, Mobile, Alabama 35244; (ii) providing deposits into certain of the funds and accounts established under the Indenture, including a deposit to the Debt Service Reserve Fund for the Series 2012 Bonds, and (iii) the payment of certain costs of issuance of the Bonds (the "Project");

"Project Fund" means the Project Fund created in Section 601 of the Indenture;

"Rehabilitation Period" means the period between the beginning of the rehabilitation of the Facility or the date of issuance and delivery of the Bonds (whichever is earlier) and the Completion Date;

"Secretary" means the Secretary of the Issuer;

"Security Agreement" means the Mortgage and Security Agreement, of even date herewith, from the Issuer to the Trustee, including any amendments thereto;

"Security interest" or "security interests" shall refer to the security interests created in the Indenture and the Security Agreement and shall have the meaning set forth in the U.C.C.;

"Series 2012A Bonds" or "Series 2012A Bonds" means the $5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (BAMA Oaks Retirement, LLC Project II), Series 2012A;

"Series 2012B Bonds" or "Series 2012B Bonds" means the $630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (BAMA Oaks Retirement, LLC Project II), Taxable Series 2012B;

"State" means the State of Alabama;

"Supplemental Statement" means any statement, supplemental statement or other tax schedule, return or document filed with the Internal Revenue Service (whether pursuant to Treasury Regulations Section 1.103-10(b)(2)(vi), as the same may be amended or supplemented, or otherwise);

"Taxable Rate" means twelve percent (12.00%) per annum;

"Trustee" means BOKF, NA dba Bank of Oklahoma, a national banking association having a principal corporate trust office in Tulsa, Oklahoma, or any co-trustee or any successor trustee under the Indenture; and

"Trust Estate" means the property described in the granting clauses of the Indenture;

"Underwriter" means Lawson Financial Corporation., Phoenix Arizona.

"U.C.C." means the Uniform Commercial Code of the State, as now or hereafter amended.

Section 1.2.    Certain Rules of Interpretation.  The definitions set forth in Section 1.1 shall be equally applicable to both the singular and plural forms of the terms therein defined and shall cover all genders.

"Herein", "hereby", "hereunder", "hereof", "hereinbefore", "hereinafter" and other equivalent words refer to this Agreement and not solely to the particular Article, Section or subdivision hereof in which such word is used.

Reference herein to an Article number (e.g., Article IV) or a Section number (e.g., Section 6.2) shall be construed to be a reference to the designated Article number or Section number hereof unless the context or use clearly indicates another or different meaning or intent.

## ARTICLE II.  REPRESENTATIONS

Section 2.1.    Representations by the Issuer.  The Issuer makes the following representations as the basis for the undertaking on its part herein contained:

(a)    Organization and Authority.  The Issuer is a public corporation organized, created and validly existing pursuant to the Constitution and laws of the State, including particularly the provisions of the Act.  The Issuer has all requisite power and authority under the Act to (i) issue the Bonds, (ii) lend the proceeds thereof to the Lessee to finance the project, and (iii) enter into, and perform its obligations under, this Agreement, the Indenture and the Security Agreement.

(b)    Pending Litigation.  There are no actions, suits, proceedings, inquiries or investigations pending, or to the knowledge of the Issuer threatened, against or affecting the Issuer in any court or before any governmental authority or arbitration board or tribunal, which involve the possibility of materially and adversely affecting the transactions contemplated by this Agreement or the Indenture or which, in any way, would adversely affect the validity or enforceability of the Bonds, the Indenture, this Agreement, the Security Agreement or any agreement or instrument to which the Issuer is a party and which is used or contemplated for use in the consummation of the transactions contemplated hereby or thereby.

(c)    Issue, Sale and Other Transactions Are Legal and Authorized.  The issuance and sale of the Bonds and the execution and delivery by the Issuer of this Agreement, the Indenture and the Security Agreement, and the compliance by the Issuer with all the provisions of each thereof and of the Bonds (i) are within the purposes, powers and authority of the Issuer, (ii) have been done in full compliance with the provisions of the Act, are legal and will not conflict with or constitute on the part of the Issuer a violation of or a breach of or default under, or result in the creation of any lien, charge or encumbrance upon any property of the Issuer (other than as contemplated by this Agreement, the Indenture, the Security Agreement and Land Use Restriction Agreement) under the provisions of, any charter, instrument, by-law, indenture, mortgage, deed of trust, note agreement or other agreement or instrument to which the Issuer is a party or by which the Issuer is bound, or any license, judgment, decree, law, statute, order, rule or regulation of any court of governmental agency or body having jurisdiction over the Issuer or any of its activities or properties, and (iii) have been duly authorized by all necessary corporate action on the part of the Issuer.

(d)    Governmental Consents.  Neither the nature of the Issuer nor any of its activities or properties, nor any relationship between the Issuer and any other person, nor any circumstance in connection with the offer, issue, sale or delivery of any of the Bonds is such as to require the consent, approval or authorization of, or the filing, registration or qualification

with, any governmental authority on the part of the Issuer in connection with the execution, delivery and performance of this Agreement, the Indenture, the Security Agreement and the Land Use Restriction Agreement or the offer, issue, sale or delivery of the Bonds, other than those already obtained.

(e)     No Defaults.  No event has occurred and no condition exists with respect to the Issuer which would constitute an "Event of Default" as defined in this Agreement, the Indenture or the Security Agreement or which, with the lapse of time or with the giving of notice or both, would become an "Event of Default" under this Agreement, the Indenture or the Security Agreement.  The Issuer is not in default under the Act or under any charter instrument, by-law or other agreement or instrument to which it is a party or by which it is bound.

(f)     No Prior Pledge.  Neither this Agreement, the Security Agreement nor any of the Pledged Revenues or the Trust Estate have been pledged or hypothecated in any manner or for any purpose other than as provided in the Indenture as security for the payment of the Bonds.

(g)     Nature and Location of Facility.  The financing of the Facility is in furtherance of the public purpose intended to be served by the Act.  The Facility will be located entirely within the corporate limits of the City.

(h)     Official Action.  By resolution duly adopted on July 13, 2012, the Issuer took "official action" (within the meaning of Section 1.103-8(a)(5) of the Treasury Regulations under the Code) providing for the purchase and rehabilitation of the Facility and the financing of the cost of the Facility, in whole or in part, through the issuance of the Bonds.

(i)     No Personal Liability.  No stipulation, obligation or agreement herein contained shall be deemed to be a stipulation, obligation or agreement of any officer, member, agent or employee of the Issuer in his/her individual capacity, and no such officer, member, agent or employee shall be personally liable on the Bonds or be subject to personal liability or accountability by reason of the issuance thereof.

Section 2.2.    Representations by the Lessee.  The Lessee makes the following representations as the basis for the undertakings on its part herein contained:

(a)     Organization and Power.  The Lessee (i) is a Georgia limited liability company authorized to do business in the State of Alabama, and (ii) has all requisite power and authority and all necessary licenses and permits to own and operate its properties and to carry on its business as now being conducted and as presently proposed to be conducted.

(b)     Pending Litigation.  There are no proceedings pending, or to the knowledge of the Lessee threatened, against or affecting the Lessee in any court or before any governmental authority or arbitration board or tribunal which involve the possibility of materially and adversely affecting the properties, business, prospects, profits or condition (financial or otherwise) of the Lessee, or the ability of the Lessee to perform its obligations under this Agreement, the Bond Purchase Agreement, the Security Agreement or the Land Use Restriction Agreement.  The Lessee is not in default with respect to an order of any court,

governmental authority or arbitration board or tribunal.

(c)    <u>Agreements Are Legal and Authorized.</u>  The execution and delivery by the Lessee of this Agreement, the Bond Purchase Agreement,  the Security Agreement and the Land Use Restriction Agreement and the compliance by the Lessee with all of the provisions hereof and thereof (i) are within the power of the Lessee, (ii) will not conflict with or result in any breach of any of the provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance (other than Permitted Encumbrances) upon any property of the Lessee under the provisions of, any agreement, charter document, by-law or other instrument to which the Lessee is a party or by which it may be bound, or any license, judgment, decree, law, statute, order, rule or regulation of any court or governmental agency or body having jurisdiction over the Lessee or any of its activities or properties, and (iii) have been duly authorized by all necessary action on the part of the Lessee.

(d)    <u>Governmental Consent.</u>  Neither the Lessee nor any of its business or properties, nor any relationship between the Lessee and any other person, nor any circumstances in connection with the execution, delivery and performance by the Lessee of this Agreement, the Bond Purchase Agreement, and the Security Agreement or the offer, issue, sale or delivery by the Issuer of the Bonds, is such as to require the consent, approval or authorization of, or the filing, registration or qualification with, any governmental authority on the part of the Lessee other than those already obtained.

(e)    <u>No Defaults.</u>  No event has occurred and no condition exists with respect to the Lessee that to the Lessee's knowledge would constitute an "Event of Default" under this Agreement, the Indenture, the Bond Purchase Agreement, the Security Agreement, the Land Use Restriction Agreement or which, with the lapse of time or with the giving of notice or both, would become an "Event of Default" under this Agreement, the Indenture, the Security Agreement, the Bond Purchase Agreement or the Land Use Restriction Agreement.  The Lessee is not in violation in any material respect of any agreement, or other instrument to which it is a party or by which it may be bound.

(f)    <u>Compliance with Laws</u>.  To the Lessee's knowledge, the Lessee is not in violation of any laws, ordinances, governmental rules or regulations to which it is subject and has not failed to obtain any licenses, permits, franchises or other governmental authorizations necessary to the ownership of its properties or to the conduct of its business, which violation or failure to obtain might materially and adversely affect the properties, business, prospects, profits or conditions (financial or otherwise) of the Lessee.

(g)    <u>Restrictions on the Lessee.</u>  The Lessee is not a party to any contract or agreement that materially and adversely affects the business of the Lessee.  The Lessee is not a party to any contract or agreement that restricts the right or ability of the Lessee to incur or guarantee indebtedness for borrowed money.

(h)    <u>Inducement.</u>  The issuance of the Bonds by the Issuer to enable the Issuer to acquire and rehabilitate the Facility for the benefit of the Lessee will directly result in an increase in employment opportunities in the City and County.

(i)    <u>Operation of Facility.</u>  The Lessee intends to operate the Facility, or cause the same to be operated, from the Completion Date to the expiration or sooner termination of this Agreement as provided herein as a "project" within the meaning of the Act and so long as the Bonds remain outstanding the Lessee agrees that it shall operate or cause the operation of the Facility as a "project" the primary purpose of which causes the Facility to comply with the requirements of the applicable provisions of Section 142 of the Code.

(j)    <u>Nature of Facility.</u>  All property acquired with the net proceeds of the sale of the Bonds will be used to acquire land or property of a character subject to the allowance for depreciation under Section 167 of the Code and such costs representing proceeds so used are properly chargeable to a capital account of the Lessee for Federal income tax purposes or would be so chargeable either with a proper election by the Lessee or but for a proper election by the Lessee to deduct the costs.

(k)    <u>I.R.S. Form 8038 Information.</u>  The information furnished by the Lessee and used by the Issuer in preparing I.R.S. Form 8038, "Information Return for Private Activity Bond Issues," which shall be filed by or on behalf of the Issuer with the Internal Revenue Service Center in Ogden, Utah, pursuant to Section 103(l) of the Code, was true and complete as of the date of filing thereof.

(l)    <u>Limitation on Maturity.</u>  The weighted average maturity of the Bonds does not exceed the weighted average estimated economic life of the components comprising the Facility by more than 20%, determined pursuant to Section 147(b) of the Code.

(m)    <u>Restrictions on Financing and Operation of Certain Facilities.</u>  At no time will:

(i)    more than 25% of the net proceeds of the sale of the Bonds be used to provide a facility the primary purpose of which is automobile sales or service; or

(ii)    any portion of the net proceeds of the sale of the Bonds be used to provide the following:  any private or commercial golf course, country club, massage parlor, tennis club, skating facility (including roller skating, skateboard and ice skating), racquet sports facility (including any handball or racquetball court), hot tub facility, suntan facility or racetrack; or

(iii)    any portion of the net proceeds of the sale of the Bonds be used to provide any airplane, skybox or other private luxury box, any health club facility, any facility primarily used for gambling, or any store the principal business of which is the sale of alcoholic beverages for consumption off premises; or

(iv)    any portion of the net proceeds of the sale of the Bonds be used (directly or indirectly) for the acquisition of land (or an interest therein) to be used for farming purposes, or 25% or more of the net proceeds of the sale of the Bonds be used (directly or indirectly) for the acquisition of land other than land to be used for farming purposes; or

(v)    any portion of the net proceeds of the sale of the Bonds be used for

the acquisition of any property the first use of which property is not pursuant to such acquisition, except with respect to any building (and the equipment therefor) if the rehabilitation expenditures with respect to such building equal or exceed 15% of the portion of the cost of acquiring such building (and equipment) financed with the proceeds of the Bonds; or

(vi)    the Facility be operated as a facility the primary purpose of which causes the Facility to constitute a prohibited facility within the meaning of Section 103(b) of the Code or fail to be a "project" under the Act.

(n)    Aggregation of Issues for Single Project.  The Facility is not a part of a single building, an enclosed shopping mall or a strip of offices, stores or warehouses using substantial common facilities, and with respect to which any other bonds, notes or other obligations have been or will be issued under Section 103(b) of the Code.

(o)    Tax- Exempt Status of the Series 2012A Bonds.  Lessee hereby represents, warrants and agrees that the Lessee's Tax and Non-Arbitrage Certification executed and delivered by the Lessee concurrently with the issuance and delivery of the Bonds is true, accurate and complete in all material respects as of the date on which executed and delivered.

(p)    Use and Operation of the Facility.  The Lessee agrees that it shall use, maintain and operate, or cause to be used, maintained and operated, the Facility on a nonsectarian basis and consistently with the Lessee's obligations imposed under this Agreement and its status as a tax-exempt organization as determined by the Internal Revenue Service.

## ARTICLE III.  REHABILITATION OF THE FACILITY; ISSUANCE OF THE BONDS

Section 3.1.    Rehabilitation of the Facility.  The Lessee agrees that the rehabilitation of the Facility will be completed as promptly as practicable after receipt of the proceeds from the sale of the Bonds, delays incident to strikes, riots, acts of God or the public enemy or other causes beyond the reasonable control of the Lessee only excepted, but if such rehabilitation is not completed, there shall be no resulting liability on the part of the Issuer and no diminution in or postponement of the payments required to be paid by the Lessee hereunder.

Section 3.2.    Agreement to Issue Bonds: Application of Proceeds.  In order to provide funds for the payment of the cost of the acquisition and rehabilitation of the Facility, the Issuer agrees that as soon as possible it will authorize, sell and cause to be delivered to the initial purchaser or purchasers thereof, the Bonds, bearing interest and maturing as set forth in Article II of the Indenture, at a price to be approved by the Lessee, and it will thereupon deposit the proceeds received from said sale in the Project Fund.

The Lessee may cause such changes to be made to the aforesaid plans and specifications for the Facility as it may desire provided that such changes shall not result in (i) the Facility not being a "project" within the meaning of the Act, (ii) the Facility constituting a prohibited facility within the meaning of Section 103(b) of the Code, (iii) less than substantially all of the net proceeds of

the sale of the Bonds being used to pay the costs of land or property of a character subject to the allowance for depreciation under Section 167 of the Code, and (iv) a violation of the limitation on maturity of the Bonds under Section 147(b) of the Code.

Section 3.3.    Disbursement from the Project Fund.  The Issuer will in the Indenture authorize and direct the Trustee to use the moneys in the Project Fund for the following purposes but, subject to the provisions of Section 3.8, for no other purposes:

(a)    payment of the initial or acceptance fee of the Trustee and fees and expenses of its Counsel, the fees for recording the deeds whereby the appropriate title in and to the Facility land has been acquired by the Issuer , payments for title examination and insurance, and any title curative documents that the Issuer may deem desirable to file for record in order to perfect or protect its title in and to the Facility land and the fees and expenses in connection with any actions or proceedings that the Issuer may deem desirable to bring in order to perfect its title in and to the Facility land;

(b)    payment to the Lessee of such amounts, if any, as shall be necessary to reimburse the Lessee in full for all advances and payments made by it prior to or after the delivery of the Bonds for expenditures in connection with the acquisition by the Issuer of appropriate title in and to the Facility land (including the cost of such acquisition and of any rights-of-way for the purpose of providing access to and from the Facility land), clearing the same, site improvement, the preparation of plans and specifications for the Facility (including any preliminary study or planning of the Facility or any aspect thereof), the acquisition, construction and installation of the Project equipment and the acquisition, construction and installation necessary to provide utility services or other facilities including trackage to connect the Facility with public transportation facilities, and all real or personal properties deemed necessary in connection with the Facility, or any one or more of said expenditures (including architectural, engineering and supervisory services) with respect to any of the foregoing;

(c)    payment of, or reimbursement of the Lessee and the Issuer for, the legal and accounting fees and expenses, financial consultants' fees, financing charges (including underwriting or placement fees) and printing and engraving costs incurred in connection with the authorization, sale and issuance of the Bonds, the preparation of this Agreement, the Security Agreement, the Indenture, the Financing Statements and all other documents in connection therewith and in connection with the acquisition of appropriate title in and to the Facility land, including fees for recording the Indenture, the Security Agreement, and the Financing Statements;

(d)    payment of, or reimbursement of the Lessee for, labor, services, material, supplies and/or equipment used or furnished in site improvement and in the rehabilitation of the Facility, all as provided in the plans and specifications therefor, payment for the cost of the acquisition and installation of furniture, fixtures and equipment constituting part of the Facility, payment for the cost of acquisition, construction and installation of utility services or other facilities including trackage to connect the Facility with public transportation facilities, and all real and personal properties deemed necessary in connection with the Facility and payment for the miscellaneous expenses incidental to any of the foregoing;

(e)    payment of, or reimbursement of the Lessee for, the fees, if any, for architectural, engineering and supervisory services with respect to the Facility;

(f)    payment of, or reimbursement of the Lessee and the Issuer for, as such payments become due, the fees and expenses of the Trustee, the Bond Registrar, the paying agent, the fees and expenses of Counsel to bond purchaser, Lawson Financial Corporation, Phoenix, Arizona, or their affiliates or subsidiaries and the fees and expenses of their Counsel properly incurred under the Indenture that may become due during the Rehabilitation Period; and payment into the Bond Fund of sufficient moneys to pay interest on the Bonds accruing during the Rehabilitation Period;

(g)    payment of, or reimbursement of the Lessee and the Issuer for, any other legal and valid costs and expenses relating to the Facility; and

(h)    all moneys remaining in the Project Fund (including moneys earned on investments made pursuant to the provisions of Section 3.8) after the Completion Date and payment in full of the cost of the acquisition and rehabilitation of the Facility, and after payment of all other items provided for in the preceding subsections of this Section then due and payable, shall at the direction of the Lessee be (i) subject to Section 5.9(d), used to acquire, construct and install additions, extensions and improvements to the Facility in accordance with amended plans and specifications therefor duly filed with the Issuer, (ii) used by the Trustee, to the maximum extent practicable consistent with making partial redemptions in amounts of not less than $5,000 or integral multiples thereof, for the redemption of Bonds at the earliest date permitted by the Indenture or the purchase of Bonds for the purpose of cancellation at any time prior to the earliest date permitted by the Indenture for the redemption of Bonds, or (iii) paid into the Bond Fund to pay interest on the Bonds, or (iv) a combination of (i), (ii) or (iii) as is provided in such direction, provided that amounts approved by the Authorized Lessee Representative shall be retained by the Trustee in the Project Fund for payment of costs not then due and payable.  Any balance remaining of such retained moneys after full payment of all such Facility costs shall be used by the Trustee as directed by the Lessee in the manner specified in clauses (i), (ii), (iii) or (iv) of this subsection.  Amounts directed by the Lessee to be used by the Trustee to redeem Bonds or to purchase Bonds for the purpose of cancellation shall not, pending such use, be invested at a yield which exceeds the yield on the Bonds.

The payments specified in subsections (a) through (g) of this Section (other than payment of interest on the Bonds accruing prior to the Completion Date) shall be made by the Trustee only upon receipt of the following:

(1)    a written requisition for such payment in the forms attached hereto as Exhibits A and B respectively signed by the Authorized Lessee Representative certifying:

(i)    that an obligation in the stated amount has been incurred in connection with the issuance of the Bonds or the rehabilitation of the Project;

(ii)    that such obligation is a proper charge against the Project Fund and has not been the basis of any previous withdrawal from the Project Fund, and specifying the

purpose and circumstances of such obligation in reasonable detail and the name and address of the person to whom such obligation is owed;

(iii)    that (A) he has no notice of any vendors', materialmen's, mechanics', suppliers' or other similar liens or right to liens, chattel mortgages or conditional sales contracts, or other contracts or obligations which should be satisfied or discharged before payment of such obligation is made, or (B) such requisition is for the purpose of obtaining funds to be used to satisfy or discharge a lien or contract of the type described in (A) above;

(iv)    that such requisition contains no request for payment on account of any portion of such obligation which the Lessee is, as of the date of such requisition, entitled to retain under any retained percentage agreements;

(v)    that such obligation is for an item which is properly chargeable to the capital account of the Lessee for Federal income tax purposes or would be so chargeable either with a proper election by the Lessee or but for a proper election by the Lessee to deduct the costs and that payment of such obligation when added to all other payments previously made from the Project Fund will not result in less than substantially all of the net proceeds of the sale of the Bonds expended at such time being used to provide land or property of a character subject to the allowance for depreciation under Section 167 of the Code;

(vi)    that such requisition contains no request for payment on account of any obligation paid or incurred by the Lessee prior to May 14, 2012;

(vii)    that each and every representation of the Lessee set forth in this Agreement is true and correct on and as of the date of such requisition;

(viii)    that no default or Event of Default has occurred and is then continuing; and

(ix)    the Project costs then incurred and the estimated costs of completing the Project that the amount remaining in the Project Fund for disbursement, after giving effect to the requested disbursement, will be sufficient to complete the Project or, if that is not the case, stating that the Lessee has on hand or has the ability to obtain the additional funds required to complete the Project.

(2)    with respect to any such requisition for payment for labor, services, material, supplies or equipment, an additional certificate, signed by the Authorized Lessee Representative certifying that insofar as such obligation was incurred for labor, services, material, supplies and/or equipment in connection with the acquisition and rehabilitation of the Facility, such labor and/or services were actually performed in a satisfactory manner and such material, supplies and/or equipment were actually used in or about the rehabilitation or delivered (and remain) at the site of the Facility for that purpose.

In making any such payment from the Project Fund the Trustee may rely on any such requisitions and any such certificates delivered to it pursuant to this Section and the Trustee shall be relieved of all liability with respect to making such payments in accordance with any such

16

requisitions and such supporting certificate or certificates without inspection of the Facility or any other investigation. Disbursements from the Project Fund for deposit in the Bond Fund to pay interest on the Bonds accruing during the Rehabilitation Period may be made by the Trustee at the written request of the Lessee when interest is due on the Bonds without the necessity of receiving any such written requisition or supporting certificates pertaining thereto.

The Issuer and the Lessee agree for the benefit of each other and for the benefit of the Trustee and the holders of the Bonds that the proceeds of the Bonds will not be used in any manner which would result in the loss of the exemption from Federal income taxation of the interest on the Series 2012A Bonds.

In addition to the other requirements for disbursements from the Project Fund, the following shall be conditions precedent to the Trustee's duty to make such disbursements:

(a)    The Lessee shall have submitted the requisition not less than five (5) Business days before the disbursement is to be made complying in form and substance with the requirements of this Section 3.3 and, in the case of the final disbursement, Section 3.5; and

(b)    The Trustee shall not have received written notice that an Event of Default shall then exist or that an event or failure shall have occurred which, with the giving of notice or the passage of time or both, would constitute an Event of Default.

Section 3.4.    Obligation to Furnish Documents to Trustee and Issuer.    The Lessee agrees to furnish to the Trustee and Issuer, at Issuer's written request, the documents referred to in Section 3.3 that are required to effect payments out of the Project Fund, and to cause such requisitions and certificates to be directed by the Authorized Lessee Representative to the Trustee and Issuer, at Issuer's written request, as may be necessary to effect such payments. Such obligation of the Lessee is subject to any provisions hereof or of the Indenture requiring additional documentation with respect to payments and shall not extend beyond the moneys in the Project Fund available for payment under the terms of the Indenture.

Section 3.5.    Establishment of Completion Date.    The Completion Date shall be evidenced to the Trustee by a certificate signed by the Authorized Lessee Representative stating that, except for amounts retained by the Trustee for Project costs not then due and payable as provided in Section 3.3(h),

(a)    the rehabilitation of the Facility has been completed substantially in accordance with the plans and specifications therefor and all labor, services, materials, supplies or equipment used in such rehabilitation have been paid for,

(b)    all other facilities necessary in connection with the Facility have been acquired, constructed and installed substantially in accordance with the plans and specifications therefor and all costs and expenses incurred in connection therewith have been paid,

(c)    the Facility and all other facilities in connection therewith have been

17

acquired, constructed and installed to its satisfaction and are suitable and sufficient for the efficient operation of the Facility for its intended purposes,

  (d) substantially all of the net proceeds of the sale of the Bonds have been used to acquire land or property of a character subject to the allowance for depreciation under Section 167 of the Code and such costs representing proceeds so used are properly chargeable to the capital account of the Lessee for Federal income tax purposes or would be so chargeable either with a proper election by the Lessee or but for a proper election by the Lessee to deduct the costs, and

  (e) the original or a true and correct copy of a certificate of occupancy, if required, and any other permissions required of governmental authorities for the occupancy of the Facility have been obtained.

  Notwithstanding the foregoing, such certificate by the Authorized Lessee Representative shall state that it is given without prejudice to any rights of the Lessee against third parties which exist on the date of such certificate or which may subsequently come into being.  The Lessee shall furnish a copy of such certificate to the Issuer at the same time such document is furnished to the Trustee.

  The aforesaid certificate of the Authorized Lessee Representative shall be furnished to the Trustee and Issuer and shall be accompanied by:

  (i) An as-built survey of the Facility within sixty (60) days of the issuance of the Bonds, prepared by a registered surveyor licensed by the State of Alabama acceptable to the Issuer, showing the dimensions and location of all improvements on the Facility, as completed;

  (ii) A certificate of the Lessee stating (i) that the rehabilitation of the Facility, including all machinery, equipment, fittings and fixtures required to be installed by the plans and specifications, has been completed substantially in accordance with the plans and specifications and in accordance with all applicable governmental requirements relating to the rehabilitation of the Facility, and (ii) that direct connection has been made to all abutting public utilities necessary for full operation and use of the Facility, including, without limitation, water, storm and sanitary sewer, electricity, gas and telephone; and,

  (iii) A final affidavit of each contractor which furnished services or materials for the Facility, sworn to by an authorized agent of such contractor and dated not more than five (5) Business days prior to the date of such requisition for disbursement, in a form which shall include without limitation, (i) a specific representation and warranty that all payments made to the contractor by the Lessee have been used by the contractor solely to pay for costs of the Facility, (ii) a statement that the agreed price of work done, material furnished and services furnished or rendered has been paid, and (iii) a statement that there are no liens of such contractor or sub-contractors, mechanics' liens, or laborers' liens that have been filed of record.

  Section 3.6. Lessee Required to Pay Project Costs and Costs of Facility Rehabilitation If Project Fund Insufficient.  If the moneys in the Project Fund available for payment of the cost of the Project and for the rehabilitation of the Facility are not sufficient to pay the cost thereof in

full, the Lessee agrees to complete the rehabilitation of the Facility and to pay all that portion of the Project costs and the costs of the Facility rehabilitation as may be in excess of the moneys available therefor in the Project Fund. The Issuer does not make any warranty, either express or implied, that the moneys which will be paid into the Project Fund and which, under the provisions of this Agreement, will be available for payment of the cost of the Project and the Facility rehabilitation will be sufficient to pay all costs which will be incurred for such purposes. The Lessee agrees that if, after exhaustion of the moneys in the Project Fund, the Lessee should pay any portion of the cost of the Facility pursuant to the provisions of this Section, it shall not be entitled to any reimbursement therefor from the Issuer or from the Trustee or from the holders or owners of any of the Bonds, nor shall it be entitled to any diminution in or postponement of the payments required to be made hereunder.

      Section 3.7.   Remedies Against Suppliers, Contractors and Subcontractors and Their Sureties.  The Lessee may prosecute or defend any action or proceeding or take any other action involving any defaulting supplier, contractor, subcontractor or surety therefor which the Lessee deems reasonably necessary, and in such event the Issuer agrees to cooperate fully with the Lessee, to the extent it might lawfully do so, in any such action or proceeding.  Any moneys recovered by way of damages, refunds, adjustments or otherwise in connection with the foregoing shall belong to the Lessee.

      Lessee will not permit any mechanics' or other liens to be established or remain against the Facility provided that if Lessee shall first notify the Trustee of Lessee's intention to do so, Lessee may in good faith contest any mechanics' or other liens filed or established against the Facility, and in such event may permit the items so contested to remain non-discharged and unsatisfied during the period of such contest and any appeal therefrom, unless by nonpayment of any items the lien of the Security Agreement as to the Facility and as to the payments to be made hereunder will be materially endangered or the Facility, or any part thereof, will be subject to loss or forfeiture, in which event the Lessee shall promptly pay and cause to be satisfied and discharged all such unpaid items

Section 3.8.   Fund Investment.  Any moneys held by the Trustee in trust funds created under the Indenture shall be invested or reinvested by the Trustee in Permitted Investments, to the extent permitted by the laws of the State as provided in the Indenture.

ARTICLE IV.  TITLE TO FACILITY; PROVISIONS FOR PAYMENT

      Section 4.l.   Title to the Facility.  The Issuer acknowledges that security title to the Facility land and improvements thereon will be conveyed to the Trustee by the Issuer pursuant to the Security Agreement as security for the payments to be made by the Lessee pursuant to Section 4.2.  The Issuer will not be vested with any other interest in the Facility as a result of issuing the Bonds.  The Issuer hereby demises and leases to the Lessee the real property identified on Exhibit "C" attached hereto and incorporated herein, as well as the Facility located thereon, and the Lessee hereby leases said real property and the Facility from the Issuer for the

19

term described in Section 8.1 hereof.

Section 4.2.       Payment Obligations of the Lessee.

(a)       So long as no Lock Box Trigger Event (defined below) has occurred and is continuing under this Agreement, the Lessee may collect or cause the collection of all Gross Revenues received in connection with the management or operation of the Facility and deposit them, or cause them to be deposited, into the Operating Account, which is to be established by Lessee for this purpose.  From such Gross Revenues, the Lessee shall pay, or cause the payment of, all operating expenses of the Facility pursuant to an Operating Budget filed with the Trustee or a certificate of the Lessee showing any deviation from such Operating Budget, and, no later than the fourth Business day before the first day of the months specified below, will remit to the Trustee monies sufficient to permit the Trustee to make the payments of deposits set forth below in order of priority set forth:

(i)       First, on the twenty-fifth (25th) day of each consecutive calendar month, beginning with May 25, 2013, after the Trustee has made interest payments through May, 2013, from the Capitalized Interest Account, for deposit into the Interest Account of the Bond Fund of the amount equal to the next interest payment coming due on the Bonds on the next Interest Payment Date;

(ii)       Second, on the twenty-fifth (25th) day of each consecutive calendar month, beginning with October 25, 2015, for deposit into the Principal Account of the Bond Fund, one-twelfth  of the amount equal to the next principal or mandatory sinking fund redemption payment coming due on the Bonds;

(iii)       Third, beginning if and when required by the Code, for deposit into the Arbitrage Rebate Fund, the amount of any rebatable arbitrage;

(iv)       Fourth, beginning in January of 2013, for deposit into the Ad Valorem Tax Fund, an amount equal to one-twelfth of the estimated ad valorem taxes that will become due on the Facility the next following October (one-ninth in the case of such payments coming due in October of 2013);

(v)       Fifth, commencing the month next following the month in which there shall have occurred any transfer from, or decline in value of, the Debt Service Reserve Fund, for deposit into the Debt Service Reserve Fund, an amount equal to one-twelfth of the amount needed to restore the balance therein to the Debt Service Reserve Fund Requirement;

(vi)       Sixth, for payment to the Management Company, the Management Fee for the forthcoming month, but the failure of the Lessee to remit to the Trustee an amount adequate for the trustee to make all or any part of such payment shall not constitute an Event of Default if, and to the extent that, such failure resulted from an insufficiency of such Gross Revenues; and

(vii)       Seventh, for payment to any terminated manager of the Facility, an amount equal to all fees that remain due and owing to such terminated manager, but the failure of the Lessee to remit to the Trustee an amount adequate for the Trustee to make all or any part of such payment shall not constitute an Event of Default if, and to the extent that, such failure

resulted from an insufficiency of such Gross Revenues.

All such payments shall be made to the Trustee at its principal corporate trust office in Tulsa, Oklahoma, or such other location as is specified in writing by the Trustee, in lawful money of the United States of America which will be immediately available on the date each such payment is due.  Each payment shall be sufficient to pay the total amount of principal of (whether at maturity, by mandatory sinking fund redemption pursuant to the provisions of Section 304 of the Indenture, or by acceleration, or optional redemption), and redemption premium (if any) and interest on, the Bonds due on such payment date.  Anything herein to the contrary notwithstanding, if on any such payment date, the balance in the Bond Fund is insufficient to make the required payments of principal of, and redemption premium (if any) and interest on, the Bonds on such date, the Lessee shall forthwith pay any such deficiency.

(b)    In the event that (i) an Event of Default under this Agreement shall have occurred and be continuing, (ii) an unaudited financial statement is not provided to the Trustee in compliance with Section 5.4(b)(i) hereof, (iii) the Debt Service Coverage Ratio falls below 1.10 for two consecutive calendar quarters, or (iv) more than 25% of trade payables exceed 60 days overdue  (any one of i through v shall be considered a "Lock Box Trigger Event"); provided, however, that, if an Event of Default is the failure by Lessee to make any monthly payment required to be made under Section 4.2(a) above, such Event of Default shall not quality as a Lock Box Trigger Event unless and until Lessee fails to make such monthly payment for two consecutive months after receipt by the Lessee of five (5) days' written notice from the Trustee), the Lessee shall transfer all amounts then on deposit in the Operating Account, and all other Gross Revenues held by it, to the Trustee for deposit into the Revenue Fund and, thereafter, on a daily basis, shall collect and transfer all Gross Revenues to the Trustee for deposit into the Revenue Fund, except for an amount not to exceed $2,000 which may be maintained in the Operating Account.  Amounts transferred to the Trustee will be (1) deposited into the Revenue Fund established under the Indenture, and (2) thereafter, disbursed by the Trustee to pay all operating expenses of the Facility pursuant to the current Operating Budget then on file with the Trustee upon receipt of written directions from the Lessee, and (3) thereafter, on the fourth Business Day before the end of each month, used by the Trustee to make the payments and deposits set forth in the foregoing clauses (a)(i) through (a)(v) in order of priority set forth.  For so long as the Trustee shall be making such payments and deposits, the deposits set forth in the foregoing clauses (a)(i) and (a)(ii) shall be made monthly, in amounts equal to, respectively, one-sixth of the next interest payment coming due on the Series 2012 Bonds, and one-twelfth of the next principal payment coming due on the Series 2012 Bonds.  The Lessee may resume use of the Operating Account only after no Event of Default shall have occurred and be continuing for seven consecutive months (the "Lock Box Release Requirement").

(c)    The Lessee further agrees that in the event payment of the principal of, and the interest on, the Bonds is accelerated upon the occurrence of an Event of Default under the Indenture, all amounts payable under Section 4.2(a) for the remainder of the term hereof shall be accelerated.

(d)    Any amount held in the Bond Fund on any payment date specified in Subsection (a) above shall be credited against the payments required to be made by the Lessee on such payment date.

(e)    If all of the Bonds then outstanding are called for redemption, any amounts held in the Project Fund and the Bond Fund on such redemption date shall be used to pay the principal of, the redemption premium (if any) and the interest on, the Bonds to be redeemed and shall reduce the amounts to be then paid by the Lessee pursuant to Subsection (a) above to effect such redemption.

(f)    If the Lessee should fail to make any of the payments required in Subsection (a) above, the item or installment which the Lessee has failed to make shall continue as an obligation of the Lessee until the same shall have been fully paid, and the Lessee agrees to pay the same with interest thereon at the rate per annum borne by the Bonds until paid in full.

Anything herein, in the Indenture or in the Bonds, to the contrary notwithstanding, the obligations of the Lessee hereunder shall be subject to the limitation that payments constituting interest under this Section shall not be required to the extent that the receipt of such payment by the holder of any Bond would be contrary to the provisions of law applicable to such holder which limit the maximum rate of interest which may be charged or collected by such holder.

Section 4.3.    Other Payments; Trustee's Fees and Expenses.  In addition to payment of the amounts specified in Section 4.2(a), the Lessee agrees to pay to the Trustee, (a) an amount equal to the reasonable fees and charges of the Trustee incurred under the Indenture, and (b) the reasonable fees and charges of the Trustee and any other paying agent for acting as paying agent and Bond Registrar as provided in the Indenture, as and when the same become due, including the reasonable fees of Counsel, as and when the same become due; provided that no such payments shall be due if such payments are attributed to or occasioned by errors or mistakes committed by the Trustee or Trustee's counsel in connection with its duties as specifically set forth in the Indenture.

If the Lessee should fail to make any of the payments required in this Section, the item or installment which the Lessee has failed to make shall continue as an obligation of the Lessee until the same shall have been fully paid, and the Lessee agrees to pay the same with interest thereon at the rate per annum borne by the Bonds until paid in full.

Section 4.4.    Obligations of the Lessee Absolute and Unconditional.  The obligations of the Lessee to make the payments required in Section 4.2 and to perform and observe the other agreements on its part contained herein shall be absolute and unconditional and shall not be subject to diminution by set-off, counterclaim, abatement or otherwise.  Until such time as the principal of, and the interest on, the Bonds shall have been paid in full, the Lessee (a) will not suspend or discontinue any payments provided for in Section 4.2 except to the extent the same have been prepaid, (b) will perform and observe all its other agreements contained herein, and (c) except as provided in Sections 7.1 and 7.2, will not terminate this Agreement for any cause, including, without limiting the generality of the foregoing, any acts or circumstances that may constitute failure of consideration, sale, loss, eviction or constructive eviction, destruction of or damage to the Facility, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State or any political subdivision of either, or any failure

of the Issuer to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or in connection herewith or with the Indenture. Nothing contained in this Section shall be construed to release the Issuer from the performance of any of the agreements on its part herein contained; and if the Issuer should fail to perform any such agreement, the Lessee may institute such action against the Issuer as the Lessee may deem necessary to compel performance so long as such action shall not do violence to the agreements on the part of the Lessee contained in the preceding sentence.

Nothing contained herein shall be construed as a waiver of any rights which the Lessee may have against the Issuer under this Agreement, or against any person under this Agreement, the Indenture or otherwise, or under any provision of law.

Section 4.5.  Lessee Consents to Assignment of Agreement and Security Agreement and Execution of Indenture.  The Lessee understands that the Issuer, as security for the payment of the principal of, and the interest on, the Bonds, will assign and pledge to, and create a security interest in favor of, the Trustee pursuant to the Indenture certain of its rights, title and interest in and to this Agreement including all Pledged Revenues and in the Security Agreement, reserving, however, its rights (a) pursuant to this Agreement and the Security Agreement providing that notices, approvals, consents, requests and other communications be given to the Issuer, (b) to reimbursement and payment of costs and expenses under Sections 5.2 and 6.4, and (c) to indemnification and to exemption from liability, both individual and corporate, under Section 5.2, and the Lessee hereby agrees and consents to such assignment and pledge. The Lessee acknowledges that it has received a copy of the Indenture and consents to the execution of the same by the Issuer and Trustee.

Section 4.6.  Lessee's Performance Under Indenture.  The Lessee agrees, for the benefit of the Bondholders, to do and perform all acts and things contemplated in the Indenture to be done or performed by it. Without limiting the generality of the foregoing, the Lessee, for good and adequate consideration, the receipt of which is acknowledged hereby, does hereby absolutely, irrevocably and unconditionally guarantee the prompt payment, as and when due, of the principal amount of the Bonds, together with all interest accrued from time to time thereon including any amounts due to Trustee by Issuer. The foregoing guaranty is intended to be an agreement of suretyship and guarantee of payment when due, and not merely a guarantee of ultimate collection.

Section 4.7.  Permitted Encumbrances.  As of any particular time, the Lessee shall be permitted to suffer the following permitted encumbrances of the Facility (i) liens for ad valorem taxes, special assessments, and other charges not then delinquent, or for taxes, assessments, and other charges being contested in accordance with Section 1.02 of the Security Agreement; (ii) this Agreement, the Security Agreement, the Indenture and the Land Use Restriction Agreement; (iii) presently existing utility, access, and other easements and rights of way, restrictions, and exceptions described in the title policy which shall be provided by the Lessee; (iv)liens for the financing of accounts receivable of the Lessee; (v) inchoate mechanics' and materialmen's liens which arise by operation of law, but which have not been perfected by the required filing of

record for work done or material delivered after the date of recording the Security Agreement and Assignment in connection with additions or alterations to the Facility; (vi) the mechanics' and materialmen's liens permitted by Section  1.02 of the Security Agreement; and (vii) mortgages and other encumbrances which are junior to the lien of the Security Agreement, subject to the written approval of the Issuer, which approval shall not be unreasonably withheld.

## ARTICLE V.  PARTICULAR AGREEMENTS

Section 5.1.    Maintenance and Operation of Facility; Taxes; No Operation of Facility by Issuer; Removal of Equipment.  The Lessee will at its own expense, keep the Facility in good repair and operating condition (normal wear and tear excepted) and keep the Facility free and clear of all encumbrances, except Permitted Encumbrances.  Lessee will promptly comply in all material respects with all present and future laws, ordinances, rules and regulations of any governmental authority affecting the Facility or any part thereof.  The Lessee may make any additions or alterations to the Facility which it may deem desirable for its efficient operation as an independent living facility which will not adversely affect the value or the revenue producing capability of the Facility, provided that all such additions and alterations are located wholly on the site of the Facility and comply in all material respects with all federal, state, and local laws, statutes, ordinances, rules and regulations as are applied to the Facility.  The Lessee further agrees that it will pay all taxes levied with respect to the Facility and the income therefrom.  Particularly, the Lessee agrees to pay all ad valorem taxes to the appropriate governmental bodies, and the Lessee agrees that it shall not attempt to obtain any exemption from paying such taxes.  If the Lessee determines that any items of equipment included in the Facility (the "Equipment") have become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary, the items may be removed from the Facility provided the Lessee (1) substitutes and installs other furnishing or equipment of equal or greater utility, or (2) in lieu of such substitution pays into the Bond Fund an amount equal to any proceeds realized from the sale or scrapping of any such items or any amount equal to any credit received from trade-in for items not to be installed in the Facility, or (3) in the case of sale of the Equipment to the Lessee or an affiliate or other disposition, pays into the Bond Fund an amount equal to the greater of the amounts and credits received or the fair market value of the items disposed of.  The requirement to pay to the Bond Fund is applicable only to the extent that the equipment to be sold or otherwise disposed of in the aggregate has a value of $15,000 or more.  Nothing contained in this Agreement shall be deemed to authorize or require the Issuer to operate the Facility or to conduct any business enterprise therewith.

Notwithstanding the aforementioned provisions, Lessee must comply with Issuer's obligations set forth in Section 1.12(d) and 1.14 of the Security Agreement and shall fulfill any such obligation of Issuer thereunder.  In event of a conflict of any provision between Section 5.1 hereby and Sections 1.12(d) and 1.14 of the Security Agreement then the provisions of the Security Agreement shall control.

Section 5.2.    Indemnification of Issuer and Trustee.

(a)      Lessee agrees to and shall indemnify and save the Issuer and the Trustee harmless against and from all claims by or on behalf of any person, firm or corporation arising from the conduct or management of, or from any work or thing done on the Facility and against and from all claims arising from (i) any condition of or operation of the Facility, (ii) any breach or default on the part of Lessee in the performance of any of its obligations under this Agreement, (iii) any act or negligence of Lessee or of any of its agents, contractors, servants, employees or licensees, or (iv) any act or negligence of any assignee or lessee of Lessee, or of any agents, contractors, servants, employees or licensees of any assignee or lessee of Lessee, provided however, this indemnity shall not apply to any acts of gross negligence or willful misconduct of the Issuer or the Trustee.  The Lessee shall indemnify and save the Issuer and the Trustee harmless from and against all reasonable costs and expenses incurred in or in connection with any such claim arising as aforesaid from (i), (ii), (iii) or (iv) supra, or in connection with any action or proceeding brought thereon, including reasonable attorneys' fees actually incurred, and upon notice from the Issuer, or the Trustee, Lessee shall defend them or either of them in any such action or proceeding.

(b)      The Lessee agrees that it will indemnify and hold the Trustee harmless, pursuant to Section 1015 of the Indenture, from any and all liability, cost, or expense, including attorneys' fees, incurred without gross negligence or bad faith in the course of the Trustee's duties, including any act, omission, delay, or refusal of the Trustee in reliance upon any signature, certificate, order, demand, instruction, request, notice, or other instrument or document believed by it to be valid, genuine and sufficient.

(c)      Notwithstanding the fact that it is the intention of the parties that the Issuer shall not incur any pecuniary liability by reason of the terms of this Agreement, or the undertakings required of the Issuer hereunder, by reason of (i) the issuance of the Bonds; (ii) the execution of the Indenture; (iii) the performance of any act required of it by this Agreement, the Security Agreement or the Indenture; (iv) the performance of any act requested of it by the Lessee; or (v) any other costs, fees, or expenses incurred by the Issuer with respect to the Facility or the financing thereof, including all claims, liabilities or losses arising in connection with the violation of any statutes or regulations pertaining to the foregoing, nevertheless, if the Issuer should incur any such pecuniary liability then in such event the Lessee shall indemnify and hold harmless the Issuer against all claims by or on behalf of any person, firm or corporation, arising out of the same, and all reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with any such claim or in connection with any action or proceeding brought thereon, and upon notice from the Issuer, the Lessee shall defend the Issuer in any such action or proceeding and pay the reasonable attorneys' fees of the Issuer actually incurred in defending any such action.

The provisions of this Section shall survive the termination of this Agreement.

Section 5.3.    Covenants Regarding Maintenance of Lessee's Existence.    The Lessee covenants that so long as this Agreement is in effect, it will maintain its existence and will not merge or consolidate with any other entity or sell or otherwise dispose of all or substantially all of its assets, provided that the Lessee may, subject to the written  approval of the Issuer, which approval shall not be unreasonably withheld, merge or consolidate with another entity or sell or otherwise transfer to another domestic partnership, corporation or other business entity all or

substantially all of its assets as an entirety and thereafter dissolve, provided any surviving, resulting or transferee entity (the "Surviving Entity") (i) is authorized to do business in the State of Alabama, (ii) is a domestic corporation, partnership, or other entity, or, if a natural person, is a resident of the United States of America, (iii) assumes in writing all of the obligations of the Lessee under this Agreement and the Land Use Restriction Agreement, (iv) has net worth (after giving effect to such transaction) at least equal to that of the Lessee immediately prior to such transaction, and (v) provided further that the Lessee immediately shall furnish to the Trustee an opinion of nationally recognized bond counsel or ruling of the Internal Revenue Service to the effect that no "Determination of Taxability" has theretofore occurred or will occur or result from such transaction.

The Lessee shall preserve and keep in full force and effect all licenses and permits necessary to the proper conduct of its business.

Section 5.4.    Annual Audit; Provision of Reports and Financial Information.

(a)    The Lessee shall file an Operating Budget with the Trustee and the Issuer (if requested) at least sixty (60) days before the beginning of each of its Fiscal Years.    The Lessee will prepare, and file with the Trustee, a report with respect to any monthly expenditure for operating expenses that exceeds the amount therefor set forth in such Operating Budget by more than ten percent (10%).

(b)    The Lessee shall provide the Issuer (if requested by the Issuer), and the Trustee with copies of the following items (each of which must show budgeted and actual results for the relevant period, the year-to-date and the corresponding period and year-to-date for the immediately preceding Fiscal Year):

(i)    Within 25 days after the end of each calendar month, unaudited monthly statements of the Lessee's operations, its balance sheet, a calculation of compliance with the financial covenants hereinafter set forth, payor mix, occupancy rate and statement of cash flows; and

(ii)    Within 90 days after the end of each Fiscal Year, the Lessee's audited financial statements prepared in accordance with generally accepted accounting principles and a calculation of compliance with the financial covenants hereinabove set forth.

(c)    Concurrently with the delivery of any audited financial statements, the Lessee shall deliver or cause to be delivered to the Issuer (if requested by the Issuer) and the Trustee a certificate signed by the chief financial officer of the Lessee that, to the best knowledge of the signer, after a review of the provisions of the Agreement, no event has occurred which, with the giving of notice or the passage of time, would constitute an Event of Default thereunder and a certificate signed by the accountant which audited such financial statements that nothing came to the attention of such accountant during the course of such audit which caused such accountant to believe any such Event of Default had occurred.

(d)    The Lessee shall also furnish to the Issuer (if requested by the Issuer) and

the Trustee, upon receipt thereof by the Lessee: (i) a copy of any letter or report with respect to the management of the Lessee's operations submitted to the Lessee by its accountants in connection with any annual or interim audit of the Lessee's accounts, and a copy of any written response of the Lessee to any such letter or report, (ii) evidence of the continued licensure by the State of Alabama and any other regulatory body, and (iii) a copy of all inspection reports by any agency of the State of Alabama or any other regulatory body.

(e)     The Lessee shall also furnish to the Issuer (if requested by the Issuer) and the Trustee, on an annual basis, a report detailing all capital improvements to the Facility.

(f)     The Lessee shall send a copy of any written opinion, report or certificate provided to it by a Management Consultant to the Issuer (if requested by the Issuer) and the Trustee.

(g)     The Lessee shall send to the Underwriter, to each holder of not less than $1,000,000 in aggregate principal amount of Series 2012 Bonds, and, upon request by any Bondholder, at such Bondholder's expense, a copy of any budget, statement, certificate or report referred to in this Section 5.4.

The Trustee shall have no duty to review the foregoing items deposited with it and shall hold such items as a repository on behalf of the Bondholders.

Section 5.5.    Agreement of Issuer Not to Assign or Pledge.  Except for the assignment and pledge of the Trust Estate in the Indenture, and as provided by the Security Agreement the Issuer agrees that it will not attempt to further assign, pledge, transfer or convey its interest in or create any assignment, pledge, lien, charge or encumbrance of any form or nature with respect to the Trust Estate.

Section 5.6.    Redemption of Bonds.  The Issuer or the Trustee, at the request at any time of the Lessee and if the same are then redeemable, shall forthwith take all steps that may be necessary under the applicable redemption provisions of the Indenture to effect redemption of all or any portion of the Bonds, as may be specified by the Lessee, on the earliest redemption date on which such redemption may be made under such applicable provisions or upon the date set for the redemption by the Lessee pursuant to Sections 7.1 and 7.2.  As long as the Lessee is not in default hereunder and the Issuer is not obligated to call Bonds pursuant to the terms of the Indenture, neither the Issuer nor the Trustee shall redeem any Bond prior to its stated maturity unless requested to do so in writing by the Lessee.

Section 5.7.    Reference to Bonds Ineffective After Bonds Paid.  Upon payment in full of the Bonds and all fees and charges of the Trustee, all references herein to the Bonds and the Trustee shall be ineffective and neither the Issuer, the Trustee nor the holders of any of the Bonds shall thereafter have any rights hereunder and the Lessee shall have no further obligation hereunder, saving and excepting those that shall have theretofore vested and any right of the Issuer or the Trustee to indemnification under Section 5.2, which right shall survive the payment

of the Bonds and the termination of this Agreement.  Reference is hereby made to Section 802 of the Indenture which sets forth the conditions upon the existence or occurrence of which payment in full of the Bonds shall be deemed to have been made.

Section 5.8.    Assignment, Sale or Lease of Facility.    Subject to the provisions of Section 5.3, the Lessee may assign its interest in this Agreement and may sell or lease the Facility, in whole or in part, only with the prior written consent of the Issuer, which consent shall not be unreasonably withheld; provided that the Trustee shall be furnished with  an opinion from Bond Counsel experienced and acceptable to the Issuer that such sale, lease, or assignment will not adversely affect the excludability from gross income for Federal income taxation purposes of interest on the Series 2012A Bonds.  No assignment or lease or sale shall relieve the Lessee of primary liability for payments due hereunder and of the performance of all other obligations required hereunder.

Section 5.9.    Covenants of Lessee and Issuer With Respect to Excludability from Gross Income of Interest By the Series 2012A Bonds From Federal Income Taxation.  Consistent with the terms of the Land Use Restriction Agreement, the Series 2012A Bonds are being issued by the Issuer in compliance with the conditions necessary for the interest income on the Series 2012A Bonds to be excludable from gross income for Federal income taxation purposes pursuant to the provisions of Section 142(d) of the Code, and substantially all of the proceeds of which are to be used for the acquisition, construction, reconstruction or improvement of land or property of a character subject to the allowance for depreciation under Section 167 of the Code.  It is the intention of the parties hereto that the interest on the Series 2012A Bonds be and remain excludable from gross income for Federal income taxation purposes, and, to that end, the Issuer and the Lessee do hereby covenant with each other, the Trustee and each of the holders of any Series 2012A Bonds, as follows:

(a)    that the Issuer will not cause and the Lessee will not cause or permit the proceeds of the Series 2012A Bonds to be used in a manner which will cause the interest on the Series 2012A Bonds to become includable in gross income for Federal income taxation purposes conferred by Section 142(d) of the Code;

(b)    that, during the term of this Agreement, the Lessee will fully comply with all effective rules, rulings and regulations promulgated by the Department of the Treasury or the Internal Revenue Service, with respect to bonds issued under Section 142(d) of the Code so as to maintain the excludability of the interest payable as excludable from gross income for Federal income taxation purposes on the Series 2012A Bonds;

(c)    that the Lessee will make no change in the plans and specifications for the Facility which would result in (i) the Facility not being a "project" within the meaning of the Act, (ii) less than substantially all (95%) of the net proceeds of the sale of the Series 2012A Bonds being used to pay the costs of land or property of a character subject to the allowance for depreciation under Section 167 of the Code, or (iii) a violation of the limitation on maturity of the Bonds under Section 147(b) of the Code;

  (d) that at no time will:

    (i) any portion of the net proceeds of the sale of the Series 2012A Bonds be used to provide any airplane, skybox or other private luxury box, any health club facility, any facility primarily used for gambling, or any store the principal business of which is the sale of alcoholic beverages for consumption off premises; or

    (ii) any portion of the net proceeds of the sale of the Series 2012A Bonds be used (directly or indirectly) for the acquisition of land (or an interest therein) to be used for farming purposes, or 25% or more of the net proceeds of the sale of the Series 2012A Bonds be used (directly or indirectly) for the acquisition of land other than land to be used for farming purposes; or

    (iii) any portion of the net proceeds of the sale of the Series 2012A Bonds be used for the acquisition of any property the first use of which property is not pursuant to such acquisition, except with respect to any building (and the equipment therefor) if the rehabilitation expenditures with respect to such building equal or exceed 15% of the portion of the cost of acquiring such building (and equipment) financed with the proceeds of the Series 2012A Bonds.

Section 5.10. <u>Non-Arbitrage Covenant; Compliance With Special Arbitrage Rules</u>.

  (a) The Lessee hereby covenants and agrees with the Issuer and the Trustee for the benefit of the holders of any of the Bonds, present and future, that it will proceed with due diligence to spend the "net sale proceeds" (hereinafter defined) of the Bonds in connection with the acquisition, rehabilitation and equipping of the Project and that it will not make, or permit, any use of the proceeds of the Series 2012A Bonds which will cause the Series 2012A Bonds to be "arbitrage bonds" within the meaning of Section 148 of the Code and any regulations promulgated thereunder as such regulations may apply to obligations issued as of the date of issuance and delivery of the Series 2012A Bonds. The Lessee shall deliver to the Issuer its certificate, evidencing the reasonable expectations of the Lessee, in such reasonable form as the Issuer shall specify and upon which the Issuer may rely in furnishing the certificate required by Section 206 of the Indenture.

  (b) The Lessee hereby further covenants and agrees with the Issuer and the Trustee, and with the holders of any of the Bonds, present and future, as follows:

    (1) All of the gross proceeds of the Series 2012A Bonds, other than gross proceeds held in a "bona fide debt service fund" (hereinafter defined) will be expended on the Project within twelve (12) months of the date of issuance and delivery of the Series 2012A Bonds, or

    (2) If any part of the gross proceeds of the Bonds has not been expended on the Project within twenty-four (24) months of the date of issuance and delivery of the Series 2012A Bonds, the Lessee shall invest or cause such gross proceeds to be invested in the manner described in Subparagraph (A) below and shall pay or cause to be paid to the United

States the amounts described in Subparagraph (B) below in accordance with the terms and conditions set forth therein.

(A)    Except during any "temporary period" (hereinafter defined), the aggregate amount of gross proceeds of the Series 2012A Bonds which are invested in "nonpurpose obligations" (hereinafter defined) having a "yield" (hereinafter defined) higher than the yield on the Series 2012A Bonds shall at no time during any "bond year" (hereinafter defined) exceed one hundred fifty per centum (150%) of the "debt service" (hereinafter defined) on the Series 2012A Bonds for such bond year.  In addition, the aggregate amount of gross proceeds of the Series 2012A Bonds invested hereunder in nonpurpose obligations having a yield higher than the yield on the Series 2012A Bonds shall be promptly and appropriately reduced as the amount of outstanding Series 2012A Bonds is reduced (whether by payment at maturity, mandatory sinking fund redemption, redemption prior to maturity or otherwise). The Lessee shall not be required to sell or dispose of nonpurpose obligations if such sale or disposition would result in the realization of a loss, for Federal income tax purposes, that exceeds the amount that would be rebated to the United States pursuant to the provisions of Subparagraph (b)(2)(B) below (but for such sale or disposition), at the time of such sale or disposition if a rebate were due at such time.  The provisions of the foregoing sentence shall not apply to the extent that other nonpurpose obligations acquired with the gross proceeds of the Series 2012A Bonds may be sold or disposed of without incurring the loss described above, and in any event the provisions of the foregoing sentence shall cease to apply thirty (30) days after the last day of the first "computation period" (defined in Subparagraph (b)(2)(B) ending thereafter on which such nonpurpose obligations can be sold or disposed of without incurring the loss describe hereinabove.  The provisions of this Subparagraph (A) shall not apply to gross proceeds of the Series 2012A Bonds which are:

(i)    invested for the initial temporary period provided in Section 1.148-2(e)(2) of the Income Tax Regulations;

(ii)    held in a bona fide debt service fund for the Series 2012A Bonds and invested for the 13-month temporary period provided in Section 1.148-2(e)(5)(ii) of the Income Tax Regulations;

(iii)    invested for the temporary periods provided for a sinking fund for the Series 2012A Bonds in Section 1.148-2(e)(8) and 1.148-2e(12) of the Income Tax Regulations;

(iv)    invested during the one-year temporary period provided for investment earnings derived from invested proceeds of the Series 2012A Bonds and from the investment of amounts held in a sinking fund for the Series 2012A Bonds under Section 1.148-2(e)(6) and 1.148-2(e)(9) of the Income Tax Regulations;

(B)    At the time or times hereinafter set forth, the Lessee shall pay to the Trustee for deposit into the Arbitrage Rebate Fund an amount, hereinafter referred to as the "Rebate Amount," which is equal to the sum of:

(i)    the excess of --

(a)    the aggregate amount earned from the date of issuance and delivery of the Series 2012A Bonds on all nonpurpose obligations in which gross proceeds of the Series 2012A Bonds have been invested (other than nonpurpose obligations attributable to an excess described herein) over

(b)    the aggregate amounts which would have been earned if the yield on such nonpurpose obligations (other than nonpurpose obligations attributable to an excess described herein) had been equal to the yield on the Series 2012A Bonds, plus

(ii)    any income attributable to the excess described in clause (i) above.

The Rebate Amount payable to the United States shall be determined annually by the Lessee for each bond year during which Series 2012A Bonds remain outstanding and upon retirement of the last of the Series 2012A Bonds (each such period is hereinafter referred to as a "computation period").  The Rebate Amount determined for one bond year shall not be reduced or offset as a result of any determination of the Rebate Amount for any other bond year.  The Rebate Amount shall be paid to the United States in installments, as follows:

(I)    subject to clause (III) below, the first such installment shall be paid no later than thirty (30) days after the end of the fifth (5th) bond year of the Series 2012A Bonds;

(II)    subject to clause (III) below, an additional installment shall be paid on or prior to the last day of each additional installment payment period during which any of the Series 2012A Bonds remain outstanding.  For purposes of this clause (II), an installment payment period shall commence on the last day on which a preceding installment of the Rebate Amount was required to be paid, and shall end on the day preceding the fifth (5th) anniversary of such payment date;

(III)    anything    herein    to    the    contrary notwithstanding, the last installment shall be paid no later than thirty (30) days after the last of the Series 2012A Bonds has been retired; and

(IV)    each installment shall be in an amount which, when aggregated with the amount of any prior installments paid to the United States hereunder, will equal at least ninety per centum (90%) of the total Rebate Amount payable to the United States hereunder as of the date such installment is paid; provided, however, that the last installment shall be in an amount equal to the entire remaining balance of the Rebate Amount payable to the United States hereunder.

The Lessee shall maintain or cause to be maintained records of such determinations for each computation period until six years after payment in full of the Series 2012A Bonds and shall make such records available to the Issuer, the Trustee and their representatives upon reasonable request therefor.  The Issuer agrees to cooperate with the Lessee in making the

31

determinations for each computation period required pursuant to this Subparagraph (b).

(3)    For purposes of clause (a) of Subparagraph (2)(B)(i) of this Subparagraph (b), the Lessee, in determining the aggregate amounts earned on all nonpurpose obligations acquired with gross proceeds of the Series 2012A Bonds –

(A)    will take into account any gain or loss incurred on the disposition of any such nonpurpose obligation, and

(B)    unless the Issuer otherwise elects, will not take into account any amounts earned on nonpurpose obligations held in a bona fide debt service fund for the Series 2012A Bonds during any bond year in which the gross earnings on such fund do not exceed One Hundred Thousand Dollars ($100,000).

(C)    For purposes of construing this Section, the following definitions shall apply:

(1)    "bona fide debt service fund" shall have the meaning set forth in Income Tax Regulation Section 1.148-1(a)(b)(12);

(2)    "bond year" shall mean the one-year period commencing on the date of issuance and delivery of the Series 2012A Bonds and ending one year later, and each one-year period thereafter until payment in full of the Series 2012A Bonds;

(3)    "debt service" shall have the meaning set forth in Code Section 148(d)(3)(D);

(4)    "yield" shall have the meaning set forth in Income Tax Regulation Section 1.148-1(b).

"Gross Proceeds" means amounts which are

(1)    sale proceeds of the Series 2012A Bonds (as defined in Income Tax Regulations §1.148-1) i.e., any amounts actually or constructively received from the sale of the Series 2012A Bonds, including amounts used to pay underwriters' discount or compensation and accrued interest other than pre-issuance accrued interest;

(2)    in the case of a refunding issue, transferred proceeds of the Series 2012A Bonds (as defined in Income Tax Regulations §1.148-9 (or the applicable corresponding provisions of prior law));

(3)    investment proceeds of the Series 2012A Bonds (as defined in Income Tax Regulations §1.148-1), i.e., any amounts actually or constructively received from investing sale proceeds, transferred proceeds and investment proceeds of the Series 2012A Bonds in Investment Property, such as interest or dividends, other than amounts actually or constructively received with respect to a Purpose Investment that are properly allocable to the immaterially higher yield permitted under Income Tax Regulations §1.148-2(d) or to Qualified Administrative

Costs under Income Tax Regulations §1.148-5(e), and

(4)    replacement proceeds of the Series 2012A Bonds (as defined in Income Tax Regulations §1.148-1), i.e., amounts (excluding sale proceeds, transferred proceeds and investment proceeds of the Series 2012A Bonds) replaced by proceeds of the Series 2012A Bonds under Section 142(a)(2) of the Code, including amounts held in a sinking fund (including a debt service fund, reserve fund, replacement fund or any similar fund, to the extent reasonably expected to be used directly or indirectly to pay debt service on the Series 2012A Bonds), a pledged fund (i.e., any amount directly or indirectly pledged to pay principal or interest on the Series 2012A Bonds that in substance provides reasonable assurance that the amount will be available to pay principal or interest on the Series 2012A Bonds if the Issuer or the Lessee encounters financial difficulties), or "other replacement proceeds" (within the meaning of Income Tax Regulations §1.148-1(c)(4)).

For purposes hereof a pledge to a guarantor of the Series 2012A Bonds is an indirect pledge to secure payment of principal and interest on the Series 2012A Bonds. In addition, an amount is treated as pledged to pay principal and interest on the Series 2012A Bonds if it is held under an agreement to maintain the amount at a particular level for the direct or indirect benefit of Bondholders or a guarantor, unless (a) the Issuer or the Lessee may grant rights in the amount which are superior to the rights of the Bondholders or the guarantor, or (b) the amount does not exceed the reasonable needs for which it is maintained, the required level is tested no more frequently than every 6 months and the amount may be spent without any substantial restriction, other than a requirement to replenish the amount by the next testing date.

"Investment Property" shall mean any investment which is:

(1)    a "security" (as defined in Section 165(g)(2)(A) or (B) of the Code , i.e., a share of stock in a corporation or a right to subscribe for or to receive a share of stock in a corporation, or

(2)    an "obligation" (i.e., any evidence of indebtedness under general Federal income tax principles, including time or demand deposits,

(3)    any annuity contract (as defined in Section 72 of the Code), or

(4)    any investment-type property (within the meaning of Treasury Regulations Section 1.148-1), i.e., any property other than property described in clauses (1), (2) or (3) above, that is held principally as a passive vehicle for the production of income. A prepayment for property or services is investment-type property if a principal purpose for prepaying is to receive an investment return from the time the prepayment is made until the time payment otherwise would be made, provided that a prepayment is not investment-type property if (a) the prepayment is made for a substantial business purpose other than investment return and the Issuer or Lessee has no commercial alternative to the prepayment, or (b) prepayments on substantially the same terms are made by a substantial percentage of persons who are similarly situated to the Issuer or the Lessee but who are not beneficiaries of tax-exempt financing.

The term "Investment Property" shall <u>not</u> include (1) any obligation issued by or on

behalf of a state or local governmental unit the interest on which is excluded from gross income under Section 103 of the Code (or any obligation that when issued purported to be excluded from gross income under Section 103 of the Code) (a "tax-exempt bond"), unless (if the Series 2012A Bonds are not "specified private activity bonds") such obligation is a "specified private activity bond" (as defined in Section 57(a)(5)(C) of the Code) i.e., a tax-exempt bond the interest on which is subject to the alternative minimum tax imposed on individuals and corporations, (2) any interest in a "regulated investment company" to the extent that at least 95 percent of the income to the holder of the interest is interest that is excludable from gross income under section 103(a) of the Code, unless (if the Series 2012A Bonds are not "specified private activity bonds") such "regulated investment company" invests in tax-exempt bonds which are "specified private activity bonds" to an extent in excess of the percentage permitted by the Internal Revenue Service to enable characterization of interest in such regulated investment company as not constituting Investment Property, (3) any "exempt demand deposit" (demand deposit SLG) (within the meaning of Treasury Regulations §1.148-8(e)(4)), and (4) any qualified temporary investment (within the meaning of Internal Revenue Service Notice 87-22, 1987-10 I.R.B. (March 9, 1987) or successor Treasury regulations) applicable to the Series 2012A Bonds.

"Nonpurpose Investment" means any Investment Property which is not acquired with the Gross Proceeds of the Series 2012A Bonds to carry out the governmental purpose for which the Series 2012A Bonds are being issued (within the meaning of Treasury Regulations §1.148-1), i.e., all Investment Property acquired or otherwise allocated to Gross Proceeds of the Series 2012A Bonds other than the loan made by the Issuer to the Lessee under this Agreement.

"Purpose Investment" means an investment that is acquired to carry out the governmental purpose of the Series 2012A Bonds i.e., the loan made to the Lessee under this Agreement.

"Qualified Administrative Costs" with respect to a Nonpurpose Investment means such term as defined in Treasury Regulations §1.148-5(e)(2) or successor regulations applicable to the Bonds. Qualified Administrative Costs are reasonable, direct administrative costs, other than carrying costs, such as separately stated brokerage or selling commissions, but not legal and accounting fees, record keeping, custody, and similar costs. General overhead costs and similar indirect costs of the Issuer or the Lessee such as employee salaries and office expenses and costs associated with computing the Rebate Amount under Section 148(f) of the Code are not Qualified Administrative Costs. In general administrative costs are not reasonable unless they are comparable to administrative costs that would be charged for the same investment or a reasonably comparable investment if acquired with a source of funds other than gross proceeds of tax-exempt bonds.

Qualified Administrative Costs include all reasonable administrative costs, without regard to the limitation on indirect costs described above if incurred by (1) a "publicly offered regulated investment company" (as defined in section 67(c)(2)(B) of the Code) and (2) a commingled fund in which the Issuer and the Lessee and any related parties do not own more than 10 percent of the beneficial interest in the fund. In the case of a guaranteed investment contract, a broker's commission paid on behalf of either the Issuer, the Lessee or the provider is not a Qualified Administrative Cost to the extent that the commission exceeds 0.05 percent of the amount reasonable expected to be invested per year.

Section 5.11.   Notification of Act of Bankruptcy.   The Lessee agrees to notify the Trustee and the Issuer as soon as possible of the occurrence of an Act of Bankruptcy or any event which, with the lapse of time, would constitute an Act of Bankruptcy.  The Lessee further agrees to notify the Trustee within ninety-five (95) days following final payment of the Bonds, whether by redemption or otherwise, of the occurrence or non-occurrence of an Act of Bankruptcy during the period commencing ninety (90) days prior to such final payment and ending on the ninety-third (93rd) day following such final payment.

Section 5.12.   Insurance.   For the term of this Agreement, the Lessee shall maintain insurance of such type and in amounts as is customarily carried and against such risks as are customarily insured against by businesses of like size and character in the State of Alabama, including but not limited to the following:

(a)      insurance upon the repair or replacement basis in an amount of not less than 100% of the then (at the time such insurance is obtained by Lessee) actual cost of replacement (excluding costs of replacing excavations and foundations but without deduction for depreciation) of the Facility against loss or damage by fire, lighting, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, and smoke and such other risks as are not or hereafter included in the uniform standard extended coverage endorsement in common use for similar structures (including vandalism and malicious mischief);

(b)      business interruption insurance (also referred to as "use and occupancy insurance" or "rental income insurance") in an amount not less than the principal and interest payments required for the next succeeding twelve (12) months, covering loss of revenues and other income by the Lessee by reason of total or partial suspension of, or interruption in the operation of the Facility cause by damage or destruction of the Facility;

(c)      boiler explosion insurance or steam boilers, if any, pressure vessels, and pressure piping in an amount no less than 100% of the actual cost of repair or replacement of the Facility (with deductible provisions not to exceed $1,000 in any one occurrence) provided, that such insurance need not be taken out until steam boilers, pressure vessels, or pressure piping have been installed in the Facility;

(d)      comprehensive general liability insurance providing insurance (with deductible provisions not exceeding $5,000) to the extent of not less than $500,000 per occurrence against liability for personal and bodily injury including death resulting therefrom, $100,000 per occurrence for damage to property, including loss of use thereof, occurring on or in any way related to the Facility or any part thereof, with excess liability or "umbrella" insurance for claims under such coverage in the aggregate of not less than $2,000,000;

(e)      worker's compensation coverage as required by the laws of the State of Alabama; and

(f)      insurance under the Federal Flood Insurance Program will be maintained at all times within the minimum requirements and amounts required for federally financed or assisted loans under the Flood Disaster Protection Act of 1973, as amended, if the Facility is

eligible under such program.

Proceeds of insurance required by (a), (c), and (f) in excess of $25,000 will be paid to the Trustee and deposited into the Special Fund and disbursed by it in accordance with instructions from the Lessee for the restoration of the Facility except as otherwise provided in Section 7.1(a) hereof. All policies of insurance shall list Issuer and Trustee as additional insureds and provide for payment to the Issuer, the Lessee, and the Trustee as their respective interests may appear, and the policies required by (a), (c) and (f) shall name the Trustee as mortgagee. A copy of all policies of insurance shall be delivered to Issuer and Trustee along with receipts evidencing payment of the same.

At least thirty (30) days prior to the expiration date of each policy maintained pursuant to this Paragraph 5.12, a renewal or replacement thereof satisfactory to Issuer and Trustee shall be delivered to Issuer and Trustee. Lessee shall deliver to Issuer and Trustee receipts evidencing the payment for all such insurance policies and renewals or replacements. The delivery of any insurance policies hereunder shall constitute an assignment of all unearned premiums as further security hereunder. In the event of the foreclosure or any other transfer of title to the Facility, it is understood by Lessee that all right, title and interest of Issuer in and to all insurance policies then in force shall pass to the purchaser or Trustee.

The Trustee shall have no duty to review the insurance required by this Section 5.12 (or the certificates thereof) or to inquire as to the compliance thereof with this Section 5.12.

Section 5.13. Condemnation of the Facility. Unless the Lessee elects to exercise any option it may have to prepay the Bonds, and if prior to full payment of the Bonds, or provision for payment thereof having been made, title to or temporary use of the Facility is taken in any condemnation proceeding, the proceeds of any condemnation award will be paid to the Trustee and applied, subject to Section 1.04 of the Security Agreement and as directed by the Lessee, to (a) the restoration of the Facility, (b) the acquisition of a suitable replacement which must be approved by the Issuer, or (c) redemption of all or a portion of the Bonds. In the event of a conflict between the provisions of this Section and Section 1.04 of the Security Agreement, the provisions of Section 1.04 of the Security Agreement shall control. If less than all of the Bonds are redeemed, the Lessee must furnish a certificate of an independent consulting architect (who must be approved in writing by the Issuer) that the property taken was not essential to the Lessee's use and occupancy of the Facility or that the Facility has been restored to a condition substantially equivalent to its condition prior to such taking or that a suitable replacement has been found. Any condemnation award remaining after the costs of such restoration or replacement will be paid into the Bond Fund and used to redeem the Bonds. Any condemnation awards paid to the Lessee for damage to or taking of its own property not subject to the lien of the Indenture shall be retained by the Lessee.

If title to or the temporary use of a "substantial portion of the Facility" is taken in any condemnation proceeding, defined as such taking which results, in the opinion of an independent consulting architect, in the Lessee being thereby prevented from carrying on its normal operations for a period of three consecutive months, the Lessee will have the option to prepay the Bonds by paying to the Trustee an amount equal to 100% of the principal amount of the Bonds,

plus accrued interest to the prepayment date.

Section 5.14.    Financial Covenants by Lessee.

(a)    Debt Service Coverage Ratio. The Lessee agrees to maintain, as calculated at the end of each Fiscal Year, a Debt Service Coverage Ratio on the Bonds (a) for the Fiscal Year ending December 31, 2013, not less than 1.10 (b) for the Fiscal Year ending December 31, 2014, not less than 1.15 to 1; (c) for the Fiscal Year ending December 31, 2015, not less than 1.20 to 1; and (d) for the Fiscal Year ending December 31, 2016, not less than 1.25 to 1. As used herein, (1) "Debt Service Coverage Ratio on the Bonds" means the ratio of Funds Available for Debt Service to annual debt service requirements on the Bonds (after payment of subordinated fees) for the Fiscal Year for which such calculation is being made; and (2) "Funds Available for Debt Service" means in any period the Pledged Revenues for such period, minus the Lessee's operating expenses (as set forth in the Operating Budget required by Section 5.4 of the Agreement), plus, to the extent included in such operating expenses, depreciation and amortization, interest on long-term indebtedness (including the Series 2012 Bonds), amortization of discount and financial expenses incurred in connection with the issuance of long-term indebtedness, and other non-cash expense deducted in accordance with generally accepted accounting principles consistently applied.

If such Debt Service Coverage Ratio shall fall below the above-required level, the Trustee shall appoint a Management Consultant within sixty (60) days following the end of such Fiscal Year to evaluate the management of the Facility and to make recommendations with regard to increasing such ratio to at least the level required, or if in the opinion of the Management Consultant the attainment of such level is impracticable, to the highest practicable level. So long as the Lessee shall retain a Management Consultant, shall comply to the extent practicable with the recommendations thereof, and shall maintain, at all times, a Debt Service Coverage Ratio of at least 1.00 (the "Minimum Coverage Ratio"), this requirement shall be deemed to have been complied with even if such ratio, as calculated at the end of any subsequent Fiscal Year, is below the required level.

(b)    Days' Cash on Hand. The Lessee agrees to have fifteen (15) Days' Cash on Hand, as of the end of each fiscal quarter, beginning with such quarter ending December 31, 2013, and thereafter. If Days' Cash on Hand, as calculated at the end of any two consecutive fiscal quarters, shall be less than the required level, the Lessee agrees to retain a Management Consultant, within sixty (60) days following the end of the second of such fiscal quarters, to evaluate the management of the Facility and to make recommendations with regard to increasing Days' Cash on Hand for subsequent fiscal quarters of the Lessee to at least the level required or, if in the opinion of the Management Consultant the attainment of such level is impracticable, to the highest practicable level. So long as the Lessee shall retain a Management Consultant and shall have, for each fiscal quarter, not less than seventy percent (70%) of the Days' Cash on Hand otherwise required by this paragraph, the requirements of this paragraph shall be deemed to have been satisfied.

(c)    Trade Payables. The Lessee agrees that, for each fiscal quarter, as calculated at the end of each such fiscal quarter, beginning with the fiscal quarter ending

37

December 31, 2013, no more than ten (10%) of its Trade Payables will be in excess of ninety (90) days.  If more than ten percent (10%) of the Lessee's trade payables are in excess of ninety (90) days for any two consecutive fiscal quarters, the Lessee will retain a Management Consultant, within sixty (60) days following the end of the second of such fiscal quarters, to evaluate the management of the Facility and to make recommendations with respect to the management of the Lessee's trade payables.  So long as the Lessee shall retain a Management Consultant and, for each fiscal quarter, no more than twenty percent (20%) of its trade payables shall be in excess of ninety (90) days, the provisions of this paragraph shall be deemed to have been satisfied.

Section 5.15.    Inspections.  The Lessee covenants that it shall permit the Issuer, Trustee, Underwriter, or any Bondholder holding, or group of Bondholders holding in the aggregate, twenty-five percent (25%) or more in principal amount of all outstanding Bonds, or any authorized representative of the foregoing, to examine, visit, and inspect, at any reasonable time, upon reasonable notice to the Management Company and Lessee, the Facility and their respective accounts, books and records, including their receipts, disbursements, contracts, investments and any other matters relating thereto and to their financial standing, and to supply such reports and information as the Issuer and the Trustee (provided the Trustee shall have no duty so to inspect) shall reasonably request.

Section 5.16. - No Liability of Issuer.  Anything herein to the contrary notwithstanding, nothing contained in this Agreement or in any other document that is a part of this transaction, including, but not limited to, the Bond Resolution of the Issuer, the  parties agree that the Security Agreement, and/or the Indenture shall, in any manner whatsoever be deemed to constitute a debt or a general obligation, or a pledge of the faith and credit of the Issuer, the State of Alabama, the City or any political subdivision thereof, and does not directly or indirectly or contingently, obligate the Issuer, said State, the City or any political subdivision thereof to levy or to pledge any form of taxation whatever for the payment of the principal indebtedness, redemption premium (if any), interest, or any other indebtedness, costs, or expense.

Section 5.17.    Incorporation of "Agreement, Joinder and Indemnity by Lessee" to the Security Agreement.  It is specifically understood and agreed upon by the Issuer and Lessee that Lessee will relieve Issuer entirely of any responsibility to perform the obligations of the Security Agreement.  Lessee agrees to perform each and every obligation of Issuer set forth in the Security Agreement and to indemnify Issuer and save the Issuer harmless for the non-performance of any such obligations, including reasonable costs and attorneys' fees which may be incurred by issuer and/or by the Trustee in the enforcement of such duties.  The "Agreement, Joinder and Indemnity by Lessee" is specifically incorporated herein by reference and made a part hereof.

## ARTICLE VI.
## EVENTS OF DEFAULT AND REMEDIES

Section 6.1.    Events of Default Defined.  The following shall be "events of default" hereunder and the term "Event of Default" shall mean, whenever it is used herein, any one or more of the following events:

(a)    failure by the Lessee to make any payment required to be made under Section 4.2(a) within five (5) Business days of when the same becomes due and payable;

(b)    failure by the Lessee to observe and/or perform any agreement hereunder or under the Land Use Restriction Agreement or on its part to be observed and/or performed, other than as referred to in subsection (a) or (b) of this Section, for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, given to the Lessee by the Issuer or the Trustee; provided, however, in the case of any such default which can be cured with due diligence but not within such thirty-day period, the Lessee's failure to proceed promptly to cure such default and thereafter prosecute the curing of such default with due diligence.

(c)    any representation by or on behalf of the Lessee contained in this Agreement or the Land Use Restriction Agreement, or in any instrument furnished in compliance with or in reference to this Agreement or the Indenture proves false or misleading in any material respect as of the date of the making or furnishing thereof;

(d)    the occurrence of an Act of Bankruptcy, dissolution, liquidation, insolvency proceeding, or reorganization; and

(e)    an "Event of Default" occurs and is continuing under the Indenture.

Section 6.2.    Remedies.  Whenever an Event of Default shall have happened and be continuing, the Trustee, as the assignee and pledgee of the Issuer under the Indenture, may take any one or more of the following remedial steps:

(a)    If the Trustee has accelerated payment of the Bonds under the Indenture, the Trustee shall declare all payments required to be made under Section 4.2(a) to be immediately due and payable, whereupon the same shall become immediately due and payable; provided, however, that upon the occurrence of an Event of Default described in Subsections 6.l(a) or (b), all payments required to be made under Section 4.2(a) shall become immediately due and payable without any further act or action on the part of any person.  If all payments required to be made under Section 4.2(a) are accelerated, the amount then due and payable by the Lessee as accelerated payments shall be the sum of (i) the aggregate principal amount of the outstanding Bonds, (ii) all interest on the Bonds then due and to become due to maturity whether by acceleration or otherwise, and (iii) all other amounts due and payable to the Bondholders and/or to the Trustee with respect to the payment of the Bonds including reasonable Counsel fees.

(b)    The Trustee may take whatever action at law or in equity may appear necessary or desirable to collect any sums then due and thereafter to become due hereunder or to enforce performance and the observance of any agreement of the Lessee hereunder.

Any amounts collected pursuant to action taken under this Section shall be paid into the appropriate account in the Bond Fund and applied in accordance with the provisions of the Indenture and after payment in full of the Bonds and the payment of any costs occasioned by an Event of Default hereunder, any excess moneys in the Bond Fund shall be returned to the Lessee.

Section 6.3.    No Remedy Exclusive.  No remedy herein conferred upon or reserved to the Trustee is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to every other remedy hereunder or now or hereafter existing at law, in equity or by statute.  No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.  The Trustee and the holders of the Bonds, subject to the provisions of the Indenture, shall be entitled to the benefit of all agreements herein contained.

Section 6.4.    Agreement to Pay Counsel Fees and Expenses.  If there should occur a default or an Event of Default hereunder and the Trustee and/or Issuer should employ Counsel or incur other expenses for the collection of sums due hereunder or the enforcement of performance or observance of any agreement on the part of the Lessee herein contained, the Lessee agrees that it will, on demand therefor, pay to the Trustee and Issuer the reasonable fee of such Counsel actually incurred and such other reasonable expenses so incurred by the Trustee and Issuer.

If the Lessee should fail to make any payments required in this Section, such item shall continue as an obligation of the Lessee until the same shall have been paid in full, and the Lessee agrees to pay the same with interest thereon from the date such payment was due at the rate per annum borne by the Bonds until paid in full.

The provisions of this Section shall survive the termination of this Agreement.

Section 6.5.    Waiver of Events of Default and Rescission of Acceleration.  If, in compliance with the requirements of Section 906 of the Indenture, the Trustee shall waive any Event of Default as therein defined and its consequences or rescind any declaration of acceleration of payments of the principal of and interest on the Bonds, such waiver shall also waive any Event of Default hereunder and its consequences and such rescission of a declaration of acceleration of the principal of and interest on the Bonds shall also rescind any declaration of any acceleration of all payments required to be made under Section 4.2.  In case of any such waiver or rescission, or in case any proceeding taken by the Trustee on account of any such Event of Default shall have been discontinued or abandoned or determined adversely, then and in every such case the Issuer, the Lessee, the Trustee, and the holders of the Bonds shall be restored

to their former positions and rights hereunder, but no such waiver or rescission shall extend to any subsequent or other Event of Default or impair any right consequent thereon.

## ARTICLE VII.  PREPAYMENT UNDER AGREEMENT

Section 7.l.    Option to Prepay Installment Amounts Under Agreement in Whole in Certain Events.  The Lessee shall have, and is hereby granted, the option to prepay at par in whole the installment amounts required to be made under Section 4.2(a) and to cancel or terminate this Agreement if any of the following shall have occurred:

(a)    the Facility shall have been damaged or destroyed to such an extent that, in the judgment of the Lessee, (i) it cannot be reasonably restored within a period of three (3) consecutive months to the condition thereof immediately preceding such damage or destruction, (ii) the Lessee is thereby prevented from carrying on its normal operations at the Facility for a period of three (3) consecutive months, or (iii) to the extent that the cost of restoration thereof would exceed the net proceeds of insurance required to be carried thereto pursuant to Section 5.12 hereof.

(b)    title in and to, or the temporary use of, all or substantially all of the Facility shall have been taken under the exercise of the power of eminent domain by any governmental authority, or person acting under governmental authority (including such a taking as, in the judgment of the Lessee, results in the Lessee being prevented thereby from carrying on its normal operations at the Facility for a period of three (3) consecutive months).

(c)    as a result of any changes in the Constitution of the State of Alabama or the Constitution of the United States of America or of legislative or administrative action (whether state or federal), or by final decree, judgment, or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Lessee in good faith, the Agreement shall become void or unenforceable or impossible of performance.

(d)    legal curtailment of the Lessee's use and occupancy of all or substantially all of the Facility for any reason other than that set forth in Subsection (b), which curtailment shall, in the judgment of the Lessee, prevent the Lessee from carrying on its normal operations at the Facility for a period of three (3) consecutive months.

(e)    this Agreement is terminated prior to its expiration for any reason other than the occurrence of an Event of Default.

(f)    the Lessee shall exercise its option to prepay pursuant to Section 305 of the Indenture.

To exercise such option, the Lessee (i) shall, within ninety (90) days following the event giving rise to the Lessee's desire to exercise such option, deliver to the Issuer and the Trustee a certificate, executed by an officer of the Lessee, stating (A) the event giving rise to the exercise of such option, (B) that the Lessee has directed the Trustee to redeem all of the Bonds in

accordance with the provisions of the Indenture, (C) that the Lessee has discontinued, or at the earliest practicable date will discontinue, its operation of the Facility, and (D) the date upon which such prepayment is to be made, which date shall not be less than forty-five (45) days nor more than ninety (90) days from the date such notice is mailed; and (ii) shall make arrangements satisfactory to the Trustee for the giving of the required notice of redemption price which shall be paid to the Trustee by the Lessee upon its exercise of the option granted in this Section shall be the sum of the following:

       (1)     an amount of money which, when added to the amount then on deposit in the Bond Fund, will be sufficient to pay and redeem all of the then outstanding Bonds on the earliest applicable redemption date including, without limitation, principal plus accrued interest thereon to said redemption date, <u>plus</u>

       (2)     an amount of money equal to the Trustee's and paying agents' fees and expenses under the Indenture accrued and to accrue until such final payment and redemption of the Bonds.

      Section 7.2.   <u>Payment of Taxable Rate Upon a Determination of Taxability</u>.  If there occurs a Determination of Taxability, the Lessee shall be obligated to pay interest on the Series 2012A Bonds at the Taxable Rate from, after, and/or retroactive to the effective date of said Determination of Taxability.

      The Lessee shall give prompt written notice to the Issuer and the Trustee of (i) the filing by the Lessee of any Supplemental Statement which shows that a Determination of Taxability has occurred, and (ii) its receipt of any oral or written advice from the Internal Revenue Service that a Determination of Taxability has occurred.

      Promptly upon learning of an occurrence described in (a) or (b) of the definition of "Determination of Taxability" in Section 1.1, the Trustee shall cause notice thereof to be given to the Bondholders in the same manner as is provided in the Indenture for notices of redemption.  In such notice to Bondholders, the Trustee upon written request of the Issuer may make provisions for obtaining advice from Bondholders, in such form as shall be deemed appropriate, respecting relevant assessments made on such Bondholders by the Internal Revenue Service, so as to be able, if appropriate, to verify the existence, present or future, of a Determination of Taxability.

      Section 7.3.   <u>Damage and Destruction</u>.  Pursuant to Section 7.1 hereof, unless the Lessee elects to exercise any option it may have to prepay amounts payable under this Agreement, and if prior to full payment of the amounts payable under this Agreement, or unless provision for payment thereof has been made, the Facility is damaged or destroyed by fire or other casualty, all Net Proceeds, if in excess of $5,000, will be paid to and held by the Trustee, whereupon (i) the Lessee will proceed promptly to repair, rebuild, or restore the property damaged or destroyed to substantially the same condition as existed prior to the event causing such damage or destruction and (ii) the Trustee will apply so much as may be necessary of the Net Proceeds to the cost of repair, rebuilding and restoration.  If Net Proceeds are not sufficient to pay for such repair, rebuilding, or restoration, the Lessee will nonetheless complete same at

Lessee's sole cost and expense. Any Net Proceeds remaining after payment of all the costs of such repair, rebuilding or restoration will be paid into the Bond Fund and used to redeem the Series 2012A and 2012B Bonds.

If substantially all of the Facility is damaged or destroyed, the Lessee will have the option to prepay the Series 2012A and 2012B Bonds by paying to the Trustee an amount equal to 100% of the principal amount of the Series 2012A and 2012B Bonds outstanding plus accrued interest to the redemption date, but with no premium. If the Lessee exercises its option to prepay the Series 2012A and 2012B Bonds, "damage or destruction of substantially all of the Facility" is defined as such damage or destruction which prevents the Lessee from carrying on its normal operations in the Facility for more than three consecutive months, or if the Facility cannot be repaired, rebuilt or restored within three consecutive months or if the cost of repair, rebuilding or restoration exceeds the Net Proceeds.

## ARTICLE VIII.  MISCELLANEOUS

Section 8.1.    Term of Agreement.  The term of this Agreement shall begin on the date of the delivery hereof and this Agreement shall terminate when payment in full of the Bonds shall have been made.

Section 8.2.    Notices.    All notices, approvals, consents, requests and other communications hereunder shall be in writing and shall be deemed to have been given when delivered or mailed by First Class Registered or Certified Mail, Return Receipt Requested, postage prepaid, and addressed as follows:

(a)    If to the Issuer:    The Medical Clinic Board of the City of Mobile (Second)
c/o James P. Rossler, Esq.
1 South Royal Street, #300
Mobile, Alabama  36602-3249

with a copy to:    James P. Rossler, Esq.
1 South Royal Street, #300
Mobile, Alabama  36602-3249

(b)    If to the Lessee:    Bama Oaks Retirement, LLC
Two Buckhead Plaza
3050 Peachtree Road NW, Suite 355
Atlanta, Georgia 30305

| with a copy to: | Gregory P. Youra, Esq. |
| | Holt Ney Zatcoff & Wasserman, LLP |
| | 100 Galleria Parkway, Suite 600 |
| | Atlanta, GA 30339 |

(c)    If to the Trustee:    BOKF, NA dba Bank of Oklahoma
One Williams Center
Tulsa, Oklahoma 74192
Attn: Marrien Neilson

(d)    If to the Underwriter: Lawson Financial Corporation
3352 E. Camelback Road
Phoenix, Arizona 85018
Attn: Robert W. Lawson

A duplicate copy of each notice, approval, consent, request or other communication given hereunder by the Issuer, the Lessee, or the Trustee shall also be given to all of the others. The Issuer, the Lessee, or the Trustee may, by notice given hereunder, designate any further or different addresses to which subsequent notices, approvals, consents, requests or other communications shall be sent or persons to whose attention the same shall be directed.

Section 8.3    Binding Effect. This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Lessee and their respective successors and assigns.

Section 8.4.    Severability.    If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

Section 8.5.    Amounts Remaining in Project Fund or Bond Fund or Special Fund. It is agreed by the parties hereto that any amounts remaining in the Project Fund or the Bond Fund upon expiration or sooner termination of this Agreement, after payment in full of the Bonds and payment of the fees, charges and expenses of the Trustee; and any paying agents in accordance with the Indenture, shall belong to and be paid to the Lessee by the Trustee.

Section 8.6.    Delegation of Duties and Assignment of Rights by Issuer. It is agreed that under the terms of this Agreement the Issuer has delegated certain of its duties thereunder to the Lessee and that under the terms of the Indenture the Issuer has assigned certain of its rights thereunder to the Trustee. The fact of such delegation shall be deemed a sufficient compliance by the Issuer to satisfy the duties so delegated herein and the Issuer shall not be liable in any way by reason of acts done or omitted by the Lessee, the Authorized Lessee Representative or the Trustee. The Issuer shall have the right at all times to act in reliance upon the authorization, representation or certification of the Authorized Lessee Representative and/or the Trustee.

Section 8.7.    Amendments, Changes and Modifications.  Except as otherwise provided herein or in the Indenture, subsequent to the date of issuance and delivery of the Bonds and prior to their payment in full, this Agreement may not be effectively amended except as provided in Article XIII of the Indenture and may not be effectively amended or terminated without the written consent of the Trustee and of all parties hereto.

Section 8.8.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

Section 8.9.    Captions.  The captions and headings herein are for convenience only and in no way define, limit or describe the scope or intent of any provisions hereof.

Section 8.10.    Payments Due on Saturday, Sundays and Holidays.  In any case where the date for any payment required to be made hereunder or under the Indenture shall be, in the city of payment, a Saturday, a Sunday, a legal holiday or a day on which banking institutions are authorized by law to close, then payment need not be made on such date in such city but may be made on the next succeeding Business day not a Saturday, a Sunday, a legal holiday or a day on which banking institutions are authorized by law to close with the same force and effect as if made on the date fixed for such payment, and if such payment is made on the next succeeding Business day no interest shall accrue for the period from and after the date on which payment was required to be made hereunder or under the Indenture.

Section 8.11.    Law Governing Construction of Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State.

## ARTICLE IX.  OPTIONS IN FAVOR OF LESSEE

Section 9.01.    General Options to Terminate Lease Term.  The Lessee shall have, and is hereby granted, the following options to terminate the Lease Term:

(a)    at any time prior to full payment of the Bonds (or provision for payment thereof having been made in accordance with the provisions of the Indenture), the Lessee may terminate the Lease Term by (i) paying to the Trustee an amount which, when added to the amount on deposit in the Bond Fund and the Debt Service Reserve Fund, will be sufficient to pay, retire, and redeem all of the Outstanding Bonds in accordance with the provisions of the Indenture (including, without limiting the generality of the foregoing, principal, redemption premium, interest to maturity or earliest applicable redemption date, as the case may be, expenses of redemption, and Trustee's and paying agents' fees and expenses), (ii) in the case of redemption, making arrangements satisfactory to the Trustee for the giving of the required notice of redemption, and (iii) paying to the Issuer any and all sums then due to the Issuer under this

Agreement, and

(b)    upon full payment of the Bonds (or provision for payment thereof having been made in accordance with the provisions of the Indenture) and of any and all sums then due to the Issuer under this Lease prior to the end of the Lease Term, the Lessee may terminate the Lease Term by giving the Issuer notice in writing of such termination which shall forthwith become effective. At any time within one hundred eighty (180) days after the expiration or sooner termination of the Lease Term or any renewal term, the Lessee shall also have, and is hereby granted, the option to. purchase the Project for a purchase price of One Hundred Dollars ($100.00) which shall be paid directly to the Issuer for its own account (and not into the Bond Fund) and any and all other sums then due to the Issuer under this Agreement. To exercise such option, the Lessee shall give written notice of exercise to the Issuer. The purchase of the Facility shall be closed within sixty (60) days from the date of such notice.

Section 9.02.    Option to Purchase Facility in Certain Events. The Lessee shall have, and is hereby granted, the option to purchase the Facility prior to the full payment of all of the Bonds (or provision for payment thereof having been made in accordance with provisions of the Indenture), if any of the following shall have occurred:

(a)    the Facility shall have been damaged or destroyed by fire or other casualty to such extent that, in the opinion of a consulting architect expressed in a certificate filed with the Issuer and the Trustee, (i) the Facility cannot be reasonably restored within a period of six (6) consecutive months to substantially the condition thereof immediately preceding such damage or destruction or (ii) the Lessee is thereby prevented from carrying on its normal operations at the Project for a period of six (6) consecutive months or (iii) the cost of reconstruction would exceed the total amount of Net Proceeds of insurance carried thereon by more than $100,000;

(b)    title to, or the temporary use of, a substantial portion of the Facility shall have been taken under the exercise of the power of eminent domain by any governmental authority or person, firm, or corporation acting under governmental authority and such a taking or takings result, in the opinion of a Consulting Architect expressed in a certificate filed with the Issuer and the Trustee, in the Lessee being thereby prevented from carrying on its normal operations therein for a period of six (6) consecutive months; or

(c)    as a result of any changes in the Constitution of the State or the Constitution of the United States of America or of legislative or administrative action (whether state or federal) or as a result of any final decree, judgment, or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Lessee this Lease shall have become void or unenforceable or impossible of performance in accordance with the intent and purposes of the parties as expressed in this Lease, or unreasonable burdens or excessive liabilities shall have been imposed on the Issuer or the Lessee, including without limitation federal, state, or other ad valorem, property, income, or other taxes not being imposed on the date of this Agreement.

In the case of any of the above events stated in subsection (a), (b), or (c) of this Section, the Lessee, if it exercises its option to purchase the Facility, must purchase the Project within one

hundred eighty (180) days after such event.

To exercise such option, the Lessee shall, within sixty (60) days following the event authorizing the exercise of such option, give written notice of the exercise of such option to the Issuer and to the Trustee, if any of the Bonds shall then be unpaid or provision for payment shall not have been made in accordance with the provisions of the Indenture, and shall specify therein the date of tender of such prepayment, which date shall not be less than forty-five (45) nor more than one hundred twenty (120) days from the date such notice is mailed, and in case of a redemption of the Bonds in accordance with the provisions of the Indenture shall make arrangements satisfactory to the Trustee for the giving of the required notice of redemption. The purchase price payable by the Lessee in the event of its exercise of the option granted in the circumstances described in subsections (a), (b), or (c) of this Section shall be the sum of the following:

      (1)   an amount of money which, when added to the amount then on deposit in the Bond Fund and the Debt Service Reserve Fund, will be sufficient to retire and redeem all the then Outstanding Bonds on the applicable redemption date provided by the Indenture, including without limitation, principal, all interest to accrue to said redemption date, and redemption expense, but without premium, plus

      (2)   an amount of money equal to the Trustee's and paying agents' fees and expenses under the Indenture accrued and to accrue until such final payment and redemption of the Bonds, plus

      (3)   an amount of money equal to a purchase price of One Hundred Dollars ($100) which shall be paid to the Issuer for its own account (and not into the Bond Fund) and any and all other sums then due to the Issuer under this Agreement.

Section 9.03.  Option to Prepay and Redeem Bonds at Optional Redemption Dates. The Lessee shall also have the option to prepay amounts due under this Agreement in such manner and amounts as will enable the Issuer to redeem the Series 2012 Bonds prior to maturity on or after November 1, 2014, as provided in Section 305 of the Indenture. The amount payable by the Lessee in the event of its exercise of the option granted under this Section shall be (i), in the case of partial redemption, the amount necessary to pay principal, all interest to accrue to the redemption date, the applicable redemption premium, as provided in Section 305 of the Indenture, and any redemption expense, and (ii) in the case of a total redemption, the amounts set forth in Article VII of the Indenture and the applicable redemption premium, as provided in Section 305 of the Indenture.

Section 9.04  Option to Prepay and Redeem the Series 2012A Bonds upon Determination of Taxability. The Lessee shall also have the option to prepay amounts due under this Agreement in such manner and amount as will enable the Issuer to redeem the Series 2012A Bonds prior to maturity, in whole and not in part, upon the occurrence of a Determination of Taxability as provided in Section 304 of the Indenture. Series 2012A Bonds redeemed pursuant to this Section shall be redeemed in accordance with the procedure set forth in Section 303 of the

Indenture. The amount payable by the Lessee in the event of its exercise of the Option granted under this Section shall be the amount necessary to pay the principal of the Series 2012A Bonds and all interest thereon to accrue to the redemption date and any redemption expense.

Section 9.05.   Conveyance on Exercise of Option to Purchase. At the closing of any purchase pursuant to the exercise of any option to purchase granted herein, the Issuer shall upon receipt of the purchase price deliver to the Lessee the following:

(a)    if necessary, a release from the Trustee, concerning the property with respect to which the option was exercised, from the lien of the Indenture, and

(b)    documents conveying to the Lessee good and marketable title (of the same quality as received by the Issuer) to the property being purchased, as such property then exists, subject to the following: (i) those liens and encumbrances (if any) to which title to said property was subject immediately following the delivery of the Series 2012 Bonds but excluding this Agreement and the Indenture, (ii) those liens and encumbrances created by the Lessee or to the creation or suffering of which the Lessee consented, (iii) those liens and encumbrances resulting from the failure of the Lessee to perform or observe any of the agreements on its part contained in this Agreement, (iv) Permitted Encumbrances other than this Agreement and the Indenture, and (v) if the option is exercised pursuant to the provisions of Section 9.02(b) hereof, the rights and title of the condemning authority.

Section 9.06.   Relative Position of Options and the Indenture. The options respectively granted to the Lessee in this Article, except under Section 9.03 hereof, shall be and remain prior and superior to the Indenture, and the options granted by Section 9.01 and Section 9.02 hereof may be exercised whether or not the Lessee is in default hereunder, provided that no such default will result in nonfulfillment of any condition to the right of the Lessee to obtain a conveyance of the Facility by making the payments required hereunder.

Section 9.07.   Public Purpose of Option to Purchase.   The Issuer and the Lessee acknowledge that the options to purchase the Facility granted in this Article are a material inducement to the Lessee to acquire, construct, and operate the Facility on behalf of the Issuer and that in granting such options the Issuer is considering the entire transaction as a whole, including the promotion of the public health of the people of the City and the State and also the promotion of the acquisition of health facilities and certain other facilities for the housing and care of elderly persons and the fact that as a condition to the exercise of the options all indebtedness with respect to the Facility will have been paid in full.

IN WITNESS WHEREOF, the Issuer and the Lessee have caused this Agreement to be executed as of the date first above written.

THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND)

BY: _____
              Chairman

[SEAL]

Attest:

_____
Secretary

STATE OF ALABAMA          )
                                              )
COUNTY OF MOBILE          )

I, the undersigned, a Notary Public in and for said State and County, do hereby certify that Cathy Motes and Michelle Mayberry, whose names as Chairman and Secretary, respectively, of The Medical Clinic Board of the City of Mobile (Second), a public corporation, are signed to the foregoing conveyance, and who are known to me and known to be such officers, acknowledged before me this day that they, in their respective capacities as such officers, being informed of the contents of the conveyance, and with full authority and of their own free will and accord, voluntarily executed the foregoing Agreement for and as the free and unrestrained act of said public corporation, for the purposes therein named and expressed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office this 26th day of November, 2012.

_____
NOTARY PUBLIC
(SEAL)
My Commission Expires:          NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                                              MY COMMISSION EXPIRES: Nov 29, 2014
                                              BONDED THRU NOTARY PUBLIC UNDERWRITERS

49

BAMA OAKS RETIREMENT, LLC

[SEAL]

BY: _____
　　　　Manager

STATE OF GEORGIA　　　　　)
　　　　　　　　　　　　　　　)
COUNTY OF FORSYTH　　　　　)

     I, the undersigned, a Notary Public in and for said State and County, do hereby certify that Christopher F. Brogdon, whose name as Manager of Bama Oaks Retirement, LLC, a Georgia limited liability company, is signed to the foregoing conveyance, and who is known to me and known to be such official, acknowledged before me this day that he, in his capacity as such official, being informed of the contents of the conveyance, and with full authority and of his own free will and accord, voluntarily executed the foregoing Agreement for and as the free and unrestrained act of said limited liability company, for the purposes therein named and expressed.

     IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office this 27th day of November, 2012.

NOTARY PUBLIC

(SEAL)

My Commission Expires: _____

My Commission Expires
January 15, 2013

50

EXHIBIT A

REQUISITION AND CERTIFICATION

Request No. _____                    Date: _____

BOKF, NA dba Bank of Oklahoma as Trustee under the Trust Indenture dated as of November 1, 2012, relating to $5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012A

The undersigned Authorized Lessee Representative designated pursuant to the terms of a Lease Agreement, dated as of November 1, 2012 (the "Agreement"), between The Medical Clinic Board of the City of Mobile (Second), a public corporation and instrumentality duly organized and existing under the laws of the State of Alabama (the "Issuer"), and BAMA Oaks Retirement, LLC, a Georgia limited liability company (the "Lessee"), hereby request that there be paid from the Project Fund (hereinbelow described) the sum of $_____, and in that connection with respect to the use of the proceeds of The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (BAMA Oaks Retirement, LLC Project II), Series 2012A (the "Bonds"), DOES HEREBY CERTIFY, as follows:

    1.    The requested payment is requested in order to satisfy an obligation in the stated amount that has been incurred in connection with the issuance of the Bonds or the acquisition or rehabilitation of the Facility and is a proper charge against The Medical Clinic Board of the City of Mobile (Second) Project Fund – BAMA Oaks Retirement, LLC Project II, 2012, and has not been the basis of any previous withdrawal from said Project Fund.

    2.    Payment should be made to:

    Name:

    Address:

    3.    Attached hereto is a bill, statement of account or a schedule showing in reasonable detail the items with respect to which payment is being requested, and, if the Lessee or the Issuer is to be reimbursed, proof of payment of such items is attached hereto, which proof is satisfactory to the undersigned and the Trustee may act thereon.

    4.    The obligation is for an item which is properly chargeable to the capital account of the Lessee for Federal income tax purposes or would be so chargeable either with a proper election by the Lessee.

    5.    (a)    The Lessee has no notice of any vendors,' materialmens,' mechanics,'

suppliers' or other similar liens or right to liens, chattel mortgages or conditional sales contracts, or other contracts or obligations which should be satisfied or discharged before payment of such obligation is made, or

        (b)    this requisition is for the purpose of obtaining funds to be used to satisfy or discharge a lien or contract of the type described in (a) above.

        6.    This requisition contains no request for payment on account of any portion of such obligation which the Lessee is, as of the date hereof, entitled to retain under retained percentage agreements.

        7.    The obligation does not represent a cost paid or incurred by the Issuer or the Lessee prior to May 14, 2012.

        8.    Each and every representation of the Lessee set forth in the Agreement is true and correct on and as of the date of this requisition.

        9.    No default or Event of Default under the Agreement has occurred and is now continuing.

        10.    The costs incurred as of the date of this requisition, when added to the estimated cost of completing the "Facility" (defined in the Agreement) demonstrate that the amount remaining in the Project Fund for disbursement, after giving effect to the disbursement requested by this requisition, will be sufficient to complete the Facility or, if this is not the case, demonstrate that the Lessee has on hand or has the ability to obtain the additional funds required to complete the Facility.

        11.    With respect to any such item representing payment for labor, services, material, supplies and/or equipment, insofar as such obligation was incurred for labor, services, material, supplies and/or equipment in connection with the acquisition, construction and installation of the Facility, (i) such labor and/or services were actually performed in a satisfactory manner, and (ii) such material, supplies and/or equipment were actually used in or about the construction of the Facility or delivered at the site of the Facility for that purpose and the item of equipment with respect to which such payment is requested constitutes a portion of the Facility.

        By: _____
               Authorized Lessee Representative

EXHIBIT B

REQUISITION AND CERTIFICATION

Request No. _____                    Date: _____

BOKF, NA dba Bank of Oklahoma as Trustee under the Trust Indenture dated as of November 1, 2012, relating to $630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012B

Attention:  Corporate Trust Department

The undersigned Authorized Lessee Representative designated pursuant to the terms of a Lease Agreement, dated as of November 1, 2012 (the "Agreement"), between The Medical Clinic Board of the City of Mobile (Second), a public corporation and instrumentality duly organized and existing under the laws of the State of Alabama (the "Issuer"), and BAMA Oaks Retirement, LLC, a Georgia limited liability company (the "Lessee"), hereby requests that there be paid from the Project Fund (hereinbelow described) the sum of $_____, and in that connection with respect to the use of the proceeds of The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (BAMA Oaks Retirement, LLC Project II), Taxable Series 2012B (the "Bonds"), DOES HEREBY CERTIFY, as follows:

1.    The requested payment is requested in order to satisfy an obligation in the stated amount that has been incurred in connection with the issuance of the Bonds or the acquisition or rehabilitation of the Facility and is a proper charge against The Medical Clinic Board of the City of Mobile (Second) Project Fund – BAMA Oaks Retirement, LLC Project II, 2012, and has not been the basis of any previous withdrawal from said Project Fund.

2.    Payment should be made to:

Name:

Address:

3.    Attached hereto is a bill, statement of account or a schedule showing in reasonable detail the items with respect to which payment is being requested, and, if the Lessee or the Issuer is to be reimbursed, proof of payment of such items is attached hereto, which proof is satisfactory to the undersigned and the Trustee may act thereon.

4.    (a)    The Lessee has no notice of any vendors,' materialmens,' mechanics,' suppliers' or other similar liens or right to liens, chattel mortgages or conditional sales contracts,

or other contracts or obligations which should be satisfied or discharged before payment of such obligation is made, or

        (b)    this requisition is for the purpose of obtaining funds to be used to satisfy or discharge a lien or contract of the type described in (a) above.

        5.    This requisition contains no request for payment on account of any portion of such obligation which the Lessee is, as of the date hereof, entitled to retain under retained percentage agreements.

        6.    Each and every representation of the Lessee set forth in the Agreement is true and correct on and as of the date of this requisition.

        7.    No default or Event of Default under the Agreement has occurred and is now continuing.

        8.    With respect to any such item representing payment for labor, services, material, supplies and/or equipment, insofar as such obligation was incurred for labor, services, material, supplies and/or equipment in connection with the acquisition and construction of the Facility, (i) such labor and/or services were actually performed in a satisfactory manner, and (ii) such material, supplies and/or equipment were actually used in or about the construction of the Facility or delivered at the site of the Facility for that purpose and the item of equipment with respect to which such payment is requested constitutes a portion of the Facility.

By: _____
                Authorized Lessee Representative

# EXHIBIT C

Legal Description:

That portion of Lot 2, Gordon Oaks, as recorded in Map Book 38, page 13 of the Probate Court records of Mobile County, Alabama, being more particularly described as follows:

To-Wit:

Beginning at the Southwest corner of Lot 2, Gordon Oaks, as recorded in Map Book 38, Page 13 of the Probate Court records of Mobile County, Alabama, said point being on the East right of way line of Knollwood Drive, (100-foot public R\W); Thence Northwesterly, along the East right of way line of said Knollwood Drive and around a curve to the left having a radius of 1400.59 feet and a delta angle of 15°-00'-19", the chord of which bears N-15°-17'-04"-W for 365.76 feet, for an arc distance of 366.80 feet to the Southwest corner of Lot 1 of said Gordon Oaks; Thence S-89°-43'-13"-E, leaving the East right of way line of said Knollwood Drive and along the South line of said Lot 1, for 435.59 feet to the Southeast corner of said Lot 1; Thence N-00°-16'-47"-E, along the East line of said Lot 1, for 64.43 feet; Thence Southeasterly, leaving the East line of said Lot 1 and around a curve to the right having a radius of 81.17 feet and a delta angle of 72°-52'-49", the chord of which bears S-53°-16'-37"-E for 96.43 feet, for an arc distance of 103.26 feet; Thence S-16°-50'-12"-W for 32.70 feet; Thence Southeasterly around a curve to the right having a radius of 222.78 feet and a delta angle of 14°-50'-05", for an arc distance of 57.68 feet; Thence S-02°-00'-08"-E for 15.41 feet; Thence N-71°-13'-52"-E for 233.59 feet to a point on the East line of aforesaid Lot 2; Thence S-08°-18'-34"-W, along the East line of said Lot 2, for 112.33 feet to the Southeast corner of said Lot 2; Thence S-71°-13'-07"-W, along the South line of said Lot 2, for 677.19 feet to the Point of Beginning. Said parcel lying and being entirely within Lot 2, Gordon Oaks, as recorded in Map Book 38, page 13 of the Probate Court records of Mobile County, Alabama, and containing 3.824 acres, more or less.

Together with the benefitting aspects of the Amended and Restated Reciprocal Easement Agreement by and between Mobama Nursing, LLC and Bama Oaks Retirement, LLC, dated January 8, 2008 and recorded in Real Property Book 6317 Page 567 of the records in the Judge of Probate of Mobile County, Alabama.

EXHIBIT D


ISSUER                    The Medical Clinic Board of the City of Mobile (Second)
                          c/o James R. Rossler, Esquire
                          1 South Royal Street #300
                          Mobile, Alabama  36602-3249


TRUSTEE:                  BOKF, NA dba Bank of Oklahoma
                          One Williams Center
                          Tulsa, Oklahoma  74192
                          Attn:  Marrien Neilson


LESSEE:                   Bama Oaks Retirement, LLC
                          Two Buckhead Plaza
                          3050 Peachtree Road NW, Suite 355
                          Atlanta, Georgia  30075


I:\TX.12\10000\10743.0190.Lease Agreement. 11 21 2012 (C)

# EXHIBIT "C"

2012069474  Book-6961  Page-1273
Total Number of Pages: 26

State of Alabama-Mobile County

I certify this instrument was filed on:
December 3, 2012 @ 10:24:56 AM

| | |
|---|---|
| NO TAX STAMP | $1.00 |
| S.R. FEE | $2.00 |
| RECORDING FEES | $66.00 |
| TOTAL AMOUNT | $69.00 |

2012069474
Don Davis, Judge of Probate

After Recording Return To:
Richard B. Miller, Esq.
Sell & Melton, L.L.P.
P.O. Box 229
Macon, Georgia 31202-0229

STATE OF ALABAMA,
COUNTY OF MOBILE.

## MORTGAGE AND SECURITY AGREEMENT

THIS MORTGAGE AND SECURITY AGREEMENT (hereinafter referred to as the "Security Agreement") made and entered into as of the 1st day of November, 2012, by and between THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND), a public corporation created and existing under the laws of the State of Alabama, pursuant to Section 11-58-1, *et seq*. of the Code of Alabama (1975), as amended (the "Act"), party of the first part (hereinafter referred to as "Issuer"), and BOKF, NA DBA BANK OF OKLAHOMA, Tulsa, Oklahoma and trustee with respect to the "Bonds" hereinafter described, party of the second part, as Trustee (hereinafter referred to as "Trustee"):

THIS INSTRUMENT IS TO BE FILED AND INDEXED IN THE REAL ESTATE RECORDS.

## W I T N E S S E T H :

That for and in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, and in order to secure the indebtedness and other obligations of the Issuer hereinafter set forth, Issuer does hereby grant, bargain, sell, convey, assign, transfer and set over unto Trustee and the successors and assigns of Trustee all of the following described land and interests in land, estates, easements, rights, improvements, property, fixtures, equipment, furniture, furnishings, appliances and appurtenances comprising the "Project," which is the 88-unit independent living facility located at 3145 Knollwood Drive, Mobile, Alabama 35244 (hereinafter referred to as the "Facility"):

(a)    All that tract, or parcel of land located in Mobile County, Alabama, more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof (hereinafter referred to as the "Land").

# EXHIBIT "C"

(b)    All buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land, and all gas and electric fixtures, radiators, heaters, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, carpeting and other floor coverings, washers, dryers, water heaters, mirrors, mantels, air conditioning apparatus, refrigerating plants, refrigerators, cooking apparatus and appurtenances, window screens, awnings and storm sashes, which are or shall be attached to said buildings, structures or improvements and all other furnishings, furniture, fixtures, machinery, equipment, appliances, vehicles and personal property of every kind and nature whatsoever located therein, but excluding inventory, now or hereafter owned by Issuer and located in, on or about, or used or intended to be used with or in connection with the use, operation or enjoyment of the Facility, including all extensions, additions, improvements, betterments, renewals and replacements of any of the foregoing and all the right, title and interest of Issuer in any such furnishings, furniture, fixtures, machinery, equipment, appliances, vehicles and personal property  on the land subject to or covered by any prior security agreement, conditional sales contract, chattel mortgage or similar lien or claim, together with the benefit of any deposits or payments now or hereafter made by Issuer, all of which are hereby declared and shall be deemed to be fixtures and accessions to the freehold and a part of the Facility as between the parties hereto and all persons claiming by, through or under them, and which shall be deemed to be a portion of the security for the indebtedness herein described and to be secured by this Security Agreement.

TOGETHER with all easements, rights-of-way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances whatsoever, in any way belonging, relating or appertaining to the Facility or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Issuer and the reversion and reversions, remainder and remainders, the rents, issues, profits and revenues of the Facility from time to time accruing (including without limitation all payments under leases or tenancies, proceeds of insurance, condemnation payments, tenant security deposits and escrow funds related to the Facility), and all the estate, right, title, interest, property, possession, claim and demand whatsoever at law, as well as in equity, of Issuer of, in and to the same.

TO HAVE AND TO HOLD the Facility, Gross Revenues (as defined below) and all parts, rights, members and appurtenances thereof (herein referred to collectively as the "Mortgaged Property") to the use, benefit and behoof of Trustee and the successors and assigns of Trustee, IN FEE SIMPLE forever, and Issuer covenants that Issuer is lawfully seized and possessed of the Mortgaged Property as aforesaid, has good right to convey the same, and that the same is unencumbered.  "Gross Revenues" means all revenues, income, receipts, and money (other than proceeds of borrowing) received with respect to the Facility in any period by or on behalf of the Issuer, including, but without limiting the generality of the foregoing, (i) revenues

2

derived from operation of the Facility; (ii) proceeds derived from the Facility with respect to (a) insurance, except to the extent otherwise required by this Indenture, (b) rights to payment for goods sold or leased or for services rendered which are not evidenced by a chattel paper, whether or not they have been earned by performance, (c) securities and other investments, and the income earnings and gains thereon, (d) inventory and other tangible and intangible property, and (e) contract rights and other rights and assets now or hereafter owned, held, or possessed by the Issuer in the Facility; and (iii) rentals received from the leasing of the Facility or units therein or from tangible personal property.

TO HAVE AND TO HOLD the Mortgaged Property unto the Trustee, its successors and assigns forever, and for the purpose of further securing the payment of the "Bonds" (as defined below), Issuer does hereby agree to pay all taxes and assessments when imposed legally upon said premises, and should Issuer make default in the payment of same, the said Trustee may, at Trustee's option, pay off the same; and to further secure said indebtedness Issuer agrees to keep said Facility insured for at least Five Million Seven Hundred Forty Thousand Dollars ($5,740,000), loss, if any, payable to said Trustee as interest may appear, and if Issuer shall fail to keep said Facility insured as above specified, then the said Trustee may, at Trustee's option, insure said property for said sum for Trustee's own benefit, the policy, if collected, to be credited on said indebtedness, less cost of collecting same; all amounts so expended by said Trustee shall become a debt to said Trustee additional to the indebtedness hereby specifically secured, and shall be covered by this Security Agreement and bear interest from date of payment by said Trustee and be due and payable at the maturity of any of the principal or any interest thereon.

Upon condition, however, that if the Issuer shall pay said Bonds and reimburse said Trustee for any amounts Trustee may have expended as taxes, assessments or other charges and insurance and interest thereon, then this conveyance to be null and void; but should default be made in the payment of any sum so expended by the said Trustee, or should said Bonds or any part thereof, or interest thereon, remain unpaid at maturity, or should the interest of said Trustee or of its successors and assigns in said Facility become endangered by reason of the enforcement of any prior lien or encumbrance thereon, so as to endanger the debt hereby secured, then in any one of said events the whole of the said indebtedness shall at once become due and payable, and this Security Agreement shall be subject to foreclosure as now provided by law in case of past due mortgages, and the said Trustee and its agents, successors and assigns, shall be authorized to take possession of the premises hereby conveyed, and after notice by publication once a week for three consecutive weeks of the time, place and terms of sale, together with a description of the premises by publication in some newspaper published in the county in which the Facility is located, to sell the same, as a whole or in parcels, in front of the main or front courthouse door, of said last named county, at public outcry, to the highest bidder for cash, and apply the proceeds of said sale: first, to the expense of advertising, selling and conveying, including a reasonable attorneys' fee; and, second, to the payment of any amounts that may have been expended or that

3

may then be necessary to expend, in paying insurance, taxes, assessments, or other encumbrances, with interest thereon; and, third, to the payment of said Bonds in full, whether the same shall or shall not have fully matured at the date of said sale; but no interest shall be collected beyond the day of sale; and, fourth, the balance, if any, to be turned over to the Issuer; and Issuer further agrees that said Trustee, its agents, successors and assigns, may bid at said sale, and purchase said property, if the highest bidder therefor; and Issuer further agrees to pay a reasonable attorneys' fee to Trustee or its assigns, for the foreclosure of this Security Agreement. Should the same be foreclosed, said fee to be a part of the debt hereby secured.

This conveyance is intended to operate as a mortgage and is given to secure the following described indebtedness (collectively, the "Combined Obligations"):

(a)    The debt evidenced by the Five Million One Hundred Ten Thousand Dollars ($5,110,000) The Medical Clinic Board Of the City Of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012A (the "Series A Bonds") maturing not later than November 1, 2042, and the Six Hundred Thirty Thousand Dollars ($630,000) The Medical Clinic Board Of the City Of Mobile (Second) First Healthcare Facility Mortgage Revenue Bonds (Bama Oaks Retirement, LLC Project II), Taxable Series 2012B (the "Series B Bonds") (the Series A Bonds and Series B Bonds being collectively referred to as the "Bonds") issued simultaneously therewith, maturing not later than November 1, 2020, including, without limitation, principal and interest at the rate of 7.00% and 7.25% per annum in the case of the Series 2012A Bonds and at the rate of 8.75% per annum in the case of the Series 2012B Bonds, issued on or about November 29, 2012, by the Issuer pursuant to the Lease Agreement (the "Agreement") of even date herewith between  Issuer and BAMA Oaks Retirement, LLC, a Georgia limited liability company (the "Lessee") and the Trust Indenture of even date herewith (the "Trust Indenture") between the Issuer and BOKF, NA dba Bank of Oklahoma (the "Trustee");

(b)    All amounts payable by Issuer in the event of a Determination of Taxability (as that term is defined in the Agreement) with respect to the Series 2012A Bonds;

(c)    All amounts payable by Lessee to Issuer pursuant to the provisions of the Agreement or any of the other documents defined in the Agreement;

(d)    Any and all additional advances made by the Trustee to protect or preserve the Mortgaged Property or the lien hereof on the Mortgaged Property, or for taxes, assessments or insurance premiums (whether or not the original Issuer remains the owner or less of any portion of the Mortgaged Property at the time of such advances).

4

Should the Combined Obligations be paid according to the tenor and effect thereof when the same shall become due and payable, and should Issuer perform all covenants herein contained in a timely manner, then this Security Agreement shall be canceled and surrendered.

Issuer hereby further covenants and agrees with Trustee as follows:

## ARTICLE I

1.01. <u>Payment of Indebtedness</u>.  Issuer will pay the Bonds according to the tenor thereof and all other Combined Obligations promptly as the same shall become due.

1.02. <u>Taxes, Liens and Other Charges</u>.

(a)    In the event of the passage of any state, federal, municipal or other governmental law, order, rule or regulation, subsequent to the date hereof, in any manner changing or modifying the laws now in force governing the taxation of debts secured by mortgages or the manner of collecting taxes so as to adversely affect Trustee, Issuer will promptly pay any such tax.  If Issuer fails to make such prompt payment or if, in the opinion of Trustee, any such state, federal, municipal, or other governmental law, order, rule or regulation prohibits Issuer from making such payment or would penalize Trustee if Issuer makes such payment or if, in the opinion of Trustee, the making of such payment might result in the imposition of interest beyond the maximum amount permitted by applicable law, then the entire balance of the principal sum secured by this Security Agreement and all interest accrued thereon shall, at the option of Trustee, become immediately due and payable.

(b)    Issuer will pay, before the same become delinquent, all taxes, liens, assessments and charges of every character including all utility charges, whether public or private, already levied or assessed or that may hereafter be levied or assessed upon or against the Facility; and upon demand will furnish to the Trustee receipted bills evidencing such payment.

(c)    Issuer will not permit any mechanics' or other liens to be established or remain against the Facility, provided that if Issuer shall first notify the Trustee of Issuer's intention to do so, Issuer may in good faith contest any mechanics' or other liens filed or established against the Facility, and in such event may permit the items so contested to remain undischarged and unsatisfied during the period of such contest and any appeal therefrom, unless by nonpayment of any items the lien of the Security Agreement as to the Facility and as to the payments to be made hereunder will be materially endangered or the Facility, or any part thereof, will be subject to loss or forfeiture, in which event the Issuer shall promptly pay and cause to be satisfied and discharged all such unpaid items.

5

1.03. <u>Insurance</u>

(a)     Issuer shall procure for, deliver to and maintain for the benefit of Trustee during the term of this Security Agreement, original paid up insurance policies of insurance companies as required by Section 5.12 of the Agreement.

(b)     Trustee is hereby authorized and empowered, at its option, to adjust or compromise any loss under any insurance policies maintained pursuant to this Paragraph 1.03, and to collect and receive the proceeds from any such policy or policies. Each insurance company is hereby authorized and directed to make payment for all such losses directly to Trustee, instead of to Issuer and Trustee jointly. In the event any insurance company fails to disburse directly and solely to Trustee but disburses instead either solely to Issuer and Trustee jointly, Issuer agrees immediately to endorse and transfer such proceeds to Trustee. Upon the failure of Issuer to endorse and transfer such proceeds as aforesaid, Trustee may execute such endorsements or transfers for and in the name of Issuer, and Issuer hereby irrevocably appoints the Trustee as Issuer's agent and attorney-in-fact so to do. After deducting from said insurance proceeds all of its expenses incurred in the collection and administration of such sums, including attorneys' fees, Trustee may apply the net proceeds or any part thereof, at its option, (i) to the payment of the Combined Obligations, whether or not due and in whatever order Trustee elects, (ii) to the repair and/or restoration of the Facility, or (iii) for any other purposes or objects for which Trustee is entitled to advance funds under this Security Agreement; all without affecting the lien of this Security Agreement. Issuer shall not be held responsible for any failure to collect any insurance proceeds due under the terms of any policy regardless of the cause of such failure.

(c)     At least thirty (30) days prior to the expiration date of each policy maintained pursuant to this Paragraph 1.03, a renewal or replacement thereof satisfactory to Trustee shall be delivered to Trustee. Issuer shall deliver to Trustee receipts evidencing the payment for all such insurance policies and renewals or replacements. The delivery of any insurance policies hereunder shall constitute an assignment of all unearned premiums as further security hereunder. In the event of the foreclosure of this Security Agreement or any other transfer of title to the Facility in extinguishment of all or any part of the Combined Obligations, all right, title and interest of Issuer in and to all insurance policies then in force shall pass to the purchaser or Trustee.

1.04. <u>Condemnation</u>. If all or any portion of the Facility shall be damaged or taken through condemnation (which term when used in this Security Agreement shall include any damage or taking by any governmental authority and any transfer by private sale in lieu thereof), either temporarily or permanently, then the Combined Obligations shall, at the option of Trustee, become immediately due and payable. Trustee shall be entitled to receive all compensation, awards and other payments or relief thereof. Trustee is hereby authorized, at its option, to

6

commence, appear in and prosecute, in its own or in Issuer's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith. All such compensation, awards, damages, claims, rights of action and proceeds and the right thereto are hereby assigned by Issuer to Trustee. After deducting from said condemnation proceeds all of its expenses incurred in the collection and administration of such sums, including reasonable attorneys' fees actually incurred, Trustee shall apply the net proceeds or any part thereof, (a) to the payment of the Combined Obligations, whether or not due and in whatever order Trustee elects, (b) to the repair and/or restoration of the Facility, or (c) for any other purposes or objects for which Trustee is entitled to advance funds under this Security Agreement, all without affecting the lien of this Security Agreement; and any balance of such moneys then remaining shall be paid to Issuer. Issuer agrees to execute such further assignment of any compensation, awards, damages, claims, rights of action and proceeds related to the condemnation of Land as Trustee may require.

1.05.  Care of Facility.

(a)  If the Facility or any part thereof is damaged by fire or any other cause, Issuer will give prompt written notice (but in no event later than the second business day thereafter) thereof to Trustee.

(b)  Trustee or its representative is hereby authorized to enter upon and inspect the Facility at any time upon reasonable notice (except for emergencies) during normal business hours.

(c)  Issuer will promptly comply in all material respects with all present and future laws, ordinances, rules and regulations of any governmental authority affecting the Facility or any part thereof.

(d)  If all or any part of the Facility shall be damaged by fire or other casualty, Issuer will promptly restore the Facility to the substantial equivalent of its most recent pre-damage condition; and if a part of the Facility shall be damaged through condemnation, Issuer will promptly restore, repair or alter the remaining portions of the Facility in a manner reasonably satisfactory to Trustee. Notwithstanding the foregoing, Issuer shall not be obligated to so restore unless in each instance Trustee agrees to make available to Issuer (pursuant to a procedure satisfactory to Trustee) any and all net insurance or condemnation proceeds actually received by Issuer and/or Trustee hereunder in connection with such casualty loss or condemnation, to the extent such proceeds are required to defray the expense of such restoration; provided, however, that the insufficiency of any such insurance or condemnation proceeds to defray the entire expense of restoration shall relieve Issuer of its obligation to restore.

1.06.  Further Assurances: After Acquired Property.  At any time, and from time to time, upon request by Trustee, Issuer will make, execute and deliver or cause to be made, executed and delivered, to Trustee and, where appropriate, cause to be recorded and/or filed and from time to

7

time thereafter to be re-recorded and/or refiled at such time and in such offices and places as shall be deemed desirable by Trustee, any and all such other and further mortgages, security agreements, financing statements, continuation statements, instruments of further assurance, certificates and other documents as may, in the opinion of Trustee, be necessary or desirable in order to effectuate, complete, or perfect, or to continue and preserve (a) the obligation of Issuer under the Bonds, the Agreement and under this Security Agreement, and (b) the lien of this Security Agreement as a first and prior lien upon and security title in and to all of the Facility and the Collateral (as hereinafter defined), whether now owned or hereafter acquired by Issuer. Upon any failure by Issuer so to do, Trustee may make, execute, record, file re-record and/or refile any and all such mortgages, security agreements, financing statements, continuation statements, instruments, certificates, and documents for and in the name of Issuer and Issuer hereby irrevocably appoints Trustee the agent and attorney-in-fact of Issuer so to do. The lien hereof will automatically attach, without further act, to all after-acquired property attached to and/or used in the operation of the Facility or any part thereof and to all after-acquired Collateral.

1.07. <u>Expenses</u>. To the extent that such is allowed by law, Issuer will pay or reimburse Trustee, upon demand therefor, for all reasonable attorneys' fees actually incurred, and reasonable costs and expenses incurred by Trustee in any suit, action, legal proceeding or dispute of any kind in which Trustee is made a party or appears as party plaintiff or defendant, affecting the indebtedness secured hereby, this Security Agreement or the interest created herein, or the Facility or Collateral, including, but not limited to, the exercise of the power of sale contained in this Security Agreement, any condemnation action involving the Facility or any action to protect the security hereof; and any such amounts paid by Trustee shall be added to the indebtedness secured by the lien of this Security Agreement.

1.08. <u>Subrogation</u>. Trustee shall be subrogated to the claims and liens of all parties whose claims or liens are discharged or paid with the proceeds of the indebtedness secured hereby.

1.09. <u>Limit of Validity</u>. If from any circumstances whatsoever, fulfillment of any provision of this Security Agreement, the Agreement or the Bonds at the time performance of such provision shall be due, shall involve transcending the limit of validity presently prescribed by any applicable usury statue or any other applicable law, with regard to obligations of like character and amount, then ipso facto the obligation to be fulfilled shall be reduced to the limit of such validity, so that in no event shall any exaction be possible under this Security Agreement, the Agreement or the Bonds that is in excess of the current limit of such validity, but such obligation shall be fulfilled to the limit of such validity. The provisions of this Paragraph 1.09 shall control every other provision of this Security Agreement, the Agreement and the Bonds.

8

1.10. <u>No Default Affidavits</u>. At Trustee's written request, all payment(s) made under the Bonds, the Agreement or hereunder shall be accompanied by the affidavit of an officer of Issuer, dated within five (5) days of the delivery of such payment to Trustee, swearing that it knows of no Default (as hereinafter defined), nor of any circumstance which after notice or lapse of time or both would constitute a Default, which has occurred and is continuing or, if any such Default has occurred and is continuing, specifying the nature and period of existence thereof and the action Issuer has taken or proposes to take with respect thereto and, except as otherwise specified, stating that Issuer has fulfilled all of Issuer's obligations under this Security Agreement which are required to be fulfilled on or prior to the date of such affidavit.

1.11. <u>Acquisition of Collateral</u>. Issuer shall not acquire any portion of the personal property covered by this Security Agreement subject to any security interest, conditional sales contract, title retention arrangement or other charge or lien taking precedence over the security title and lien of this Security Agreement except for purchase money security interests in items of personal property acquired by Issuer in the ordinary course of business.

1.12. <u>Security Agreement</u>.

(a) With respect to furnishings, furniture, fixtures, machinery, appliances, vehicles, inventory and personal property or in any way connected with the use and enjoyment of the Facility, this Security Agreement is hereby made and declared to be a security agreement encumbering, and granting a security interest in, each and every item of such property included herein as a part of the Facility, in compliance with the provisions of the Uniform Commercial Code as enacted in the State of Alabama. Upon written request by the Trustee, at any time and from time to time, a financing statement or statements reciting this Security Agreement to be a security agreement affecting all of such property shall be executed by the Issuer and the Trustee and appropriately filed by Trustee.

(b) As further security for the Combined Obligations, Issuer hereby pledges and assigns to Trustee the Gross Revenues of the Issuer and grants to Trustee a security interest in all existing and future accounts, Gross Revenues, contract rights, and accounts receivable of the Issuer, all existing and future instruments, chattel paper and general intangibles of the Issuer and all proceeds of the above, but only to the extent that any such item is directly related to or directly arises from the Facility and/or the operations thereon (the property in which a security interest has been granted in this Paragraph (b) and the foregoing Paragraph (a) being herein called the "Collateral"). In addition to all other provisions of this Security Agreement, Issuer will from time to time at the request of Trustee perform any and all steps requested by Trustee to perfect and maintain Trustee's security interest in the Collateral, including but not limited to transferring any part or all of the Collateral to Trustee or any nominee of Trustee, placing and maintaining signs, executing financing statements and notice of lien, delivering to Trustee documents of title representing the Collateral or any of the Collateral in which the security interest of Trustee can only be perfected by possession of such Collateral or evidencing the Trustee's security interest in any other manner acceptable to and requested by Trustee. Issuer

9

will from time to time at the request of Trustee execute and deliver to Trustee assignments of accounts in form satisfactory to Trustee but should Issuer fail in any one or more instances to execute and deliver such assignment of accounts, such failure shall not constitute a waiver or limitation of the security interest of Trustee in all the Collateral, which shall remain in full force and effect.

(c)     The remedies of any violation of the covenants, terms and conditions of the security agreement contained in this Security Agreement shall be (i) as prescribed herein, or (ii) as prescribed by general law, or (iii) as prescribed by the specific statutory consequences now or hereafter enacted and specified in said Uniform Commercial Code, all at the Trustee's sole election.  The Issuer and the Trustee agree that the filing of any such financing statement or statements in the records normally having to do with personal property shall not in any way affect the agreement of the Issuer and the Trustee that everything used in connection with the production of income from the Facility or adapted for use therein or which is described or reflected in this Security Agreement, is, at all times and for all purposes and in all proceedings, both legal or equitable, shall be, regarded as part of the real estate conveyed hereby regardless of whether (i) any such item is physically attached to the improvements, (ii) serial numbers are used for the better identification of certain items capable of being thus identified in an exhibit to this Security Agreement, or (iii) any such item if referred to or reflected in any such financing statement or statements so filed at any time.  Similarly, the mention of any such financing statement or statements of the rights in and to (i) the proceeds of any fire and/or hazard insurance policy, or (ii) any award in eminent domain proceedings for a taking or for loss of value, or (iii) or right to income growing out of the use and/or occupancy of the Facility, whether pursuant to lease or otherwise, shall not in any way alter any of the rights of the Trustee as determined by this Security Agreement or affect the priority of the Trustee's security interest granted hereby or by any other recorded document, it being understood and agreed that such mention in such financing statement or statements is solely for the protection of the Trustee in the event any court shall at any time hold with respect to the foregoing clauses (i), (ii), or (iii) of this sentence, that notice of the Trustee's priority of interest, to be effective against a particular class of persons, must be filed in the Uniform Commercial Code records.

(d)     The Issuer warrants that (i) the Issuer's name, identity or corporate structure and principal place of business are as set forth in Exhibit "B" hereof, on the title page hereof and on the execution page hereof; (ii) except as set forth on Exhibit "B," the Issuer has been using or operating under said name, identity or corporate structure without change; and (iii) the location of the Collateral (other than the Gross Revenues) is upon the Land.  Subject to the terms of Section 5.1 of the Agreement, the Issuer covenants and agrees that the Issuer will furnish the Trustee with notice of any change in the matters addressed by clauses (i) or (iii) of this subparagraph 1.12(d) within thirty (30) days of the effective date of any such change and the Issuer will promptly execute any financing statements or other instruments deemed necessary by the Trustee to prevent any filed financing statement from becoming misleading or losing its perfected status.

10

1.13.  Due on Transfer.  Issuer covenants and agrees with Trustee that Issuer shall not encumber (other than by Permitted Encumbrances, as defined in the Agreement), pledge, convey, transfer or assign any or all of its interest in the Facility or the Collateral without the prior written consent of Trustee, except as specifically provided herein.

1.14.  Release of Furnishings, Fixtures and Equipment.  In any instance where Issuer in its sound discretion determines that any items of furnishings, fixtures and equipment have become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary, Issuer may, provided it is not in Default hereunder, remove such items of furnishings, fixtures and equipment from the Facility and sell, trade-in, exchange or otherwise dispose of them, free and clear of the lien hereof, provided that in the event any of the Bonds are outstanding at the time of such removal, Issuer shall either:

(a)    Purchase with its own funds (as defined in clause (b) below) within a reasonable time and install within a reasonable time thereafter anywhere in the Facility other furnishings, fixtures and equipment having equal or greater fair market value and utility (but not necessarily having the same function) in the operation of the Facility as an independent living facility all of which substituted furnishings, fixtures and equipment shall be free of all liens and encumbrances (other than Permitted Encumbrances) and shall become a part of the Facility, and therefore subject to the lien hereof; provided, however, that Issuer may not proceed under this clause (a) if such removal and substitution would impair operating unity or otherwise adversely affect the fair market value of the Facility; or

(b)      Not make any such substitution and installation, provided that Issuer shall promptly deposit into the Project Fund cash in an amount equal to f the sale or scrapping of the furnishings, fixtures and equipment so removed or the credit received for the trade-in thereof, or the fair market value thereof, whichever is higher.  Issuer shall not be required to replace any furnishings, fixtures and equipment which constitute a part of the Facility and which are removed from the Facility after compliance by Issuer with the provision of this subsection and so long as Issuer complies with the provisions of this subsection with respect to the removal from the Facility of any furnishings, fixtures and equipment constituting a part of the Facility, any furnishings and equipment which Issuer purchases and installs in or on the Facility with its own funds shall not, unless such furnishings and equipment are necessary for the Facility to remain a skilled nursing facility be deemed to be part of the Facility or subject to the lien of this Security Agreement even though such furnishings and equipment might "replace" furnishings, fixtures and equipment so removed.

1.15.  Limited Obligation of Issuer.  It is the intention and agreement of the parties hereto that any and all amounts owed by Issuer hereunder will be satisfied only from the pledged revenues (defined in the Agreement) from Lessee under the Agreement. It is further the intention and agreement of the parties that the indebtedness secured hereby is only a limited obligation of the Issuer and will be payable solely from the Pledged Revenues to be assigned and pledged to the payment thereof and will not constitute a debt or a general obligation or a pledge of the faith

11

and credit of the State of Alabama or any political subdivision thereof, including the City of Mobile, Alabama ("City"), and will not directly, indirectly, or contingently obligate said State or any political subdivision thereof, including said City, to levy or to pledge any form of taxation whatever for the payment thereof.

ARTICLE II

2.01. <u>Events of Default</u>. The terms "Default," "Event of Default" or "Events of Default," wherever used in this Security Agreement, shall mean any one or more of the following events:

(a)    Failure by Issuer to pay as and when due and payable after the expiration of any applicable cure periods any installment of principal or interest as required by the Bonds or any other amount payable by this Security Agreement or as part of the other Combined Obligations; or

(b)    Failure by Issuer to duly observe or perform any other term, covenant, condition or agreement of this Security Agreement, provided that Issuer shall have the right to cure such failure within 30 days after receipt of written notice from the Trustee specifying such failure; provided, however, in the case of such failure which can be cured with due diligence but not within such thirty-day period, the Issuer's failure to proceed promptly to cure such failure and thereafter prosecute the curing of such failure with due diligence; or

(c)    Failure by Issuer to duly observe or perform any term, covenant, condition or agreement in any other agreement given or made as additional security for the performance of the Bonds or this Security Agreement, provided that Issuer shall have the right to cure such failure within 30 days after receipt of written notice from the Trustee specifying such failure; provided, however, in the case of such failure which can be cured with due diligence but not within such thirty-day period, the Issuer's failure to proceed promptly to cure such failure and thereafter prosecute the curing of such failure with due diligence; or

(d)    Any representation or warranty of Issuer contained in this Security Agreement, the Agreement, or in any of the other documents referred to therein (collectively, the "Combined Documents"), or in any certificate, instrument or other writing furnished pursuant to or in connection with any of the foregoing, proves to be untrue or misleading in any material respect; or

(e)    Any default or Event of Default shall occur under the Agreement or any of the other Combined Documents.

12

2.02.   Acceleration of Maturity.   If an Event of Default shall have occurred and be continuing, then the entire Combined Obligations shall, at the option of Trustee, immediately become due and payable without notice or demand, time being of the essence of this Security Agreement; and no omission on the part of Trustee to exercise such option when entitled to do so shall be construed as a waiver of such right.

2.03.   Right to Enter and Take Possession.

(a)       If an Event of Default shall have occurred and be continuing, Issuer upon demand of Trustee, shall forthwith surrender to Trustee the actual possession of the Facility and if, and to the extent permitted by law, Trustee itself, or by such officers or agents as it may appoint, may enter and take possession of all the Facility without the appointment of a receiver, or an application therefor, and may exclude Issuer and their agents and employees wholly therefrom, and may have joint access with Issuer to the books, papers and accounts of Issuer that are related to the Facility.

(b)       If Issuer shall for any reason fail to surrender or deliver the Facility or any part thereof after such demand by Trustee, Trustee may obtain a judgment or decree conferring upon Trustee the right to immediate possession or requiring Issuer to deliver immediate possession of the Facility to Trustee to the entry of which judgment or decree Issuer hereby specifically consents.  Issuer will pay to Trustee upon demand, all expenses of obtaining such judgment or decree, including reasonable compensation to Trustee, its attorneys and agents; and all such expenses and compensation shall, until paid, be secured by the lien of this Security Agreement.

(c)       Upon every such entering upon or taking of possession, Trustee may hold, store, use, operate, manage and control the Facility and conduct the business thereof, and, from time to time (i) make all necessary and proper maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional fixtures, personalty and other property; (ii) insure or keep the Facility insured; (iii) manage and operate the Facility and exercise all the rights and powers of Issuer to the same extent as Issuer could in its own name or otherwise with respect to the exercise by others of any of the powers herein granted Trustee, all as Trustee from time to time may determine to be in its best interest.  Trustee may collect and receive all the rents, issues, profits and revenues from the Facility, including those past due as well as those accruing thereafter, and, after deducting (aa) all expenses of taking, holding, managing and operating the Facility (including compensation for the services of all persons employed for such purposes); (bb) the cost of such maintenance, repairs, renewals, replacements, additions, betterments, improvements, purchases and acquisitions; (cc) the cost of such insurance; (dd) such taxes, assessments and other similar charges as Trustee may at its option pay; (ee) other proper charges upon the Facility or any part thereof; and (ff) the reasonable compensation, expenses and disbursements of the attorneys and agents of Trustee, Trustee shall apply the remainder of the moneys and proceeds so received by Trustee first to the payment of accrued interest, and second to the payment of overdue installments of principal.

13

(d)     Whenever all that is due upon such interest, deposits and principal installments and under any of the terms, covenants, conditions and agreements of this Security Agreement shall have been paid and all Events of Default made good, Trustee shall surrender possession of the Facility to Issuer, its successors or assigns.  This return of possession of the Premises to Issuer shall not affect Trustee's right to take possession of the Premises in the event of a subsequent default by Issuer.

2.04.  <u>Performance by Trustee</u>.  If Issuer shall default in the payment, performance or observance of any term covenant or condition of this Security Agreement, Trustee may, at its option, pay, perform or observe the same, and all payments made or costs or expenses incurred by Trustee in connection therewith, shall be secured hereby and shall be, without demand, immediately repaid by Issuer to Trustee with interest thereon at the default rate provided in the Bonds.  Trustee shall be the sole judge of the necessity for any such actions and of the amounts to be paid.  Trustee is hereby empowered to enter and to authorize others to enter upon the Facility or any part thereof for the purpose of performing or observing any such defaulted term, covenant or condition without thereby becoming liable to Issuer or any person in possession holding under Issuer.

2.05.  <u>Receiver</u>.  If an Event of Default shall have occurred and be continuing, Trustee upon application to a court of competent jurisdiction, shall be entitled as a matter of strict right without notice and without regard to the occupancy or value of any security for the indebtedness secured hereby or the solvency of any party bound for its payment, to the appointment of a receiver to take possession of and to operate the Facility and to collect and apply the rents, issues, profits and revenues thereof.  The receiver shall have all of the rights and powers permitted under the laws of the state wherein the Land is situated.  Issuer will pay to Trustee upon demand all expenses, including receiver's fees, reasonable attorneys' fees actually incurred, and reasonable costs and agent's compensation, incurred pursuant to the provisions of this Paragraph 2.05; and all such expenses shall be secured by this Security Agreement.

2.06.  <u>Enforcement</u>.

(a)     If an Event of Default shall have occurred and be continuing, Trustee at its option, may sell the Facility or any part of the Facility at public sale or sales at the front or main door of the courthouse of the county in which the Facility or any part of the Facility is situated, to the highest bidder for cash, in order to pay the indebtednesses secured hereby and accrued interest thereon and insurance premiums, liens, assessments, taxes and charges, including utility charges, if any, with accrued interest thereon, and all expenses of the sale and of all proceedings in connection therewith, including reasonable attorneys' fees, if incurred, after advertising the time, place and terms of sale once a week for three (3) consecutive weeks immediately preceding such sale, provided that the first such advertisement shall be published on a date at least eighteen (18) days prior to the date of such sale in a newspaper, published in  Mobile County, Alabama, in which Sheriff's sales are advertised in said county. At any such public sale, Trustee may execute and deliver to the purchaser a conveyance of the Facility or any part of the Facility or any part of

14

the Facility in fee simple, with full warranties of title and to this end, Issuer hereby constitutes and appoints Trustee the agent and attorney-in-fact of Issuer to make such sale and conveyance, and thereby to divest Issuer of all right, title or equity that Issuer may have in and to the Facility and to vest the same in the purchaser or purchasers at such sale or sales, and all the acts and doing of said agent and attorney-in-fact are hereby ratified and confirmed and any recitals in said conveyance or conveyances as to facts essential to a valid sale shall be binding upon Issuer. The aforesaid power of sale and agency hereby granted are coupled with an interest and are irrevocable by death or otherwise, are granted as cumulative of the other remedies provided hereby or by law for collection of the Combined Obligations and shall not be exhausted by one exercise thereof but may be exercised until full payment of all of the Combined Obligations.

(b)    If an Event of Default shall have occurred and be continuing, Trustee may, in addition to and not in abrogation of the rights covered under subparagraph (a) of this Paragraph 2.06, either with or without entry or taking possession as herein provided or otherwise, proceed by a suit or suits in law or in equity or by any other appropriate proceeding or remedy (i) to enforce payment of the Bonds and the other Combined Obligations or the performance of any term, covenant, condition or agreement of this Security Agreement or any term, covenant, condition or agreement of this Security Agreement or any other right, and (ii) to pursue any other remedy available to it, all as Trustee shall determine most effectual for such purposes.

2.07.    Purchase by Trustee.    Upon any foreclosure sale, Trustee may bid for and purchase the Facility and shall be entitled to apply all or any part of the indebtedness secured hereby as a credit to the purchase price.

2.08.    Application of Proceeds of Sale.    In the event of a sale under power or a foreclosure sale of the Facility, the proceeds of said sale shall be applied first to the expenses of such sale and of all proceedings in connection therewith, including reasonable attorney's and trustee's fees actually incurred, then to insurance premiums, liens, assessments, taxes and charges including utility charges advanced by Trustee then to payment of the outstanding principal balance of the indebtedness secured hereby, then to the accrued interest on all of the foregoing, and finally the remainder, if any, shall be paid to Issuer.

2.09.    Issuer as Tenant Holding Over.    In the event of any such sale under power or foreclosure sale by Trustee, Issuer shall be deemed a tenant holding over and shall forthwith deliver possession to the purchaser or purchasers at such sale or be summarily dispossessed according to provisions of law applicable to tenants holding over.

15

2.10.   Waiver of Appraisement, Valuation Stay, Extension and Redemption Laws. Issuer agrees to the full extent permitted by law that in case of a Default on the part of Issuer hereunder, neither Issuer nor anyone claiming through or under it shall or will set up, claim or seek to take advantage of any appraisement, valuation, stay, extension, homestead, exemption or redemption laws now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this Security Agreement, or the absolute sale of the Facility, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereat, and Issuer for itself and all who may at any time claim through or under it, hereby waives to the full extent that it may lawfully do so, the benefit of all such laws, and any and all right to have the assets comprised in the security intended to be created hereby marshalled upon any foreclosure of the lien hereof.

2.11.   Leases.  Trustee at its option, is authorized to foreclose this Security Agreement subject to the rights of any tenants of the Facility.

2.12.   Discontinuance of Proceedings and Restoration of the Parties.  In case Trustee shall have proceeded to enforce any right, power or remedy under this Security Agreement by sale under foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Trustee, then and in every such case, Issuer and Trustee shall be restored to their former positions and rights hereunder, and all rights, powers and remedies of Trustee shall continue as if no such proceeding had taken place.

2.13.   Remedies Cumulative.  No right, power or remedy conferred upon or reserved to Trustee by this Security Agreement is intended to be exclusive of any other right, power or remedy, but each and every such right, power and remedy shall be cumulative and concurrent and shall be in addition to any other right, power and remedy given hereunder or now or hereafter existing at law or in equity or by statute or under the Combined Documents.

2.14.   Waiver.

(a)   No delay or omission of Trustee or any holder of the Bonds to exercise any right, power or remedy accruing upon any default shall exhaust or impair any such right, power or remedy or shall be construed to be a waiver of any such default or acquiescence therein; and every right, power and remedy given by this Security Agreement to Trustee may be exercised from time to time and as often as may be deemed expedient by Trustee. No consent or waiver, expressed or implied, by Issuer to or of any breach or default by Issuer in the performance of the obligations thereof shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the sale or any other obligations of Issuer hereunder. Failure on the part of Trustee to complain of any act or failure to act or to declare an Event of Default, irrespective of how long such failure continues, shall not constitute a waiver by Trustee of its rights hereunder or impair any rights, powers or remedies  consequent on any breach or default by Issuer.

16

(b)     If Trustee (i) grants forbearance or an extension of time for the payment of any Combined Obligations; (ii) takes other or additional security for the payment of any Combined Obligations; (iii) waives or does not exercise any right granted herein or in any of the Combined Documents; (iv) releases any part of the Facility from the lien and security title of this Security Agreement or otherwise changes any of the terms, covenants, conditions or agreements of any of the Combined Documents; (v) consents to the filing of any map, plat or replat affecting the Facility; (vi) consents to the granting of any easement or other right affecting the Facility; or (vii) makes or consents to any agreement subordinating the lien and security title hereof, any such act or omission shall not release, discharge, modify, change or affect the original liability under the Bonds, the Agreement, this Security Agreement or any other Combined Obligations of or any subsequent purchaser of the Facility or any part thereof, or any maker, co-signer, endorser, surety or guarantor; nor shall any such act or omission preclude Trustee from exercising any right, power or privilege herein granted or intended to be granted in the event of any default then made or of any subsequent default; nor, except as otherwise expressly provided in an instrument or instruments executed by Trustee, shall the lien of this Security Agreement be altered thereby.  In the event of the sale or transfer by operation of law or otherwise of all or any part of the Facility, Trustee, without notice, is hereby authorized and empowered to deal with any such vendee or transferee with reference to the Facility or the indebtedness secured hereby, or with reference to any of the terms, covenants, conditions or agreements hereof, as fully and to the same extent as it might deal with the original parties hereto and without in any way releasing or discharging any liabilities, obligations or undertakings.

2.15.  <u>Suits to Protect the Facility</u>.  Trustee shall have power (a) to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Facility by any acts which may be unlawful or any violation of this Security Agreement, (b) to preserve or protect its interest in the Facility and in the rents, issues, profits and revenues arising therefrom, and (c) to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would impair the security hereunder or be prejudicial to the interest of Trustee.

2.16.  <u>Trustee May File Proofs of Claim</u>.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Issuer, their creditors or their property, Trustee, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Trustee allowed in such proceedings for the entire amount of the Combined Obligations due and payable at the date of the institution of such proceedings and for any additional amount which may become due and payable by Issuer hereunder after such date.

2.17. <u>Waiver of Issuer's Rights</u>.

BY EXECUTION OF THIS SECURITY AGREEMENT ISSUER EXPRESSLY:

(A)    ACKNOWLEDGES THE RIGHT TO ACCELERATE THE INDEBTEDNESS EVIDENCED BY THE BONDS AND ALL OTHER COMBINED OBLIGATIONS AND THE POWER OF ATTORNEY GIVEN HEREIN TO TRUSTEE TO SELL THE FACILITY BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY ISSUER WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE (IF ANY) AS IS SPECIFICALLY REQUIRED TO BE GIVEN UNDER THE PROVISIONS OF THIS SECURITY AGREEMENT AND UNDER STATE LAW;

(B)    WAIVE ANY AND ALL RIGHTS WHICH ISSUER MAY HAVE UNDER THE CONSTITUTION OF THE UNITED STATES (INCLUDING THE FIFTH AND FOURTEENTH AMENDMENTS THEREOF, THE VARIOUS PROVISIONS OF THE CONSTITUTIONS FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW), (1) TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY TRUSTEE OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO TRUSTEE EXCEPT SUCH NOTICE (IF ANY) AS IS SPECIFICALLY REQUIRED TO BE PROVIDED IN THIS SECURITY AGREEMENT AND BY LAW; AND (2) CONCERNING THE APPLICATION, RIGHTS OR BENEFITS OF ANY STATUTE OF LIMITATION OR ANY MORATORIUM, REINSTATEMENT, MARSHALLING, FORBEARANCE, APPRAISEMENT, VALUATION, STAY, EXTENSION, HOMESTEAD, EXEMPTION OR REDEMPTION LAWS

(C) ACKNOWLEDGE THAT ISSUER HAS READ THIS SECURITY AGREEMENT AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF THIS SECURITY AGREEMENT AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO ISSUER AND ISSUER HAS CONSULTED WITH COUNSEL OF ISSUER'S CHOICE PRIOR TO EXECUTING THIS SECURITY AGREEMENT; AND

(D) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF ISSUER HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY ISSUER AS PART OF A BARGAINED FOR LOAN TRANSACTION AND THAT THIS SECURITY AGREEMENT IS VALID AND ENFORCEABLE BY TRUSTEE AGAINST ISSUER IN ACCORDANCE WITH ALL THE TERMS AND CONDITIONS HEREIN.

ARTICLE III

3.01. <u>Successors and Assigns</u>. This Security Agreement shall inure to the benefit of and be binding upon Issuer and Trustee and their respective heirs, executors, legal representatives, successors and assigns. Whenever a reference is made in this Security Agreement to Issuer or Trustee such reference shall be deemed to include a reference to the heirs, executors, legal

18

representatives successors and assigns of Issuer or Trustee. It is specifically agreed and understood that this Security Agreement may be assigned to the Trustee.

3.02. <u>Terminology</u>. All personal pronouns used in this Security Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa. Titles and Articles are for convenience only and neither limit nor amplify the provisions of this Security Agreement itself, and all references herein to Articles, Paragraphs or subparagraphs thereof, shall refer to the corresponding Articles, Paragraphs or subparagraphs thereof, of this Security Agreement unless specific reference is made to such Articles, Paragraphs or subparagraphs thereof of another document or instrument.

3.03. <u>Severability</u>. If any provision of this Security Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Security Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

3.04. <u>Applicable Law</u>. This Security Agreement shall be interpreted, construed and enforced according to the laws of the State of Alabama.

3.05. <u>Notices.</u> Any and all notices, elections or demand permitted or required to be made under this Security Agreement shall be in writing, signed by the party giving such notice, election or demand, and shall be delivered personally, or sent by registered or certified United States mail, postage prepaid, to the other party at the address set forth below, or at such other address within the continental United States of America as may have theretofore been designated in writing. The date of personal delivery or the date of mailing, as the case may be, shall be the date of such notice, election or demand. For the purposes of this Security Agreement:

The address of Lessee is:  BAMA Oaks Retirement, LLC
c/o Christopher F. Brogdon
Two Buckhead Plaza
3050 Peachtree Road NW, Suite 355
Atlanta, Georgia  30305

with copies to:  Gregory P. Youra, Esq.
Holt Ney Zatcoff & Wasserman, LLP
100 Galleria Parkway, Suite 600
Atlanta, Georgia 30339

19

Lawson Financial Corporation
3352 East Camelback Road
Phoenix, Arizona 85018
Attn:  Robert W. Lawson

The address of Issuer is:        The Medical Clinic Board of the City of Mobile (Second)
                                c/o James P. Rossler, Esq.
                                1 South Royal Street #300
                                Mobile, Alabama  36602-3249

with a copy to:                 James P. Rossler, Esq.
                                1 South Royal Street #300
                                Mobile, Alabama  36602-3249

3.06   Time of the Essence.   Time is of the essence with respect to each and every covenant, agreement and obligation of Issuer under this Security Agreement, the Bond and any and all other instruments now or hereafter evidencing, securing or otherwise relating to the indebtedness.


[REMAINDER OF PAGE LEFT BLANK INTENTIIONALLY]


20

IN WITNESS WHEREOF, Issuer has executed this Security Agreement under seal, as of the day and year first above written.

THE MEDICAL CLINIC BOARD OF THE CITY OF MOBILE (SECOND)

(SEAL)

By: _____
Chairman

Attest: _____
Secretary

STATE OF ALABAMA     )
                                          )
COUNTY OF MOBILE     )

I, the undersigned, a Notary Public in and for said State and County, do hereby certify that Cathy Motes and Michelle Mayberry, whose names as Chairman and Secretary, respectively, of The Medical Clinic Board of the City of Mobile (Second), a public corporation, are signed to the foregoing conveyance, and who are known to me known to be such officers, acknowledged before me this day that they, in their respective capacities as such officers, being informed of the contents of the conveyance, and with full authority and of their own free will and accord, voluntarily executed the foregoing Mortgage and Security Agreement for and as the free and unrestrained act of said public corporation, for the purposes therein named and expressed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office this 26th day of November, 2012.

_____
NOTARY PUBLIC

(SEAL)

My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Nov 29, 2014
BONDED THRU NOTARY PUBLIC UNDERWRITERS

21

AGREEMENT, JOINDER AND INDEMNITY BY LESSEE


BAMA Oaks Retirement, LLC, a Georgia limited liability company authorized to do business in the State of Alabama (the "Lessee") hereby agrees to discharge the duties of the Issuer set forth in the foregoing Mortgage and Security Agreement, dated as of November 1, 2012 (the "Security Agreement") to the extent that it is legally permissible for the Lessee to do so; it being the intent of the parties hereto to relieve the Issuer from all the obligations and burdens that normally fall upon a mortgagor in recognition of the fact that the Issuer is a conduit lender with respect to the financing of the Facility as set forth in that certain Lease Agreement, dated as of November 1, 2012, between the Issuer and the Lessee (the "Agreement").

Consistent with similar provisions, Section 5.2 of the Agreement and Section 410 of that certain Trust Indenture, dated as of November 1, 2012, between the Issuer and BOKF, NA dba Bank of Oklahoma (the "Indenture"), Lessee hereby agrees to and shall indemnify and save the Issuer and the Trustee harmless against and from all claims by or on behalf of any person, firm or corporation arising from the execution or enforcement of the foregoing Security Agreement; provided however, this indemnity shall not apply to any acts of gross negligence or willful misconduct of the Issuer or the Trustee. The Lessee shall indemnify and save the Issuer and the Trustee harmless from and against all reasonable costs and expenses incurred by Issuer and/or Trustee in or in connection with the foregoing indemnity, including reasonable attorneys' fees actually incurred, and upon notice from the Issuer or the Trustee, Borrower shall defend them or either of them in any such action or proceeding.

Lessee hereby subjects its interest in and to all of the real property that comprises the Facility to the lien of this Security Agreement. Borrower also hereby grants to the Trustee a security interest in the gross revenues and other personal property that is part of the Facility, all to secure its obligations under the Agreement.

Notwithstanding the fact that it is the intention of the parties that the Issuer shall not incur pecuniary liability by reason of the terms of the Security Agreement, or the undertakings required of the Issuer thereunder, by reason of (i) the issuance of the Bonds; (ii) the execution of the Security Agreement; (iii) the performance of any act required of it by the Security Agreement; (iv) the performance of any act requested of it by the Lessee; or (v) any other costs, fees, or expenses incurred by the Issuer with respect to the Facility or the financing thereof, including all claims, liabilities or losses arising in connection with the violation of any statutes or regulations pertaining to the foregoing, nevertheless, if the Issuer should incur any such pecuniary liability, then in such event, the Lessee shall indemnify and hold harmless the Issuer against all claims by or on behalf of any person, firm or corporation, arising out of the same, and all reasonable costs and expenses (including reasonable attorneys' fees) incurred by Issuer in connection with any such claim or in connection with any action or proceeding brought thereon, and upon notice from the Issuer, the Lessee shall defend the Issuer in any such action or

22

proceeding and pay the reasonable attorneys' fees of the Issuer actually incurred in defending any such action.

[SIGNATURES ON THE FOLLOWING PAGE(S)]

23

The provisions of this Agreement, Joinder and Indemnity shall survive the termination of this Security Agreement.

BAMA OAKS RETIREMENT, LLC

By: _____
        Manager

STATE OF GEORGIA    )
                        )
COUNTY OF BIBB    )

I, the undersigned, a Notary Public in and for said State and County, do hereby certify that Christopher F. Brogdon whose name as Manager of BAMA Oaks Retirement, LLC, a Georgia limited liability company, is signed to the foregoing conveyance, and who is known to me and known to be such official, acknowledged before me this day that he, in his capacity as such official, being informed of the contents of the conveyance, and with full authority and of his own free will and accord, voluntarily executed the foregoing Mortgage and Security Agreement for and as the free and unrestrained act of said limited liability company, for the purposes therein named and expressed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office this __27th__ day of November, 2012.

_____
NOTARY PUBLIC

(SEAL)

My Commission Expires: _____

24

# EXHIBIT A

Legal Description:

That portion of Lot 2, Gordon Oaks, as recorded in Map Book 38, page 13 of the Probate Court records of Mobile County, Alabama, being more particularly described as follows:

To-Wit:
 Beginning at the Southwest corner of Lot 2, Gordon Oaks, as recorded in Map Book 38, Page 13 of the Probate Court records of Mobile County, Alabama, said point being on the East right of way line of Knollwood Drive, (100-foot public R\W); Thence Northwesterly, along the East right of way line of said Knollwood Drive and around a curve to the left having a radius of 1400.59 feet and a delta angle of 15°-00'-19", the chord of which bears N-15°-17'-04"-W for 365.76 feet, for an arc distance of 366.80 feet to the Southwest corner of Lot 1 of said Gordon Oaks; Thence S-89°-43'-13"-E, leaving the East right of way line of said Knollwood Drive and along the South line of said Lot 1, for 435.59 feet to the Southeast corner of said Lot 1; Thence N-00°-16'-47"-E, along the East line of said Lot 1, for 64.43 feet; Thence Southeasterly, leaving the East line of said Lot 1 and around a curve to the right having a radius of 81.17 feet and a delta angle of 72°-52'-49", the chord of which bears S-53°-16'-37"-E for 96.43 feet, for an arc distance of 103.26 feet; Thence S-16°-50'-12"-W for 32.70 feet; Thence Southeasterly around a curve to the right having a radius of 222.78 feet and a delta angle of 14°-50'-05", for an arc distance of 57.68 feet; Thence S-02°-00'-08"-E for 15.41 feet; Thence N-71°-13'-52"-E for 233.59 feet to a point on the East line of aforesaid Lot 2; Thence S-08°-18'-34"-W, along the East line of said Lot 2, for 112.33 feet to the Southeast corner of said Lot 2; Thence S-71°-13'-07"-W, along the South line of said Lot 2, for 677.19 feet to the Point of Beginning. Said parcel lying and being entirely within Lot 2, Gordon Oaks, as recorded in Map Book 38, page 13 of the Probate Court records of Mobile County, Alabama, and containing 3.824 acres, more or less.

Together with the benefitting aspects of the Amended and Restated Reciprocal Easement Agreement by and between Mobama Nursing, LLC and Bama Oaks Retirement, LLC, dated January 8, 2008 and recorded in Real Property Book 6317 Page 567 of the records in the Judge of Probate of Mobile County, Alabama.

EXHIBIT B


ISSUER                    The Medical Clinic Board of the City of Mobile (Second)
                          c/o James P. Rossler, Esq.
                          1 South Royal Street #300
                          Mobile, Alabama  36602-3249


TRUSTEE:                  BOKF, NA dba Bank of Oklahoma
                          One Williams Center
                          Tulsa, Oklahoma 74192
                          Attn: Marrien Neilson


LESSEE                    BAMA Oaks Retirement, LLC
                          Two Buckhead Plaza
                          3050 Peachtree Road NW, Suite 355
                          Atlanta, Georgia 30305


I:TX12\10000\10743.0190.Mortgage and Security Agreement. 11 21 2012 (C)

26

# EXHIBIT "D"

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (the "Agreement") is made and entered into as of _November 29_, 2012, (the "Effective Date") by and between Bama Oaks Retirement, LLC, a Georgia limited liability company (hereinafter called "Owner"), and Saint Simons Health Care, LLC, a Georgia limited liability company (hereinafter called "Manager").

Owner and Manager agree that Manager shall manage that certain independent living facility located at 3145 Knollwood Drive, Mobile, Alabama 36693 (the "Facility"), owned by Owner, on the following terms and conditions:

## SECTION ONE:  MANAGEMENT DUTIES AND OBLIGATIONS

1.01    <u>Management of Facility</u>. During the term of this Agreement, Manager shall supervise the management of the Facility including but not limited to staffing, accounting, billing, collections, setting of rates and charges and general administration. In connection therewith Manager (either directly or through supervision of employees of the Facility) shall provide the services set forth on <u>Exhibit "A"</u> attached hereto and incorporated herein by reference.

## SECTION TWO:  TERM AND TERMINATION

2.01    <u>Term</u>. The term of this Agreement shall commence on the Effective Date and shall terminate on November 30, 2017, unless sooner terminated as provided herein.

2.02    <u>Termination</u>. Owner may terminate this Agreement upon giving Manager sixty (60) days written notice after the end of the third year of this Agreement. Manager may terminate this Agreement at any time upon giving the Owner sixty (60) days written notice.

## SECTION THREE:  MANAGEMENT FEE

3.01    <u>Fee to Manager</u>. During each term of this Agreement the Owner shall pay Manager a monthly fee equal to five thousand and 00/100 Dollars ($5,000.00).

3.02    <u>Subordination of Management Fee</u>.  Owner and Manager agree that, for so long as Manager or any affiliate thereof shall manage the Facility, payment of the Management Fee shall be fully subordinated to the prior payment, as and when due, of all:  (a) debt service (principal, interest and premium, if any) on the Series 2012A and Series 2012B Bonds (Bama Oaks Retirement Project II) (the "Series 2012 Bonds"), which were issued by The Medical Clinic Board of the City of Mobile (Second) and (b) all other sums that the Owner may, at any time, be required to pay for deposit into any fund or account established under the Trust Indenture pursuant to which the Series 2012 Bonds were issued.

## SECTION FOUR:  COVENANTS OF OWNER

4.01    <u>Insurance</u>. Owner shall provide and maintain throughout the Term, the following insurance with responsible companies naming Owner and Manager (as its interest may appear) as insured thereunder in amounts approved by Manager and Owner.

**EXHIBIT "D"**

(a)     public liability insurance and insurance against theft of or damage to patient's property in the Facility or its Premises;

(b)     workman's compensation, employers' liability or similar insurance as may be required by law;

(c)     insurance against loss or damage to the Facility from fire and such other risks and casualties now or hereafter embraced by "Extended Coverage," as well as such other risks and casualties with respect to which insurance is customarily carried for similar facilities;

(d)     business interruption insurance against loss of income due to the risks insured against under this Section 4.01;

(e)     such other insurance or additional insurance as Manager and Owner together shall reasonably deem necessary for protection against claims, liabilities and losses arising from the operation or ownership of the Facility.

If Owner fails to effect or maintain any such insurance, Owner will indemnify Manager against damage, loss or liability resulting from all risks for which such insurance should have been maintained, and Manager may, but shall not be liable for its failure to do so, effect the same as the agent of Owner by taking out policies in such insurance companies as may be selected by Manager, running for a period not to exceed one year.

## SECTION FIVE:  MISCELLANEOUS

5.01     <u>Assignment by Manager</u>. Manager shall not assign its rights or obligations under this Agreement without the consent of Owner.

5.02     <u>Assignment by Owner</u>. Owner shall not assign its rights or obligations under this Agreement without the notice to Manager.

5.03     <u>Binding on Successors and Assigns</u>. The terms, covenants, conditions, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto, their heirs, administrators, executors, successors and assigns, subject to provisions of Section 5.01 and 5.02 above.

5.04     <u>Negation of Partnership, Joint Venture and Agency</u>. Nothing in this Agreement contained shall constitute or be construed to be or to create a partnership, joint venture or lease between Owner and Manager with respect to the Facility. The parties intend for the relationship of Manager to Owner under this Agreement to be that of an independent contractor, nor that of an agent. Owner shall not have the power to control the time method or manner of Manager's performance hereunder, Owner shall look solely to the results to be achieved by Manager, and nothing contained herein shall be construed to create a relationship of agency between Manager and Owner.

5.05  <u>Notices</u>. All notices hereunder by either party to the other shall be in writing. All notices, demands and request shall be deemed given when mailed, postage prepaid, registered, or certified mail, return receipt requested,

(a)  to Owner:    Bama Oaks Retirement, LLC
                  Two Buckhead Plaza
                  3050 Peachtree Road NW, Suite 355
                  Atlanta, GA 30305

(b)  to Manager:  Saint Simons Health Care, LLC
                  Two Buckhead Plaza
                  3050 Peachtree Road NW, Suite 355
                  Atlanta, GA 30305

or to such other address or to such other person as may be designated by notice given from time to time during the term by one party to the other.

5.06  <u>Entire Agreement</u>. This Agreement contains the entire agreement between the parties hereto, and no representations or agreements, oral or otherwise, between the parties not embodied herein or attached hereto shall be of any force and effect. Any additions or amendments to this Agreement subsequent hereto shall be of no force and effect unless in writing and signed by the party to be bound.

5.07  <u>Governing Law</u>. This Agreement has been executed and delivered in the State of Georgia, all the terms and provisions hereof and the rights and obligations of the parties hereto shall be construed and enforced in accordance with the laws thereof.

5.08  <u>Captions and Headings</u>. The captions and headings throughout this Agreement are for convenience and reference only, and the words contained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of or the scope or intent of this Agreement nor in any way affect this Agreement.

5.09  <u>Disclaimer of Employment of Facility Employees</u>. No person employed by Owner in operation of the Facility will be an employee of Manager, and Manager will have no liability for payment of wages, payroll taxes and other expenses of employment, except that Manager shall have the obligation to exercise reasonable care in its management of the Facility to properly apply available Facility funds to the payment of such wages and payroll taxes.

5.10  <u>Impossibility of Performance</u>. Neither party to this Agreement shall be deemed to be in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitation, acts of God or of the public enemy, flood or storm, strikes or statutory regulation or rule of any federal, state, or local government, or any agency thereof.

5.11    <u>Non-assumption of Liabilities</u>. Manager shall not, by entering into and performing this Agreement, become liable for any of the existing or future obligations, liabilities or debts of Owner, and Manager shall not be managing the Facility assume or become liable for any of the obligations, debts and liabilities of Owner, and Manager will in its role as manager of the Facility have only the obligation to exercise reasonable care in its management and handling of the funds generated from the operation of the Facility.

5.12    <u>Responsibility for Misconduct of Employees and Other Personnel</u>. Manager will have no liability whatever for damages suffered on account of the dishonesty, willful misconduct or negligence of any employee of the Owner regarding the Facility in connection with damage or loss directly sustained by it by reason of the dishonesty, willful misconduct and gross negligence of Manager employees in the operation of the Facility during the term of this Agreement.

5.13    <u>Rights Cumulative, No Waiver</u>. No right or remedy herein conferred upon or reserved to either of the parties hereto is intended to be exclusive of any other right or remedy, an each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder, or now or hereafter legally existing upon the occurrence of any event of default hereunder. The failure of either party hereto to insist at any time upon the strict observance or performance of any of the provisions of this Agreement or to exercise any right or remedy as provided in this Agreement shall not impair any such right or remedy to be construed as a waiver or relinquishment thereof. Every right and remedy given by this Agreement to the parties hereto may be exercised from time to time and as often as may be deemed expedient by the parties hereto, as the case may be.

5.14    <u>Time of Essence</u>. Time is of the essence of this Agreement.

5.15    <u>Invalid or Unenforceable Provisions</u>. If any terms, covenants or conditions of this Agreement or the application thereof to any person or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Agreement shall be valid and shall be enforced to the fullest extent permitted by law.

5.16    <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

5.17    <u>Authorization of Agreement</u>. Manager and Owner represent and warrant, each to the other, that this Agreement has been duly authorized by its respective Board of Directors and, if required by law, shareholders; and that this Agreement constitutes a valid and enforceable obligation of Manager and Owner in accordance with its terms.

5.18    <u>Designation</u>. Owner agrees that, during the term of this Agreement, Manager shall have the right to designate and make public reference to the Facility as a Manager managed facility.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, as of the day and year first above written.

SAINT SIMONS HEALTH CARE, LLC

By:_____
      Christopher F. Brogdon, Manager

BAMA OAKS RETIREMENT, LLC.

By:_____
      Christopher F. Brogdon, Manager

# EXHIBIT "A"

## SERVICES PROVIDED

I.     <u>Services.</u>

(a)    Hire on behalf of Owner and maintain an adequate staff at the Facility at salaries approved from time to time by Owner; and release employees at Manager's discretion.

(b)    Recommend and institute, subject to approval of Owner, appropriate employee benefits. Employee benefits may include pension and profit sharing plans, insurance benefits, and incentive plans for key employees and vacation policies.

(c)    Design and maintain accounting, billing and collection records.

(d)    Order, supervise and conduct a program of regular maintenance and repair of the Facility except that physical improvements costing more than $5,000.00 shall be subject to prior approval of Owner which shall not be unreasonably withheld.

(e)    Administer and schedule all services of the Facility.

(f)    Provide for the orderly payment (to the extent funds of Owner are available therefor) of accounts payable, employee payroll, taxes and insurance premiums.

(g)    Advise and assist Owner in obtaining and maintaining adequate insurance coverage with Owner, Manager and such other persons as requested by Owner named as insured for the Facility. Manager shall advise Owner with regard to the availability, nature and desirable policy limits of insurance coverage for the Facility, and shall request and receive bids for such coverage.

(h)    Establish and maintain books of account using accounts and classifications approved by owner.

(i)    Advise and assist Owner in designing an adequate and appropriate public and personnel relations program.

II.    <u>Reports to Owner</u>. Manager shall prepare and deliver to Owner monthly financial statements (unaudited) containing a balance sheet and statement of income in reasonable detail, and such monthly financial statements will be delivered to Owner within 30 days after the close of each calendar month. Manager shall submit to Owner each month a vacancy report for the Facility.

III.   <u>Bank Accounts and Working Capital</u>. Manager shall deposit all funds received from the operation of the Facility in an Operating Account in a bank or banks presently being used by the Facility or such other banks as are designated from time to time by Manager. Owner shall provide sufficient working capital for the operation of the Facility and shall make deposits in the Operating Accounts of such working capital from time to time upon the request of Manager. All costs and expenses incurred in the operation of the Facility shall be paid out of the

Operating Accounts. All checks or other documents withdrawal must be signed by the Comptroller of Manager or his designate. Deposits may be made by the Comptroller of Manager or his designate.

IV.    <u>Access to Records and Facility</u>. The books and records kept by Manager for the Facility shall be maintained at the Facility, although Manager shall have the right to maintain copies of such records at its home office for the purpose of providing services under this Agreement. Manager shall make available to Owner, its agents, accountants and attorneys, during normal business hours, all books and records pertaining to the Facility and Manager shall promptly respond to any questions of Owner with respect to such books and records and shall confer with Owner at all reasonable times, upon request, concerning operation of the Facility. In addition, Owner shall have access to the Facility at all reasonable hours for the purpose of examining or inspecting the Facility.

V.    <u>Taxes</u>. Any taxes or other governmental obligations properly imposed on the Facility are the obligations of the Owner, not of Manager, and shall be paid out of the Operating Accounts of the Facility.

# EXHIBIT "E"

# FREDERIC DORWART, LAWYERS PLLC

OLD CITY HALL

124 EAST FOURTH STREET, TULSA, OK 74103

Main (918) 583-9922

Facsimile (918) 583-8251

January 11, 2021

*via certified mail, return receipt requested*

The Medical Clinic Board of the City of Mobile (Second)
James P. Rossler
1 South Royal Street #300
Mobile, Alabama 36602-3249

Bama Oaks Retirement, LLC
Two Buckhead Plaza
3050 Peachtree Road NW, Suite 355
Atlanta, Georgia 30305
Attn: Christopher F. Brogdon, Manager

*Re:*   **NOTICE OF ACCELERATION UNDER LEASE AGREEMENT** *dated as of November 1, 2012, by and between Medical Clinic Board of the City of Mobile (Second) (the "Issuer") and Bama Oaks Retirement, LLC ("Lessee") related to the bonds issued in the aggregate principal amount of (1) $5,110,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Series 2012A (the "Series A Bonds"), and of (2) $630,000 The Medical Clinic Board of the City of Mobile (Second) First Mortgage Healthcare Facility Revenue Bonds (Bama Oaks Retirement, LLC Project II), Taxable Series 2012B (the "Series B Bonds") (hereinafter collectively the "Bonds") (as modified, renewed, restated, or otherwise amended from time to time, (the "Bond Agreement"); Trust Indenture dated as of November 1, 2012, between Issuer and BOKF, N.A., authorizing the Issuer in the aggregate principal amount of $5,740,000, (as modified, renewed, restated, or otherwise amended from time to time, the "Indenture"); Mortgage and Security Agreement dated November 1, 2012 (the "Security Deed"), granted by the Issuer in favor of BOKF. The Lease Agreement, the Indenture, the Security Deed, and all other documents, instruments, and agreements executed from time to time in connection therewith may hereinafter be referred to collectively as the "Bond Documents."*

Dear Lessee:

The undersigned and this law firm represent BOKF, N.A, the Indenture Trustee for the above referenced bond offering ("Trustee"). Any capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Bond Documents.

9666108.1

# EXHIBIT "E"

NOTICE OF ACCELERATION UNDER LEASE AGREEMENT

P a g e | **2**

    **Notice of Default**: Lessee was previously provided with notice of its various defaults under the terms of the Bond Documents through Trustee's notices to bondholders, including but not limited to the August 31, 2015, October 12, 2015, and July notices. Lessee remains in default of its obligations under the Bond Documents as said defaults are identified in the notice of default. The existence and continuation of the defaults by Lessee constitute a breach of Lessee's obligations under the Bond Documents and, together with any other events of default under the Bond Documents, shall be referred to herein collectively as the "Defaults."

    **Acceleration and Demand**: This letter is to advise Lessee that because of the occurrence of the Defaults and Lessee's failure to cure the Defaults, Trustee declares the indebtedness evidenced by the Bond Documents, together with any monies agreed to be paid by Lessee pursuant to the Bond Documents, to be immediately due and payable without further notice or demand and notwithstanding any prior waiver of any breach or default. The indebtedness due under the Bond Documents is as follows to January 6, 2021:

| | |
|---|---|
| Principal: | $5,446,707.38 |
| Interest: | $1,498,149.42 |
| Trustee's Fee and Expenses: | $159,659.28 |
| | |
| Total Outstanding: | $7,104,516.08 |

Interest and fees shall continue to accrue in accordance with the terms of the Bond Documents. Be advised that the Bond Documents provide for the payment of expenses of collection, including attorneys' fees, if collected by or through an attorney-at-law.

    Trustee's exercise of its rights, powers, and remedies to accelerate  as set forth above is cumulative and concurrent. Trustee exercises this right in addition to any other right, power, and remedy given to Trustee under the Bond Documents, or existing at law or equity. By this letter, Trustee reserves all other rights, powers, and remedies that are available to it either through the Bond Documents or by operation of law.

    Since the occurrence of the Default, the Trustee or its agents has or may meet with, discuss, and negotiate with Lessee concerning this letter, any of the Bond Documents or any Bonds, indebtedness, liabilities, or obligations arising under those Bond Documents. Any such meetings, discussions, or negotiations did not and shall not constitute a waiver of any default or Event of Default under the Bond Documents or a waiver, release, or limitation upon any of the Trustee's rights or remedies under any of the Bond Documents or prejudice any of the Trustee's rights or remedies under these documents except to the extent expressly provided in a written agreement executed in accordance with the provisions of the Bond Documents.

    The Trustee has not made any agreement or commitment to extend, renew, amend, replace, supplement, or modify any of the Bond Documents in any respect, and the Trustee hereby

NOTICE OF ACCELERATION UNDER LEASE AGREEMENT
P a g e | **3**

specifically confirms that it has not made any such commitment and specifically advises that no action or inaction should be taken or omitted by Lessee or any other person based upon any understanding that a commitment exists or any expectation that any such commitment will be made in the future. Furthermore, the Trustee is not and shall not be bound by any oral agreement; and no rights or liabilities, either express or implied shall arise on the part of the Trustee until and unless the agreement on any given issue has been reduced to a written agreement executed in accordance with the provisions of the Bond Documents.

Except as specifically and expressly provided otherwise in the Bond Documents, the Trustee is not required to give Lessee or any other person notice or demand of any kind. This letter, any forbearance, any delay or postponement by the Trustee in the exercise of its rights or remedies, any notice or failure to give notice, any action or failure to act, any funding, any making of any Bond or advance, any acceptance of any payment (whether principal, interest, or any other sum), any demand or failure to make demand  including  without limitation for performance and/or payment of all or any portion of any obligation or liability (including without limitation any obligations or indebtedness, as defined in any Bond Documents), or any meeting, discussion, or negotiation by the Trustee is not, and shall  not be construed to be, a modification, alteration, release, limitation, waiver, or cure of any default, breach, right, remedy, power, or privilege of Trustee under any Bond Document, or any other agreement, document, instrument, applicable law, or equity.  The failure of the Trustee to exercise any right, remedy, power, or privilege under any Bond Document, or any other agreement, document, instrument, applicable law, or equity does not constitute a waiver thereof or an agreement not to exercise any right, remedy, power, or privilege in the future.  The Trustee expressly reserves all rights, remedies, powers, and privileges it has or may have under any Bond Document or otherwise.

Respectfully,

*Nora R. O'Neill*

Nora R. O'Neill

**THIS FIRM IS ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE BOND DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE**

9666108.1